**No. 25-7380**

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

WHATSAPP INC., a Delaware corporation;
META PLATFORMS, INC., FKA FACEBOOK INC.,

*Plaintiffs-Appellees,*

v.

NSO GROUP TECHNOLOGIES LIMITED;
Q CYBER TECHNOLOGIES LIMITED,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the Northern District of California, No. 4:19-cv-7123-PJH, Hon. Phyllis J. Hamilton, District Judge*

## DEFENDANTS-APPELLANTS' OPENING BRIEF

STEPHEN A. BROOME
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA  90017
(213) 443-3000

HOPE D. SKIBITSKY
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
295 5th Ave., 9th Floor
New York, NY  10016
(212) 849-7000

DEREK L. SHAFFER
RACHEL FRANK QUINTON
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
555 13th St. NW, Suite 600
Washington, DC  20004
(202) 538-8000

ALEX H. LOOMIS
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
111 Huntington Ave., Suite 520
Boston, MA  02199
(617) 712-7100

*Counsel for Defendants-Appellants*
*NSO Group Technologies Limited and Q Cyber Technologies Limited*

February 11, 2026

## DISCLOSURE STATEMENT

Under Fed. R. Civ. P. 26.1 and Circuit R. 26.1-1, Defendants-Appellants disclose as follows:

NSO Group Technologies Limited's parent company is Q Cyber Technologies Limited. Q Cyber Technologies Limited's parent company is Northpole Newco S.A.R.L. No publicly held corporation or other publicly held entity owns 10% or more of the stock of these entities.

Dated:  February 11, 2026              */s/ Derek L. Shaffer*
                                        Derek L. Shaffer

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT.................................................................................i

TABLE OF AUTHORITIES..............................................................................iv

PRELIMINARY STATEMENT ..........................................................................1

JURISDICTIONAL STATEMENT ......................................................................6

ADDENDUM STATEMENT ...............................................................................6

ISSUES STATEMENT ........................................................................................6

CASE STATEMENT ...........................................................................................7

    A.    NSO's Business ...............................................................................7

    B.    Plaintiffs' Allegations And The Motion To Dismiss..........................9

    C.    Summary Judgment .......................................................................10

    D.    The Clarification Order..................................................................12

    E.    The Trial And Verdict....................................................................13

    F.    The Post-Trial Order ......................................................................15

STANDARD OF REVIEW ................................................................................26

ARGUMENT ....................................................................................................26

I.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY
      JUDGMENT ..............................................................................................26

    A.    Summary Judgment Should Not Have Been Granted On
          Plaintiffs' CFAA And CDAFA Claims.............................................27

    B.    Summary Judgment Should Not Have Been Granted On
          Plaintiffs' Contract Claim..............................................................35

II.    THE DISTRICT COURT ERRED IN GRANTING A PERMANENT
      INJUNCTION............................................................................................38

    A.    Plaintiffs Failed To Prove Success On The Merits...........................39

    B.    Plaintiffs Failed To Prove Irreparable Injury...................................40

          1.    There Is No Evidence That Alleged Past CFAA
                Violations Constitute Irreparable Harm ...................................40

2. There Is No Evidence That NSO's Business Model On Its Own Constitutes Irreparable Harm ........................41

3. There Is No Evidence Of Reputational Damage To Plaintiffs' Goodwill That Constitutes Irreparable Harm .........44

4. Plaintiffs Have An Adequate Legal Remedy .........................45

C. Plaintiffs Failed To Prove That The Balance Of Hardships Favors A Permanent Injunction ..............................................47

D. Plaintiffs Failed To Prove That The Public Interest Favors A Permanent Injunction ..............................................48

E. At Minimum, The Permanent Injunction Is Overbroad......................50

1. Sections 3(a), 3(b), And 3(d) Prohibit Lawful Activity ...........51

2. Section 3(c) Prohibits Mere Contractual Breaches .................52

3. Sections 3(b) and 4 Apply To Foreign Sovereigns .................52

III. THE DISTRICT COURT ERRED IN GRANTING AN EXCESSIVE PUNITIVE DAMAGES AWARD .................................53

A. The District Court Improperly Excluded Evidence Of NSO's Intent To Supply A Law Enforcement And Intelligence Tool ..........54

B. The District Court Awarded An Unconstitutionally Excessive Punitive Damages Award .................................56

1. NSO's Actions Are Not Reprehensible...................................56

2. The Court's Award Is Disproportionate .................................59

3. The Court's Award Dwarfs Comparable Civil Penalties .........61

CONCLUSION ...............................................................63

REQUEST FOR ORAL ARGUMENT.................................64

STATEMENT OF RELATED CASES ................................65

CERTIFICATE OF COMPLIANCE ...................................66

CERTIFICATE OF SERVICE.............................................67

STATUTORY ADDENDUM................................................68

iii

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Bains LLC v. Arco Prods. Co.*,
   405 F.3d 764 (9th Cir. 2005)................................................................59, 60, 62

*Baird v. Bonta*,
   163 F.4th 723 (9th Cir. 2026)........................................................................26

*Benn v. Allstate Ins. Co.*,
   569 F. Supp. 3d 1029 (C.D. Cal. 2021)..........................................................39

*Berman v. Freedom Fin. Network, LLC*,
   30 F.4th 849 (9th Cir. 2022)..........................................................................36

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996) ...................................................................18, 58, 60, 62

*Brodsky v. Apple Inc.*,
   445 F. Supp. 3d 110 (N.D. Cal. 2020) ...........................................................27

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ......................................................................................35

*Chabolla v. ClassPass Inc.*,
   129 F.4th 1147 (9th Cir. 2025).................................................................36, 37

*Deerpoint Grp., Inc. v. Agrigenix, LLC*,
   345 F. Supp. 3d 1207 (E.D. Cal. 2018)..........................................................39

*Dresser-Rand Co. v. Jones*,
   957 F. Supp. 2d 610 (E.D. Pa. 2013) .............................................................33

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ......................................................................................40

*Enargy Power Co. v. Xiaolong Wang*,
   2013 WL 6234625 (D. Mass. Dec. 3, 2013) ...................................................41

*In re Estate of Ferdinand Marcos Human Rights Litig.*,
   94 F.3d 539 (9th Cir. 1996)............................................................................52

iv

*Facebook, Inc. v. Power Ventures, Inc.*,
   252 F. Supp. 3d 765 (N.D. Cal. 2017) ....................................................40, 41, 43

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016)...................................................................32

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
   702 F.2d 770 (9th Cir. 1983)....................................................................55

*Fiber Sys. Int'l, Inc. v. Roehrs*,
   470 F.3d 1150 (5th Cir. 2006)..................................................................40

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
   98 F.4th 1180 (9th Cir. 2024)..............................................................50, 51

*Godun v. JustAnswer LLC*,
   135 F.4th 699 (9th Cir. 2025)...........................................................21, 36, 37

*Estate of Hill ex rel. Grube v. NaphCare, Inc.*,
   2025 WL 1588738 (9th Cir. June 5, 2025) ......................................................24

*Hangarter v. Provident Life & Acc. Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004)....................................................................60

*Hardeman v. Monsanto Co.*,
   997 F.3d 941 (9th Cir. 2021)...........................................................24, 56, 58

*Herb Reed Enters. v. Fla. Ent. Mgmt.*,
   736 F.3d 1239 (9th Cir. 2013)..................................................................45

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022)............................................20, 28, 29, 30, 31, 47

*Hyer v. City & Cnty. of Honolulu*,
   118 F.4th 1044 (9th Cir. 2024)..................................................................49

*John K. Maciver Inst. for Pub. Pol'y, Inc. v. Schmitz*,
   885 F.3d 1004 (7th Cir. 2018)...................................................................43

*Joseph v. Carnes*,
   566 F. App'x 530 (7th Cir. 2014) ...............................................................46

v

*Keebaugh v. Warner Bros. Ent. Inc.*,
   100 F.4th 1005 (9th Cir. 2024)....................................................................37

*Keene v. City & Cnty. of S.F.*,
   2025 WL 341831 (9th Cir. Jan. 30, 2025) ...............................................39

*Key v. Qualcomm Inc.*,
   129 F.4th 1129 (9th Cir. 2025)....................................................................46

*Laatz v. Zazzle, Inc.*,
   2024 WL 377970 (N.D. Cal. Jan. 9, 2024) ...............................................37

*Mitri v. Walgreen Co.*,
   660 F. App'x 528 (9th Cir. 2016) .........................................................59, 62

*Morgan v. Woessner*,
   997 F.2d 1244 (9th Cir. 1993)....................................................................60

*Nielsen v. Preap*,
   586 U.S. 392 (2019) ....................................................................................33

*No Labels Party of Ariz. v. Fontes*,
   142 F.4th 1226 (9th Cir. 2025)....................................................................38

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012)................................................................30, 32

*Oasis W. Realty, LLC v. Goldman*,
   250 P.3d 1115 (Cal. 2011) ..........................................................................36

*Phany Poeng v. United States*,
   167 F. Supp. 2d 1136 (S.D. Cal. 2001) .....................................................44

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007) ....................................................................................58

*Planned Parenthood of Columbia/Willamette Inc. v. American
   Coalition of Life Activists*,
   422 F.3d 949 (9th Cir. 2005)............................................................25, 59, 60

*Podium Corp. Inc. v. Chekkit Geolocation Servs., Inc.*,
   2021 WL 5772269 (D. Utah Dec. 6, 2021).................................................35

vi

*Powers v. McDonough*,
   163 F.4th 1162 (9th Cir. 2025)................................................................26, 38

*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004)..............................................................50

*Quiksilver, Inc. v. Kymsta Corp.*,
   360 F. App'x 886 (9th Cir. 2009) .......................................................52

*Ramirez v. TransUnion LLC*,
   951 F.3d 1008 (9th Cir. 2020)..............................................................58

*Reliable Prop. Servs., LLC v. Cap. Growth Partners, LLC*,
   1 F. Supp. 3d 961 (D. Minn. 2014) .......................................................41

*Riley v. Volkswagen Grp. of Am., Inc.*,
   51 F.4th 896 (9th Cir. 2022)..................................................56, 59, 61

*Saccameno v. U.S. Bank Nat'l Ass'n*,
   943 F.3d 1071 (7th Cir. 2019)..............................................................59

*San Miguel Pure Foods Co. v. Ramar Int'l Corp.*,
   625 F. App'x 322 (9th Cir. 2015) .......................................................41

*Schrader Cellars, LLC v. Roach*,
   129 F.4th 1115 (9th Cir. 2025)..............................................................27

*Sellers v. JustAnswer LLC*,
   73 Cal. App. 5th 444 (2021)..............................................36, 37, 38

*Sidibe v. Sutter Health*,
   103 F.4th 675 (9th Cir. 2024)..................................................26, 54

*United States v. Sineneng-Smith*,
   590 U.S. 371 (2020) ...............................................................................45

*Softketeers, Inc. v. Regal W. Corp.*,
   2023 WL 2024701 (C.D. Cal. Feb. 7, 2023)..........................................47

*Sprint Sols., Inc. v. Cell Wholesale, Inc.*,
   2015 WL 13919095 (C.D. Cal. Dec. 10, 2015) ....................................51

vii

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024) ...................................................................40

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) .................................18, 25, 26, 56, 57, 60, 61, 62

*TracFone Wireless, Inc. v. Adams*,
   98 F. Supp. 3d 1243 (S.D. Fla. 2015) .............................................41

*Tri Cnty. Tel. Ass'n v. Campbell*,
   2019 WL 7841073 (D. Wyo. June 4, 2019) ......................................33

*Union Pac. R. Co. v. Mower*,
   219 F.3d 1069 (9th Cir. 2000)......................................................39

*United Nat. Maint., Inc. v. San Diego Convention Ctr. Corp.*,
   2012 WL 3861946 (S.D. Cal. Sept. 5, 2012) ....................................46

*Van Buren v. United States*,
   593 U.S. 374 (2021) ...................................................4, 28, 29, 31

*Washington v. Trump*,
   145 F.4th 1013 (9th Cir. 2025)................................................23, 50

## Statutes

18 U.S.C. § 1030(a)(2) ......................................................4, 27, 33, 52

18 U.S.C. § 1030(a)(4) ...................................................................4

18 U.S.C. § 1030(b).................................................................12, 34

18 U.S.C. § 1030(e)(6) .........................................................28, 32, 33

28 U.S.C. § 1291 ..........................................................................6

28 U.S.C. § 1331 ..........................................................................6

28 U.S.C. § 1367 ..........................................................................6

Cal. Civ. Code § 3422(3).................................................................39

Cal. Civ. Code § 3423(e).................................................................39

Cal. Civ. Proc. Code § 526(b)(5)......................................................................39

## **Rules**

Fed. R. Civ. P. 37(b)(2)(A)(ii)......................................................................56

Fed. R. Crim. P. 41(b)(6).............................................................................2

Fed. R. Evid. 403..................................................................................13, 54

Fed. R. Evid. 703......................................................................................49

## **Other Authorities**

FTC, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook* (July 24, 2019).........................................45

*Going Dark: Lawful Electronic Surveillance In The Face Of New Technologies: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the H. Comm. on the Judiciary*, 112th Cong. 10-16 (2011) (statement of Valerie Caproni, FBI General Counsel)...................1

*Going Dark: Encryption, Technology, and the Balance Between Public Safety and Privacy: Hearing Before the S. Comm. on the Judiciary*, 114th Cong. 69 (2015) (joint statement of James B. Comey, FBI Director, & Sally Quillian Yates, Deputy Attorney General)..................................................................................................2

Ivan Mehta, *WhatsApp now has more than 3 billion users a month*, TechCrunch (May 1, 2025) ........................................................8, 45

James B. Comey, FBI Director, Going Dark: Are Technology, Privacy, and Public Safety on a Collision Course?, Remarks Before the Brookings Institution (Oct. 16, 2014) ........................................3, 48

Josh Constine, *WhatsApp hits 1.5 billion monthly users. $19B? Not so bad,* TechCrunch (January 31, 2018) ...............................................44

*Oversight of the FBI: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. 21 (2020) (statement of Christopher Wray, FBI Director) ...........................................................................................1, 2

x

President Barack Obama, Speech on NSA Reforms, Address Before
the U.S. Dep't of Justice (Jan. 17, 2014) ............................................................2

WhatsApp, FAQ, "About government requests for user data,"
(captured Feb. 4, 2026) ...................................................................................3

## PRELIMINARY STATEMENT

The final judgment and permanent injunction below rest upon a series of stark departures from precedent limiting the Computer Fraud and Abuse Act ("CFAA"). The upshot of the district court's (Hamilton, J.) judgment renders it per se criminal to develop software designed to conduct surveillance on encrypted devices. The consequences of affirming would be catastrophic: law enforcement and intelligence agencies in the United States and allied countries would lose critical tools for identifying and stopping terrorists, child predators, and hostile foreign actors who exploit encrypted platforms to do their worst. Settled law calls for reversal.

Since 2011, U.S. government officials have warned that targets of law enforcement and intelligence services were increasingly "Going Dark." *Going Dark: Lawful Electronic Surveillance In The Face Of New Technologies: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the H. Comm. on the Judiciary*, 112th Cong. 10-16 (2011) (statement of Valerie Caproni, FBI General Counsel), https://perma.cc/Z2HP-2NBE. Encrypted platforms often cannot "comply with court orders" that permit the government "to collect valuable evidence in cases ranging from child exploitation and pornography to organized crime and drug trafficking to terrorism and espionage." *Id.* at 10. This costs law enforcement agencies "millions of leads a year." *Oversight of the FBI: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. 21 (2020) (statement of Christopher Wray,

1

FBI Director), https://perma.cc/5FEK-TYEQ. To be sure, the digital economy depends on strong encryption. At the same time, governments around the world require "capabilities designed to mitigate … the 'Going Dark' problem." *Going Dark: Encryption, Technology, and the Balance Between Public Safety and Privacy: Hearing Before the S. Comm. on the Judiciary*, 114th Cong. 69 (2015) (joint statement of James B. Comey, FBI Director, & Sally Quillian Yates, Deputy Attorney General), https://perma.cc/CL8A-NZZB.

Lawful surveillance of encrypted devices affords essential capability to counter the "Going Dark problem." Breaking encryption has been core to U.S. intelligence agencies' work "[t]hroughout American history." President Barack Obama, Speech on NSA Reforms, Address Before the U.S. Dep't of Justice (Jan. 17, 2014), https://perma.cc/U4R4-QJBE (defending NSA collection). And in 2016, the Rules Advisory Committee adopted Federal Rule of Criminal Procedure 41(b)(6), which specifically authorizes issuance of warrants "to use remote access to search electronic storage media" in computers. Yet collecting encrypted information from a phone or computer is no easy task, and governments must often turn to the private sector so they can keep pace with rapidly evolving technology.

That is where companies like Defendants-Appellants (collectively, "NSO") come in. NSO develops tools for governments to lawfully access phones to enable collection of encrypted communications that would otherwise be inaccessible. NSO

2

does not employ these tools itself.  It licenses them exclusively to select government agencies, subject to rigorous vetting and approval by NSO and the Government of Israel, where NSO is based.

Plaintiff-Appellee WhatsApp, Inc. is a messaging and social media app with billions of users worldwide.  According to WhatsApp, it uses end-to-end encryption such that it "cannot and does not produce the content of its users' messages in response to government requests."  WhatsApp, FAQ, "About government requests for user data," https://perma.cc/4ZPE-VJBR (captured Feb. 4, 2026).  More and more tech companies make such no-exception pledges as they "respond[] to what they perceive is a market demand."  James B. Comey, FBI Director, Going Dark: Are Technology, Privacy, and Public Safety on a Collision Course?, Remarks Before the Brookings Institution (Oct. 16, 2014), https://perma.cc/K263-BZE2.  Law-abiding citizens can have their own reasons for preferring to communicate by such secure platforms.  For criminals and terrorist organizations, however, such platforms are an operational necessity.  3-ER-399-400.

In 2019, WhatsApp and its parent company, Plaintiff-Appellee Meta Platforms, Inc., sued NSO for alleged CFAA violations.  Plaintiffs claimed that NSO *itself*, rather than its customers, violated the CFAA and California Comprehensive Computer Data Access and Fraud Act (CDAFA) and breached WhatsApp's terms of service by developing a program that empowered NSO's government customers

to send code to target devices "over WhatsApp servers." 3-ER-474, 3-ER-480-81. But the CFAA and CDAFA require proof that NSO specifically exceeded its authorized use of WhatsApp servers. 18 U.S.C. §§ 1030(a)(2), (a)(4). Binding precedent teaches that such unlawful access—triggering criminal as well as civil liability—does not occur unless a defendant blows past code-based barriers, not mere contractual terms, corporate policies, or the app developer's preferred uses. *See Van Buren v. United States*, 593 U.S. 374, 388 (2021).

Here, any notion that NSO strayed into off-limits portions of the servers is foreclosed by the record—or, at a minimum, subject to intense factual dispute. When ordinary users send messages to other WhatsApp users, they use a "signaling server" to create a connection between their two WhatsApp accounts, and then use a "relay server" to send the communication data between the two parties. That is all that NSO's software did. It obtained no information from WhatsApp's signaling and relay servers apart from whether the target devices actually had a WhatsApp account—the same information any other WhatsApp user could obtain.

The district court below steamrolled past this issue, ruling at summary judgment that NSO had necessarily violated the CFAA and CDAFA and breached the terms of service. From there, the court held a one-sided jury trial, featuring WhatsApp's worst indictments of NSO while excluding NSO's exculpatory evidence. The result: a monetary judgment of $450,000 in compensatory damages

4

and *$4 million* in punitive damages, absent any finding that NSO's actions were egregious enough to warrant a 9:1 ratio.

Still worse, the district court granted a worldwide permanent injunction barring NSO from engaging in a host of conduct that is legal, including:

- developing or licensing "any technology that … interacts with … any aspect of the WhatsApp Platform," including the collection of a target user's WhatsApp messages;

- creating WhatsApp accounts; and

- reverse-engineering WhatsApp code.

The injunction also interferes with ongoing law enforcement and intelligence operations by ordering NSO to cut off the foreign governments' access to its tools.

To enter this sweeping injunction, the district court veered beyond the conduct for which it found NSO liable—NSO accessing WhatsApp's servers (not WhatsApp users' devices)—and beyond any alleged harm to WhatsApp. This injunction effectively cripples the operations of NSO, because it is in the business of helping governments surveil encrypted devices. If this Court affirms, governments will be barred from lawful surveillance, making the world "Go Dark" by judicial decree.

This Court should reverse the liability determination and vacate (or at least narrow) the permanent injunction. Absent that, the Court should, at a minimum, vacate or remit the punitive damages award.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367. 3-ER-431-37. This Court has jurisdiction under 28 U.S.C. § 1291. Final judgment entered on November 12, 2025, and NSO timely appealed on November 19, 2025. 1-ER-3; 3-ER-488-89.

## ADDENDUM STATEMENT

Relevant statutory provisions are appended *infra*, pp.68-70.

## ISSUES STATEMENT

1. Whether the district court erred in summarily imposing CFAA, CDAFA, and contract liability notwithstanding genuine disputes regarding material facts.

2. Whether the district court erred in permanently enjoining NSO from lawful activity unrelated to CFAA liability even though (a) WhatsApp disclaimed the irreparable harm relied on and (b) doing so critically interferes with foreign governments' law enforcement and counterterrorism operations.

3. Whether the district court erred in awarding punitive damages in a 9:1 ratio, while excluding critical evidence essential to NSO's defense and permitting WhatsApp to present a one-sided picture of NSO's intent.

6

## CASE STATEMENT

### A.    NSO's Business

NSO is an Israeli company that designs and markets software tools to government agencies for use in investigating crimes and terrorism. 3-ER-369, 3-ER-407. NSO's flagship product, Pegasus, allows law enforcement and intelligence agencies to circumvent encryption when collecting data from mobile devices as part of authorized criminal and terrorism investigations. 2-ER-206.

Pegasus plays a critical role in deciphering encrypted communications. 2-ER-322-24, 2-ER-191. Encryption occurs during transmission; encrypted messages and calls cannot be intercepted or understood by anyone, even with technology, unless obtained directly from the target device itself. 2-ER-21-25. Without access to the target device, encrypted communications remain "gobbledygook" to law enforcement. 2-ER-324. As a result, governments seeking to stop crime and terrorism must use surveillance technologies like Pegasus to obtain encrypted evidence. 3-ER-399-400, 2-ER-353, 2-ER-191. Pegasus enables governments (not NSO) to access suspected criminals' mobile devices and thus obtain evidence from encrypted platforms. 2-ER-353. Given the technical complexity of accessing encrypted devices, governments often rely on commercial providers like NSO to develop the necessary surveillance technology. 3-ER-399, 3-ER-402-03.

7

The Pegasus system has multiple components, including (1) an "agent" designed to reside on a target device and collect information from that device, and (2) installation "vectors" for delivering the agent to "target devices" (i.e., mobile devices belonging to the investigation subjects of NSO's government customers). 2-ER-113. NSO licenses Pegasus exclusively to select government agencies, subject to rigorous vetting and approval by the company and the Government of Israel. 3-ER-404, 2-ER-98. This level of due diligence on NSO's prospective customers is unusual; "most companies and individuals" who create cyber surveillance tools "do not perform due diligence on customers." 3-ER-404-05. NSO's only customers are sovereign governments. 2-ER-206. These facts have been corroborated repeatedly, including by independent third-party Ernst & Young Global. 2-ER-206, 3-ER-469, 3-ER-471-72.

WhatsApp, one of the most popular messaging platforms in the world, provides end-to-end encryption for its 3 billion users. *See, e.g.*, Ivan Mehta, *WhatsApp now has more than 3 billion users a month*, TechCrunch (May 1, 2025), https://perma.cc/RUZ9-8GEF. Between April 2018 and May 2020, NSO licensed three Pegasus "vectors" that messaged target devices through WhatsApp during the initial phases of the installation process. 2-ER-138-39. All three vectors would send messages over WhatsApp's relay servers (i.e., servers that allow WhatsApp users to communicate with one another) to target devices that, if successful, would cause the

target devices to download the Pegasus agent from a third-party server controlled by Pegasus's government operator. 2-ER-138-39. The vectors did not, however, access closed parts of WhatsApp servers. 2-ER-139.

NSO no longer has any installation vector that uses WhatsApp servers. 2-ER-209. But while these WhatsApp vectors were available and being employed, the FBI purchased a license to use Pegasus. 2-ER-99. More broadly, NSO's intelligence expert, Colonel Ty Shepard, explained, "U.S. military and intelligence agencies, as well as those of U.S. allies, routinely use surveillance tools similar to Pegasus to combat a variety of threat actors." 3-ER-401.

### B. Plaintiffs' Allegations And The Motion To Dismiss

In October 2019, Plaintiffs sued NSO, asserting, as relevant here, CFAA, CDAFA, and breach-of-contract claims. 3-ER-474. Plaintiffs alleged that NSO reverse-engineered WhatsApp code to develop a program that emulates legitimate WhatsApp network traffic in order to transmit Pegasus to approximately 1,400 target devices. 3-ER-480-81. Plaintiffs asserted that this conduct violated the CFAA and CDAFA. 3-ER-482-83. Plaintiffs' breach-of-contract theory was that NSO's employees created WhatsApp accounts and agreed to WhatsApp's terms of service, and that those terms prohibited reverse-engineering, sending harmful computer code, gaining unauthorized access, and collecting user information in an unauthorized manner. 3-ER-477, 3-ER-479, 3-ER-484.

9

In July 2020, the district court granted in part and denied in part NSO's motion to dismiss. 3-ER-467. As relevant here, the court found that Plaintiffs had not plausibly alleged that NSO accessed WhatsApp servers "without authorization" because NSO, like "any WhatsApp user, had authorization to send messages using the WhatsApp app, which would be transmitted over WhatsApp's servers." 3-ER-459. But the Court held WhatsApp had sufficiently pleaded that NSO "exceed[ed] authorized access" to WhatsApp servers by creating "a program that went beyond [WhatsApp's] restrictions by evading WhatsApp's security features." 3-ER-459.

## C. Summary Judgment

Following discovery, Plaintiffs sought partial summary judgment on liability. 3-ER-380-81.

Plaintiffs contended that NSO violated the CFAA and CDAFA when it "exceeded any purported authorized access" by "sending [certain] types of messages" across WhatsApp's relay servers that compromised the servers. 3-ER-390. NSO argued otherwise, citing internal documents in which Plaintiffs admitted that "WhatsApp servers were not compromised by" any vector's use of WhatsApp to send messages. 2-ER-346, 3-ER-371. Both sides' witnesses confirmed that Pegasus did not damage, alter, or impair WhatsApp's servers or the servers' code. 2-ER-331-34, 2-ER-337-38, 2-ER-150. As designed, every message Pegasus sent through WhatsApp servers complied with every technical requirement imposed by

10

those servers. 2-ER-84-88, 2-ER-139. Nor did Pegasus access any server information that was off-limits to any other WhatsApp user or breach code-based access barriers protecting such information. 2-ER-84-88. Pegasus merely used messaging functions that WhatsApp servers made available to all users. 2-ER-84-88. Last, NSO showed that it had not obtained protected information from WhatsApp's servers, and that, in any case, its sovereign clients were the entities that employed Pegasus, not NSO. 2-ER-359, 2-ER-105-06.

For breach of contract, Plaintiffs argued that NSO breached its terms of service by violating restrictions on "reverse-engineering," "sending harmful computer code," "collecting user information," "accessing or attempting to access WhatsApp without authorization," and "using WhatsApp for illegal purposes." 3-ER-386-389 (capitalization altered). But the parties sharply disputed whether NSO had ever agreed to the terms of service and even formed a contract. Plaintiffs maintained that there was undisputed evidence that a contract was formed because "agreeing to the Terms is necessary to create a WhatsApp account and use WhatsApp." 3-ER-384. NSO responded that Plaintiffs had not established as a matter of law that any contract had been formed because the terms of service were insufficiently conspicuous to spawn a contract. 2-ER-355-58.

The district court granted WhatsApp's motion for partial summary judgment. It concluded that NSO violated the CFAA and CDAFA as a matter of law when it

11

"exceed[ed]" its "authorized access" to WhatsApp by "obtain[ing] information about the target users' device *via* the Whatsapp servers." 1-ER-63-64 (emphasis added). It rejected NSO's argument that it did not "obtain information" but rather its "government clients" did. 1-ER-63. The court reasoned that this argument was "fully addressed by [18 U.S.C. § 1030(b)] which assigns liability to co-conspirators." 1-ER-63. Yet the court did not analyze whether NSO was, in fact, liable under a co-conspiracy theory. *See* 1-ER-63-64.

The court also granted summary judgment on WhatsApp's breach claim. It rejected NSO's argument that a contract had not been properly formed because "defendants [could not] meaningfully dispute that agreeing to the terms of service was necessary to create a Whatsapp account and to use Whatsapp[.]" 1-ER-66. It did not cite or consider any evidence, visual or otherwise, as to whether the terms of service were conspicuous. 1-ER-65-66.

### D.     The Clarification Order

Shortly before the damages trial, the district court issued an order to "clarify[]" its statements about conspiracy in the summary judgment order. 2-ER-308-09. This clarification order emphasized that, at summary judgment, "the evidentiary record did not show … specific details about how exactly the relevant attacks were conducted." 2-ER-308. Instead, the court "concluded that even the limited conduct to which defendants admit (i.e., developing Pegasus and providing

12

it to their clients, as well as providing training and ongoing support) along with evidence that appears undisputed that they updated Pegasus to circumvent plaintiffs' security updates, sufficed ….” 2-ER-308-09.  In so characterizing its past findings, the district court did not cite any part of the summary judgment order or record.

The court then stressed that, despite what it said in its summary judgment order, it “could not—and still cannot—definitively determine whether direct liability or co-conspirator liability is a better fit to the facts of the case.  That said, … the court concludes that there is a sufficient basis to establish direct liability,” but only “arguably coconspirator liability.” 2-ER-309.  The court accordingly “stopped short of an express finding that defendants engaged in conspiracy to violate the CFAA.” *Id.*

## E.     The Trial And Verdict

The case went to a jury solely to decide damages.  1-ER-68.

Pre-trial, the court granted Plaintiffs' motion to exclude, under Federal Rule of Evidence 403, evidence that NSO designed Pegasus for law-enforcement purposes and that NSO engaged in extensive screening and oversight procedures, albeit without being able to control its customers.  1-ER-34-40.  The court reasoned that “plaintiffs have not had a meaningful opportunity to review evidence” about who NSO's clients were.  1-ER-36.  NSO, however, was unable to produce any such evidence because (1) Israeli law prohibited NSO from producing the minimal

13

information it did have "for national security reasons"; and (2) it had no insight into how its customers used Pegasus (although it did have a practice of terminating licenses to any sovereign customer that, it believed, used Pegasus for improper purposes), rendering information about how customers used Pegasus irrelevant to *NSO*'s intent. 1-ER-36-37. Moreover, the court had also ruled, in an earlier discovery order, that NSO was not required to disclose "the specific identities of [its] third" party customers. 3-ER-414. Despite acknowledging these points, the court maintained "it would be inconsistent to allow [NSO] to argue that" it intends only to allow Pegasus to be used for law enforcement purposes, subject to vetting, "while simultaneously arguing that defendants have nothing to do with the decision of who to target and no control over when and where Pegasus is used." 1-ER-38.

By contrast, over NSO's objection, the court allowed Plaintiffs to urge the jury to punish NSO for designing Pegasus to hack and spy on WhatsApp users. NSO argued that this combination of rulings would create "an artificial and one-sided trial" in which Plaintiffs could raise generalized evidence purportedly describing "NSO as selling malicious spyware," while barring "NSO from presenting any evidence of its intent" to license Pegasus only for proper law enforcement and intelligence purposes. 2-ER-312. Yet again, the court came down against NSO, ruling that Plaintiffs could present their generalized evidence about Pegasus's improper uses (even though this had nothing to do with the underlying

14

CFAA/CDAFA liability theory), so long as they did not identify specific individuals who may have been targeted. 2-ER307-07.

Exploiting this one-sided record, Plaintiffs told the jury that NSO's "purpose … was to put the spyware on the phone" and that they were "attacking for the purpose of spying" so "they targeted and sent this malicious spyware onto the phones of 1,400 people … that are the victims of this spyware." 2-ER-223. WhatsApp urged the jury to award a punitive damages number that reflects that "spying is not okay. Send that message." 2-ER-228. In sum, Plaintiffs were allowed to impugn NSO's character and motives, while NSO was prohibited from trying to rehabilitate itself.

The jury returned a verdict awarding Plaintiffs $444,719 in compensatory damages and $167,254,000 in punitive damages—a ratio of 376:1. 2-ER-303-05.

### F. The Post-Trial Order

NSO moved for remittitur or a new trial, arguing the ratio violated due process. 2-ER-259, 2-ER-260-64. In parallel, the court held an evidentiary hearing on whether to grant a permanent injunction. 2-ER-172.

In October 2025, the court issued a post-trial order granting Plaintiffs' motion for a permanent injunction and reducing the punitive damages award to $4,002,471. 1-ER-33.

15

On the permanent injunction, the court found that Plaintiffs had established irreparable harm based on past CFAA violations and the risk of future violations, as purportedly evidenced by NSO's thwarting of "end-to-end encryption that [Plaintiffs] have promised to their users." 1-ER-15. The court reasoned that circumventing encryption caused Plaintiffs to suffer "business harm" because "users would be dissuaded from using WhatsApp if its encryption were ineffective." 1-ER-15-17. But Plaintiffs had specifically waived this theory of irreparable harm and presented no evidence in support of it. *See* 2-ER-349; *see also* 3-ER-418, 3-ER-421. The court rejected NSO's evidence that it no longer possessed any installation vectors that use WhatsApp technology and would comply with U.S. law going forward, reasoning that NSO's business model entailed developing software that could collect WhatsApp messages from target devices. 1-ER-14-15. By its own acknowledgment, "the court's consideration of liability and damages was based on NSO's accessing of Whatsapp's servers," but the court said that injunctive relief involves "a different standard than was applicable when considering the issue of compensatory and punitive damages." 1-ER-16-17. The court rejected NSO's argument that Plaintiffs had waived any theory of harm based on reputational damages, reasoning the harm from thwarted encryption constituted "business harm" rather than "just a reputational harm." 1-ER-17.

The court also found that the balance of hardships favored an injunction, concluding that any harm NSO alleged was outweighed by the fact that "plaintiffs tout end-to-end encryption as a feature for users to protect their privacy and security, and their business would be significantly harmed if that feature was rendered ineffective." 1-ER-20.

As to the public interest, the district court discounted the testimony of NSO's expert, former U.S. Attorney Joshua Minkler, who testified that technologies like Pegasus are critical for law enforcement to access encrypted communications that "cannot be obtained now" even with valid court orders. 2-ER-164-66. The court reasoned that, because Mr. Minkler's knowledge of Pegasus's specific uses derived from "publicly-available information, such as newspaper articles," and, because the court had declined to consider public reporting suggesting improper uses of Pegasus, "basic principles of equity and fairness" required disregarding Mr. Minkler's testimony. 1-ER-21. The court also ignored testimony from NSO's intelligence expert, Colonel Shepard, who explained that commercial tools like Pegasus are essential "for U.S. allies who do not have the resources to develop and maintain their own cyber surveillance capabilities," as well as sophisticated governments like the United States, given that companies "regularly update their applications to block [] decryption tools" employed by governments. 3-ER-399-400, 3-ER-402. Without

17

such tools, he continued, "[t]here would be substantial risks and harm to American lives and critical infrastructure." 3-ER-401.

Ultimately, the court found all four factors favored a permanent injunction and granted Plaintiffs' motion, subject to narrow revisions. 1-ER-26, 1-ER-33.

On punitive damages, the court applied the three guideposts from *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003): reprehensibility, proportionality, and comparable civil penalties. 1-ER-26-31. As to reprehensibility, the court reasoned that the factors go both ways but concluded, without making any making findings supporting the conclusion, that NSO's conduct was "more egregious" than "not particularly egregious." 1-ER-28-30. On proportionality, the court found that the compensatory damages award of $444,719 was "relatively insignificant" "to a company the size of Whatsapp and/or Meta" and that, even if it were "considered 'significant,'" the court's analysis "would be the same" because the conduct was "more egregious." 1-ER-29-30. Based on the "repeated, deliberate, and covert nature" of NSO's intrusions, the court selected a 9:1 ratio. 1-ER-30-31. As to comparable civil penalties, the court concluded that "the lack of any similar cases involving civil penalties limits this factor's usefulness here." 1-ER-31.

18

A few weeks later, the district court entered final judgment, awarding Plaintiffs $444,719 in compensatory damages, $4,002,471 in punitive damages, and formally granting the permanent injunction. 1-ER-2-6.

The permanent injunction prohibits NSO from "using … any technology that interacts with or emulates any aspect of WhatsApp Platform," from "[c]ollecting, or assisting others in collecting, data or information from the WhatsApp Platform" (which includes WhatsApp applications on users' phones), from "[c]reating accounts," and from "[r]everse engineering or decompiling" WhatsApp code. 1-ER-5-6; *see* 1-ER-23-26. The injunction also requires NSO "to delete and destroy any and all computer code or technologies" that depend on the WhatsApp Platform and "to disable customer access to any and all computer code or technologies maintained by the Prohibited Parties that use, access, or depend on the WhatsApp Platform." 1-ER-5; *see* 1-ER-23-26. Although the injunction's definition of "Prohibited Parties" excludes foreign sovereigns, Section 3(b) prohibits NSO from "assisting others in collecting" data from the WhatsApp Platform, while Section 4 requires NSO to disable its government customers' access to its technologies, thus precluding NSO's customers from collecting WhatsApp messages from any target devices in the future.

NSO sought a stay of the injunction pending appeal. Both the district court and this Court denied its motions.

19

## SUMMARY OF ARGUMENT

I.     The district court erred in granting summary judgment.

On the CFAA/CDAFA claims, NSO presented unrebutted evidence that it did not bypass any access restrictions or access any protected part of WhatsApp's servers. That should defeat any claim that NSO exceeded authorized access under the two statutes. In particular, NSO's representatives declared that messages "traveled through WhatsApp servers in the same way as any other message sent using a genuine WhatsApp client" and did not "alter, delete, impair, or corrupt" WhatsApp's servers. 2-ER-150. NSO's cybersecurity expert affirmed that "neither NSO nor its customers either accessed any WhatsApp server without authorization or exceeded their authorized access." 2-ER-83. Indeed, WhatsApp's own internal presentation confirmed that "[t]he WhatsApp servers were not compromised." 2-ER-346. And there was no evidence NSO bypassed "an authentication requirement, such as a password gate." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1197 (9th Cir. 2022) (citation omitted).

Moreover, NSO did not operate Pegasus—its government clients did. NSO's representatives testified: "we do not operate Pegasus." 2-ER-105-06. The summary judgment order suggested that NSO could be held liable under the CFAA's conspirator provision, 1-ER-63, but the court later confirmed it was *not* finding that NSO conspired with its government customers. 2-ER-308-09. That left no

20

discernible basis for the court to hold NSO liable for its customers' actions in operating Pegasus or collecting information from WhatsApp users. 2-ER-308-09. Notably, any such violative conduct by NSO's customers was neither examined in the summary judgment order nor substantiated by the evidentiary record.

The court also erred in granting Plaintiffs summary judgment on their contract claim. No contract based on the terms of service could have been formed absent a showing that the terms of service to which NSO purportedly agreed were conspicuous. Conspicuousness is a "fact-intensive" analysis requiring examination of actual screenshots showing "font size, color, and contrast" and "location of the advisal on the webpage." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025) (citation omitted). No such analysis was conducted below, for Plaintiffs did not even introduce admissible evidence as to how WhatsApp's terms were supposedly disclosed. In lieu of evidence, the court simply declared that "agreeing to the terms of service was necessary to create a WhatsApp account." 1-ER-66-67. Under this Court's precedent, that is insufficient to establish contract formation, much less to find it necessarily occurred as a matter of law.

II.    The permanent injunction is unsustainable. It derives not from analysis of the relevant factors, but from the district court's raw disapproval of NSO's business model—helping governments surveil encrypted communications.

21

First, as noted above, Plaintiffs failed to establish actual success on the merits of their statutory claims, which are the only possible basis for the injunction.

Second, Plaintiffs failed to prove irreparable harm for which legal remedies are inadequate. NSO's alleged past CFAA violations do not constitute per se irreparable harm justifying a prospective injunction. And the court identified no evidence that NSO would violate the CFAA/CDAFA in the future. To the contrary, NSO's CEO testified that NSO has no "installation vector … that uses WhatsApp technology." 2-ER-95. The court responded that Plaintiffs risked reputational harm if NSO were allowed to continue developing vectors permitting governments to lawfully obtain encrypted messages. But developing such software is not a statutory violation, and the court is not empowered to decry a business model upon which law enforcement and intelligence services rely. In any case, Plaintiffs explicitly disclaimed injunctive relief based upon such injuries and presented no evidence that an injunction was needed to protect their "goodwill." 2-ER-349.

Third, the balance of hardships favors NSO. NSO presented unrebutted evidence that the injunction "would force NSO out of business" by requiring it to "delete and destroy" its core technology. 2-ER-194; 1-ER-6. Even if Plaintiffs had established any future irreparable harm, it would pale by comparison.

Fourth, the public interest disfavors the injunction. Former U.S. Attorney Joshua Minkler and Colonel Shepard both credibly attested that technologies like

22

Pegasus are critical for law enforcement and counterterrorism efforts to access encrypted communications that "cannot be obtained now" even with valid court orders. 2-ER-164; 3-ER-399-400. The court improperly discounted this testimony and, indeed, did not consider Colonel Shepard's testimony at all. 1-ER-20-22.

Finally, the injunction is overbroad and, at a minimum, should be narrowed. "[I]njunctive relief 'must be tailored to remedy the specific harm alleged.'" *Washington v. Trump*, 145 F.4th 1013, 1038 (9th Cir. 2025) (citation omitted). The injunction fails that test. Sections 3(a), 3(b), and 3(d) of the injunction prohibit lawful activity disconnected from any liability finding, forbidding NSO from creating accounts and using any technology that "interacts with or emulates any aspect of the WhatsApp Platform." 1-ER-5. Section 3(c) enjoins reverse-engineering WhatsApp's source code, which is not a CFAA violation. 1-ER-5-6. Section 4 requires NSO to disable customer access, which means that NSO will be required to disable sovereigns' access to critical law enforcement and intelligence operations. 1-ER-6. These provisions are an abuse of discretion because, as the court acknowledged, sovereigns should be carved out of the scope of any injunction.

III. The district court's $4,002,471 punitive damages award—a 9:1 ratio—should also be vacated or, at minimum, reduced.

The punitive damages award should be vacated to rectify foundational errors. The court abused its discretion when it prevented NSO from presenting evidence

23

that its tools had valid law enforcement and intelligence purposes, while permitting Plaintiffs to argue that NSO intentionally designed spyware to target over a thousand innocent individuals. By excluding NSO's exculpatory evidence, the court gravely skewed the trial record, leading to a one-sided narrative that inflamed the jury, resulting in a 376:1 punitive damages ratio.

The ensuing punitive damages award (even as remitted) violates due process. The court committed multiple legal errors warranting remittitur to no more than a 4:1 ratio, or approximately $1,778,876.

First, the court erred by failing to make any findings on reprehensibility, instead merely noting "some" factors favored each side. 1-ER-28. Substantively, NSO's conduct was not reprehensible: any harm was purely economic, WhatsApp has no financial vulnerability, and NSO's witness testified Pegasus was designed "not [to] harm any WhatsApp servers." 2-ER-237. The court excluded evidence of NSO's legitimate law enforcement purposes while permitting Plaintiffs to argue NSO engaged in "despicable" "spying" on "1,400 people that are the victims." 1-ER-34-40, 2-ER-291. This invitation to punish NSO for harm to non-parties was impermissible. In any case, this Court caps ratios at 4:1 even for death or serious physical harm. *Hardeman v. Monsanto Co.*, 997 F.3d 941, 976 (9th Cir. 2021); *Estate of Hill ex rel. Grube v. NaphCare, Inc.*, 2025 WL 1588738, at \*4 (9th Cir. June 5, 2025). The harms here are far less reprehensible.

24

Second, the court did not properly analyze proportionality. It first found the $444,719 in compensatory damages to be "relatively insignificant," which apparently weighed in favor of a higher punitive damages award, because Plaintiffs are wealthy companies. 1-ER-29. This was legal error. This Court has repeatedly held that far smaller awards are "substantial." *Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 963-64 (9th Cir. 2005). No authority supports the notion that damages awards become less substantial when the plaintiff is wealthier. Notably, punitive damages *cannot* be awarded to compensate the plaintiff, but only to deter future abuses and punish; any proper consideration of wealth in this context is reserved for protecting the *poorest* of plaintiffs, the economically vulnerable, as intentionally preying upon *them* is more reprehensible and therefore deserving of punitive damages. The court then erred in ruling that, even if the compensatory damages award were substantial, it would not affect the proportionality analysis—contrary to *State Farm*. 1-ER-29-30. Last, the court ruled that NSO's conduct was "more egregious," despite finding that the reprehensibility factors were seemingly balanced (and again, it should have found a complete absence of reprehensibility or egregiousness). 1-ER-30.

Third, the court ignored that CDAFA's $10,000 maximum penalty is 1/400th of the award. Despite this staggering disparity between civil penalties and punitive

damages, the court accorded this factor no weight—again contrary to Supreme Court precedent.

## STANDARD OF REVIEW

"This court reviews a district court's grant of summary judgment de novo." *Baird v. Bonta*, 163 F.4th 723, 731 (9th Cir. 2026).

In connection with the trial and permanent injunction, "legal conclusions [are reviewed] de novo, the factual findings for clear error, and the decision to grant a permanent injunction, as well as its scope, for an abuse of discretion." *Powers v. McDonough*, 163 F.4th 1162, 1181 (9th Cir. 2025) (citation omitted).

"A district court's evidentiary rulings are reviewed for an abuse of discretion," and will result in reversal or vacatur if "the error was prejudicial." *Sidibe v. Sutter Health*, 103 F.4th 675, 691 (9th Cir. 2024).

The constitutionality of an award of punitive damages is reviewed de novo with "[e]xacting appellate review." *State Farm*, 538 U.S. at 418.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT

The summary judgment order should be vacated. "A grant of summary judgment is appropriate only when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Baird*, 163 F.4th at 731 (citation omitted). This Court should "view[] the evidence in the light most

26

favorable to the non-moving party" and draw "all reasonable inferences in its favor," without weighing "the evidence or determin[ing] the truth of the matter." *Schrader Cellars, LLC v. Roach*, 129 F.4th 1115, 1122 (9th Cir. 2025) (citations omitted).

### A. Summary Judgment Should Not Have Been Granted On Plaintiffs' CFAA And CDAFA Claims

Plaintiffs did not deserve summary judgment on their CFAA and CDAFA claims. NSO neither bypassed access restrictions nor obtained protected information from WhatsApp's servers. At minimum, genuine disputes of material fact on these elements precluded summary judgment.

Plaintiffs' CFAA and CDAFA claims are coextensive for purposes of this appeal (and Plaintiffs did not argue that they differed in scope at all). Both prohibit obtaining "information from any protected computer" "without authorization or exceeding authorized access." 18 U.S.C. § 1030(a)(2)(C); *see* 1-ER-65 (predicating CDAFA ruling on CFAA liability); *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 131 (N.D. Cal. 2020) (treating CDAFA and CFAA as coextensive). Again, the court ruled as a matter of law that NSO had authorization to use WhatsApp's servers and thus did not access them "without authorization." 1-ER-63. But it inexplicably found, as a matter of law, that NSO "exceed[ed] [its] authorized access." 1-ER-63.

The CFAA defines "exceeds authorized access" to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C.

27

§ 1030(e)(6). A party exceeds access only when it "obtain[s] information from particular areas in the computer—such as files, folders, or databases—to which their computer access does not extend." *Van Buren*, 593 U.S. at 378. The CFAA "does not cover those who … have improper motives for obtaining information that is otherwise available to them." *Id.* Nor does it "criminalize[] every violation of a computer-use policy" or a website's "terms of service." *Id.* at 394. Liability instead "stems from a gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system." *Id.* at 376. The "rule of lenity" supports this "narrow interpretation" of the CFAA, "so as not to turn a criminal hacking statute into a 'sweeping Internet-policing mandate.'" *hiQ*, 31 F.4th at 1200-01 (citation omitted).

NSO did not exceed authorized access. It presented unrebutted evidence that its software used WhatsApp's relay servers exactly as the WhatsApp system permits, without accessing or obtaining information from any off-limits parts of the WhatsApp servers. NSO representatives attested that Pegasus "traveled through WhatsApp [relay] servers in the same way as any other message sent using a genuine WhatsApp client," and did not "alter, delete, impair, or corrupt" WhatsApp's servers or code. 2-ER-150. NSO's independent cybersecurity expert likewise affirmed that "neither NSO nor its customers either accessed any WhatsApp server without authorization," as the district court found (3-ER-459)—"or exceeded their

28

authorized access to any WhatsApp server." 2-ER-83. An internal WhatsApp presentation produced in discovery confirmed that "[t]he WhatsApp servers were not compromised by" NSO's conduct. 2-ER-345. WhatsApp's Rule 30(b)(6) designee also confirmed that WhatsApp's servers did not "execute" any "malicious code," that Pegasus "did not corrupt any data on the signaling or the relay servers," and that Pegasus did not slow down or delete any data from the servers; the servers merely passed on the NSO code to the target phones. 2-ER-331-34, 2-ER-336-38.

This evidence precludes summary judgment under *Van Buren*. NSO did not circumvent "username and password requirements" or other "generally applicable rules regarding access permissions." *hiQ*, 31 F.4th at 1201. The gates were up for entities using Pegasus no less than for any other WhatsApp user. Pegasus merely enables governments to send messages through authorized pathways that WhatsApp provides to all users.

The district court ruled against NSO, nonetheless, because it believed that NSO's technology "obtain[ed] information directly from the target users' devices" as well as "information about the target users' device *via the Whatsapp servers*." 1-ER-64 (emphasis added). Citing Plaintiffs' brief rather than evidence, the court here appeared to be referencing deposition testimony by NSO's vice president of research and development, Tamir Gazneli. 1-ER-64. He explained that Pegasus would send, through WhatsApp relay servers, a request to the target's device for information

29

about its operating system and online status, and would also query the server about whether the target device has WhatsApp installed. 2-ER-123; 2-ER-128-29.

But this is not a CFAA violation. Neither Mr. Gazneli nor anyone else testified that NSO was thereby circumventing closed gates or accessing protected parts of the WhatsApp server. Instead, Mr. Gazneli said that Pegasus would gather from WhatsApp's servers information pertaining only to one discrete issue: "whether the target has an active WhatsApp account." 2-ER-129. But that information, he explained, is available to "any other normal [WhatsApp] user when he enters [a] new phone number in his contacts list." 2-ER-129; *see* 2-ER-130 (stating that other system information could be obtained by other WhatsApp users "by other means"). Whenever a WhatsApp user sends a call request, a WhatsApp server checks whether the callee has a WhatsApp account and provides that information to the caller's device. 2-ER-150. That is a necessary first step for every WhatsApp call, as WhatsApp servers obviously cannot initiate a call with a callee who lacks WhatsApp. In short, there was zero evidence, let alone undisputed evidence, that NSO bypassed "an authentication requirement, such as a password gate, … that divides open spaces from closed spaces" on any computer, *hiQ*, 31 F.4th at 1197 (citation omitted), or obtained "unauthorized information or files," *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012) (en banc).

30

When later denying a stay, the court dismissed NSO's arguments by noting that, "given the cutting edge technology at issue in this case, the lack of similar past cases does not persuade the court." 2-ER-72. But novel technology does not wipe away settled law. *Van Buren*'s "gates-up-or-down inquiry" applies regardless of purported technological novelty. 593 U.S. at 390. Such a clear rule is both necessary to avoid an interpretation of the CFAA that would turn "millions of otherwise law-abiding citizens" into "criminals," *id.* at 394, and compelled by the "rule of lenity," *hiQ*, 31 F.4th at 1200-01 (citation omitted). The district court never found—because the record does not indicate—that any technical gate blocked NSO from obtaining the relevant information. That is the end of the inquiry.

In its summary judgment order, the court did not deny any of the above, let alone call out undisputed facts establishing the opposite. If anything, it seemingly confessed in its later clarification order that, at summary judgment, "the evidentiary record did not show … specific details about how exactly the relevant attacks were conducted." 2-ER-308-09. That amounts to a confession of error: there *were* disputes of fact standing in the way of summary judgment. Yet the court improperly drew inferences against NSO.

Confronting this evidentiary gap, the court apparently pivoted to a different theory of liability when denying a stay pending appeal; at that point, it embraced a terms-of-service theory of liability that this Court's precedents reject. Specifically,

31

the court faulted NSO for "reverse-engineering" WhatsApp's code. 2-ER-71. But reverse-engineering code is not illegal. *See* 1-ER-25 (the district court acknowledging as much). To the contrary, "[r]everse engineering is an important method" used to "detect potential vulnerabilities in code" and develop competing products. Brief for Comput. Sec. Researchers et al., as Amici Curiae Supporting Petitioner, *Van Buren*, 593 U.S. 374 (2020) (No. 19-783), at 21. To be sure, Plaintiffs, like many tech companies, prohibit reverse-engineering code in their terms of service. *E.g.*, *supra*, pp.9-11. Even assuming the terms of service gave rise to a contract obligation (which they do not, *see infra* Part I.B), "a violation of the terms of use … cannot establish liability under the CFAA." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). The CFAA and CDAFA do not criminalize such commonplace "violation[s] of computer use restrictions." *Nosal*, 676 F.3d at 857.

The district court's ruling that WhatsApp obtained illicit information from target devices, rather than WhatsApp servers, also runs into two additional problems.

First, Plaintiffs had to show that NSO obtained information *from WhatsApp servers*, not from target devices. The CFAA defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information *in the computer* that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6) (emphasis added). The definite article "the" indicates that, to

32

exceed authorized access to a computer, the defendant must obtain or alter information in that same computer in which it exceeds access. *See Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("'[T]he' is a function word indicating that a following noun … has been previously specified by context.") (cleaned up). The court, however, found only that Pegasus "obtain[ed] information about the target users' device *via* the Whatsapp servers." 1-ER-64 (emphasis added). Obtaining information stored in WhatsApp users' devices "via" WhatsApp servers does not equate to obtaining information "in" WhatsApp servers, as the CFAA requires. 18 U.S.C. § 1030(e)(6). Moreover, the CFAA applies to anyone who "exceeds authorized access, and *thereby* obtains" protected information. 18 U.S.C. § 1030(a)(2)(C) (emphasis added). The word "thereby" indicates that the "unauthorized access [must] provide[] a means to access information." *Tri Cnty. Tel. Ass'n v. Campbell*, 2019 WL 7841073, at *4 (D. Wyo. June 4, 2019). Because NSO did not exceed access to WhatsApp's servers, *supra*, pp.28-31, no information was obtained from target devices *by virtue of* an intrusion into WhatsApp servers.

Second, and in any case, there was no basis to find liability at summary judgment because *NSO's clients*, not NSO itself, are the ones that deploy Pegasus make all decisions relative to target devices, and thus "access[]" the target devices under the CFAA and CDAFA. 2-ER-105-07; *see, e.g.*, *Dresser-Rand Co. v. Jones*, 957 F. Supp. 2d 610, 614-15 (E.D. Pa. 2013) ("Use of the computer is integral to the

33

perpetration of a fraud under the CFAA, and not merely incidental."). NSO's representatives could not have been clearer: "[w]e do not operate Pegasus." 2-ER-105-07. NSO no more "access[ed]" third-party phones under the CFAA than a locksmith "picks locks" within the meaning of a burglary statute. NSO builds the tools, and sovereign governments decide when and how to use them pursuant to their own statutory authorities.[1]

The district court's summary judgment order glides past this problem. At summary judgment, the court did not disagree with NSO that Plaintiffs had failed to establish that NSO operated Pegasus. It ruled instead that, to hold NSO liable for use of Pegasus, it would have to do so under the CFAA's conspirator liability provision, "§ 1030(b)." 1-ER-64. Despite stating that such arguments were "fully addressed by section (b)," the court *never* analyzed whether NSO could in fact be liable as a co-conspirator, let alone whether Plaintiffs had so established as a matter of law. 1-ER-63.

Recognizing this gap in its analysis, the court issued a clarification order four months later that, again, changed its theory of liability. It declared that its summary judgment decision merely "left open the possibility" of conspiracy while "stopp[ing]

---

[1] Plaintiffs' CFAA and CDAFA claims stem solely from the fact that NSO operated Pegasus during a limited R&D process and when providing demonstrations to government customers. 2-ER-83-84. But NSO never accessed third parties' devices. All the third-party devices "accessed" for purposes of the demonstration and R&D belonged to NSO with proper authorization. 2-ER-83-84; 2-ER-126.

34

short of an express finding that defendants engaged in conspiracy to violate the CFAA." 2-ER-309. It claimed it had "concluded" that NSO could be held liable because it "develop[ed] Pegasus and provid[ed] it to [its] customers," while "providing training and ongoing support" and "updat[ing] Pegasus to circumvent plaintiffs' security updates." 2-ECF-308-09. But none of that conduct violates the CFAA or erases the distinction between NSO and its customers. Short of conspiracy, the CFAA provides no means by which NSO can be held liable for assisting sovereign customers surveil third-party devices. *See, e.g.*, *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."); *Podium Corp. Inc. v. Chekkit Geolocation Servs., Inc.*, 2021 WL 5772269, at *8 (D. Utah Dec. 6, 2021) (no CFAA civil cause of action against aiders and abetters). Beyond that, the court's "clarification" is revisionist. Neither the summary judgment order nor the clarification order cites any evidence that NSO exceeded authorization to any computer when undertaking these activities.

## B. Summary Judgment Should Not Have Been Granted On Plaintiffs' Contract Claim

Separately, the district court erred in granting summary judgment on breach of contract because there was a material dispute of fact over whether NSO and

35

Plaintiffs ever formed a contract. *See, e.g.*, *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011) ("the existence of the contract" is a required element of a contract claim). "To form a contract under California law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) (cleaned up). "In the world of internet contracts," the notice prong generally turns on whether the user of a website had "inquiry notice" of the site's terms. *Id.* "An enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

This case turned on conspicuousness—a "fact-intensive," "totality of the circumstances" analysis that hinges on "font size, color, and contrast (against the page's background)" as well as "the location of the advisal on the webpage." *Godun*, 135 F.4th at 709. "There is no bright-line test for finding that a particular design element is adequate in every circumstance." *Chabolla*, 129 F.4th at 1156-57. "[E]ven minor differences" in design elements can be dispositive. *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 481 (2021).

36

As a result, any conspicuousness analysis requires a court to examine actual screenshots of how the webpage appeared. *See Godun*, 135 F.4th at 709. *Godun*, in holding that there was no contract formation, reviewed screenshots showing "gray-on-gray presentation" with text that did "not contrast with the lighter portions of the background image" and an advisal that was "not located 'directly above or below' the action button." 135 F.4th at 711-12. *Chabolla* likewise involved detailed visual examination of whether the terms of service were conspicuous. 129 F.4th at 1156-58; *see also, e.g.*, *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1018 (9th Cir. 2024).

The court below did not analyze WhatsApp's webpages containing the purported clickwrap terms of service because there was no admissible record evidence whatsoever on the subject (Plaintiffs produced none in discovery). Eschewing the requisite conspicuousness analysis, the court simply announced that a contract must have been formed because "agreeing to the terms of service was necessary to create a Whatsapp account and to use Whatsapp." 1-ER-66-67. The court suggested that two cases, *Laatz v. Zazzle, Inc.*, 2024 WL 377970, at *7 (N.D. Cal. Jan. 9, 2024), and *Sellers*, 73 Cal. App. 5th 444, justified finding contract formation based on this (purported) fact alone. 1-ER-66. In fact, both cases conducted a full conspicuousness analysis of the relevant contracts, spending *pages* on the subject, complete (in *Laatz*'s case) with screenshots. *See Laatz*, 2024 WL

377970, at *7-9; *Sellers*, 73 Cal. App. 5th at 477-84. Because it failed to undertake the requisite conspicuousness analysis, the court erred as a matter of law in finding contract formation at summary judgment.

## II. THE DISTRICT COURT ERRED IN GRANTING A PERMANENT INJUNCTION

"To obtain a permanent injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction." *No Labels Party of Ariz. v. Fontes*, 142 F.4th 1226, 1231 (9th Cir. 2025) (citation and quotation marks omitted). A plaintiff must satisfy all these factors. *See id.* "In determining the scope of injunctive relief, the district court must weigh the competing claims of injury and the effect on each party of granting or withholding of the requested relief." *Powers*, 163 F.4th at 1196 (cleaned up).

This Court should vacate the permanent injunction because Plaintiffs did not satisfy any of the relevant factors, let alone all of them. The operative injunction serves not to preclude likely future CFAA/CDAFA violations, but instead to shut down NSO and prevent it from even developing software that could otherwise be used, lawfully, by one or another government. If nothing else, the permanent injunction should be substantially narrowed.

## A. Plaintiffs Failed To Prove Success On The Merits

The permanent injunction should be vacated because, as explained above, Plaintiffs were not entitled to summary judgment on their CFAA and CDAFA claims. Plaintiffs could receive an injunction only under CFAA or CDAFA because "California law precludes a court from ordering an injunction to prevent the breach of a contract." *Benn v. Allstate Ins. Co.*, 569 F. Supp. 3d 1029, 1038 (C.D. Cal. 2021); *see* Cal. Civ. Proc. Code § 526(b)(5); Cal. Civ. Code § 3423(e); *see also Keene v. City & Cnty. of S.F.*, 2025 WL 341831, at *1 (9th Cir. Jan. 30, 2025) ("California law governs ... whether injunctive relief is appropriate [for California state-law claims].") (cleaned up). And the court "relie[d] only on the CFAA and CDAFA in issuing this injunction." 1-ER-24.[2]

Accordingly, if this Court vacates the CFAA and CDAFA judgment, the injunction should be vacated. *See, e.g.*, *Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1078 (9th Cir. 2000).

---

[2] Although the court did not rely on this precedent, it stated, in dicta, that "some courts have issued injunctions to enforce contractual terms. 1-ER-24. The authorities it cites do not support this rule. *Deerpoint Group, Inc. v. Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1226 (E.D. Cal. 2018), ruled that a contract restricting use and disclosure *of trade secrets* could be enforced by injunction. The statute the district court cited, Cal. Civ. Code § 3422(3), does not mention contract breaches or override Cal. Civ. Code § 3423(e)'s specific prohibition of injunctions barring contract breaches.

39

## B. Plaintiffs Failed To Prove Irreparable Injury

The court ruled that Plaintiffs had established irreparable injury for three reasons: (1) liability under the CFAA and CDAFA is per se irreparable harm; (2) there is a risk that Plaintiffs will suffer future CFAA and CDAFA violations; and (3) absent an injunction, Plaintiffs' ability to market secure encrypted communications services will be irreparably injured. All three rationales fail.

### 1. There Is No Evidence That Alleged Past CFAA Violations Constitute Irreparable Harm

The court first wrongly ruled that any CFAA or CDAFA violations necessarily "constitute irreparable harm." 1-ER-12 (quoting *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017)). But a violation of a statutory right does not, without more, establish irreparable harm. *See, e.g., eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006). Absent express word, courts presume that statutes do not "depart from established principles" governing the availability of injunctive relief, including the need to show irreparable injury. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted). Further proof of irreparable injury is therefore needed to obtain an injunction against future CFAA violations. *See Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1159 n.6 (5th Cir. 2006).

The one (non-precedential) case the district court relied on, *Power Ventures*, is not to the contrary. *Power Ventures* relied primarily on the risk of future injury

40

and the fact that the defendants did not even "contest that Facebook suffered irreparable harm" in concluding that "irreparable harm" supported an injunction. 252 F. Supp. 3d at 782-83. The cases *Power Ventures* relied on also did not predicate their irreparable injury findings on past computer intrusions alone, but instead involved ongoing harms such as computers rendered unusable by a CFAA violation, publicized stolen data, and uncontested misappropriation of company products. *See Enargy Power Co. v. Xiaolong Wang*, 2013 WL 6234625, at *10 (D. Mass. Dec. 3, 2013); *Reliable Prop. Servs., LLC v. Cap. Growth Partners, LLC*, 1 F. Supp. 3d 961, 965 (D. Minn. 2014); *TracFone Wireless, Inc. v. Adams*, 98 F. Supp. 3d 1243, 1256 (S.D. Fla. 2015).

### 2. There Is No Evidence That NSO's Business Model On Its Own Constitutes Irreparable Harm

Perhaps realizing this problem, the court also noted that "the prospect of future harm is directly relevant to the irreparable injury inquiry." 1-ER-14. But mere "prediction[s] about the future" do not suffice; findings of likely future injury must be "based on proof of actual harm." *San Miguel Pure Foods Co. v. Ramar Int'l Corp.*, 625 F. App'x 322, 327 (9th Cir. 2015).

The court identified no evidence that NSO *would* violate the CFAA or CDAFA in the future or even retained the ability to do so. Instead, it relied on evidence that NSO continued to *develop software* that governments could use to collect information from devices. *See* 1-ER-14-15. It cited, for example, testimony

41

from NSO's CEO, Yaron Shohat, that NSO had "installation vectors for Pegasus" in 2024. 2-ER-134. But simply having installation vectors for Pegasus that allow NSO's customers to use the program, without more, does not violate the CFAA or CDAFA. *See supra*, pp.32-35. The court also cited Mr. Gazneli's testimony that NSO's "business" was devising ways to allow its customers to access target devices. 2-ER-120; 2-ER-123. But neither is that a CFAA or CDAFA violation. Developing code that governments can employ pursuant to lawful warrants is rightful and necessary—indeed, the FBI purchased a Pegasus license. 2-ER-102. The court wrongly treated any and all governmental access as *statutory harm* when saying that "such harm [to Plaintiffs] is ongoing." 1-ER-15.

The court also overlooked the distinction between developing code (NSO's role) and employing it against target devices (NSO's clients' role) when, quoting Plaintiffs' attorney argument, it stated that NSO had "engaged in [CFAA] violations … up to tens of thousands of times." 1-ER-13-14. In actuality, it was NSO's "[c]ustomers" that employed NSO vectors many times. 2-ER-119. The other so-called violations that Plaintiffs' counsel referred to consisted of "reverse engineering" WhatsApp software. 2-ER-169. But again, reverse-engineering software is not a CFAA violation, as the court below acknowledged. *See* 1-ER-25.

NSO emphasized that it intended to comply with the law, not violate it. 2-ER-246-47. Mr. Shohat clarified that NSO has no "installation vector … that uses

42

WhatsApp technology in any way." 2-ER-95. NSO's vectors that used and obtained (unprotected, publicly available) information from WhatsApp servers have all been eliminated and can no longer be used by anyone. 2-ER-209. The fact that NSO had, during the R&D phase, obtained (unprotected) information from WhatsApp servers does not, as the court suggested (1-ER-15), furnish reason to conclude that NSO would do so again, even after a court has ruled that its prior actions were unlawful. Otherwise, *any* past CFAA violation would give rise to an injunction. Courts require "a 'real and immediate threat' of future" violations, not just "past wrongs," to establish irreparable injury. *John K. Maciver Inst. for Pub. Pol'y, Inc. v. Schmitz*, 885 F.3d 1004, 1016 (7th Cir. 2018) (citation omitted). In *Power Ventures*, a likelihood of future violations existed because Power Ventures' business model depended on CFAA violations targeting Facebook's servers. 252 F. Supp. 3d at 782-83. NSO's business, by contrast, does not depend on accessing information on WhatsApp servers.

In sum, the court's suggestion (again quoting Plaintiffs' attorney argument) that NSO is "like a safecracker who still has all his tools," 1-ER-13, is both inaccurate (NSO has no tools to access WhatsApp's servers) and unfair. NSO is instead like a locksmith, serving a critical role in the digital economy, that wants to comply with U.S. law, just as it adheres to Israeli law.

43

### 3. There Is No Evidence Of Reputational Damage To Plaintiffs' Goodwill That Constitutes Irreparable Harm

To cover gaps in its analysis, the court ruled that Plaintiffs suffered irreparable injury "when they are not able to offer the end-to-end encryption that they have promised their users." 1-ER-15. This broad claim not only defies empirical reality—WhatsApp has gone from 1.8 billion users to 3 billion since it filed the lawsuit, *see* Josh Constine, *WhatsApp hits 1.5 billion monthly users. $19B? Not so bad,* TechCrunch (January 31, 2018), https://perma.cc/5673-N9G5; Mehta, *supra*— but is unavailable as a matter of law for multiple reasons.

*First*, Plaintiffs disclaimed this theory of injury (and did not argue it in their motion papers). 2-ER-349; 2-ER-196-204; 2-ER-173-87. To avoid discovery into their own infringements of their users' privacy, Plaintiffs explicitly stated that they would not "make arguments about injury to Plaintiffs' reputation or goodwill in support of the injunctive relief that Plaintiffs' seek." 2-ER-349; *see also* 3-ER-418, 3-ER-421. This disclaimed theory is precisely what the district court relied on: "Plaintiffs appear to have made such encryption, and the privacy and security that it entails, a significant part of its pitch to users, making it reasonable to conclude that users would be dissuaded from using WhatsApp if its encryption were ineffective." 1-ER-16. Given that Plaintiffs must show "injury to *Plaintiff[s]* and not third parties," *Phany Poeng v. United States*, 167 F. Supp. 2d 1136, 1142 (S.D. Cal. 2001), this allegedly irreparable injury cannot be anything other than an invocation of

reputation or goodwill. Nor can irreparable injury rest on a theory that Plaintiffs have disavowed. *See, e.g.*, *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020).

The court sought to avoid this conclusion by calling this a "business harm," not "just a reputational harm," but that is a distinction without a difference. 1-ER-17. All harm to a business's reputation or goodwill is "business" harm.

*Second*, the court grounded its ruling on "unsupported and conclusory statements." *Herb Reed Enters. v. Fla. Ent. Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (rejecting similar "platitudes" about goodwill harm caused by trademark infringement). Here, the court cited no evidence, because there was none, backing up its assumption that users "would be dissuaded" from using WhatsApp absent an injunction. 1-ER-16. Even if NSO were enjoined, other companies supplying the same services would exist, while Plaintiffs' users' privacy would continue to be infringed by *Plaintiffs themselves*. *See, e.g.*, FTC, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook* (July 24, 2019), https://perma.cc/WY97-AHLY.

### 4. Plaintiffs Have An Adequate Legal Remedy

Even setting aside the above points, the court erred in ruling that Plaintiffs' alleged "injury cannot be remedied by money damages alone." 1-ER-18. "*Separate from any reputational damages*, which are not properly part of this case," the court

ruled, "Whatsapp would suffer harm in the form of having its proprietary code and its users' data compromised, along with the loss of any users who migrate to a platform with better protection against unauthorized access." 1-ER-18 (emphasis added). But that overlooks the availability of standard monetary damages, which would compensate Plaintiffs for harms arising from compromised code, loss of customers, and attendant lawsuits. *See, e.g.*, *Joseph v. Carnes*, 566 F. App'x 530, 534 (7th Cir. 2014) (injunction to bar improper computer access under the Stored Communications Act (SCA) was improper because "plaintiffs do not explain *why* monetary damages could not adequately remedy any future violations of the SCA by the defendants"). Reputational damages were "not properly part of this case" because Plaintiffs waived them. 2-ER-349; 3-ER-418. Waiving damages is not the same thing as showing that Plaintiffs' injuries are not monetarily remediable. *See, e.g.*, *Key v. Qualcomm Inc.*, 129 F.4th 1129, 1142 (9th Cir. 2025) ("[F]ailure to prove [a] … claim, however, 'does not make that remedy inadequate.'" (citation omitted)).

The court then ruled that the risk that Plaintiffs might have to "litigate multiple suits in the future" renders their harm irreparable. 1-ER-19 (quoting *United Nat. Maint., Inc. v. San Diego Convention Ctr. Corp.*, 2012 WL 3861946, at *7 (S.D. Cal. Sept. 5, 2012)). But this ruling repeats the same unfounded assumption that NSO *would*, in future, access parts of WhatsApp servers to which it lacks authorized access.

46

C.     **Plaintiffs Failed To Prove That The Balance Of Hardships Favors A Permanent Injunction**

The injunction should also be vacated because the balance of hardships weighs against it.  Here, NSO presented unrebutted evidence that the injunction "would put NSO's entire enterprise at risk" and "force NSO out of business," because "Pegasus is NSO's flagship product." 2-ER-194; 2-ER-209-10.  This factor should have weighed heavily in the analysis because the "threat of being driven out of business" constitutes irreparable harm.  *hiQ*, 31 F.4th at 1188 (citation omitted).  So does "irreversible loss of data, contracts, customers, and market share." *Softketeers, Inc. v. Regal W. Corp.*, 2023 WL 2024701, at *11 (C.D. Cal. Feb. 7, 2023), *aff'd*, 2025 WL 636708 (9th Cir. Feb. 27, 2025).

The court did not deny these harms but ruled they were outweighed by "harm to plaintiffs' business if an injunction were not to issue."  1-ER-20.  But again, the district court's analysis of harm to Plaintiffs was vague and not substantiated.  *Supra*, Part II.B.   Plaintiffs, unlike NSO, did not face corporate failure absent an injunction—the bulk of the alleged violations took place in 2018-2020 without any ostensible harm to Plaintiffs' business.

The court seemingly discounted NSO's harms because its business model hinges on "seeking to access data that plaintiffs have protected not only with a username-and-password requirement, but also with end-to-end encryption." 1-ER-20.  This, of course, was not the theory of CFAA and CDAFA liability underlying

47

the summary judgment order; the district court never found that NSO circumvented WhatsApp username-password requirements or collected anyone's encrypted communications. In any case, there is nothing wrong, let alone illegal, about a company developing software designed to circumvent encryption in aid of law enforcement and warrants. *See, e.g.*, Comey, *supra*. Any policy disapproval of lawful surveillance does not belong in the equitable analysis and does not justify destroying NSO for the sake of affording maximal comfort to Plaintiffs.

### D. Plaintiffs Failed To Prove That The Public Interest Favors A Permanent Injunction

Finally, the court erred in disregarding how an injunction forbidding NSO from assisting lawful surveillance would harm the public interest. NSO's expert, former U.S. Attorney Joshua Minkler, credibly testified that an injunction against NSO would disserve the public interest: Pegasus and similar technologies are essential tools enabling law enforcement to combat the challenges posed by end-to-end encryption. 2-ER-157; 2-ER-160-61; 2-ER-164-65. Colonel Shepard likewise testified that "U.S. military and intelligence agencies, as well as those of U.S. allies, routinely use," and, indeed, rely on, "surveillance tools similar to Pegasus to combat a variety of threat actors." 3-ER-401.

The court completely ignored Colonel Shepard's report and discounted Mr. Minkler's testimony, without offering good reasons for doing so. The court noted that Mr. Minkler's knowledge of Pegasus's specific uses derived from "publicly-

available information, such as newspaper articles"; because the court had declined to consider public reporting suggesting that foreign governments had used NSO tools improperly, it said that "basic principles of equity and fairness" required disregarding Mr. Minkler's testimony. 1-ER-21. This was error because the court was not being asked to rely on such public records—only on Mr. Minkler's credibility and expertise. Federal Rule of Evidence 703 expressly permits an expert to base his opinions on facts "that the expert has been made aware of"—including secondary sources—if "experts in the particular field would reasonably rely on those kinds of facts." Fed. R. Evid. 703; *see, e.g.*, *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024). The court had no basis for discrediting—and notably, did not discredit—Mr. Minkler's and Colonel Shepard's unchallenged expert opinions about how and why law enforcement and intelligence services need tools to access encrypted communications.

Common sense and consensus point the same way. Attorneys General William Barr and Merrick Garland have warned that unbreakable encryption "allows … criminals to operate with impunity" and poses "an emerging and accelerating threat," and President Barack Obama has urged the public against "fetishizing" phone privacy "above every other value." 2-ER-216-17. That an essential government tool *can* be abused does not mean it must be extinguished. By the district court's logic, it would serve the public interest to enjoin the production of

49

bullet-proof vests lest they be misused by criminals—never mind the adverse consequences for law enforcement and the military.

The court purported to resolve such concerns by carving out foreign governments "from any injunctive relief." 1-ER-21. But this ignores that foreign sovereign governments are NSO's *only* customers and that they will necessarily bear the fallout of NSO being disabled. *See* 2-ER-206. Moreover, the foreign sovereign carve-out is illusory, as explained *infra*, Part II.E.3.

Finally, the court noted that "there is no evidence that Pegasus has been used for law enforcement purposes within the United States," but that could easily change. 1-ER-21-22. The FBI has, for example, licensed Pegasus before. 2-ER-99. The permanent injunction stands to constrain law enforcement from obtaining software that can lawfully access criminals' and terrorists' encrypted devices.

### E.    At Minimum, The Permanent Injunction Is Overbroad

"[I]njunctive relief 'must be tailored to remedy the specific harm alleged,' and 'an overbroad injunction is an abuse of discretion.'" *Washington*, 145 F.4th at 1038 (brackets omitted) (citation omitted). "The scope of the injunction must be no broader and no narrower than necessary to redress the injury shown by the plaintiffs." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024) (cleaned up). A court cannot "enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (citation

omitted). The injunction below flies in the face of these constraints, prohibiting lawful activity and mere contractual breaches while denying adequate allowance for foreign sovereigns' law enforcement and intelligence needs.

### 1. Sections 3(a), 3(b), And 3(d) Prohibit Lawful Activity

Sections 3(a), 3(b), and 3(d) of the injunction are overbroad because they enjoin lawful, "innocuous activities." *Sprint Sols., Inc. v. Cell Wholesale, Inc.*, 2015 WL 13919095, at *14 (C.D. Cal. Dec. 10, 2015). Section 3(a) prohibits NSO from "using … any technology that interacts with or emulates any aspect of the WhatsApp Platform." 1-ER-5. Section 3(b) bars NSO from "[c]ollecting … data or information from the WhatsApp Platform"—including WhatsApp applications on targets' phones. 1-ER-6. And Section 3(d) prohibits NSO from "[c]reating accounts." 1-ER-6. Nor is this conduct properly connected to the operative liability theory, which hinges on a finding specifically that NSO improperly obtained access to information "via the WhatsApp servers." 1-ER-64. These provisions bar NSO from ensuring that its sovereign customers can collect WhatsApp messages from target devices even when the Pegasus vectors never touch WhatsApp servers. Even if this conduct were unlawful (and it is not), the provisions would be far broader than "necessary to redress the injury shown by the plaintiff[s]." *Flathead-Lolo-Bitterroot*, 98 F.4th at 1195 (citation omitted).

51

### 2. Section 3(c) Prohibits Mere Contractual Breaches

Section 3(c) of the injunction enjoins NSO from "[r]everse engineering or decompiling" WhatsApp code. 1-ER-6. Reverse-engineering and decompiling WhatsApp code, however, do not violate the CFAA or CDAFA because they do not require NSO to "access[] a computer without authorization or exceed[] authorized access." 18 U.S.C. § 1030(a)(2). Instead, reverse engineering and decompiling ran afoul of the breach-of-contract ruling, *e.g.*, 2-ER-254; as noted above, however, there could be no injunction barring future breaches of the present terms and conditions. *Supra*, Parts II.A-B.1. Nevertheless, without citing any supporting authority, the court stated that, because NSO used "reverse engineering or decompiling" to devise the vectors and develop the agent for collection, it was permissible to enjoin such actions here. This was legal error because an injunction cannot bar future contract breaches, *supra*, p.39 & n.2, and "an injunction must be 'tailored to eliminate only the specific harm alleged.'" *Quiksilver, Inc. v. Kymsta Corp.*, 360 F. App'x 886, 889 (9th Cir. 2009) (citation omitted).

### 3. Sections 3(b) and 4 Apply To Foreign Sovereigns

The court acknowledged that "foreign sovereign governments should be excluded or carved out from any injunctive relief." 1-ER-21-23; *cf. In re Estate of Ferdinand Marcos Human Rights Litig.*, 94 F.3d 539, 548 (9th Cir. 1996) (abuse of discretion to enjoin a foreign sovereign). Yet the court failed to incorporate such a

52

carve-out. True, the term "Prohibited Parties" in the injunction excludes foreign sovereigns. 1-ER-5. But multiple provisions in the injunction render this carve-out meaningless. Section 3(b) prohibits NSO from "[c]ollecting, or assisting others in collecting, data or information from the WhatsApp Platform." 1-ER-6. The term "WhatsApp Platform" includes the app on users' phones. 1-ER-5. This flatly bars NSO from equipping governments with technology that collects WhatsApp messages from target devices, regardless whether its vectors ever send messages over WhatsApp servers. Likewise, Section 4 requires NSO "to disable customer access to any and all computer code or technologies maintained by the Prohibited Parties that use, access, or depend on the WhatsApp Platform." 1-ER-6. The court clarified that NSO need only disable sovereign customers' access to code or technologies "maintained by the Prohibited Parties." 1-ER-8. But that still requires NSO to cut off sovereign customers from such data.

If it is not vacated (and it should be), the injunction should be amended to prohibit only developing and selling products which collect "from the WhatsApp servers" (which would match the district court's liability finding, *supra*, Part I.A), and to specify that NSO is not required to disable foreign *sovereign* customer access.

## III. THE DISTRICT COURT ERRED IN GRANTING AN EXCESSIVE PUNITIVE DAMAGES AWARD

If the Court declines to vacate summary judgment on the CFAA/CDAFA claims, it should nonetheless vacate or remit the district court's award of $4,002,471

in punitive damages (a 9:1 punitive : compensatory ratio) because the court improperly excluded exculpatory evidence at trial and in any event denied due process.

## A. The District Court Improperly Excluded Evidence Of NSO's Intent To Supply A Law Enforcement And Intelligence Tool

Federal Rule of Evidence 403 permits exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of," as relevant here, "unfair prejudice." This Court sets "a high bar for exclusion" under Rule 403, as this Rule is intended only to exclude "matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Sidibe*, 103 F.4th at 691 (citation omitted). If evidence was wrongly excluded under Rule 403, this Court will "presume prejudice unless it is more probable than not that the error did not materially affect the verdict." *Id.* at 691-92 (citation omitted).

It was an abuse of discretion to exclude, categorically, all evidence that NSO designed Pegasus for law enforcement purposes, such as investigating crime, terrorism, or child exploitation, and that NSO engaged in extensive screening and oversight procedures. 1-ER-34-40. This evidence was directly relevant and, indeed, essential to refute Plaintiffs' thesis for seeking punitive damages; per the court's instruction, the jury could award punitive damages only upon finding that NSO's "conduct was despicable" and malicious. 2-ER-301-02. The district court did not contest the relevance of NSO's defensive testimony. Instead, it ruled that any such

54

relevance was outweighed by supposed prejudice to Plaintiffs, who had not had "a meaningful opportunity to review evidence" about who NSO's clients were. 1-ER-36. But the court had previously ruled that information about "the specific identities of [NSO's] third" party customers was not relevant and declined to order discovery into this issue. 3-ER-414. Plaintiffs could not be prejudiced by their inability to access irrelevant evidence, nor could NSO properly be subject to a de facto discovery sanction for not producing evidence that had been ruled outside the scope of legitimate discovery. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii). It is legal error, not just an abuse of discretion, to impose such case-dispositive sanctions absent intentional noncompliance with a discovery order. *E.g.*, *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 782 (9th Cir. 1983).

This error was also gravely prejudicial, as the court simultaneously permitted Plaintiffs to argue that NSO attacked WhatsApp users "for the purpose of spying" and "target[ed] and sent this malicious spyware onto the phones of 1,400 people … that are the victims of this spyware," while asking the jury to award punitive damages signaling that "spying is not okay." 2-ER-223, 2-ER-228. That one-sided narrative inflamed the jury, which predictably awarded punitive damages equal to 376x its compensatory award. *See* 1-ER-26. To counter that narrative, NSO needed to show the jury that, unlike most companies in its position, it undertakes extensive vetting and other measures to guard against misuse of its tools by foreign

55

governments, and that law enforcement and intelligence operations depend upon such tools. *See, e.g.*, 3-ER-404. But the court prevented NSO from fairly presenting its side of the story to the jury.

**B.** **The District Court Awarded An Unconstitutionally Excessive Punitive Damages Award**

Due process prohibits "grossly excessive" punitive damages, and this Court reviews such awards de novo with "[e]xacting appellate review." *BMW*, 517 U.S. at 568; *Hardeman*, 997 F.3d at 970 (citation omitted). Three factors limit the availability and scope of punitive damages: (1) the reprehensibility of the defendant's conduct, (2) the ratio between compensatory and punitive damages, and (3) the difference between the award and comparable civil penalties. *Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 900 (9th Cir. 2022). The court erred as to each factor; indeed, it did not even apply factors (1) and (3), and applied (2) only partially. These factors, weighed together, demonstrate that punitive damages should have been limited to a 4:1 ratio at most.

**1.** **NSO's Actions Are Not Reprehensible**

Reprehensibility is "[t]he most important indicium of the reasonableness of a punitive damages award." *State Farm*, 538 U.S. at 419 (citation omitted). Reprehensibility turns on five factors: whether (1) the harm was physical or economic; (2) the conduct showed indifference to health or safety; (3) the plaintiff

56

was financially vulnerable; (4) the conduct was repeated or isolated; and (5) the conduct involved intentional malice or mere accident. *Id.*

The first three factors unquestionably favor NSO: the harm was purely economic, there was no evidence that NSO's conduct showed indifference to health or safety, and WhatsApp is anything but financially vulnerable. *See* 2-ER-270-84. Plaintiffs, by contrast, focused on arguing that factors (4) (repeated conduct) and (5) (intentional malice) favor them. *See* 1-ER-28.

The court did not resolve this dispute or make any findings. It "simply conclude[d]," the court explained, "that some of the reprehensibility factors support plaintiffs' argument, while some support defendants' argument, and then move[d] on to the next factor." 1-ER-28.

This Court can and should reverse because *neither* factor (4) nor (5)—the only disputed ones—favor Plaintiffs. There were no repeated CFAA/CDAFA violations. There was insufficient evidence suggesting that NSO acted with "intentional malice, trickery, or deceit." *State Farm*, 538 U.S. at 419. Mr. Gazneli testified that Pegasus was specifically designed "not [to] harm any WhatsApp servers." 2-ER-237-38. Nor did Plaintiffs offered any evidence that NSO had made a false statement to them.

The jury's $167,254,000 award does not, on its own, justify finding this factor satisfied. The jury answered no special interrogatories. Moreover, the jury had a skewed portrait of NSO's motivations, given the court's erroneous exclusion order

57

discussed *supra*, Part III.A. Such evidence of NSO's legitimate reasons for acting is relevant to whether the "conduct is sufficiently reprehensible to warrant imposition of" substantial punitive damages. *Gore*, 517 U.S. at 579-80. By contrast, the court permitted WhatsApp to argue that NSO engaged in "despicable" "spying" on "1,400 people that are the victims," and to request "a punitive damages number that sends a message that spying is not okay." 2-ER-291 2-ER-294. The upshot was to invite the jury improperly to "punish a defendant for injury that it inflicts upon nonparties," a violation of due process. *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007). The court then compounded the confusion by incorrectly instructing the jury that NSO violated the law by using "such access to obtain or alter information on the WhatsApp servers *and target devices.*" 2-ER-298-99 (emphasis added).

Even if there were findings and a sufficient evidentiary basis for the damages based on factor (5), the 9:1 ratio would still be too high. This Court caps ratios at 4:1 or less even where four of five factors favor reprehensibility. In *Hardeman*, for example, 3.8:1 was "the outer limits of constitutional propriety" when the defendant caused "serious physical harm" through "repeated actions" exhibiting "malice" and "reckless disregard of the health or safety of others." 997 F.3d at 973-76. And in *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1036-37 (9th Cir. 2020), "repeated and

58

willful" misconduct against "financially vulnerable" individuals warranted only 4:1. NSO's conduct does not remotely approach such reprehensibility.

### 2. The Court's Award Is Disproportionate

The second guidepost, "proportionality," asks "whether the punitive damages awards by the jury were proportional to the harm caused by [the defendant's] scheme." *Riley*, 51 F.4th at 902. This Court has "limited punitive damages to a 4 to 1 ratio 'where there are significant economic damages but behavior is not particularly egregious.'" *Id.* (cleaned up). To go above that, there must be "more egregious behavior." *Id.* (citation omitted) (emphasis removed).

The district court began by ruling that "a compensatory damage award of $444,719" was "relatively insignificant." 1-ER-29. This is legal error. This Court has repeatedly held that awards far smaller than $444,719 are substantial. *Planned Parenthood*, 422 F.3d at 963-64 (~$40,000); *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 776 (9th Cir. 2005) ($50,000); *Mitri v. Walgreen Co.*, 660 F. App'x 528, 530-31 (9th Cir. 2016) ($88,000); *see also, e.g.*, *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1090 (7th Cir. 2019) (observing that "courts have found awards of roughly [$580,000] 'substantial' … and imposed a 1:1 ratio").

To overcome this precedent, the district court ruled NSO had fewer due process protections under this prong *because Plaintiffs are wealthier*. "[A]n amount that would be 'significant' to an individual plaintiff in a specific case," the court

59

reasoned—like doctors facing death threats, *Planned Parenthood*, 422 F.3d at 951-52, Sikh fuel truckers repeatedly harassed with ethnic and religious slurs, *Bains*, 405 F.3d at 767, or a Walgreen's employee fired for reporting billing fraud, 660 F. App'x at 530—is "insignificant to a plaintiff such as WhatsApp or its parent company, Meta." 1-ER-29 (citing these three cases specifically).

Such reasoning offends due process. No authority suggests that punitive damages can be inflated to favor wealthier plaintiffs. To the contrary, a plaintiff's wealth is generally irrelevant because punitive damages *cannot* be awarded "to compensate the plaintiff, but to punish the defendant and to deter the defendant and others from such conduct in the future." *Morgan v. Woessner*, 997 F.2d 1244, 1256 (9th Cir. 1993). The exception is when the defendants' conduct is especially reprehensible insomuch as it threatens "an individual who was economically vulnerable." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1014 (9th Cir. 2004); *see, e.g.*, *Gore*, 517 U.S. at 576. Of course, wealthy plaintiffs are not preyed upon as defenseless targets, nor do they need punitive damages to incentivize contingency lawyers. Inflating punitive damages awards to better gratify wealthier plaintiffs is "grossly excessive [and] arbitrary." *State Farm*, 538 U.S. at 416.

The court then ruled that its award "would be the same regardless of whether the compensatory damage award is considered 'significant' or 'insignificant'" because NSO's actions were "more egregious," "not so innocuous as to fall in the

60

category of 'not particularly egregious.'" 1-ER-30. It thereby added to its legal errors.

*First*, the notion that a substantial compensatory award should not push down the punitive damages ratio is legal error. "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. That is, substantial damages push toward the *low end* of *Riley*'s permissible ranges, not just toward excluding the third category entirely. Even if the district court were correct in analyzing egregiousness, therefore, the ratio should be lower.

*Second*, the court erred in characterizing, without explanation, NSO's conduct as "more egregious" rather than "not particularly egregious." Again, the court itself observed that reprehensibility was balanced, albeit without making specific findings. *Supra*, p.57. A finding that reprehensibility factors are evenly split, without elaboration, does not support a conclusion that conduct was "more egregious"—it suggests the opposite. And again, NSO's conduct was not in fact remotely reprehensible. *Supra*, Part III.A.

### 3. The Court's Award Dwarfs Comparable Civil Penalties

"For the third guidepost," this Court "looks at the disparity 'between the punitive damages award and the civil penalties authorized or imposed in comparable cases.'" *Riley*, 51 F.4th at 904 (citation omitted). In *State Farm*, for example, the

Court held that a $145 million punitive damages arising from fraud was excessive because the "most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, an amount dwarfed by the … punitive damages award." 538 U.S. at 428 (citation omitted). Likewise, this Court limited Title VII punitive damages to "between $300,000 and $450,000" given the $300,000 statutory cap. *Bains*, 405 F.3d at 777.

The import of these cases is straightforward here. CDAFA's maximum civil penalty—a clearly comparable civil violation given that Plaintiffs' claims derive from the same statute—is $10,000, or just under 1/400th of the punitive damages award. Other courts have held that lower punitive damages awards were excessive compared to $10,000 civil penalties. *See Gore*, 517 U.S. at 584 ($2 million punitive damages); *Mitri*. 660 F. App'x at 531 ($1.155 million punitive damages).

The court simply ignored NSO's arguments. It stated that "the lack of any similar cases involving civil penalties limits this factor's usefulness here," even though the above cases focused on the possible *statutory* penalty alone. 1-ER-31. It also deemed this factor "less important," 1-ER-31, without explaining why it could be ignored entirely.

Accordingly, on remand, punitive damages should not exceed a 4:1 ratio, or approximately $1,778,876.

62

## CONCLUSION

This Court should reverse the CFAA liability determination and vacate (or at least narrow) the permanent injunction. Absent that, the Court should, at a minimum, vacate or remit the punitive damages award.

Dated: February 11, 2026

STEPHEN A. BROOME
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000
stephenbroome@quinnemanuel.com

HOPE D. SKIBITSKY
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
295 5th Ave., 9th Floor
New York, NY 10016
(212) 849-7000
hopeskibitsky@quinnemanuel.com

Respectfully submitted,

*/s/ Derek L. Shaffer*
DEREK L. SHAFFER
RACHEL FRANK QUINTON
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
555 13th St. NW, Suite 600
Washington, DC 20004
(202) 538-8000
derekshaffer@quinnemanuel.com
rachelfrank@quinnemanuel.com

ALEX H. LOOMIS
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
111 Huntington Ave., Suite 520
Boston, MA 02199
(617) 712-7100
alexloomis@quinnemanuel.com

*Counsel for Defendants-Appellants*
*NSO Group Technologies Limited and Q Cyber Technologies Limited*

63

## **REQUEST FOR ORAL ARGUMENT**

NSO respectfully requests that this Court hear oral argument in this appeal.

64

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, NSO is unaware of any related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, the above brief is in 14-point, proportionally spaced Times New Roman type and contains 13,977 words, excluding the items exempted by Fed. R. App. P. 32(f).

Dated:  February 11, 2026          */s/ Derek L. Shaffer*
                                    Derek L. Shaffer

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the above Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.  I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

Dated:  February 11, 2026        */s/ Derek L. Shaffer*
                          Derek L. Shaffer

## STATUTORY ADDENDUM

## TABLE OF CONTENTS

**Statute**                                                    **Page:**

18 U.S.C. § 1030(a)(2), (a)(4), (b), (e)(6), (g)                 69

68

**18 U.S.C. § 1030(a)(2), (a)(4), (b), (e)(6), (g)**

(a)    Whoever—

…

(2)    intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

    (A)    information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) [1] of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

    (B)    information from any department or agency of the United States; or

    (C)    information from any protected computer;

…

(4)    knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

shall be punished as provided in subsection (c) of this section.

…

(b)    Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

…

(e)    As used in this section—

69

(6)     the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter;

…

(g)     Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.  A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses [5] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i).  Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages.  No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage.  No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

70