**No. 25-7380**

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WHATSAPP INC., a Delaware corporation; META PLATFORMS, INC., FKA FACEBOOK INC.,

*Plaintiffs-Appellees*,

v.

NSO GROUP TECHNOLOGIES LIMITED; Q CYBER TECHNOLOGIES LIMITED,

*Defendants-Appellants*,

*On Appeal from the U.S. District Court for the Northern District of California, No. 4:19-cv-07123-PJH, Hon. Phyllis J. Hamilton*

### EXCERPTS OF RECORD VOLUME II OF III (ER-69-363)

STEPHEN A. BROOME
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

HOPE D. SKIBITSKY
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
295 5th Ave., 9th Floor
New York, NY 10016
(212) 849-7000

DEREK L. SHAFFER
RACHEL FRANK QUINTON
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
555 13th St. NW, Suite 600
Washington, DC 20004
(202) 538-8000

ALEX H. LOOMIS
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
111 Huntington Ave., Suite 520
Boston, MA 02199
(617) 712-7100

*Counsel for Defendants-Appellants*

February 11, 2026

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

      Plaintiffs,

      v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

      Defendants.

Case No. 19-cv-07123-PJH

**ORDER DENYING MOTION TO STAY
PERMANENT INJUNCTION;
EXTENDING ADMINISTRATIVE STAY
FOR 45 DAYS**

Re: Dkt. 813

Before the court is defendants' motion to stay the court's permanent injunction order pending appeal. <u>See</u> Dkt. 813. Having read the papers filed by the parties and carefully considered their arguments and relevant authority, and good cause appearing, the court hereby rules as follows.

A.    Legal standard

Federal Rule of Civil Procedure 62(d) provides that, "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."

In evaluating a motion for a stay pending appeal, the court considers "whether the applicant has made a strong showing of likelihood of success on the merits, whether the applicant will be irreparably injured without a stay, whether a stay will substantially injure the other parties, and where the public interest lies." <u>See</u> <u>Arizona Democratic Party v. Hobbs</u>, 976 F.3d 1081, 1086 (9th Cir. 2020); <u>Al Otro Lado v. Wolf</u>, 952 F.3d 999, 1006-07

**ER-70**

(9th Cir. 2020) (citing Nken v. Holder, 556 U.S. 418, 434 (2009)).  The first two factors "are the most critical"; the last two are reached only after "an applicant satisfies the first two factors."  Al Otro Lado, 952 F.3d at 1007 (citing Nken at 434-35).

The standard for granting a stay is a "sliding scale," i.e., the elements of the test are "balanced, so that a stronger showing of one element may offset a weaker showing of another."  Arizona Democratic Party, 976 F.3d at 1086 (citing Al Otro Lado, 952 F.3d at 1007).  "A stay is not a matter of right, even if irreparable injury might otherwise result."  Al Otro Lado, 952 F.3d at 1006 (citing Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926)).

B.      Analysis

      1.      Likelihood of success on the merits

Defendants argue that they are likely to succeed on the merits on the following issues: (1) the court's imposition of liability, (2) the court's finding of personal jurisdiction, (3) the court's treatment of defendants' affirmative defenses, and (4) the court's issuance of a permanent injunction.  See Dkt. 813 at 8-19.

      a.      Liability

As to liability, defendants argue that the court "improperly found that NSO exceeded authorized access'" under the CFAA and CDAFA, that the court misapplied the "intent to defraud" standard under the CFAA, that the court had insufficient evidence that NSO had agreed to the Whatsapp terms of service, and that the court improperly held NSO liable for the alleged conduct of its clients.  See Dkt. 813 at 8-12.

The court does not find that defendants have made a strong showing of likelihood of success on the merits of their arguments regarding liability.  Starting with the "exceeds authorized access" issue, even based only on the limited discovery provided by defendants, the undisputed evidence showed that NSO went far beyond their authorized use of Whatsapp by reverse-engineering the application to design a spyware vector which allowed NSO's clients to surveil Whatsapp's users and obtain data from its servers.  See, e.g., Dkt. 494 at 11-13.  When Whatapp attempted to fix the security vulnerability,

defendants designed around the fix to continue their surreptitious access. See id.; Dkt. 802 at 5-7. Defendants could not, and do not, argue that they had actual authorization to engage in this conduct – instead, they simply argue that there is not yet a Ninth Circuit or Supreme Court case that directly contradicts their position. However, given the cutting-edge technology at issue in this case, the lack of similar past cases does not persuade the court that defendants are likely to succeed on the merits of their argument regarding the "exceeds authorized access" prong of the CFAA and CDAFA.

Next, defendants argue that they are likely to succeed on the merits of their argument that they did not have the requisite "intent to defraud." The essence of defendants' argument is that they did not intend to steal "any money or property from Whatsapp." See Dkt. 813 at 11. Defendants cite no authority applying their purported rule to violations of the CFAA or CDAFA. And on the merits, the court concludes that defendants' view does not present a strong showing that they are likely to succeed.

As to the Whatsapp terms of service, plaintiffs presented testimony regarding the necessity of agreeing to the terms of service before creation of a Whatsapp account, and the notice given to users. See Dkt. 467 at 2. Moreover, the court noted in its summary judgment order that defendants refused to produce relevant discovery regarding the phones that were used to create accounts on defendants' behalf. See Dkt. 494 at 14. Based on that evidentiary record, the court concluded that "defendants cannot meaningfully dispute that agreeing to the terms of service was necessary to create a Whatsapp account and to use Whatsapp," and defendants' arguments on this motion do not persuade the court that they are likely to succeed on the merits of this argument.

Finally, defendants argue that the court held NSO liable for its clients' conduct, namely, obtaining data from target users. As mentioned in this and previous orders, defendants withheld significant discovery in this case, and the relationship between NSO and its customers was a topic where evidence was particularly limited. As a result, conclusions about certain conduct could not be drawn. As the court stated in a previous order:

3

**ER-72**

> [T]he evidentiary record did not show (at the time of summary judgment, nor now) the specific details about how exactly the relevant attacks were conducted.  Based on that unclear record, the court concluded that even the limited conduct to which defendants admit (i.e., developing Pegasus and providing it to their clients, as well as providing training and ongoing support) along with evidence that appears undisputed that they updated Pegasus to circumvent plaintiffs' security updates, sufficed to establish liability even before reaching the issue of whether evidentiary sanctions were necessary.

See Dkt. 699 at 1-2.

Thus, the court held defendants liable for their own conduct, not for the conduct of its customers.  As the court explained, "[w]hile the court's order left open the possibility that defendants engaged in conspiracy to violate the CFAA, as the relevant evidence may indeed support that conclusion – based on the state of the evidentiary record, the court stopped short of an express finding that defendants engaged in conspiracy to violate the CFAA."  See id. at 2.  Accordingly, the court is not persuaded that defendants are likely to succeed on the merits of their argument that the court improperly found NSO liable for the conduct of its customers.

b.      Personal jurisdiction

Turning to the issue of personal jurisdiction, defendants argue that the court improperly held that the use of California-based servers was sufficient to support personal jurisdiction, and that the court erred by imposing a discovery sanction that defendants intended to use California-based servers.  See Dkt. 813 at 12-14.

As the court noted in its previous order, the court had first addressed personal jurisdiction during the pleadings stage and found that it was supported by the complaint's allegations, but defendants argued at summary judgment that the allegations were not supported by the evidence.  See Dkt. 494 at 5.

Notably, defendants do not dispute that their code was indeed sent through plaintiffs' California-based servers, defendants dispute only that they had intent to use those servers and/or any control over which servers were used.  However, as the court noted in its order granting summary judgment, because "defendants did not produce Pegasus code in a way that was meaningfully accessible to plaintiffs or to the court,

4

**ER-73**

plaintiffs were unable to obtain detailed evidence of how the [defendants' code] chose which server(s) to use." See Dkt. 494 at 9. Accordingly, the court imposed a narrow evidentiary sanction that "the use of plaintiffs' California-based servers was a purposeful choice made by defendants." Id. at 9-10.

Defendants appear to now challenge the premise that they should have been required to produce Pegasus code in the first place, but the court finds no basis for those arguments, which attempt to distract from the plain fact that the functionality of the Pegasus code was central to resolving this litigation, and that defendants consistently resisted producing discovery on that topic. While defendants did and still do claim that they should be excused from the applicable discovery rules, and remain free to present that argument on appeal – the court at this time does not conclude that defendants are likely to succeed on the merits of their personal jurisdiction argument.

c.     Affirmative defenses

Defendants argue that the court did not resolve their affirmative defenses regarding the law enforcement exception, the unclean hands defense, and the waiver defense. See Dkt. 813 at 14-15.

Regarding the law enforcement exception, defendants have repeatedly presented their argument that Pegasus was licensed by the FBI, but have also repeatedly failed to produce any evidence that the conduct challenged in this case was part of a "lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States," as required by 18 U.S.C. § 1030(f). Defendants simultaneously argue that the court "did not address" this defense, and that the court "has made that finding" rejecting the defense but that "there are serious questions as to its correctness." See Dkt. 821 at 13. In short, the court has indeed resolved defendants' argument regarding the CFAA's law enforcement exception, and while defendants are free to challenge that resolution on appeal, they have not persuaded this court that they are likely to succeed on the merits of that argument.

5

**ER-74**

As to the unclean hands defense, plaintiffs are correct that the defense is premised on an argument that was rejected at trial – that plaintiffs' investigation into defendants' spyware itself constituted an attempt to steal defendants' code. And finally, as to waiver, the court finds no basis for the argument that plaintiffs allowed defendants' conduct to continue after learning about it. To the extent that defendants complain about the lack of specific written findings on each asserted affirmative defense, the court notes that such specificity is not required. See, e.g., United States v. Dooley, 719 Fed. App'x 604, 606 (9th Cir. 2018). Overall, defendants have not persuaded the court that they are likely to succeed on the merits of their argument regarding affirmative defenses.

d.    Injunction

Defendants challenge the court's imposition of a permanent injunction, arguing that the court improperly found irreparable harm, improperly enjoined activities that did not involve Whatsapp servers, failed to carve out a law enforcement exception, and improperly enjoined reverse-engineering and decompiling code from the Whatsapp platform. See Dkt. 813 at 15-19.

Regarding irreparable harm, defendants argue that the court erred in relying on reputational damages, which were expressly disclaimed by plaintiffs. However, the court explained in its previous order that it concluded that the thwarting of end-to-end encryption caused plaintiffs to suffer business harm, and that such harm was properly considered when determining whether to order an injunction. See Dkt. 802 at 7-9. Moreover, plaintiffs presented testimony regarding the primary role of privacy in Whatsapp's business. See, e.g., Dkt. 749 at 325-27. Accordingly, the court is not persuaded that defendants are likely to succeed on the merits of this argument.

The law enforcement exception was previously addressed above, and was also addressed in an order resolving defendants' objections to the proposed injunction. See Dkt. 808 at 1. In short, the court concluded that there was "no evidence that the United States has ever used Pegasus for law enforcement activities," and thus, there was no basis for the "sweeping carveout" proposed by plaintiffs, which went further than the

**ER-75**

United States District Court
Northern District of California

exception as codified in 18 U.S.C. § 1030(f).  Accordingly, the court is not persuaded that defendants are likely to succeed on the merits of this argument.

Finally, the court will address both arguments about the scope of the injunction together.  As stated above, defendants object to the injunction's inclusion of activity that does not access Whatsapp's servers, as well as reverse-engineering and decompiling.  The court addressed both arguments in its order granting plaintiffs' motion for permanent injunction, and concluded that both inclusions were warranted as "sufficiently related to defendants' unlawful access of plaintiffs' and their users' data."  See Dkt. 802 at 11, 17; see also Facebook, Inc. v. Power Ventures, Inc., 252 F.Supp.2d 765, 784 (N.D. Cal. 2017) ("it is well established that federal courts have the equitable power to enjoin otherwise lawful activity if they have jurisdiction over the general subject matter and if the injunction is necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct or to prevent continued violations of the law.").  Accordingly, the court is not persuaded that defendants are likely to succeed on the merits of these arguments.

Thus, overall, the court concludes that defendants have not made a strong showing of likelihood of success on the merits of the arguments presented.

2.      Irreparable injury to applicant

Defendants argue that they will be irreparably injured in the absence of a stay, first because the destruction of any code is permanent, and second because an injunction "will put NSO's entire enterprise at risk."  See Dkt. 813 at 19-21.  The court recognizes that the illegal nature of the enjoined conduct does not automatically prevent consideration of the harm that an injunction would impose, but the court also finds persuasive the "long-settled principle that harm caused by illegal conduct does not merit significant equitable protection."  See Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 867 (9th Cir. 2017); Softketeers, Inc. v. Regal W. Corp., 2023 WL 2024701 at *11 (C.D. Cal. Feb. 7, 2023).

Moreover, plaintiffs point to defendants' own evidence on this motion, showing that

7

**ER-76**

Whatsapp is just one of many sources from which defendants' software can extract data. See, e.g., Dkt. 813-6 at 8 ("Monitor a multitude of applications including Skype, Whatsapp, Viber, WeChat, Line, Facebook Messenger, Telegram, and Blackberry Messenger (BBM).")

As a result, the court gives only slight weight to any injury caused by the absence of a stay.

### 3.   Substantial injury to other parties

Defendants argue that plaintiffs will not be irreparably harmed in the absence of a stay.  Plaintiffs argue that this factor is due less weight than the first two factors, and further argue that the court's order granting the injunction set forth the ways in which plaintiffs continue to be harmed by defendants' conduct.  Overall, the court agrees that its previous order set forth the basis for concluding that plaintiffs face at least the same risk of ongoing harm as did the plaintiff in Power Ventures, because, as in that case, the defendants in this case have exhibited "bad faith conduct" indicating that "they will not easily be deterred from attempting to access [plaintiffs'] servers without authorization in violation of the CFAA."  See Dkt. 802 at 4-5 (citing Power Ventures, 844 F.3d at 782).

Accordingly, the court concludes that plaintiffs would indeed be substantially injured by a stay.

### 4.   Public interest

Defendants argue that the public interest favors a stay, first because "the FBI purchased a license for Pegasus in December 2018," and second because "the U.S. public would also be harmed by depriving foreign governments of access to Pegasus." See Dkt. 813 at 22-24.  Defendants' first argument has been addressed in this order's discussion of the asserted law enforcement exception, and is further undermined by NSO's presence on the U.S. Department of Commerce's Entity List.  As to defendants' second argument, the injunction specifically does not apply to foreign governments.  See Dkt. 802 at 13, 14-15.

Instead, the court notes that the Ninth Circuit has held that the public has

"substantial interest in thwarting denial-of-service attacks and blocking abusive users, identity thieves, and other ill-intentioned actors." hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180, 1202 (9th Cir. 2022). Accordingly, the court concludes that the public interest weighs against a stay.

Thus, having considered the four factors applicable to defendants' motion for a stay pending appeal, the court concludes that defendants have not met their burden on this motion. In particular, the court is not persuaded that defendants have shown that they are likely to succeed on the merits of their appeal. Moreover, as quoted above, the Ninth Circuit has held that "[a] stay is not a matter of right, even if irreparable injury might otherwise result." See Al Otro Lado, 952 F.3d at 1006 (internal citation omitted). Accordingly, defendants' motion to stay the permanent injunction pending appeal is DENIED.

The only remaining issue is whether to extend the administrative stay to allow defendants to seek a stay from the Ninth Circuit. The court agrees that a final, limited administrative stay for that purpose is warranted, and thus temporarily stays the permanent injunction order (Dkt. 809) for a period of up to 45 days from the date of this order to allow defendants to seek a stay pending appeal from the Ninth Circuit Court of Appeals in accordance with Federal Rule of Appellate Procedure 8(a)(2). Within five (5) days of the Ninth Circuit's decision on the anticipated motion to stay, defendants shall file a notice of the decision in this court.

**IT IS SO ORDERED.**

Dated:  December 19, 2025

                                           _/s/ Phyllis J. Hamilton_
                                      PHYLLIS J. HAMILTON
                                      United States District Judge

United States District Court
Northern District of California

9

**ER-78**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# Exhibit 3

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DECLARATION OF TERRENCE MCGRAW IN SUPPORT OF DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>Action Filed:  10/29/2019 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNREDACTED VERSION OF DOCUMENT PROPOSED

TO BE FILED UNDER SEAL

**ER-80**

I, Terrence McGraw, declare as follows:

1. I am an Executive Consultant in Cybersecurity for Gray Analytics, and I have been engaged by Defendants NSO Group Technologies, Limited and Q Cyber Technologies Limited (collectively "NSO") as an expert in this matter.

2. In connection with my engagement, I have reviewed and evaluated technical materials produced by WhatsApp Inc. ("WhatsApp or "WA), Meta Platforms, Inc. f.k.a. Facebook, Inc ("Facebook" or "FB"), and NSO. I have personal knowledge of the facts in this declaration, and I would and could testify competently to these facts if called as a witness.

**Qualifications**

3. I hold a MSA in Information Systems Resource Management from Central Michigan University. Additionally, I am a graduate of the U.S. Army School of Information Technology Telecommunications Systems Engineering program, a Master's Degree equivalent provided and endorsed by Georgia Southern University and the University of Pittsburgh.

4. In 2008, I was assigned to the Army Global Network Operations and Security Command (which in 2010 became the Army Cyber Command Operations Center), where I remained assigned until 2012 when I deployed for my second tour in Afghanistan. I had three major leadership roles during this time:

5. I served as the Future Operations Chief of the Army Global Network Operations and Security Center between 2008 and 2010. Future Operations is the planning and management of operations outside a 72-hour window. My responsibilities included planning for Army Cyber operations, incident response actions, and infrastructure and operational changes for which Army Cyber was responsible.

6. My next role was leading a highly classified small counterintelligence joint task force composed of military and civilian members of the Army, Navy, Air Force, Marines and civilian analysts from the National Security Agency ("NSA"). The mission goals of this task force were to develop new systems and processes to improve counterintelligence capabilities within the NSA and Cyber Command. This program required the highest level of authorization and oversight

**ER-81**

the Pegasus to target computers (e.g., C2 servers) physically located in California.

56.     Plaintiffs' analysis identified 38 IP addresses that Plaintiff characterized as "C2 servers." Only one of those IP addresses appears to have been registered to a company located in California in 2019: the IP address 104.223.76.220 was registered in ARIN to QuadraNet Enterprises LLC of Los Angeles, CA (the "QuadraNet IP Address").

57.     I have seen no evidence that NSO ever chose to lease a server from QuadraNet. To the contrary, it is my understanding that NSO never leased any server from QuadraNet. A document produced by WhatsApp in discovery (and apparently received from QuadraNet) shows that the server with the IP address 104.223.76.220 was leased from QuadraNet by a company called 365 Online Technology JSC located in Hanoi, Vietnam, with the email address admin@greencloudvps.com, for the period October 1, 2017, to October 29, 2019.   Further information produced by WhatsApp in discovery (and apparently obtained from Greencloud) does not connect the QuadraNet IP Address to NSO.

58.     I am not aware of any information that would lead me to believe that NSO leased or intended to lease a server at the QuadraNet IP Address or knew or believed that any C2 servers were physically located in California in 2019. I am also unaware of any information that would lead me to believe that NSO ever leased or intended to lease, directly or indirectly, any third-party server located in California in 2019.

59.     For these reasons, it does not appear that NSO purposefully configured any installation of Pegasus, during the relevant time period, to utilize a C2 server that it knew to be in California.

60.     Moreover, though the QuadraNet IP Address was registered to a California-based company in 2019, that does not mean that the hardware (i.e., the physical server) to which the Internet Protocol would route requests to that QuadraNet IP Address was physically present in California. Cloud providers and web hosting companies often use DNS schemes and load balancers (like those used by WhatsApp) to ensure traffic does not bottleneck at any piece of hardware but is, instead, distributed across many devices. Consequently, a public IP address is

**ER-82**

often virtual, meaning it does not always relate to a specific piece of hardware in a specific location. For example, Google's DNS service can be reached at the IP address of 8.8.8.8, and that IP address is registered to Google in California. But requests to that IP address can be routed to and handled by any one of hundreds of servers around the world, depending on Google's routing protocols, infrastructure, and traffic conditions.

61.     A public IP address is often just the entry point into the architecture that hosts it. Internally a data center, a web hosting service, a government agency or a commercial company may only have a very few public IP addresses, and internal routing is done with private IP addresses and MAC addresses of individual pieces of hardware. For example, a cloud provider will often assign one public IP address to a company leasing infrastructure, and yet, it will geographically distribute the actual hardware and software across its infrastructure, based on its own unique design. In such systems, the end customer leasing servers may have no idea where geographically their data resides. Unless a company is specifically leasing actual "hardware" with a known, negotiated location to handle requests to a given IP address, the company has no knowledge or control over what physical server will handle requests directed to the IP address.

**Neither NSO Nor Its Customers Accessed Any WhatsApp Server Without Authorization or Exceeded Their Authorized Access.**

62.     It is my opinion that neither NSO nor its customers either accessed any WhatsApp server without authorization or exceeded their authorized access to any WhatsApp server. I have been informed that the Court has already held that NSO and its customers did not access any WhatsApp servers without authorization because they signed up with the WhatsApp service and were consequently granted authorization to use the WhatsApp service. I agree with that conclusion. It is my further opinion that neither NSO nor its customers (during the operation of Pegasus) accessed any part of a WhatsApp server (including the signaling or relay servers) that was "off limits" to them, where "off limits" means beyond some technological access barrier they were not entitled to cross.

63.     I have seen nothing in my review of the materials in this case to suggest that NSO

**ER-83**

ever operated the Pegasus software to gain access to any target device without the consent of that device's owner. NSO's customers may well have done that, as the intended use of Pegasus is to gain access covertly to material located on the phones of those suspected to be engaged in terrorism or criminal activity, but even then, the access to WhatsApp servers did not exceed authorization. During the research and development phase, NSO transmitted messages across the WhatsApp servers when testing Pegasus against NSO's own target devices. It is my opinion that neither NSO nor its customers ever accessed any part of a WhatsApp signaling or relay server that was "off limits" to the Pegasus/WhatsApp user (i.e., was beyond some technological access barrier the Pegasus/WhatsApp user was not entitled to cross).

**(1)      Neither NSO itself nor NSO customers exceeded their authorized access to a WhatsApp signaling server.**

64.      It is my opinion that NSO and its customers did not access any WhatsApp signaling server in a manner that exceeded their authorization.

65.      As explained above, the only technical access controls that WhatsApp used to limit access to the signaling servers was a public-private key encryption scheme. Under that scheme, a client with the appropriate private key could authenticate itself to the signaling server and use the signaling server.

66.      Pegasus did not circumvent this access restriction on the signaling server's services. During the operation of Pegasus, the Pegasus clients would encrypt authentication messages to the signaling sever using their private keys, the signaling servers would validate those messages using the client's public key, and the signaling server would process the client's requests pursuant to that authentication. Therefore, Pegasus's access to the signaling server's services was authorized and did not involve the circumvention of any technical access restrictions.

67.      I understand Plaintiffs may contend that Pegasus users obtained the authentication credentials to the signaling servers in a manner that did not comply with WhatsApp's terms of service. I have no opinion on whether this contention is correct, but it does not impact my opinion because it does not imply that the user obtained access to the signaling server by circumventing

**ER-84**

any *technical* access barriers.

68.     The messages that Pegasus sent to the signaling servers also did not result in the Pegasus user accessing any part of the signaling servers that was off limits to him or her. As noted above, the Pegasus client sent to the signaling servers stanzas that included values for certain valid parameters, and the signaling servers merely forwarded those stanzas (with the parameter values) to the callee device. The values of the parameters (and the fact that those values were unusual) had no impact on the signaling server's processing of those stanzas. In other words, the signaling server merely provided the service that the Pegasus user was authorized to access.

69.     For example, the Pegasus client would send the signaling server a call offer stanza where the value of the "connecting_tone_desc" parameter of the stanza was a string that defined a shell script and ELF (Executable and Linkable Format) executable. But the signaling server did not execute that shell script or ELF executable. In fact, it would be impossible to do so, as the code was written specifically for Android Operating Systems. Instead, it merely passed the string to the callee device as the value of the "connecting_tone_desc" parameter.  Indeed, the signaling server performed no processing that depended on the value of the "connecting_tone_desc" parameter.  As noted above, the signaling server did not validate the value of the "connecting_tone_desc" parameter. Nor did the signaling server perform any different function in response to receiving any value for the "connecting_tone_desc" parameter. Instead, the signaling server would simply forward the value to the "connecting_tone_desc" parameter to the callee as it would have done had the caller provided *any other* value for the "connecting_tone_desc" parameter.

70.     Because the Pegasus user's communication with the WhatsApp signaling server merely used services that the Pegasus user was authorized to use, neither NSO nor its customers accessed any part of the signaling server that was off limits to them.

     **(2)    Neither NSO nor its customers exceeded their authorized access to a WhatsApp relay server.**

71.     It is my opinion that neither NSO nor its customers accessed any WhatsApp relay server in a manner that exceeded the user's authorization.

72.     As explained above, the only technical access control that WhatsApp used to limit access to the relay servers was that a client must present the relay server with an authorization token for the relay server, which the client could obtain only from the WhatsApp signaling server. I have seen no evidence suggesting that the Pegasus client accessed the Relay server in any way other than by presenting a legitimate authorization token obtained from WhatsApp through WhatsApp's signaling server. Thus, I have seen no evidence that Pegasus somehow circumvented this access restriction to the WhatsApp relay servers.

73.     The messages that Pegasus sent through the relay servers also did not result in the Pegasus user accessing any part of the relay servers that was off limits to him or her. As WhatsApp admitted (through its corporate designee, Mr. Gheorghe), the relay servers behaved normally during Pegasus use—merely shuttling packets back and forth between the caller and callee. Indeed, the only message exchanged over the WhatsApp servers that WhatsApp even contends was "malicious" was the offer stanza sent from the caller to callee over the *signaling* server. Thus, none of the messages that Pegasus sent over any WhatsApp relay servers traversed or caused the sender to gain access to any part of those servers that was off limits to the Pegasus user (i.e., behind some technical barrier that the Pegasus user was not authorized to cross).  Put another way, the information sent by Pegasus over WhatsApp's relay servers traversed the identical path across WhatsApp relay servers as the VoIP calls made by any other WhatsApp user around that same time.

74.     In sum, Pegasus users merely used the WhatsApp servers (both signaling and relay servers) as a delivery mechanism—the way one might use the post office to deliver letters. To use that delivery mechanism, the Pegasus user had to (and did) present access credentials, issued by WhatsApp. I note that WhatsApp performs no checks to verify anything about a person to whom it issues access credentials—it merely issues access credentials to anyone who provides a mobile phone number, and no information about the WhatsApp user is required. Moreover, the Pegasus user's use did not cause any of the WhatsApp servers to perform any function that WhatsApp had not programmed those servers to perform. The Pegasus software is intended to reach the phone of an end user that is a person of interest to a law enforcement or intelligence agency and Pegasus

contains no software code executed by WhatsApp Servers. These facts are clearly acknowledged by WhatsApp in its technical analysis and by the WhatsApp personnel who conducted that analysis. Thus, Pegasus users did not circumvent or manipulate the server functionality in any way.

75. The Court's order denying Defendants' motion to dismiss (Dkt. No. 111) relied on several WhatsApp allegations that WhatsApp has acknowledged in discovery to be untrue. For example, the Court took WhatsApp at its word that "WhatsApp imposes certain limitations on accessing portions of its servers, such as prohibiting access to the technical call settings." *Id.* at 37. But discovery has shown that this assertion is false. Instead, as discovery has shown, at the time of the incidents described in the Complaint, the WhatsApp signaling server was not validating incoming stanzas (including of offer stanzas) against any formal schema, let alone blocking stanzas that failed such a validation. It is self-evident that the WhatsApp servers were not "prohibiting access to the technical call settings" that Pegasus used (such as the "connecting_tone_desc" parameters) or else Pegasus would not have been able to use them. Instead, WhatsApp servers permitted use of the "connecting_tone_desc" parameters, and they permitted messages containing the values that Pegasus set for those parameters. Indeed, one of WhatsApp's security engineers admitted that WhatsApp *intentionally* permitted client applications to utilize that setting "for backwards compat[ibility] reasons." (Akro. Decl. Exh. K (Robinson Tr. 307:15-309:1).) Thus, before May 2019, WhatsApp servers contained no technical restriction against sending messages of the form sent by the Pegasus client, including with the "connecting_tone_desc" parameters used by Pegasus.

76. In another example, the Court accepted WhatsApp's allegation that Pegasus users used Pegasus to "avoid the technical restrictions built into WhatsApp Signaling Servers." *Id.* But as shown above, this is also false.

77. The Court also accepted WhatsApp's allegation that Pegasus users "formatted call initiation messages containing malicious code to appear like a legitimate call and concealed the code within call settings." But that is false too because the Pegasus exploit code was not "concealed" within the XMPP stanzas at all. To the contrary, it appeared there in plain, human readable text that would have been immediately understood by any competent engineer. And

indeed, it appears that the moment WhatsApp engineers saw the value of the connecting_tone_desc parameter on May 2, 2019, they immediately recognized it as an exploit. The reason WhatsApp did not recognize this exploit earlier was simply that, prior to WhatsApp undertaking a Stanza Validation Project totally unrelated to Pegasus, WhatsApp was not validating the value of the connecting_tone_desc parameter, or of many other values of the call offer stanzas that Pegasus was using, or of most other stanzas. Thus, Pegasus did not "conceal[] code within code settings."

78.     Far from "compromising" WhatsApp servers, Pegasus always used WhatsApp servers in complete compliance with the technical access rules WhatsApp defined for those servers. Pegasus used WhatsApp servers *only as a channel to deliver code to target devices*, and it did this in accordance with the rules set by those WhatsApp servers. Using genuine credentials to send messages that comply with a server's technical requirements is not a form of "hacking"; it is simply use of the servers.

79.     Plaintiffs contend that NSO modified its software after WhatsApp changed the access rules for its servers, but NSO modified its software *to comply with the new rules*, not to circumvent them. For example, WhatsApp changed its server rules in December 2018 in a way that prevented NSO's "Heaven" vector from requiring target devices to use relay servers controlled by the Pegasus user.  Instead of trying to find a way to violate that rule, NSO developed the "Eden" vector, which used relay servers controlled by WhatsApp, *exactly as WhatsApp's code required*. Eden was therefore a modification made to *comply* with WhatsApp's rules. It is nonsensical to claim that changing an application to comply with a server's new rules is somehow "hacking" the server.

**NSO Did Not Damage Any WhatsApp Server.**

80.     For many of the same reasons explained in the previous section, it is my opinion that Pegasus did not impair the integrity or availability of any data, program, system, or information on any WhatsApp server or cause any damage to any computer owned by WhatsApp.

81.     As I noted above, I agree with WhatsApp's internal assessment that WhatsApp's servers were not compromised in this incident. That is because, as further explained above, Pegasus used WhatsApp signaling and relay servers only for their ordinary and intended purpose

of shuttling data between client devices. As WhatsApp agreed through the deposition of Mr. Gheorghe as WhatsApp's corporate designee, this use of the WhatsApp servers to shuttle data between client devices did not impair the availability of those servers, corrupt any data on those servers, slow down those servers, or delete any of WhatsApp's data from those servers. Thus, Pegasus did not harm the WhatsApp servers in any way.

82.     This is unsurprising because the messages Pegasus delivers to the target's device through the WhatsApp servers are crafted specifically for that target device's operating system, hardware architecture, and configuration. Thus, the messages are simply not executable by the WhatsApp servers. Thus, Pegasus did not impair WhatsApp's server infrastructure in any way.

83.     Pegasus also did not slow down the WhatsApp servers because the amount of data generated by the Pegasus system is negligible compared to the amount of data the WhatsApp infrastructure routinely handles. Mr. Gheorghe likewise admitted this while testifying as WhatsApp's corporate designee. (Akro. Decl. Exh. L (Gheorghe Tr. 249:12-250:21).) As such, it appears that NSO made efforts to not negatively impact WhatsApp's network infrastructure.

84.     Pegasus would have actively avoided harming or impacting WhatsApp's servers in any way. This is because the goal of law enforcement is to gather intelligence and to minimize harm to uninvolved third parties. In addition, a major goal of law enforcement and intelligence gathering surveillance is to avoid detection, and any operational impact or impediment to the system would prevent achievement of those goals. Indeed, because modern cybersecurity security systems employ analytic engines that look for unusual or suspicious traffic patterns, surveillance professionals try to prevent detection by *not* performing any actions that would degrade or impact network connections or infrastructure. It is best practice to "hide in plain sight" and not stand out from the crowd.  If the WhatsApp network infrastructure had been impacted by Pegasus, the impact would be immediate and obvious. Large swaths of the user base would complain, the help desk would be inundated with requests, and normal logging systems would fail, which would cause alarms to be raised. None of these things occurred.

85.     I have seen no evidence indicating that WhatsApp's infrastructure or servers were

**ER-89**

damaged in any way.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 27th day of September 2024, in Cape Coral Florida.

_____
TERRENCE MCGRAW

# Exhibit H

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

--------------------------------X

WHATSAPP INC.                          :

a Delaware corporation, and        :

META PLATFORMS INC,                :

a Delaware Corporation:

                 Plaintiffs       :

        v.                        :    Case No.

NSO GROUP TECHNOLOGIES LTD         :    4:19-cv-07123-PJH

and                               :

Q CYBER TECHNOLOGIES LTD           :

             Defendants           :

--------------------------------X

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of YARON SHOHAT

LONDON

THURSDAY, AUGUST 29TH, 2024

9:19 A.M. BST

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

Deposition of YARON SHOHAT, held at the offices of:

DAVIS POLK & WARDWELL LLP

5 ALDERMANBURY SQUARE

LONDON

EC2 7HR

UNITED KINGDOM

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

whose technology is involved in the provision of the installation vectors defendants used for Pegasus today?

MR. AKROTIRIANAKIS:  I am going to instruct the witness not to answer that question, on the basis of the court's order docket number 292.

MR. BLOCK:  Joe, we discussed this before.

MR. AKROTIRIANAKIS:  We did.

MR. BLOCK:  And I want to just state for the record, our understanding of that order is not a "limitation ordered by the court under rule 30 C2".  It made no mention of any depositions and gives no basis for you to instruct the witness not to answer.  You have referred, in relation to those instructions, to the court's Richmark analysis.  The threshold question is whether the witness is prohibited from answering my question because of a non-US legal obligation.  So if the defendants assert that a non-US law prohibits the witness from answering my question, please say so.  We can decide later whether to ask the court to consider, under Richmark, what the result should be for the defendants' discovery and obligations in this case.  But at this deposition, I respectfully request a clear statement from defendants as to the threshold issue.

So is it your position that a non-US law prohibits the witness from answering the question I asked?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 51

MR. AKROTIRIANAKIS:  My position is that the court's order states that -- the court's order adopts the definition requested by you, with a time limitation imposed by the court, and says that you can seek further discovery from the court.

MR. BLOCK:  Are you stating that the defendant is prohibited by a foreign legal obligation from answering the question that I asked?  I understand, because I asked you that question before and you didn't, that you have not given that instruction.  And so we object to your instruction to the witness not to answer as a violation of rule 30.

By Mr. Block:

Q.  Mr. Shohat, do defendants have an installation vector for Pegasus today that uses Whatsapp technology in any way?

MR. AKROTIRIANAKIS:  I am sorry, I am going to need to catch up with the transcript here.

Okay, go ahead.

A.  Go ahead?

MR. AKROTIRIANAKIS:  Do you have his question in mind?

A.  Yes, I do.  Can you repeat it, please?

Q.  Yes.  Do defendants have an installation vector for Pegasus today that uses Whatsapp technology in any way?

A.  No.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 52

Q.  Do defendants have an installation vector for Pegasus today that uses Facebook technology in any way?

A.  No.

Q.  Do defendants use an emulator capable of sending Whatsapp messages in connection with Pegasus today?

MR. AKROTIRIANAKIS:  Objection.  No foundation.

A.  I don't think I am the right person to answer that.

Q.  Do you know the answer?

A.  I don't know.

Q.  Okay.

What are the internal names that defendants use for every installation vector that you are aware of that use Whatsapp technology?

MR. AKROTIRIANAKIS:  Objection.  Foundation.  Also vague as to time.

A.  Actually, I don't know.  We are not -- like, the internal code names for vectors are internal and mostly used by the R&D and support teams, and less of an interest for, of me.  You mentioned before the name Hummingbird, which is the general name we use for zero click installation, regardless of whether it is using Whatsapp or other methods.  That's the term that I am using.

Q.  So do you know which Hummingbird installation vectors use Whatsapp?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 137

when WestBridge was created?

A.   I think -- I believe it happened, took place, in 2015.

Q.   And do you know why WestBridge was created by defendants in 2015?

A.   Yes, WestBridge was --

MR. AKROTIRIANAKIS:  Objection.  Misstates his testimony. No foundation.

A.   WestBridge was created, I believe, by -- as part of Francisco Partners' strategy to expand business in North America, to be a reseller for NSO, for the Group's products in North America.

Q.   Do you know who was in charge at WestBridge when it was founded in 2015?

A.   The first person in charge was Omri Lavie.

Q.   Did Mr. Lavie spend time in the United States as part of his role with WestBridge, to your knowledge?

A.   Yes.

Q.   Do you know how much time he spent in the United States?

A.   He relocated to the United States.

Q.   Where was he living when he relocated to the United States to work at WestBridge?

A.   I don't know at the time where he lived.

Q.   Okay.  Do you know --

A.   I know for sure it was east coast.  Put it this way.

Q.   What do you know about the activities that Mr. Lavie

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 138

undertook in connection with his work for WestBridge?

MR. AKROTIRIANAKIS:  I am going to object that that question is outside the scope of his designation.  And so he can answer in his personal capacity, if he knows, but no foundation.

A.  I don't know.

Q.  What did WestBridge do in 2015 to market and/or sell defendants' products in the United States?

MR. AKROTIRIANAKIS:  Same objections.  Outside of the scope. No foundation.

A.  Made effort to sell the product.

Q.  Do you know the customers to whom it made an effort for those sales?

MR. AKROTIRIANAKIS:  Objection.  Vague.

A.  NSO sells only to governmental agencies, so WestBridge would meet with governmental agencies, the type of FBI, CIA and the like.  But I don't know specifically of specific meetings.

Q.  Okay.  Let me just get that clear for the record.  Are you able to identify any specific customer in the United States with whom WestBridge, or any other representative of defendants, met for the purposes of selling Pegasus?

MR. AKROTIRIANAKIS:  Objection.  Misstates his testimony. Exceeds the scope of the designation.  No foundation.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 139

A.   So which time period?

Q.   Let's start with 2015?

A.   I don't know.

Q.   2016?

A.   I don't know.

Q.   2017?

A.   I don't know.

Q.   2018?

A.   So around '18 or '19, it is a matter of public record that Pegasus was sold to the FBI.  The FBI director stated that in Congress, in front of Congress committee. So obviously a meeting has been held with the FBI.

Q.   2020?

MR. AKROTIRIANAKIS:  Same objections.

A.   I don't know of any other specific meetings.

Q.   Okay.  You don't know, or you are unwilling or unable to disclose?

A.   I don't know.  Had I knew, I wouldn't disclose.  But I don't know about specific meetings, no.

Q.   Okay.  With respect to defendants' efforts to market and sell in the United States, including through defendants' affiliates, the accused technology that was in use between April 29, 2018, and May 10, 2020, the only customer you can identify with whom the defendants or their representatives met is the United States Federal

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 140

Bureau of Investigation; is that a true statement?

A. I said that it is fair to assume that meetings were held with several intelligence and law enforcement agencies of the US and of the US government.  Do I know of specific meetings held?  No.

Q. Do you know the identities of the customers with whom meetings were held, other than the FBI?

A. I know that -- okay, WestBridge is independent -- was and is independent of the defendants.  And part of it is because WestBridge, or any US reseller selling to federal agencies, is required to meet classification requirements.  And therefore they didn't divulge me, or the company specifically, with who they were meeting.

So even if I was told that there is a meeting in Virginia, I can guess, just like you, which federal agency they met.  But they did not tell me that.  They kept it to themselves.  And that's part of the reason that WestBridge was established by Francisco Partners as a completely separate entity, with full autonomy, and it did not report into Q or NSO or its CEO, even not the one before me, because they required independence, and required to not be subjects of foreign company, because they are dealing with US government.

Q. Is it your testimony that no one at defendants directed the activities of WestBridge in any way?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 147

it back, if that's the question.

Q.   Okay.  And what do you do?

MR. AKROTIRIANAKIS:  Objection.  Vague.

A.   We disable the system.

Q.   How do you do that?

A.   So, there are different methods, depending on what access we are given to the system.  If it is encoded initially with the customer, it would give us access and we would remove permissions so the customer would not be able to use -- to access the system.  Like any other system, you have to have a username and password to log in, and we would block that.

Q.   What if the customer -- is the customer able to withhold that access from you?

A.   Yes, we need permission to access the system.

Q.   How do you disable the system if the customer withholds access?

A.   We have a mechanism, a technical mechanism, by which we can prevent the system from installing additional agents.  So that's something we can do remotely, even without access to the system itself.

Q.   What is that mechanism?

A.   I cannot describe it technically, but if I would -- there are ways to design such access, such kill switch. I am sure someone will be able to explain exactly how it

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 148

works.

Q.  You cannot because you lack knowledge, or you cannot because of a restriction on your testimony?

A.  No, I lack knowledge.  I can assume, but I don't want to assume exactly how it works.

Q.  Have you ever -- have defendants ever performed that remote disabling mechanism to which you just referred?

A.  Yes.

Q.  Okay.

    I think we established that it is impossible for Pegasus to be deployed without the participation of employees of defendants, right?

MR. AKROTIRIANAKIS:  Objection.  Withdrawn.

A.  Impossible is too definite, but whenever we deploy a system, it is done by defendant employees.

Q.  Other than the system we discussed for the FBI, what systems have defendants deployed in the United States?

MR. AKROTIRIANAKIS:  Objection.  That misstates the testimony and assumes facts not in evidence.

A.  The system I mentioned was the only deployment done by defendants in the United States for Pegasus.

Q.  Who is Terrence DiVittorio?

A.  Terry was the head of WestBridge after Mr. Lavie.

Q.  Do you know when leadership at WestBridge transitioned from Mr. Lavie to Mr. DiVittorio?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 149

MR. AKROTIRIANAKIS:  Objection.  Assumes facts not in evidence.

A.  I do not, but I will give you a range.

Q.  Please.

A.  It is between 2016 and 2018.

Q.  Was Mr. DiVittorio in charge of WestBridge when you joined defendants in early 2018?

A.  Yes.

Q.  Do you know who Josh Shaner is?

A.  I heard the name.

Q.  Do you know what Josh Shaner's responsibilities were?

A.  I just know he was a WestBridge employee.  I don't know the exact responsibilities.

Q.  You said before that WestBridge had engineers, do you remember that?

A.  Yes.

Q.  Who were you thinking of?

A.  I don't know the names.

Q.  Okay.

A.  I know they had the ability to demonstrate the system and to provide a certain level of support to the system, which would require engineers.

Q.  Some of your documents talk about tier 1 or tier 2 support.  Are you generally familiar with those concepts?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 233

MR. AKROTIRIANAKIS:  Objection.  It's over broad.  No foundation.

A.  I believe that in '18/'19 most, the vast majority of customers were using the concurrent model.

Q.  Also true today?

MR. AKROTIRIANAKIS:  Objection.  No foundation.

A.  I think it is still true today.

MR. BLOCK:  Let's take a short break.

A.  Okay.

THE VIDEOGRAPHER:  Going off the record.  The time is 18:29.

(6:29 p.m.)

                              (break taken.)

(6:42 p.m.)

THE VIDEOGRAPHER:  Going back on the record.  The time is 18:42.  Thank you.

MR. BLOCK:  Welcome back, Mr. Shohat.

A.  Thank you.

By Mr. Block:

Q.  Are you aware that defendants have issued something they call a transparency report?

A.  Yes.

Q.  The first time defendants issued a transparency report was 2021, correct?

A.  Correct.

Q.  Did you have any involvement in the 2021 report?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 234

A.  I recall it was discussed and reviewed by the management team before being issued, yes.

Q.  The management team including you?

A.  Including me.

Q.  But Mr. Hulio was CEO at that time and signed the report?

A.  Yes.

Q.  NSO claims it does not operate Pegasus, right?

A.  We do not operate Pegasus.

Q.  NSO claims it has no visibility into the usage of Pegasus?

A.  We have no visibility into the target information.

Q.  And NSO says it does not collect information about customers?

MR. AKROTIRIANAKIS:  Objection.  Misstates his testimony. No foundation.

     If you understand the question you can answer it.

A.  I don't think it is stated the way it was presented. Obviously we do collect information about the customers, like the financials, how much they owe us, a lot of information, so you need to be more specific.

Q.  So it is false that NSO has no visibility into Pegasus, Pegasus' usage, and does not collect information about customers?

A.  The defendants do not collect information about the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 235

targets of the customers or the intelligence gathered by the systems the customers use.

Q. Okay, so at a minimum if someone were to say that NSO does not collect information about customers that would be overstated?

A. I need to see the context of how it was stated.

Q. Sure.  This is exhibit 2028.

A. Okay.

(Exhibit 2028                        marked for identification)

Q. Which is the 2021 transparency report.  And I will refer you to page 6.  Under "understanding Pegasus".

A. Page 6, "Understanding Pegasus" yes.

Q. The second sort of stanza says:

"Myth: NSO operates Pegasus and collects information about the individuals it is used against..."

And then it says:

"Fact: NSO licenses Pegasus to sovereign states and state agencies.  Does not operate Pegasus.  Has no visibility into its usage and does not collect information about customers."

Do you see that?

A. I see that.  And --

Q. My question for you, sir, is defendants do collect some information about customers, right?

MR. AKROTIRIANAKIS:  Objection.  Foundation for this

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 236

document.

A. In the context of this question the information that NSO does not collect about customers was stated in the myth, which is the information about individual, the individual it is used against.  This information is not collected, and even not exposed to NSO.

Q. Okay.

So NSO does not collect information about the individuals it is used against, do you agree with that?

A. I agree with that.

Q. On page 8.

A. Yes.

Q. Do you see a header, sorry, there is a break in the text and then you read below, the next paragraph begins "as part of our governance framework", do you see that?

A. Mm-hm.

Q. And then in the middle of the next block, eight lines from the bottom, it says "We strictly require ... "

Do you see the beginning of the sentence "we strictly require..."?

A. Yes.

Q. That sentence says:

"We strictly require that Pegasus is used only where there is a legitimate law enforcement or intelligence driven reason connected to a specific pre identified

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 237

phone number and after a process is followed where a state agency decision maker independent of the user, such as a court, authorizes that use consistent with a written domestic law."

Did I read that correctly?

A.  Yes.

Q.  Is it your testimony that every single customer of Pegasus must, as a prerequisite to obtaining it, show to NSO that it uses the product only after a process with a state agency decision maker, independent of the user, as described here?

MR. AKROTIRIANAKIS:  Objection.  Misstates the document.

A.  No, first of all.  Please, give me a minute to read the whole paragraph.

Okay, I have read it.

So you asked if we require to see a decision maker independent, to see --

Q.  Let me just ask, is that okay?

A.  Yes.

Q.  Does every single NSO customer promise to NSO that it will not infect a mobile device unless "a state agency decision maker independent of the user, such as a court, authorizes that use consistent with a written domestic law"?

MR. AKROTIRIANAKIS:  Vague as to time.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**Page 256**

CERTIFICATE OF COURT REPORTER

I, CHRIS LANG, an Accredited Real-time Reporter, hereby certify that the testimony of the witness YARON SHOHAT in the foregoing transcript, taken on this 29TH day of AUGUST, 2024 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Name:   CHRIS LANG

Date:   8/29/24

# EXHIBIT 5

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANT NSO GROUP TECHNOLOGIES LIMITED'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES NOS. 1-3, 6-9**<br><br>**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**<br><br>Action Filed:   10/29/2019 |

SUPPLEMENTAL OBJECTIONS AND
RESPONSES TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES (1-3, 6-9)

Case No. 4:19-cv-07123-PJH

**ER-111**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Describe," "NSO Spyware," "Device," and "WhatsApp Computers." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that any of its technologies "accessed or used any WhatsApp Computers") and is thus argumentative. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control. NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO products or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objections to the defined terms "Describe," "NSO Spyware," "Device," and "WhatsApp Computers." NSO will interpret those phrases as defined above. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control. NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the

SUPPLEMENTAL OBJECTIONS AND
RESPONSES TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES (1-3, 6-9)

9

Case No. 4:19-cv-07123-PJH

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

Subject to and without waiving these objections, NSO responds that Pegasus was generally configured to operate in three stages: (1) a government Pegasus user would trigger an installation process to initiate contact with a target device to install a Pegasus agent, (2) pursuant to those instructions, the target device would eventually reach out to a third-party server to obtain and install the Pegasus agent, and (3) the government Pegasus user would interact with the Pegasus agent on the target device to perform the desired surveillance activity.  With respect to the Accused Technologies—Heaven, Eden, and Erised—only the initial installation phase made use of any WhatsApp Computer.  The Pegasus agent was ultimately installed on a monitored device and no WhatsApp Computer was involved in any data exfiltration.

## 1.  Eden

The Eden installation process began with a "fingerprinting" stage, whereby Eden would gather information about the callee (target) device. This information gathering included querying the WhatsApp server whether the callee device was associated with an active WhatsApp account, using normal APIs that the server made available, using the exact same process that occurs every time a WhatsApp user inputs a new phone number and attempts to contact that callee device. Eden also obtained information about the callee device (such as whether the callee device was online) by exchanging messages with that callee device over WhatsApp servers.  None of this activity accessed any part of the WhatsApp servers that was off limits to WhatsApp users.

After the information gathering described above, Pegasus would establish a VoIP call connection with the callee device through WhatsApp servers. Specifically, Pegasus would send a "call offer" to a WhatsApp signaling server (which is the server responsible for establishing VoIP call connections between clients) requesting to be connected to the callee device. WhatsApp signaling servers are configured to pass that request to the callee device.

The WhatsApp signaling server permitted the call offer to include values for various call settings and parameters. These included a string parameter named "connecting_tone_desc" and a

| SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES (1-3, 6-9) | 10 | Case No. 4:19-cv-07123-PJH |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

call setting for enabling an XOR cipher. Eden set the value of the "connecting_tone_desc" parameter to a string defining a shell script and executable, which the callee device would later execute. Eden would also enable the XOR cipher made available by the WhatsApp server. The WhatsApp signaling server was configured to simply pass the call offer, including those parameter values, to the callee device. The WhatsApp server did not execute or interpret the shell script or executable. Nor did the WhatsApp server perform any function that it was not programmed to perform on behalf of all users.

The WhatsApp signaling server did not execute any Eden code, and thus, Eden did not obtain any access to the signaling server that exceeded its authorization. Rather, Eden simply used the signaling server as a conduit through which to pass parameter values to the callee device.

Eden then exchanged additional messages with the callee device to obtain additional information about that device, such as whether it was a 32-bit or 64-bit device. Eden exchanged these additional messages with the callee device using traditional and legitimate functions of the WhatsApp relay server, including those enabling relay negotiation and bandwidth estimation between devices.

After Eden determined whether the callee device was 32-bit or 64-bit, it would send a duplicate call offer message to the callee device through the WhatsApp servers to do a transport restart.

Eden then exchanged additional messages with the callee device to configure the callee device to disclose certain memory information. These messages included oversized bandwidth estimation packets that caused the callee device to overwrite certain pointers.

Eden then upgraded the call to a group call, wherein the participating devices exchange additional messages, including capability buffers and pre-accept messages (standard procedures in the WhatsApp VoIP system). These messages included parameter values that pointed to and enabled execution of the shell script sent in the "connecting_tone_desc" parameter earlier in the process.

Finally, Eden would terminate the calls by sending the standard call termination message

| SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES (1-3, 6-9) | 11 | Case No. 4:19-cv-07123-PJH |
|---|---|---|

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  NSO further objects to the extent this interrogatory seeks disclosure of NSO's third-party clients, as the Court has ordered that Defendants need not disclose those clients (Dkt. No. 292 at 5).

Subject to and without waiving these objections, pursuant to Federal Rule of Civil Procedure 33(d), NSO responds that it is in the process of producing unredacted documents from Production Volume 8 (and potentially other volumes) that contain information responsive to this interrogatory.  This includes, but is not limited, to NSO_WHATSAPP_00012913 and NSO_WHATSAPP_00044814, which were reproduced to the plaintiffs on September 13, 2024.

Dated: September 13, 2024                KING & SPALDING LLP

                                         By:    /s/ Joseph N. Akrotirianakis
                                                JOSEPH N. AKROTIRIANAKIS
                                                AARON S. CRAIG

                                                Attorneys for Defendants NSO
                                                GROUP TECHNOLOGIES LIMITED
                                                and Q CYBER TECHNOLOGIES
                                                LIMITED

SUPPLEMENTAL OBJECTIONS AND                    24                Case No. 4:19-cv-07123-PJH
RESPONSES TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES (1-3, 6-9)

# EXHIBIT 6

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

H I G H L Y   C O N F I D E N T I A L

ATTORNEYS' EYES ONLY

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

Case No. 4-19-cv-07123-PJH

-----------------------------------

WHATSAPP INC., a Delaware corporation,

and META PLATFORMS INC., a Delaware corporation,

    Plaintiffs,

v.

NSO GROUP TECHNOLOGIES LTD and

Q CYBER TECHNOLOGIES LTD,

    Defendants.

-----------------------------------

Deposition of TAMIR GAZNELI, taken by AILSA
WILLIAMS, Certified Court Reporter, held at the
offices of Davis Polk & Wardwell, London, United
Kingdom, on 4 September, 2024 at 9:00 a.m

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 78

Q WhatsApp client that was being used as part of the R&D?

A They were not activated against the real WhatsApp server because about they were used in the internal server.

Q So the endpoint WhatsApp client that was being tested during that phase when you were working in the internal environment, that was not an actual WhatsApp client?

MR. AKROTIRIANAKIS: Object to the form of the question. Also misstates his testimony.

A I would say towards the actual WhatsApp client, it was connected and activated towards the internal WhatsApp server.

Q And as part of that phase of the development, did NSO create WhatsApp accounts?

MR. AKROTIRIANAKIS: Object to the form of the question. Also vague.

A How to define WhatsApp account? Is WhatsApp account a live WhatsApp account that is connected to a real WhatsApp server?

Q Do you have WhatsApp?

A Yes.

Q Did you create an account when you signed up for WhatsApp?

Page 79

A Yes.

Q So you understand what that means, in terms of creating a WhatsApp account?

A I understand what you mean in this question. That is why I asked the previous question.

Q So --

A When you say activating WhatsApp account, it is not real if it is not connected to a real WhatsApp server.

Q So in the sense that you created a WhatsApp account -- before I ask that, what phone number is your WhatsApp account associated with?

A With my personal phone number.

Q And what is that phone number? The reason I ask is because we have some WhatsApp chats that have numbers without names and so we would like to be able to determine whether you are the person on them.

A Okay. So you ask for my phone number?

Q Yes, please?

A 0508803185.

Q Thank you. Again, it is not to invade your privacy. It is so we can match it to

Page 80

documents.

Q Were any live WhatsApp accounts created during any phase of the testing of the Hummingbird vectors by NSO?

A Yes.

Q Could you say approximately how many?

MR. AKROTIRIANAKIS: Objection, foundation.

Q You understand you are designated as a corporate representative on the research and development of the relevant spyware, right?

A I wouldn't call it spyware.

Q I am just reading from the actual topic. You understand you are designated on that?

MR. AKROTIRIANAKIS: He is designated on the topics as phrased in NSO Group Technologies and Q Cyber Technology Limited's objection and responses to the notice of deposition.

Q And you understand that that includes research and development of software including the Hummingbird vectors?

A Yes.

Q You are here to present NSO and Q Cyber's full corporate knowledge on those topics,

Page 81

right?

A Yes.

Q And so could you say approximately how many WhatsApp accounts were created as part of the testing of the Hummingbird vectors?

A I don't have the exact number, but I can estimate it is about 50 numbers.

Q And then when the Hummingbird vectors are actually used, are additional WhatsApp accounts created at that point?

A At the customer?

Q In connection with use by a customer, if that is how you would like to phrase it?

A Yes.

Q Do you have any understanding of approximately how many times -- let me put it this way -- on how many target devices the Hummingbird vectors have been successfully used by NSO?

MR. AKROTIRIANAKIS: No foundation.

A When you say Hummingbird was used, what do you mean by that?

Q Used as -- successfully used as an installation vector to cause the installation of the agent?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

A   In which timeframe?

Q   What I will call the relevant timeframe, so April 2018 to May 2020?

MR. AKROTIRIANAKIS:  Object to the form of the question.

A   I don't have an exact number.

Q   Approximately?

MR. AKROTIRIANAKIS:  No foundation.

A   So you ask in terms of how many times customers tried to use Hummingbird?

Q   Successfully?

A   Customers?  The question is about customers?

Q   How many times the Hummingbird vectors were successfully used to install the agent on a target device during the relevant period?

MR. AKROTIRIANAKIS:  No foundation.

A   I don't have the exact number.

Q   I understand you don't have the exact number.  I am asking for an approximate number.  Tens, hundreds, thousands, tens of thousands?

MR. AKROTIRIANAKIS:  No foundation.

A   It is not tens of thousands but it

Page 83

is not hundreds.

Q   So thousands?

A   In between, yes.

Q   In between hundreds and hundreds of thousands?

A   No.

MR. AKROTIRIANAKIS:  Objection, misstates his testimony?

Q   In between what?

A   In between hundreds and tens of thousands.

Q   Got it.  When NSO researchers created live WhatsApp accounts, as part of the R&D that led to the Hummingbird vectors, did they install WhatsApp via web, via mobile or how did they install it?

A   On the device itself.

MR. AKROTIRIANAKIS:  Objection, misstates his testimony.

Q   So via mobile?  On a mobile device?

A   On mobile device.

Q   The term "Pegasus", does that to you mean the agent or is it broader than the agent?

A   This is the name of the product.

Q   And does that include the

Page 84

installation vectors or would Pegasus be the agent itself?

MR. AKROTIRIANAKIS:  Objection, vague.

MR. PEREZ-MARQUES:  I just want to clarify our terminology so I can make the questions clearer.

A   The product that is called Pegasus eventually delivers the data to the customers which are sent to the customers by the agent, and and the agent installed using installation investigators.

Q   And so the agent is part of Pegasus?

A   Yes.

Q   And the installation vectors are part of Pegasus?

A   Yes.

Q   And the agent is the piece of Pegasus that actually delivers information to customers?

A   Yes.

Q   And that information is obtained from the target devices?

A   Yes.

Q   And so you are familiar with Pegasus, yes?

Page 85

MR. AKROTIRIANAKIS:  Objection, vague.

A   In what terms?

Q   I mean you are the head of R&D at NSO.  You are familiar with Pegasus?

A   Yes.

Q   And you are familiar with the agent?

A   Yes.

Q   Did you have any role in the development of the agent?

A   No.

Q   Are you familiar with the source code for the installation vectors, the Hummingbird vectors?

A   As I said before, part of it, but not all of it.

Q   What part are you familiar with?

A   No specific part.  I said I don't recall any -- each of the lines of the --

Q   You mean you are generally familiar with the source code for the Hummingbird vectors?

A   Yes.

Q   And you are familiar with how the agent functions?

MR. AKROTIRIANAKIS:  Objection, vague.

A   Because I was never part of agent

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 106

require any interaction by the target.

Q   And why is that preferable?

MR. AKROTIRIANAKIS:  Objection, misstates his testimony.

A   From the customer's point of view, 0 click installation vectors are more concealed and they enable them to execute their operations in more concealed ways.

Q   Is it harder to research and develop a 0 click installation vector than a 1 click?

A   It is not a matter of harder or not. It is different expertise.

Q   In what sense is it a different expertise?

A   The researchers working on 0 click vectors installation flows are required to think of ways how the installation vector can be executed without the need for the target to interact with the device.

Q   I understand it is a different question that they are trying to answer, but why is the expertise different?

A   When I say expertise I mean that the researchers that are required to research these type of vectors have additional questions to

Page 107

answer and one of the questions is the interaction, as we discussed, and that requires additional capabilities in terms of their expertise.

Q   So I would like to go back to Exhibit 2032, which you still have in front of you.  The next section on page 3 has a section titled "Benefits of our endpoint solution".  Do you see that?

A   Yes.

Q   And the first benefit identified is global coverage.  Is that right?

A   Yes.

Q   It states:

"Monitor targets' devices while they connect to the internet from any location."

Right?

A   Yes.

Q   And there are no geographical locations identified, right?

A   It defines the potential factor.  It does not define anything that relates to a specific customer.

Q   And there are no geographical limitations identified there, right?

Page 108

A   As I said, this defines the potential capability of this vector, yes.

Q   Of Pegasus?

A   Of the solution.

Q   Is that an accurate statement of Pegasus' capabilities?

MR. AKROTIRIANAKIS:  Objection, vague.

A   Different vectors have different limitations, so it is not a general statement that you can make about each and every capability in Pegasus.

Q   But this is not a statement about vectors, is it?  It is about the agent, isn't it?

A   I will have to read it.

Q   It says "Monitor target's devices while they connect to the internet from any location."

A   But this is one sentence.  Out of context, I am not sure it answers the question.

Q   It is the agent that monitors target devices, right, not the vector?

A   The agent is the one that monitors target devices, yes.

Q   And is it correct that Pegasus can monitor a target's devices from any location?

Page 109

A   As for the potential of the agent, yes.

Q   The next bullet states:

"Unlimited access to targets' mobile devices.  Remotely and covertly collect information about a target's relationships, locations, phone calls, plans and activities."

Do you see that?

A   Yes.

Q   And is that an accurate statement of Pegasus' capabilities?

A   Yes, it is like.

Q   A few bullets down there is a bullet that begins "Operate target devices".  Do you see that?

A   Yes.

Q   It says:

"Activate the microphone to listen in on a target's environment.  Turn on the camera to take snapshots and take screenshots to collect non-communications data of high intel value."

Is that an accurate statement of Pegasus' capabilities?

A   Yes.

Q   Is it fair to say that the purpose

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 110

of Pegasus is to obtain information from a target's devices?

A  Yes.

Q  And among other capabilities Pegasus has the ability to turn on a device microphone?

A  In some types of agents, yes.

Q  And to take photos with a device camera, that is also a capability of Pegasus?

A  Yes.

Q  And it had those capabilities in 2019?

A  Yes.

Q  And it continues to have those capabilities today?

A  As I said before, it depends on agents, the specifics of the agent.

Q  How so?

A  Eventually the vector defines what are the capabilities that the agent can ask.

Q  So certain vectors can only make available certain functionality of the agent?

A  Yes.

Q  And with respect to Pegasus as installed by the Hummingbird vectors, did Pegasus in 2019 have the capability to turn on device

Page 111

microphones and take snapshots?

A  Yes.

Q  The section I read also describes the information obtained as having high intel value.  Do you see that?

A  Yes.

Q  And do you agree that the information obtained by Pegasus is valuable?

MR. AKROTIRIANAKIS:  Objection, beyond the scope of the designation of this witness.

A  The value of the intel is in the eyes of the customer.

Q  And the information is valuable to NSO's customers, yes?

MR. AKROTIRIANAKIS:  Objection, beyond the scope of the designation.  No foundation.

A  Eventually the customers seek to get access to the data that is on the device, and part of it is using microphone and camera, snapshots, as it states here.

Q  And not limited to microphone and snapshots, but the information obtained through Pegasus is valuable to NSO's customers.  Isn't that right?

MR. AKROTIRIANAKIS:  Object to the form

Page 112

of the question.  It is beyond the scope of the designation.  Also no foundation.

A  We believe that this is information that customers would like to get access to.  That is why we developed the capabilities.

Q  Right, and because they consider it valuable, they are willing to pay NSO typically millions of dollars to license the Pegasus technology.  Right?

MR. AKROTIRIANAKIS:  Objection, beyond the scope of the designation for this witness.

A  Because they value the information they are willing to buy the software in order to use it.

Q  Do you know whether they buy the software versus license the software?

A  From my point of view, this is a legal term.

Q  Okay, not your area.  Right?  Section 2.2 on the next page is titled "Technology Highlights".  Do you see that section?

A  Yes.

Q  It says:

"The EPS solution uses cutting edge technology."

Page 113

Do you agree with that characterization?

A  Yes.

Q  If we go to page 6, there is a section 3.2 titled "Agent Installation Vectors".  Do you see that?

A  Yes.

Q  It states that:

"Installing an agent on a target's device is the heart of any intelligence operation using EPS."

Do you see the language I just read?

A  Yes.

Q  Do you agree with that?

MR. AKROTIRIANAKIS:  Objection, beyond the scope of the designation of the witness.

A  This is what it says.

Q  Do you agree with it?

MR. AKROTIRIANAKIS:  Same objection.  No foundation.

A  I would read the entire sentence, which states "Installing the agent on target's device is the heart of any intelligence operation using EPS, and each installation is carefully planned to ensure success."

Q  Do you agree with that?

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 154

A  Yes.

Q  Did you have any role in preparing this document?

A  No.

Q  Do you know approximately when it was prepared?

A  Not the exact date but if I remember right it was around the beginning of 2018.

Q  The first section there says "Assets we want to protect".  Do you see that?

A  Yes.

Q  And "protect" means protect from discovery by third parties?

MR. AKROTIRIANAKIS:  Object to the form.

A  Protect from being discovered at all.

Q  The first one listed there says:

"Resources of value we want to protect."

The first one is:

"Exploits and techniques that are being used as part of the installation vector.  The most important asset we want to protect, the WhatsApp exploit."

Do you see that?

A  Yes.

Page 155

Q  And that refers to the 0 click WhatsApp exploit that was known at this time as Heaven?

MR. AKROTIRIANAKIS:  Objection.  The question is vague.

A  At that particular time that was the exploit.

Q  Why was the Heaven exploit the most important asset that this team wanted to protect?

MR. AKROTIRIANAKIS:  Objection, misstates the document.

A  Again, this is the OpSec team's assessment of the specific capability, and he was directed to assess the Heaven capability, and as part of all the resources which are listed here, and we can go over each and every one of them, protecting the exploit is the most important in this list.

Q  More important even than the clients' identities?

A  Yes --

Q  More important than target awareness?

A  In order to be able to handle the risks in terms of client's identity, so target

Page 156

awareness, you wanted to start having the ability, the vulnerability, so yes.

Q  Below that there is a section titled "Solution Highlights", and the first thing under that says with some asterisks "New silent fingerprint".  What does that refer to?

MR. AKROTIRIANAKIS:  Objection, foundation.

A  I need to review it.

Q  Please.

A  So this is the description of new silent fingerprint that was suggested at that time.

Q  And what was the new silent fingerprint?  What does that refer to?

A  To a way of implementing the fingerprint.  The "new" comes in terms of new way to implement it.

Q  And what was new about it?

A  Different number of messages, different type of activities in terms of client endpoint and target, yes.

Q  Before we continue with that section, in the resources of value we want to protect, number 5 says "Live systems (IS\PS\WIS)."

Page 157

A  Yes.

Q  What is IS?

A  Installation server.

Q  Installation server.  And what is PS?

A  Pegasus server.

Q  What is WIS?

A  This is the acronym of WhatsApp installation server, but it means an Android server which is responsible for installing the end solution.

Q  And installing it by transmitting a message through WhatsApp?

MR. AKROTIRIANAKIS:  Objection, misstates testimony.

A  Installing it by sending the required messages to the target's WhatsApp client.

Q  And you understand that those WhatsApp messages travel through WhatsApp's ecosystem?

A  Any message in the WhatsApp ecosystem travels through WhatsApp's ecosystem.

Q  Including the ones that were being sent as part of the Hummingbird installation vectors, right?

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 158

A   Yes.

Q   Under "New silent fingerprint", it says:

"In order to get target's device, OS details plus WA client version, we need to send a fingerprint request."

Do you see that?

A   Yes.

Q   And OS is operating system, right.

A   Yes.

Q   And WA client version, that is what version of WhatsApp the target is running?

A   Yes.

Q   It says:

"Fingerprint is done by sending a forged request from a client that mimics a server response to the target WA client."

What does that mean?

MR. AKROTIRIANAKIS:  Objection.  No foundation.

A   As I read it, it means send specific message from one client to the target client.

Q   What does it mean that it is a forged request?

MR. AKROTIRIANAKIS:  Objection, no

Page 159

foundation.

A   Again, as I read it --

Q   Before you continue, you are designated as the corporate representative on the full functionality of Pegasus during this time period.  Yes?

A   Yes.

Q   And you are prepared to bring to bear NSO and Q Cyber's full corporate knowledge on that topic?

A   Yes.

Q   Okay.  So what does "forged request" mean?

MR. AKROTIRIANAKIS:  Objection, no foundation.  You also misstated the witness' obligation and the company's obligation under rule 30(b)(6).  If you understand the question you can answer it.  You can go ahead.

A   It says that it mimics servers response to the client's target.

Q   What does it mean -- sorry, were you finished?

A   Yes.

Q   What does it mean that it mimics the server response?

Page 160

A   This is a response that the server generates, and it mimics that message towards the client, the target's client.

Q   So it sends a message that appears to be a server response?

A   Yes.

Q   But is not an actual server response?

A   It could be a server response but it was generated by the source client.

Q   And the source client is a client that NSO developed, right?

A   Yes.

Q   Did that source client have a name by which you referred to it?

A   This is implemented inside the WIS server.

Q   So within the WIS server there is a source client created by NSO.  Is that right?

MR. AKROTIRIANAKIS:  Objection, misstates his testimony.

A   It includes the required functionalities that are relevant and required for this purpose of this vector.  Not an entire client.

Page 161

Q   Got it.  So it doesn't necessarily have everything that a real WhatsApp client would have, correct?

MR. AKROTIRIANAKIS:  Objection.

Q   But it has sufficient aspects --

MR. AKROTIRIANAKIS:  Objection.  The question is vague.

Q   But it has the aspects of the WhatsApp client that are necessary to carry out the installation vector?

MR. AKROTIRIANAKIS:  Object to the form of the question.

A   It has the ability to send messages from that source to the target's client application.

Q   And would you refer to that source client as the WIS or would you have another way to refer to it?

A   WIS.

Q   Got it.  Okay.  To be clear, the WIS is not an actual WhatsApp client, correct?

A   This is not an actual WhatsApp client.  It uses part of the protocol capabilities to be sent from one source to the target.

Q   So NSO created its own source client

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 262

A   No.

(Exhibit 2039 marked for identification.)

Q   This is Exhibit 2039, which is a WhatsApp chat from May 12, 2019. Again various participants. In the second page Tomer Timor has a message. Who is Mr. Timor?

A   He was, if I am right, at that stage presales employee.

Q   Presales?

A   Yes.

Q   He says in the sort of third paragraph down:

"So bottom line, Eden has finished its duty with us as a patch was done on the server side with the application it works with."

Do you recall this event?

A   Yes.

Q   And what does that refer to? What is the event that is being described here?

A   Closure of ability to trigger the vulnerability on the target's WhatsApp client.

Q   So this reflect WhatsApp's remediation of the exploit that is described in the complaint?

MR. AKROTIRIANAKIS:  Objection, calls

Page 263

for a legal conclusion. No foundation.

A   It refers to changes that were done, whether on the server side and the client side, in order to prevent us from triggering the vulnerabilities.

Q   And so after this point, after that update in May 12 or around May 12, 2019, was NSO able to use Eden after that point?

A   No.

Q   In the next paragraph down he said:

"I heard some sales managers talking in a dramatic way. Your job is to make sure they remember that along the years NSO has proven time after time that one of its biggest value is the ability to 'survive' this harsh environment of the cat and mouse game."

Do you see that.

A   Yes.

Q   What does that refer to?

MR. AKROTIRIANAKIS:  Objection, no foundation.

A   This is a domain that you are not in control how long your capability will prolong at least for total control, and that is why he quotes cat and mouse game. The ecosystem that you were

Page 264

working or acting makes changes eventually, forces you to adjust it.

Q   So NSO designs an exploit, the exploit gets shut down. NSO designs another, right?

MR. AKROTIRIANAKIS:  Objection, misstates his testimony.

Q   Is that generally the cat and mouse game?

MR. AKROTIRIANAKIS:  Misstates testimony.

A   This is the domain that you have to stay -- to keep and find new vulnerabilities after the systems get changed.

Q   That is just inherent to the domain in which NSO operates, right?

A   Yes.

Q   When something gets shut down, you have to work to develop another?

MR. AKROTIRIANAKIS:  Objection, misstates his testimony.

A   Eventually you have to provide -- you want to provide the 1 click and 0 click solutions to customers, and it doesn't relate to a specific service or application.

Page 265

Q   And at this point in May 2019 when the WhatsApp update prevented Eden from working did NSO have any 0 click Android solutions?

A   No.

Q   Did the R&D group subsequently find another 0 click installation vector for Android devices?

A   Yes.

Q   What was that?

A   ERISED.

Q   When was ERISED approved for production?

A   I don't recall the exact date.

Q   If we back to the exhibit we were looking at, in that same message from Mr. Timor he says:

"R&D are working hard on different directions. Hopefully we will have good news soon, but please remember that our technological status is still great as we as a company have the resources to find something new in a relatively short time."

Do you agree with his statement, sir?

A   He was optimistic.

Q   Is it accurate that at this point,

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 266

in May 2019, NSO's R&D group was working hard on potential solutions to restore 0 click capability?

A   As a research group and development team, you constantly work on research in order to find possible ways, rapid solutions.  As I explained before, eventually we are producing a product for customers.

Q   And that is still true today, right?

MR. AKROTIRIANAKIS:  Objection, vague.

A   This is our business.

Q   So you don't remember when ERISED was approved for production?

A   No, not the exact time.

Q   Do you remember when ERISED began to be used by customers, approximately?

A   It is really not an exact time.  I couldn't tell.

Q   What is your best estimate?

A   If I recall right, it was close to the end of the year.

Q   So late 2019?

A   If I recall right.

Q   And I understand you are only answering questions up to May 2020.  Is that right?

Page 267

A   Yes.

Q   And up to that date in May 2020, did ERISED remain in use?

A   Yes.

Q   So as to whether NSO has ever stopped using ERISED, I assume that is a question you are not willing to answer?

A   Regarding ERISED, the vulnerabilities in ERISED was not in WhatsApp at all and that part was eventually closed.

Q   So you are willing to answer that question about after May 2020?

A   I am answering a question about ERISED capability --

Q   Where was the vulnerability that was exploited by ERISED?

A   Specific part in one of Samsung related code.

Q   So was ERISED limited to Samsung devices?

A   Yes.

Q   But did it also work by transmitting WhatsApp messages?

A   It was our decision whether to trigger it using WhatsApp messages or not.

Page 268

Q   So it could be triggered using WhatsApp messages?

A   Yes.

Q   And were those WhatsApp messages sent via WhatsApp servers?

A   Yes.

Q   And similar to what we saw about Heaven, those were non-standard WhatsApp messages?

MR. AKROTIRIANAKIS:  Object to the form.

A   As I said before, some of them maybe were non-standard but not all of them.

Q   Were the messages, the WhatsApp messages that were sent as part of ERISED installation, were those also originated from the WIS?

A   Yes.

Q   So just at a high level if you can, how was ERISED different from Eden?

A   So ERISED didn't use any voice or video call to be established, and didn't use any relay server for communication in the installation flow.  As I explained before, it triggered vulnerability which was outside the application of WhatsApp and only used WhatsApp messages to be able to trigger the specific code in which the

Page 269

vulnerability resides.

Q   So under ERISED NSO used WhatsApp messages to trigger a vulnerability in the Samsung system?

A   Yes.

Q   And then triggering that vulnerability would then cause the further steps of the installation flows?

A   Yes.

Q   Was a stager delivered through WhatsApp servers as part of ERISED?

A   Not the exact same but modifications of it.

Q   Just to be clear, after -- and were the same fingerprinting methods used?

A   Part of it, because as we talked before ERISED required also additional information whether the vendor is Samsung or not.

Q   Just to be clear, after WhatsApp closed the vulnerability that was being exploited by Eden in May 2019, NSO worked on developing a new 0 click exploit that also worked, at least in part, by transmitting WhatsApp messages.  Yes?

MR. AKROTIRIANAKIS:  Misstates testimony.

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270

A   We researched for a new solution. We found vulnerability in the system which was specific for Samsung and we decided to implement it and build installation flow based on WhatsApp application.

Q   And after WhatsApp closed the vulnerability that was being exploited by Eden, NSO succeeded in developing a new 0 click installation vector that operated in part through delivering WhatsApp messages, yes?

MR. AKROTIRIANAKIS:  Misstates testimony.

A   We found additional vulnerability which we were able to build installation for using that.

Q   And that installation vector, ERISED, which used WhatsApp servers and WhatsApp messages remained in use by NSO customers as of at least May 2020.  Is that right?

A   Yes.

Q   So, with this lawsuit pending, NSO was actively making available to its customers a 0 click exploit that involved the transmission of messages over WhatsApp servers?

MR. AKROTIRIANAKIS:  No foundation.

Page 271

A   I don't recall the exact time that the lawsuit was filed.

Q   It was filed in October 2019.  So with that context, with this lawsuit pending NSO was actively making available to its customers a 0 click exploit that involved the transmission of messages over WhatsApp servers.  Correct?

A   Yes.

Q   And as to NSO continues to make available to its customers a 0 click exploit that uses WhatsApp servers, you are not willing to tell me.

A   No.

Q   No, you are not willing to tell me?

MR. AKROTIRIANAKIS:  We already had this conversation, counsel.

MR. PEREZ-MARQUES:  Is that right?  I just want to make sure I understand the "no".  The no is you won't tell me, right?

A   I can't tell you.

MR. PEREZ-MARQUES:  Okay.  Why don't we take a short break.

THE VIDEOGRAPHER:  Going off the record. The time is 16:57.  End of media card five, volume one, of the video deposition of Tamir Gazneli.

Page 272

(A short break.)

This is the beginning of media card number six, volume one, in the video deposition of Tamir Gazneli.  Going on the record.  The time is 17:14.

Q   Do you understand you are still under oath?

A   Yes.

Q   I would like to show you another exhibit.  This is Exhibit 2040.

(Exhibit 2040 marked for identification).

It is another Confluence document labelled or titled "Deviate installations on white environment from 12/01/2020".  Do you see that?

A   Yes.

Q   Do you recognize this document?

A   Yes.

Q   What is it?

A   This is the output of QA team that was responsible for testing the capabilities or statistical behavior.

Q   Capabilities or statistical behavior of what?

A   In this timeframe it is for ERISED.

Q   And so what is -- the second column

Page 273

here in the chart says "ERISED ID".  What does that reflect?

A   It is numbering of the devices that were used for ERISED testing.

Q   Test target device?

A   No.  Our devices that were used to test the behavior, statistical behavior of the vector.

Q   Got it.  What I meant when I said "test target device", I meant that on the target side of the exploit you were using a test device?

MR. AKROTIRIANAKIS:  Object to the form of the question.

Q   Do you understand what I mean?

A   We use device on which we test how the installation vector works and behaves.

Q   Okay.  And is the test device acting as the sender of the exploit or the recipient of the exploit?

A   Recipient.

Q   That is what I meant by test target device.

A   Okay.

Q   So these are all NSO-controlled devices on which the ERISED is being tested?

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 274

A  Owned and controlled, yes.

Q  And some of the numbers it looks like repeat.  Do you see that?  For instance ER11 shows up a couple of times on page 1?

A  Yes.

Q  And so that reflects that it is being tested more than once on the same device?

A  Yes.

Q  Do these reflect the results of the testing?

A  I don't see the results here.

Q  It looks like the document may be cut off.  It looks like there is another column that we can only see part of, right?

A  I expect it to be results for each attempt, but I don't see any results here.

Q  And typically in this type of document, based on your experience, you would expect to see results of the tests?

A  At least the outcome of the attempt.

Q  And you don't see that here, as produced?  I am not sure we got your answer.

A  I cannot see the result here.

Q  And the column that is headed "QA version" that would be the version of WhatsApp

Page 275

that is being run on the target device or the test device?

A  Yes.

Q  Okay.  When it says "Deviate installations", what does that mean?

A  Deviate was just part of the ERISED used -- part of the code.

Q  What part was that?

A  It was specific part for the exploitation flow, that was part of the general remote code execution capability in ERISED.

Q  Part of the remote code execution capability?

A  Yes.

Q  And so was Deviate the part of the code that worked with the Samsung vulnerability?

THE VIDEOGRAPHER:  Sorry, one second.  It is okay.

Q  My question was was Deviate the part of the code that worked with the Samsung vulnerability?

A  Yes.

Q  And so this chart here reflects attempts to install Deviate on test devices?

Page 276

MR. AKROTIRIANAKIS:  Objection, misstates the document.

A  It is a list of attempts to define what is the statistical behavior of this part of the installation, yes.

Q  And so with respect to these WhatsApp versions, would that reflect that ERISED was being used at least at the time that those versions of WhatsApp were released?

MR. AKROTIRIANAKIS:  Objection, misstates the document.  Also vague.

A  Can you repeat the question, please?

Q  Yes.  With respect to those WhatsApp version numbers that go along with at least many of these tests, this would reflect that ERISED was being at least tested during the time that those WhatsApp versions were available?

A  Yes, tested, for sure.

Q  You can put that aside.  Are you aware that the Heaven exploit in its code included hard coded references to S.WhatsApp.net?

A  S.WhatsApp.net is a domain name.

Q  Mm hmm.  And are you aware that that was coded into the Heaven source code.

MR. AKROTIRIANAKIS:  Object to the form

Page 277

of the question.  Assumes facts not in evidence.

A  Which code.

Q  The Heaven code?

A  Yes, if I recall right, yes.

Q  Yes, it was coded in there?

A  Yes.

Q  And you said S.WhatsApp.net is a domain.  Is that right?

A  It is a domain name, yes.

Q  And where would that domain take the traffic?

A  I don't know.

Q  But a WhatsApp server, is that right?

A  This is, if I recall right, the domain name of the signaling WhatsApp server.

Q  Okay.  So that is -- S.WhatsApp.net is the domain name of a WhatsApp signaling server?

A  If I recall right.

Q  And so including S.WhatsApp.net in the Heaven source code would do what, with respect to the WhatsApp signaling server?

A  Communicate through that WhatsApp signaling server.

Q  It would direct the communication to

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 290

would NSO do as part of the demonstration of the Pegasus software?

A   Use an ecosystem which was built for the demonstrations, for example, we saw the sales 3, and used company owned devices in order to demonstrate the behavior and the abilities on it.

Q   When you say used company owned devices, you mean as the target, right?

MR. AKROTIRIANAKIS:  Object to the form of the question.

A   As the device on which the installation was conducted.

Q   And so in terms of -- if we imagine a demonstration of Pegasus, that would work through WhatsApp's servers the same as if it was an actual use by a customer.  Is that right?

A   In terms of WhatsApp server, yes.

Q   And is the same true with respect to testing, that that would operate through WhatsApp servers the same way as an actual use by a customer?

A   Testing in an external environment?

Q   Yes.

A   Yes.

Q   If you know, what service providers

Page 291

did defendants use to procure servers for use in connection with Pegasus?

A   I don't know.

Q   I believe that is a topic on which you are designated, but let me just check.  The topic was "you or any relevant spyware's use of any third party server, including the AWS server to access plaintiff's computer", and your counsel said that you would testify as to defendant's understanding of the development of the accused technology in use between April 29, 2018 and May 10, 2020, including general information about defendant's use of third party servers in the accused technology.  Are you prepared to testify on that topic?

MR. AKROTIRIANAKIS:  Only if it was in the original topics.  In light of his testimony?

MR. PEREZ-MARQUES:  Do you have my question, Mr. Gazneli?

A   I remember that the -- saying that I was testifying about the use.

Q   The use of third party servers?

A   Use, not which specific third party servers they were.

Q   Okay.  So you don't know which third

Page 292

parties were used?

A   No.

Q   Do defendants have policies about which service providers it uses for servers in connection with Pegasus?

MR. AKROTIRIANAKIS:  Same objection.  Beyond the scope of the designation.

A   This is the same answer.

Q   What is the same answer?

A   I don't know.

Q   Did defendants ever lease servers or other computer infrastructure from Quadranet Enterprises LLC?

MR. AKROTIRIANAKIS:  Object to the form of the question.  No foundation.  Beyond the scope of designation.

A   Can you repeat the question?

Q   Did defendants ever lease servers or other computer infrastructure from Quadranet Enterprises LLC of Los Angeles, California?

A   I don't know if a server was leased by that company or not.

Q   If you wanted to find out the answer to that question, who would you ask?

A   The White Services.

Page 293

Q   Who is in charge of the White Services group?

A   Ramon.

Q   Ramon.  Did defendants ever lease servers or other computer infrastructure from 365 Online Technology JSC in Hanoi, Vietnam?

A   No.

Q   Did defendants ever lease servers or other computer infrastructure from Green Cloud Technology?

A   Again, it is under White Services responsibility.

Q   When you say Ramon, you mean Ramon Eshkar?

A   Yes.

Q   Going back to the fingerprinting stage of the Hummingbird vectors, the information that NSO is obtaining regarding the target device, you gave a few examples, operating system, whether it is online, whether it has WhatsApp installed.  Do you recall that, generally?

A   Yes.

Q   From where is NSO obtaining that information?

MR. AKROTIRIANAKIS:  Object to the form.

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 294

A   Except the parameter about whether the target has an active WhatsApp account, all the other information parts are from the target's client application.

Q   The target's WhatsApp client?

A   Yes.

Q   And does that go through the WhatsApp servers?

A   As any other message.

Q   And what about the information about whether the target is an active WhatsApp client? Where does that information come from?

A   This comes from WhatsApp server, as it comes for any other normal user when he enters new phone number in his contacts list.

Q   And when you say whether the target has an active WhatsApp account, what do you mean?

A   Activated WhatsApp account.

Q   That is different from whether like the app is in the foreground?

A   Yes.  Whether it ever has been activated WhatsApp account in a WhatsApp ecosystem.

Q   Apologies, because I know we covered this before, but for the Hummingbird vectors, did

Page 295

the fingerprinting work through the transmission of WhatsApp messages?

A   Yes.

Q   Okay.  And so prior to sending the WhatsApp message, that would tell you, the operating system, whether the app is in the foreground, would NSO first have to confirm from the WhatsApp server whether the user had an active WhatsApp account?

A   The first stage in the WhatsApp fingerprint was first checking that the target device number has an activated WhatsApp account. Then check the other three preliminary parameters, which is whether the target device is Android device, whether he is online, meaning it is connected to a network, and whether he is in foreground or not.

Q   And if the target was in foreground would you proceed with the installation?

A   No.

Q   And so before proceeding to the -- I will call it the second piece of the fingerprinting --

A   Yes.

Q   -- NSO would first have to confirm

Page 296

that the target had an activated WhatsApp account?

MR. AKROTIRIANAKIS:  Object to the form of the question.

A   This is one of the parts in the fingerprinting.

Q   And is it right to think of it as sequential, that you would only proceed to sending a message to the target's WhatsApp client only after you had first confirmed that the client had an activated WhatsApp account?

MR. AKROTIRIANAKIS:  Object to the form of the question.

A   There is no ability to send any message to a client which does not exist.

Q   So the first piece of information obtained as part of fingerprinting comes from the WhatsApp server?

A   Yes, as it comes to any other number that you have in list --

Q   And then the installation flow would not proceed -- would or would not proceed, depending on the answer, the information that NSO got from the WhatsApp server.  Right?

MR. AKROTIRIANAKIS:  Object to the form of the question.

Page 297

A   It was a decision of customer whether to proceed or not to the installation.

Q   If there is no WhatsApp activated account you could not proceed?

A   If there is no WhatsApp, no.  If there is a WhatsApp, the answer still may be no.

Q   And once the fingerprinting flow has confirmed that the client has an activated WhatsApp account, does it proceed automatically with the rest of the fingerprinting or is there a separate decision that gets made by an operator?

A   When you say "separate", which part do you mean?

Q   I mean one possibility is -- everything I just described happens in three milliseconds, and yes, the first step is to confirm whether there is an activated account, but then it immediately goes on to the remaining steps.  The other option is there is someone sitting at a computer, and they get a response that says this target has an activated account, and then they press a separate button that triggers the rest of the fingerprinting.  That is what I meant.

A   For information part, I explain

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 302

detection packet overwrote certain variables. Is that correct?

A  On the target client application?

Q  Yes.

A  Yes.

Q  Including the AF variable, is that correct?

A  Yes.

Q  And whether the AF variable was overwritten determined whether it was a 32 bit phone or a 64 bit phone. Is that right?

A  Yes.

Q  WhatsApp users using the official WhatsApp client could not send an oversized bit width detection packet, correct?

A  Correct.

Q  And could not overwrite the AF variable, correct?

A  Yes.

Q  And defendants obtained that information of 32 bit versus 64 bit from WhatsApp servers?

A  No.

Q  From the target device?

A  Yes.

Page 303

Q  Transmitted through WhatsApp servers?

A  Yes.

MR. AKROTIRIANAKIS:  Object to the form of that question.

Q  Defendants took that information and used it to design the next stages of the attack?

MR. AKROTIRIANAKIS:  Object to the form of the question.

Q  Such as choosing which payload to deliver?

MR. AKROTIRIANAKIS:  Same objection.

A  It was used to define how to proceed with the installation flow.

Q  And who made the decision as to how to proceed with the installation flow?

MR. AKROTIRIANAKIS:  Object to the form of the question.

A  Who in terms of person?

Q  Sure. Was that decision made by a person?

A  No.

Q  So how was that decision made?

A  By the installation server.

Q  It was made by the software

Page 304

developed by NSO?

A  Yes.

Q  A regular WhatsApp user using the WhatsApp client app can't obtain this 32 versus 64 bit information, can it?

A  Again the question?

Q  A regular WhatsApp user using the WhatsApp client app cannot obtain this information?

A  They can obtain it by other means on the device.

Q  But not through the WhatsApp client app?

A  Not through WhatsApp client app.

Q  And WhatsApp servers are not intended to disclose that information, is that right?

MR. AKROTIRIANAKIS:  Object to the form of the question.

A  WhatsApp servers are intended to block any unusual activity they would like to detect and block.

Q  After determining the bit width, defendants sent a duplicate call offer message. Is that right?

Page 305

A  Yes.

Q  And that was to reset the target device's internal memory?

MR. AKROTIRIANAKIS:  Object to the form of the question.

A  You would need to define what internal memory you refer to.

Q  Can you help me with that? You are the expert.

A  It was used to reset the specific memory area that was used in the application, WhatsApp application.

Q  And that would allow the next stage of the attack?

A  Yes.

Q  And WhatsApp users using the official WhatsApp client could not send the duplicate call offer message. Right?

A  Right.

Q  Did you explain those steps to defendants' expert?

A  I don't recall reviewing each and every step of the steps.

Q  The next step was to calculate the location of the LIB WhatsApp.SO file, right?

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

CERTIFICATE OF COURT REPORTER

I, AILSA WILLIAMS, an Accredited LiveNote Reporter, hereby certify that Tamir Gazneli was duly sworn, that I took the Stenograph notes of the foregoing deposition and that the transcript thereof is a true and accurate record transcribed to the best of my skill and ability.  I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which the deposition was taken, and that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

Before completion of the deposition, review of the transcript was requested.  Any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

*Ailse Jh Williams*

AILSA WILLIAMS
Dated:    September 6, 2024.

Page 335

E R R A T A

Deposition of Tamir Gazneli
(Please show all corrections on this page, not in the transcript.)
Page/Line No.      Description        Reason for change

Signed:   ....................
Name:
Date:      ...................

85 (Pages 334 - 335)

# EXHIBIT 10

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

--------------------------------X

WHATSAPP INC.                      :

a Delaware corporation, and        :

META PLATFORMS INC,                :

a Delaware Corporation:

                Plaintiffs    :

        v.                    :    Case No.

NSO GROUP TECHNOLOGIES LTD     :    4:19-cv-07123-PJH

and                            :

Q CYBER TECHNOLOGIES LTD       :

                Defendants     :

--------------------------------X

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of YARON SHOHAT

LONDON

THURSDAY, AUGUST 29TH, 2024

9:19 A.M. BST

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

Q. Yes.

A. Okay. Which page, please?

Q. Page 6, please.

A. Page 6.

Yes.

Q. Under section 2 in the second paragraph, do you see where it says:

"Pegasus deploys an invisible software (SW) component agent on a target's device which extracts and securely transmits data for intelligence analysis."

A. I see it.

Q. What does it mean that the agent was invisible?

MR. AKROTIRIANAKIS: Objection. Vague. No foundation.

A. I didn't write it. I don't know what it refers to.

Q. Are you familiar with the Pegasus technology that the defendants offer?

A. Of course.

Q. Okay. Does that technology deploy a software component that defendants describe as "invisible"?

A. It deploys an agent which the owner or user of the targeted device is not aware of. If that's what "invisible" means ...

Q. Does it deploy it in a manner that's invisible to the infrastructure used to install it?

MR. AKROTIRIANAKIS: Objection. Vague.

Page 47

A. I am not sure what you mean by "infrastructure".

Q. Okay, when you said "agent", what did you mean?

A. Piece of software.

Q. And what is the agent in the context of Pegasus?

A. The software of Pegasus, which is running on the targeted device.

Q. Okay, and what's an installation vector?

A. It is the way, the method, to deliver that agent on to the device.

Q. The second to last bullet on page 6 says:

"Cooperation with local MNO is not required."

Do you see that?

A. Where, exactly?

Q. The second to last bullet on page 6. On exhibit 2016 it says:

"Cooperation with local MNO is not required."

Do you see that?

A. I see that.

Q. Do you know what "MNO" stand for?

A. Yes.

Q. What is it?

A. Mobile network operator.

Q. Why does NSO highlight the fact that cooperation with the local mobile network operator is not required?

MR. AKROTIRIANAKIS: Objection. No foundation.

Page 48

A. Because competing solutions do require MNO cooperation. Some of the competing.

Q. Have defendants sometimes used Whatsapp infrastructure as part of an installation vector for Pegasus?

A. I wouldn't call it Whatsapp infrastructure. But if you ask if we -- if it might send Whatsapp messages, the answer's yes.

Q. Including with respect to zero click installation?

A. Yes.

Q. Does the operation of that Whatsapp related zero click installation vector require cooperation from Whatsapp?

A. No.

Q. Before operating that Whatsapp related zero click installation vector, did defendants ever inform Whatsapp about what they were doing?

MR. AKROTIRIANAKIS: No foundation.

A. I don't know if there were any discussions with Whatsapp personnel. Might. I am not aware of.

Q. So if it happened, you don't know about it?

A. I don't know about it.

Q. And now, as CEO of defendants, you have never become aware of a communication that defendants had with Whatsapp before deploying the Hummingbird installation vectors; correct?

A. If such discussions did occur, they were before the

Page 49

relevant period of 2019. So since then, there were not such discussions.

Q. And I am asking about whether those discussions occurred before 2019?

MR. AKROTIRIANAKIS: Objection. The question's incomplete. Or maybe not even a question at all.

A. I didn't say that there were discussions before 2019. I said that, if there were discussions, they were before 2019.

Q. But you are not aware of any discussion between defendants and Whatsapp before 2019; correct?

A. I am not aware. But it is definitely possible.

Q. Are you aware of any instance in which defendants have asked permission from a third party whose technology defendants are using as part of an installation vector for Pegasus?

MR. AKROTIRIANAKIS: Objection. No foundation.

A. I am not aware.

Q. Do defendants have installation vectors for Pegasus today?

A. Yes.

MR. AKROTIRIANAKIS: I am actually going to instruct the witness not to answer that question. The witness has now answered the question, but ...

Q. Have defendants sought permission from any third party

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

whose technology is involved in the provision of the installation vectors defendants used for Pegasus today?

MR. AKROTIRIANAKIS: I am going to instruct the witness not to answer that question, on the basis of the court's order docket number 292.

MR. BLOCK: Joe, we discussed this before.

MR. AKROTIRIANAKIS: We did.

MR. BLOCK: And I want to just state for the record, our understanding of that order is not a "limitation ordered by the court under rule 30 C2". It made no mention of any depositions and gives no basis for you to instruct the witness not to answer. You have referred, in relation to those instructions, to the court's Richmark analysis. The threshold question is whether the witness is prohibited from answering my question because of a non-US legal obligation. So if the defendants assert that a non-US law prohibits the witness from answering my question, please say so. We can decide later whether to ask the court to consider, under Richmark, what the result should be for the defendants' discovery and obligations in this case. But at this deposition, I respectfully request a clear statement from defendants as to the threshold issue.

So is it your position that a non-US law prohibits the witness from answering the question I asked?

Page 51

MR. AKROTIRIANAKIS: My position is that the court's order states that -- the court's order adopts the definition requested by you, with a time limitation imposed by the court, and says that you can seek further discovery from the court.

MR. BLOCK: Are you stating that the defendant is prohibited by a foreign legal obligation from answering the question that I asked? I understand, because I asked you that question before and you didn't, that you have not given that instruction. And so we object to your instruction to the witness not to answer as a violation of rule 30.

By Mr. Block:

Q. Mr. Shohat, do defendants have an installation vector for Pegasus today that uses Whatsapp technology in any way?

MR. AKROTIRIANAKIS: I am sorry, I am going to need to catch up with the transcript here.

Okay, go ahead.

A. Go ahead?

MR. AKROTIRIANAKIS: Do you have his question in mind?

A. Yes, I do. Can you repeat it, please?

Q. Yes. Do defendants have an installation vector for Pegasus today that uses Whatsapp technology in any way?

A. No.

Page 52

Q. Do defendants have an installation vector for Pegasus today that uses Facebook technology in any way?

A. No.

Q. Do defendants use an emulator capable of sending Whatsapp messages in connection with Pegasus today?

MR. AKROTIRIANAKIS: Objection. No foundation.

A. I don't think I am the right person to answer that.

Q. Do you know the answer?

A. I don't know.

Q. Okay.

What are the internal names that defendants use for every installation vector that you are aware of that use Whatsapp technology?

MR. AKROTIRIANAKIS: Objection. Foundation. Also vague as to time.

A. Actually, I don't know. We are not -- like, the internal code names for vectors are internal and mostly used by the R&D and support teams, and less of an interest for, of me. You mentioned before the name Hummingbird, which is the general name we use for zero click installation, regardless of whether it is using Whatsapp or other methods. That's the term that I am using.

Q. So do you know which Hummingbird installation vectors use Whatsapp?

Page 53

MR. AKROTIRIANAKIS: Objection. Vague.

A. I was told that as part of the preparation for this deposition. I am not sure if my counsel --

MR. AKROTIRIANAKIS: He is not asking about conversations that you had with lawyers for the company about the lawsuit.

A. Before that, I did not know, or did not recall, which codes were referring to Whatsapp or other vectors.

Q. Okay. Before that, did you know, setting aside the code names, which vectors used Whatsapp technology and which did not?

MR. AKROTIRIANAKIS: Objection. Vague.

A. I might have knew, but I did not recall before meeting with my lawyers in the last few days.

Q. Okay.

Are you aware of any installation vectors that use Facebook or Facebook Messenger?

A. I am not aware.

Q. You don't know which installation vectors do or do not use those services?

MR. AKROTIRIANAKIS: Objection. Misstates his testimony.

A. I am not aware of any usage of Facebook Messenger.

Q. Is there any policy at defendants with respect to conducting research and development on Whatsapp technology?

14 (Pages 50 - 53)

# Exhibit 3

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  jakro@kslaw.com
AARON S. CRAIG (Bar No. 204741)
  acraig@kslaw.com
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DECLARATION OF TAMIR GAZNELI IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Action Filed:  10/29/2019 |

**<u>HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY</u>**

**<u>UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>**

DECLARATION OF TAMIR GAZNELI                                    Case No. 4:19-cv-07123-PJH

**ER-137**

I, Tamir Gazneli, declare as follows:

1. I am Tamir Gazneli, I have personal knowledge of the facts set forth herein, and except as otherwise stated, I could testify competently to each fact herein.

2. I am the Director of Research and Development at NSO Group. Based on my experience in that position, I am familiar with the operation of the Pegasus software, including the "Hummingbird" installation vectors ("Heaven," "Eden," and "Erised"), as those installation vectors existed between April 2018 and May 2020.

3. The Hummingbird installation vectors operated, in part, by sending WhatsApp messages to a target's WhatsApp application (or "client") on the target's mobile device. These WhatsApp messages contained code that was executed on the target's mobile device, but not on WhatsApp's servers. The code was written into certain fields of the messages sent over WhatsApp. NSO did not design these fields. Rather, these were fields that WhatsApp's servers allowed messages to include.

4. From the perspective of a Pegasus user, the Hummingbird installation of Pegasus was triggered by the user entering a surveillance target's mobile telephone number into a field in a program running on the user's laptop. In response, the program would instruct a server called the WhatsApp Installation Server ("WIS") to install Pegasus on the surveillance target's device. To do so, WIS would compose messages, which were then sent to the surveillance target's device over WhatsApp, using a genuine WhatsApp client and genuine WhatsApp credentials.

5. Thus, although WIS created the WhatsApp messages, those messages were sent to the target device (via WhatsApp servers) using a genuine WhatsApp client and genuine WhatsApp credentials. WIS could not itself connect to a WhatsApp server.

6. Each of NSO's government customers had its own set of genuine WhatsApp clients that Pegasus used to send WhatsApp messages to a surveillance target.

7. Those genuine WhatsApp clients were downloaded and activated through the normal procedures for downloaded and activating WhatsApp clients, including the creation of

DECLARATION OF TAMIR GAZNELI                    1                    Case No. 4:19-cv-07123-PJH

**ER-138**

genuine authentication credentials that authorized the WhatsApp client to connect to WhatsApp servers.

8. Pegasus used these genuine WhatsApp clients and authentication credentials to connect to the WhatsApp system and to send the messages required for implementing the Hummingbird installation vectors.

9. Neither the WhatsApp client nor WhatsApp servers prevented, through any technological restriction or limitation, the messages sent by Pegasus from being sent to target devices. That is why those messages could be delivered at all.

10. The messages sent by Pegasus contained code created by NSO, but none of that code was executed on WhatsApp servers. The Pegasus code was executed only on target devices. The messages traveled through WhatsApp servers in the same way as any other message sent using a genuine WhatsApp client. Pegasus did not alter, delete, impair, or corrupt any information on WhatsApp servers.

11. When Pegasus would connect to WhatsApp using the genuine WhatsApp client and genuine authentication credentials, the WhatsApp servers would initially provide the same information they provide in response to any WhatsApp call. Specifically, the WhatsApp servers would check whether the target device had an active WhatsApp account and provide that information to the genuine WhatsApp client used by Pegasus. WhatsApp servers provide that information during every WhatsApp call initiated by any WhatsApp user, because WhatsApp cannot initiate a call with a callee who does not have a WhatsApp account.

12. When the target device processed the messages from WIS, the processing would cause the target device to download surveillance software (the Pegasus agent) from the NSO customer's servers.

13. NSO's government customers alone would operate Pegasus and make all decisions about how to do so.

DECLARATION OF TAMIR GAZNELI                    2                    Case No. 4:19-cv-07123-PJH

**ER-139**

14.    NSO never installed the Pegasus agent on the device of a non-consenting third party.  NSO never used an installed Pegasus agent to obtain information from the device of a non-consenting third party.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 10th day of October 2024.



TAMIR GAZNELI

# Exhibit E

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

H I G H L Y   C O N F I D E N T I A L

ATTORNEYS' EYES ONLY

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

Case No. 4-19-cv-07123-PJH

------------------------------------

WHATSAPP INC., a Delaware corporation,

and META PLATFORMS INC., a Delaware corporation,

Plaintiffs,

v.

NSO GROUP TECHNOLOGIES LTD and

Q CYBER TECHNOLOGIES LTD,

Defendants.

------------------------------------

Deposition of TAMIR GAZNELI, taken by AILSA WILLIAMS, Certified Court Reporter, held at the offices of Davis Polk & Wardwell, London, United Kingdom, on 4 September, 2024 at 9:00 a.m

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 186

A   I would clarify.

Q   Can I just get a yes or no to that so we are all on the same page?

A   The answer is no.

MR. AKROTIRIANAKIS:  He is going to answer the question --

Q   Go ahead then.

A   Go ahead with the question.  The question was --

Q   You were going to answer.  On the source side, it is not a WhatsApp client, it is the WIS which NSO created.  Isn't that correct?

A   The messages are built and sent from the WIS client.  These messages have to be sent from an application.  Client is notified, which he uses to connect to the application and sends the messages through a real and active client.

Q   Through an active WhatsApp account?

A   Yes.

Q   And whose account would that be?

A   Accounts were established for the customer.

Q   So the message is generated by the WIS?

A   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 187

Q   But it is put into the WhatsApp servers by an actual WhatsApp client?

A   WIS has a connection to a client which is activated through the normal procedures of client activation.

Q   Meanings it uses like an authentication token from an actual account?

MR. AKROTIRIANAKIS:  Had you completed your answer before he --

A   No.

Q   Go ahead.

A   WIS crafts messages which are required to initiate the call and test connectivity with the client which was activated for each and every customer.  It was connected to the WhatsApp system as a normal client because it is a normal client, and sent, and the message is sent by normal client from one peer to a normal client that target's device.

Q   And so in addition to the WIS there is a stand-alone client, genuine WhatsApp client on the source side of this transmission?

A   Yes.

Q   And so the message is created by the WIS but transmitted through that WhatsApp client?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 188

A    Yes.

Q    And when you said it has connectivity, the WIS has connectivity to a genuine WhatsApp client, what did you mean by that?

A    I mean that it has to be -- it has to have a way to connect the target and send the message to the target.

Q    So the WIS is able to send the message it created through that WhatsApp client?

A    Yes.

Q    Got it.  And that WhatsApp client on the initiating side would be one that -- an account that NSO created?

A    As part of deployment, each customer has his own set of WhatsApp clients that were used for this operation.

Q    Created by NSO, right?

A    Yes.

Q    Through the White Services team?

A    Yes.

Q    And those would be anonymized as well?

A    Yes, as part of the operation requirements for the customer to be anonymized.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

CERTIFICATE OF COURT REPORTER

I, AILSA WILLIAMS, an Accredited LiveNote Reporter, hereby certify that Tamir Gazneli was duly sworn, that I took the Stenograph notes of the foregoing deposition and that the transcript thereof is a true and accurate record transcribed to the best of my skill and ability.  I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which the deposition was taken, and that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

Before completion of the deposition, review of the transcript was requested.  Any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

AILSA WILLIAMS

Dated:    September 6, 2024.

# Exhibit 2

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DECLARATION OF TAMIR GAZNELI IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL**<br><br>**[UNREDACTED VERSION OF DOCUMENT FILED UNDER SEAL]** |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**ER-148**

I, Tamir Gazneli, declare as follows:

1.     I am Tamir Gazneli, I have personal knowledge of the facts set forth herein, and except as otherwise stated, I could testify competently to each fact herein.

2.     I am the Director of Research and Development at NSO Group. Based on my experience in that position, I am familiar with the operation of the Pegasus software, including the "Hummingbird" installation vectors ("Heaven," "Eden," and "Erised"), as those installation vectors existed between April 2018 and May 2020.

3.     The Hummingbird installation vectors operated, in part, by sending WhatsApp messages to a target's WhatsApp application (or "client") on the target's mobile device.  These WhatsApp messages contained code that was executed on the target's mobile device, but not on WhatsApp's servers.  The code was written into certain fields of the messages sent over WhatsApp. NSO did not design these fields.  Rather, these were fields that WhatsApp's servers allowed messages to include.

4.     From the perspective of a Pegasus user, the Hummingbird installation of Pegasus was triggered by the user entering a surveillance target's mobile telephone number into a field in a program running on the user's laptop. In response, the program would instruct a server called the WhatsApp Installation Server ("WIS") to install Pegasus on the surveillance target's device. To do so, WIS would compose messages, which were then sent to the surveillance target's device over WhatsApp, using a genuine WhatsApp client and genuine WhatsApp credentials.

5.     Thus, although WIS created the WhatsApp messages, those messages were sent to the target device (via WhatsApp servers) using a genuine WhatsApp client and genuine WhatsApp credentials.  WIS could not itself connect to a WhatsApp server.

6.     Each of NSO's government customers had its own set of genuine WhatsApp clients that Pegasus used to send WhatsApp messages to a surveillance target.

7.     Those genuine WhatsApp clients were downloaded and activated through the normal procedures for downloading and activating WhatsApp clients, including the creation of

genuine authentication credentials that authorized the WhatsApp client to connect to WhatsApp servers.

8.   Pegasus used these genuine WhatsApp clients and authentication credentials to connect to the WhatsApp system and to send the messages required for implementing the Hummingbird installation vectors.

9.   Neither the WhatsApp client nor WhatsApp servers prevented, through any technological restriction or limitation, the messages sent by Pegasus from being sent to target devices.  That is why those messages could be delivered at all.

10.   The messages sent by Pegasus contained code created by NSO, but none of that code was executed on WhatsApp servers.  The Pegasus code was executed only on target devices. The messages traveled through WhatsApp servers in the same way as any other message sent using a genuine WhatsApp client.  Pegasus did not alter, delete, impair, or corrupt any information on WhatsApp servers.

11.   When Pegasus would connect to WhatsApp using the genuine WhatsApp client and genuine authentication credentials, the WhatsApp servers would initially provide the same information they usually provide in response to any WhatsApp call.  Specifically, the WhatsApp servers would check whether the target device had an active WhatsApp account and provide that information to the genuine WhatsApp client used by Pegasus.  WhatsApp servers provide that information during every WhatsApp call initiated by any WhatsApp user, because WhatsApp cannot initiate a call with a callee who does not have a WhatsApp account.

12.   When the target device processed the messages from WIS, the processing would cause the target device to download surveillance software (the Pegasus agent) from the NSO customer's servers.

13.   Pegasus's "Heaven" installation vector sent messages containing code instructing the target device to connect to an IP address of an external server controlled by NSO's government customers.  The information about the external server IP address and the instruction to connect to

**ER-150**

that IP address were contained solely within the code sent by Heaven, not within any communication sent by WhatsApp signaling servers.

14.     At one point in my deposition, I was asked about a "forged server response" sent by Pegasus.  As I testified, that was a message sent by Pegasus—not by WhatsApp servers—that target devices would interpret as a message from WhatsApp's servers.  Pegasus did not instruct WhatsApp's servers to send the "forged server response" to target devices.

15.     It was the WhatsApp infrastructure (not Pegasus) that selected the set of IP addresses corresponding to the WhatsApp relay servers available to Pegasus.  Pegasus did not control what set of IP addresses WhatsApp's infrastructure made available or what servers received messages addressed to those IP addresses.  The decision of which relay server IP address in the set to use for any given connection was a decision made by the WhatsApp client (not by Pegasus or NSO's WIS server).  The WhatsApp client made that decision based on the respective performance (i.e., latency) of the servers at the provided IP addresses, not the physical location of any of those servers.  The selection of server IP addresses by the WhatsApp infrastructure, and Pegasus's choice of which of those IP addresses to use, are *runtime* decisions made *when an NSO customer uses Pegasus*.  At that time (when the customer uses Pegasus), NSO cannot see what relay server IP addresses are available, let alone determine the physical locations of servers corresponding to those IP addresses, let alone choose which IP address to use.  The only role NSO played in the choice of relay servers is to configure Pegasus to choose the relay server IP address (from those offered by WhatsApp) using a genuine WhatsApp client, and the genuine WhatsApp client chose based on lowest latency, not on the physical location of the servers corresponding to the offered IP addresses.

16.     NSO never installed the Pegasus agent on the device of a non-consenting third party. NSO never used an installed Pegasus agent to obtain information from the device of a non-consenting third party.

**ER-151**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 18th day of October 2024.



TAMIR GAZNELI

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

_____

| | |
|---|---|
| WHATSAPP, INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, | DOCKET NO. 4:19-CV-7123-PJH |
| | (Pages 1 through 222) |
| Plaintiffs, | |
| vs. | |
| NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, | Oakland, California Thursday, August 28, 2025 10:04 a.m. |
| Defendants. | |

_____

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
MOTION FOR PERMANENT INJUNCTION
and MOTION FOR NEW TRIAL

**BEFORE THE HONORABLE PHYLLIS J. HAMILTON
UNITED STATES DISTRICT JUDGE**

*MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC
Federal Official Court Reporter
2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001
307.433.2169 * MelanieSonntagCRR@gmail.com*

*Proceedings reported remotely with realtime stenography; transcript produced with computer-aided transcription.*

4:19-CV-7123-PJH                                                        2

APPEARANCES:
For the Plaintiffs:       GREG D. ANDRES
                          ANTONIO J. PEREZ-MARQUES
                          LUCA E. MARZORATI
                          DAVIS POLK & WARDWELL, LLP
                          450 Lexington Avenue
                          New York, NY 10017

                          MICAH G. BLOCK
                          DAVIS POLK & WARDWELL, LLP
                          900 Middlefield Road, Suite 200
                          Redwood City, CA 94063

For the Defendants:       JOSEPH N. AKROTIRIANAKIS
                          AARON S. CRAIG
                          KING & SPALDING, LLP
                          633 West Fifth Street, Suite 1700
                          Los Angeles, CA 90071

                          MATTHEW V. NOLLER
                          MATHEW H. DAWSON
                          KING & SPALDING, LLP
                          50 California Street, Suite 3300
                          San Francisco, CA 94111

4:19-CV-7123-PJH                                                          3

                          I N D E X

                                                        PAGE
 MOTION FOR PERMANENT INJUNCTION
 PRELIMINARY MATTERS                                     4

 OPENING STATEMENT BY MR. PEREZ-MARQUES                 10

  PLAINTIFFS' WITNESSES:
  ANDREW BLAICH
  Direct Examination by Mr. Andres                      17

  LANDER BRANDT
  Direct Examination by Mr. Marzorati                   59

  DEFENSE WITNESSES:
  JOSHUA J. MINKLER
  Direct Examination by Mr. Akrotirianakis              76
  Voir Dire Examination by Mr. Andres                   92
  Direct Examination (Resumed)                         104
   by Mr. Akrotirianakis
  Cross-Examination by Mr. Andres                      117
  Redirect Examination by Mr. Akrotirianakis           130

  Argument by Mr. Perez-Marques                        141
  Argument by Mr. Akrotirianakis                       173
  Argument by Mr. Perez-Marques                        193

  MOTION FOR NEW TRIAL OR REMITTITUR
  Argument by Mr. Akrotirianakis                       195
  Comments by the Court                                196
  Argument by Mr. Akrotirianakis                       198
  Argument by Mr. Perez-Marques                        199
  Argument by Mr. Akrotirianakis                       200
  Comments by the Court                                202
  Argument by Mr. Craig                                219


                          E X H I B I T S
                                            IDENTIFIED  RECEIVED
 PLAINTIFFS' EXHIBITS
      A      Screenshot                         37         38
      B      Video                              45         46
      C      Image                              49         51

 DEFENSE EXHIBITS
      1093   Transcript of Obama Remarks       107        110

4:19-CV-7123-PJH      MINKLER - DIRECT - AKROTIRIANAKIS                77

state of Indiana.

There, from 1994 through 2010, I was a criminal Assistant United States Attorney, serving in the OCDETF unit, Organized Crime Drug Enforcement Task Force unit, investigated and prosecuted the organized crime in the district. That was until 2010.

After 2010 I -- I became the supervisor, the lead attorney for that unit, where I would supervise -- prosecute cases and supervise others that prosecuted that case.

In 2011 I became the First Assistant United States Attorney in that office, where I served from 2011 to 2014.

In 2014 the -- the US Attorney resigned to run for mayor of the City of Indianapolis and was elected -- he's still the mayor -- and so I became the Acting United States Attorney. I was the Acting United States Attorney in that district from August 2014 until 2015.

There was no nominee, and so the Attorney General at the time, Eric Holder, appointed me as the Attorney General -- not Attorney General; sorry -- as the United States Attorney. So I was the United States Attorney, as appointed by the Attorney General.

The -- the District Court Judges -- there were seven -- then had to decide whether I got to keep that job. They voted and I kept that job from 2015 through October 2017.

In October of 2017 I was unanimously confirmed by the

4:19-CV-7123-PJH      MINKLER - DIRECT - AKROTIRIANAKIS                78

Senate, I was presidentially appointed by then-President Trump, and unanimously confirmed by the United States Senate, and I was the United States Attorney for the District from that point until 2020, November 2020.

The second week of November I left the United States Attorney's Office and joined Barnes & Thornburg -- it's a law firm headquartered in Indianapolis -- where I became a partner in that law firm. I've been a partner in that law firm since. I am currently the cochair of the white collar Government investigations and compliance practice group.

Q. Mr. Minkler, on what topics have you been asked to form opinions in this matter?

A. I've been asked to form opinions on the challenges faced by law enforcement with end-to-end encryption, the usefulness to law enforcement of technology, to include Pegasus, to answer that challenge or to intercept or allow law enforcement to gain access to end-to-end encrypted information or evidence and how that would comply with current laws in the United States of America.

Q. And did you form opinions in response to each of those issues?

A. I did.

Q. Are you familiar with the requirements for offering opinion testimony in Federal Court?

A. I am.

Melanie Sonntag, RDR, CRR, CRC                    MelanieSonntagCRR@gmail.com

**ER-157**

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 90 of 295
Case 4:19-cv-07123-PJH   Document 795   Filed 09/02/25   Page 79 of 223

4:19-CV-7123-PJH      MINKLER - DIRECT - AKROTIRIANAKIS                    79

Q.   And what is the basis for that familiarity?

A.   I have offered expert opinion in Federal Court for the last 30 years.

Q.   And do you believe that your training, background, experience as you've described it allows you to offer opinions on the three topics that you've listed for us?

A.   I do.

Q.   How many -- as a prosecutor -- as -- as a Federal prosecutor, how many investigations did you supervise or lead?

A.   Approximately 50.

Q.   And which law enforcement agencies did you work with in those investigations?

A.   Federally I worked with the Federal Bureau of Investigation, the Drug Enforcement Administration, the ATF. I also worked with -- at that time -- the United States Customs; now it's referred to as, I believe, Homeland Security.  The IRS.  Health and Human Services.  OIG.

I also worked closely with state and local law enforcement in the state of Indiana.

Q.   Did the investigations that you've testified to result in any criminal prosecutions?

A.   They did.

Q.   Are you able to estimate how many criminal defendants you've prosecuted in your career?

A.   Over the 24 years Federally, approximately 500.

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 91 of 295
Case 4:19-cv-07123-PJH    Document 795    Filed 09/02/25    Page 82 of 223

4:19-CV-7123-PJH    MINKLER - DIRECT - AKROTIRIANAKIS    82

Information was shared by United States Federal law enforcement with the Republic of Mexico and by the Republic of Mexico to United States law enforcement.

And my understanding is that the Republic of Mexico was able to tap phones following Mexican law based on the intelligence we shared.

Q.    You . . . have told us about the interception of realtime communications.

Do you have examples in your history as a prosecutor of the interception of stored electronic communications?

A.    I do.

I supervised, in 2015, an investigation and prosecution of Jared Fogle.  Jared Fogle was the now-infamous Subway pitchman -- pitchman who advertised extreme weight loss through eating Subway sandwiches.

During that time he -- he also lived in Indiana.

During that time he operated the Jared Fogle Foundation with Russell Taylor.  The Jared Fogle Foundation was also a front for their exploitation of children.  They traded images of children being sexually abused.

Fogle also traveled to engage in commercial sex acts with minors.  We obtained stored electronic evidence.  He -- he used the internet, phones, and other communications devices to facilitate these crimes.  The evidence was found on computers and mobile phones.

4:19-CV-7123-PJH      MINKLER - DIRECT - AKROTIRIANAKIS      83

And so we did use access to stored electronic communications.  We obtained that evidence through search warrants which were issued by Federal Judges.  The communications were extremely effective in securing the guilty pleas and eventual sentence of Mr. Fogle.

I remember one extremely troubling text message which was compelling evidence that led to his conviction where, in his attempt to obtain others for -- other -- younger women for commercial sex acts, minors, he texted "The younger, the better."

Q.  Did either Operation Money Clip or Jared Fogle -- the Jared Fogle investigation involve the use by the -- well, involve the interception of end-to-end encrypted communications?

A.  No end-to-end encrypted communications were used by the targets in those investigations, nor were they intercepted.

Q.  What would have been the effect on those investigations if the criminals involved had been using end-to-end encrypted communications?

A.  For Operation Money Clip, this was exclusively a Title III case.  That's really what made the case, the wiretaps.

If the end-to-end -- if the communications had been end-to-end encrypted, law enforcement could not have intercepted those.  So the investigation wouldn't have taken place.  Arrests wouldn't have happened, and it wouldn't have

4:19-CV-7123-PJH    MINKLER - DIRECT - AKROTIRIANAKIS    84

been a successful prosecution.

The -- the images that Taylor and Fogle had were not end-to-end encrypted.  Had they been end-to-end encrypted when they sent them back and forth or their messages had been end-to-end encrypted, law enforcement could not have obtained that evidence with the search warrant, and Fogle and Taylor would have escaped prosecution and still be allowed to continue their criminal activity today.

Q.   In your experience as a Federal prosecutor, have you ever worked on or supervised a matter that involved the recovery of stored communications of an attorney?

A.   I have.

I've supervised an investigation during 2010 and early 2011 which received some publicity.  It was an investigation into the sitting Marion County prosecutor, Carl Brizzi, and his chief deputy, David Wyser.

In that investigation we obtained their email communications and text messages through the use of search warrants.

Q.   Are there, to your knowledge, special Department of Justice guidelines that relate to recovering, through the methods you've testified about, attorney communications?

A.   Yes.

When -- before seeking those search warrants from the Judge, we had to obtain -- because they were attorneys -- had

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 94 of 295
Case 4:19-cv-07123-PJH   Document 795   Filed 09/02/25   Page 85 of 223

4:19-CV-7123-PJH     MINKLER - DIRECT - AKROTIRIANAKIS              85

to obtain the approval of an official at the Office of

Enforcement Operations at main Justice.

I believe that was also approved by an associate -- a

Deputy Associate Attorney General.  That is a requirement of

the Department of Justice for recovering communications

involving lawyers.  The same requirements apply to

journalists.

Q.   Do you have, based on your background and experience that

you've now told us about, an understanding of what end-to-end

encryption is?

A.   I do know what end-to-end encryption is.

Q.   And can you tell us what your understanding is with

respect to end-to-end encryption?

A.   Communications involving two devices which are encrypted.

Only individuals with the two devices know what the

communication are -- is -- sorry -- and it cannot be

intercepted or obtained by law enforcement.

Q.   And what, over the course of your career as a Federal

prosecutor, was the prevalence of end-to-end encryption as you

observed it in the investigations that you led and supervised?

A.   Well, when I started in -- in 1994 -- really, through the

'90s -- we were still using wiretaps for landline phones.

And then soon after that, mobile phones, which

presented, you know, an evolving challenge.  You didn't --

couldn't just clip the intercepts to the wires on the phone

4:19-CV-7123-PJH      MINKLER - DIRECT - AKROTIRIANAKIS                110

Secretary of President Obama's remarks at South By Southwest

Interactive, which is -- I can tell the Court -- is a

conference.

        THE COURT:  I'll allow it in.

   (Defense Exhibit 1093 received into evidence.)

        THE COURT:  But, frankly, I don't -- it's not going

to have any impact on any decision I make.

        I -- I don't quite understand what you all are doing

here today.  But we'll talk about it later.

        Let's just finish with the witness, please.

BY MR. AKROTIRIANAKIS:

Q.  Mr. Minkler, do you have an opinion whether law

enforcement needs to have some access to either decryption or

interception technologies in order to successfully investigate

and prosecute crimes like those that you've described?

A.  Yes, I do have an opinion.

        Law enforcement needs technology.  It -- it is in law

enforcement's interests and the public interest to have

technology which allows them to intercept end-to-end encrypted

communications.

Q.  And you testified that you reviewed the -- the declaration

of -- counsel asked you if you'd done other work since your

deposition in this case, and you said that one of the things

that you reviewed was the declaration of Yaron Shohat.

A.  I did review the declaration of Mr. Shohat.

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 96 of 295
Case 4:19-cv-07123-PJH   Document 795   Filed 09/02/25   Page 111 of 223

4:19-CV-7123-PJH      MINKLER - DIRECT - AKROTIRIANAKIS          111

Q.   Okay.  Did that include a product description guide that detailed the capabilities of Pegasus technology?

A.   It did.  And I had previously reviewed the product description guide.

Q.   As it relates to end-to-end encryption, how would the product description that you reviewed address the problems described by President Obama and the attorneys general that you testified about?

A.   Pegasus, as I understand the product through the product description, would allow law enforcement to intercept end-to-end encrypted communications.  That would be phone calls, text messages, emails.  It would also allow law enforcement to obtain precision location information.  It would also allow law enforcement to obtain stored electronic communications, contacts, calendars.

     Again, this is information that, when it was not end-to-end encrypted, I did obtain many times in investigations.  It cannot be obtained now.  And Pegasus would allow law enforcement to obtain that information, as I understand the product description, which is, in my opinion, in the best interests of law enforcement.

Q.   Having those tools available would be beneficial, in your opinion?

A.   Very beneficial.  Currently, law enforcement is in the dark.  They can't obtain that information if it's end-to-end

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 97 of 295
Case 4:19-cv-07123-PJH    Document 795    Filed 09/02/25    Page 112 of 223

4:19-CV-7123-PJH    MINKLER - DIRECT - AKROTIRIANAKIS    112

encrypted.  They -- they always used to be able to obtain that information through lawful court orders.  Now it's end-to-end encrypted.  They cannot.

And the product, as I understand it described, Pegasus, would allow them to do that.

Q.   Based on your review of the product description, is there any feature of Pegasus technology that allows a -- a Government user of Pegasus to obtain something that, prior to the proliferation of end-to-end encrypted communications, law enforcement was unable to obtain either with a search warrant or a -- a subpoena or a Title III order or some other form of legal process?

A.   No.  No.  They -- with Pegasus they would obtain the same information that they always have in the past.  Pegasus is just an evolving tool which allows them to continue to obtain the evidence they always have.

They can't do it now because it's end-to-end encrypted.  And Pegasus would allow them to respond to that and -- and obtain that evidence.

Q.   And based on your study relative to this case, have you found examples of Pegasus having been deployed beneficially to law enforcement?

A.   My understanding is that it has been deployed in other countries beneficially.

MR. ANDRES:  Objection; lacks foundation for the

Case 25-7380, 02/11/2026, DktEntry: 29.3, Page 98 of 295
Case 4:19-cv-07123-PJH   Document 795   Filed 09/02/25   Page 113 of 223

4:19-CV-7123-PJH     MINKLER - DIRECT - AKROTIRIANAKIS               113

basis of that knowledge.

THE COURT:  Overruled.  I'll allow it.

A.  (Continuing.)  I've reviewed, again, public reporting, which describes law enforcement's use of Pegasus by our allies in Spain, in Belgium, in Poland, and in the Republic of Mexico.  It's been public reported -- publicly reported -- that, among other techniques used to locate Joaquin "El Chapo" Guzmán, a device capable of locating someone using end-to-end encryption was used.

BY MR. AKROTIRIANAKIS:

Q.  And Mr. Guzmán -- are you familiar with his story, if you will?

A.  I am.

Q.  Okay.  And who -- just very briefly -- was Joaquin Guzmán?

A.  He was identified by the United States as Public Enemy No. 1.  He was the largest drug trafficker that ever supplied narcotics to the United States, responsible for the deaths of -- of many.

Eventually arrested on the United States indictments and prosecuted in the Eastern District of New York.

Q.  Where was he arrested, to your knowledge?

A.  In Mexico.

Q.  Did that involve the use of Pegasus, based on the public reporting you've reviewed?

A.  Based on the public reporting I've reviewed.

4:19-CV-7123-PJH       MINKLER - DIRECT - AKROTIRIANAKIS          114

Q.   Again, where was he prosecuted?

A.   In -- in the Eastern District of New York in Brooklyn.

Q.   And -- and is presently incarcerated in the United States, serving a life sentence?

A.   That is correct.

Q.   You mentioned intelligence sharing.  In your experience in Operation Money Clip between Mexico and the United States, based on -- on your experience, do any of the other countries you've mentioned, as publicly reported to be Pegasus customers, share intelligence with the United States?

A.   Yes.  In my experience, all those countries do share intelligence with the United States.  I've personally been involved in -- when I was with the Department of Justice -- in sharing intelligence and evidence with other countries through the Office of International Affairs in mutual legal assistance treaties.

Q.   And so we share information.

     Do we also receive incoming intelligence information from those countries?

A.   Yes, that's correct.  Through the same process.

Q.   Are you aware of public reporting that -- regarding alleged misuses of Pegasus?

A.   I am.

Q.   And do those reports change your -- the opinions that you've expressed today?

Melanie Sonntag, RDR, CRR, CRC                MelanieSonntagCRR@gmail.com

**ER-167**

THE COURT:  Before you leave the question of the irreparable injury, do you think that the -- that the *Power Ventures* case -- which I don't think clearly answers my question -- makes any distinction between injury to WhatsApp as opposed to injury to the target users?

And what is the -- and the injury to WhatsApp -- aside from the remediation and all of that, how would you describe the injury to WhatsApp?  Clearly, with regard to the target users, if we are to count them -- and I think that the *Power Ventures* case did count the -- you know -- the breach of privacy for the target users.

But what's your best argument that either or both should be considered by me, the target users and/or WhatsApp, and how would you describe the injury to WhatsApp to make it fit within the meaning of the *Power Ventures*?

MR. PEREZ-MARQUES:  Sure, Your Honor.

So what I would say about *Power Ventures* is I don't believe *Power Ventures* distinguishes that clearly between harm --

THE COURT:  Right.

MR. PEREZ-MARQUES:  -- to the company and harm to the users.

But it -- it sort of bypasses that distinction in a way that makes it quite analogous to our case because that case concerned scraping.  So it's user information being taken

from Facebook.

And what the Court ruled on summary judgment is that, yes, this is -- there is user information here, but it's being taken via WhatsApp servers.

THE COURT:  Right.

MR. PEREZ-MARQUES:  So it's sort of on the -- it's on all fours in the sense that, yes, there's harm to users that we believe should be considered; certainly, for public interest it should be considered.

But in terms of whether there's an irreparable injury, we think that's the case, too.  And the reason -- just putting aside sort of the legal analogy, just intuitively the reason that there's an irreparable injury that arises here is that the nature of their violations, including through the reverse engineering of this software, subjects us to an ongoing risk.

They have learned something that they weren't entitled to know, and it's information that they continue to possess that puts us at a risk of continued attacks.  And that's why not only does the -- the past violation entail an irreparable injury, but it also demonstrates a significant ongoing risk of harm.

THE COURT:  Can you quantify or characterize the harm to WhatsApp that is nonreputation -- injury to reputation?

But -- there's something about it that you're not

saying but that I sense, having to do with the -- your ability, your client's ability, to protect the privacy of the people that use it and depend upon the encryption working.

How does that impact?

MR. PEREZ-MARQUES:  Sure, Your Honor.

There's no question that there is an impact to the integrity of the platform.  And that was part of -- as the Court heard at trial when our witnesses talked about, you know, whether there was a compromise or whether there wasn't compromise of WhatsApp servers, that is, indeed, part of the compromise, that the expectation of privacy of users of the service is frustrated by bad actors like NSO who seek to collect messages that they're not entitled to.

But other aspects of the harm -- so, first of all, there is the ongoing need -- and this also goes to balance of hardships -- the ongoing need to investigate and monitor and detect and prevent and stop.

And that is an irreparable injury because so long as they're out there with the ability not subject to an injunction -- and this is -- the Court, Northern District of California, in *Google v. Jackman* said it well that -- in finding irreparable injury -- that "Absent injunction, plaintiffs will need to expend further resources to discover and eliminate defendants' violations."  And that's the same here.

C E R T I F I C A T E

I, MELANIE HUMPHREY-SONNTAG, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Diplomate Reporter, Certified Realtime Reporter, and Certified Realtime Captioner, do hereby certify that I remotely reported by realtime stenography the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 2nd day of September, 2025.

/s/ Melanie Humphrey-Sonntag

_____

MELANIE HUMPHREY-SONNTAG
RDR, CRR, CRC
Federal Official Court Reporter

**ER-171**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**


<u>**CIVIL MINUTES**</u>


**Date: August 28, 2025 (Time: 4 hours, 55 minutes)   JUDGE:  Phyllis J. Hamilton**

**Case No:19-cv-07123-PJH**
**Case Name: WhatsApp Inc., et al. v. NSO Group Technologies Limited, et al.**


**Attorney(s) for Plaintiff:        Greg Andres; Antonio Perez-Marques; Luca**
**Marzorati; Micah Block**
**Attorney(s) for Defendant:      Joseph Akrotirianakis; Aaron Craig; Matthew**
**Noller; Matt Dawson**


**Deputy Clerk: Kelly Collins            Court Reporter: Melanie Sonntag**

**PROCEEDINGS**

Motion for Permanent Injunction hearing- Held. Court takes the matter under submission.

See attached trial and exhibit log.

Motion for New Trial Hearing – Held. Court takes the matter under submission.

Court grants parties request for a two-week continuance of pending deadlines. Defendants to re-file the technical documents on the public docket by 9/15/2025. Joint omnibus motion to seal due by 9/19/2025.


**Order to be prepared by:   [] Pl [] Def [X] Court**

**cc: chambers**


**ER-172**

Greg D. Andres
Antonio J. Perez-Marques
Gina Cora
Craig T. Cagney
Luca Marzorati
   (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:   greg.andres@davispolk.com
         antonio.perez@davispolk.com
         gina.cora@davispolk.com
         craig.cagney@davispolk.com
         luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email:   micah.block@davispolk.com

*Attorneys for Plaintiffs*
*WhatsApp LLC and Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| WHATSAPP LLC and META PLATFORMS, INC. <br><br> Plaintiffs, <br><br> v. <br><br> NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, <br><br> Defendants. | Case No. 4:19-cv-07123-PJH <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION** <br><br> Date:   April 10, 2025 <br> Time:   9:30 am <br> Ctrm:   3 <br> Judge:  Hon. Phyllis J. Hamilton <br> Action Filed: October 29, 2019 |

**ER-173**

# TABLE OF CONTENTS

PAGE

NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION ................................1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................1

BACKGROUND ...........................................................................3

    A.    Plaintiffs Discover NSO's Attack in May 2019 ................................3

    B.    NSO Asserts That the Only Relevant Conduct Took Place in April and May 2019 ....................................................................3

    C.    Discovery Shows That NSO Attacked Plaintiffs Before April 2019, and Continued to Attack Plaintiffs After May 2019 ...............................4

    D.    Procedural History ..................................................5

LEGAL STANDARD ......................................................................6

ARGUMENT ............................................................................7

    I.    Plaintiffs Are Entitled to Injunctive Relief .................................7

        A.    Plaintiffs Suffered Irreparable Injury for Which Monetary Damages Are Insufficient ..............................................7

            1.    NSO's Violations of the CFAA and the CDAFA Establish Irreparable Harm ..........................................8

            2.    Without an Injunction, Plaintiffs Face a Risk of Future Harm ............9

            3.    NSO Still Possesses the Technologies Used to Access Plaintiffs' Servers and Install Spyware on Target Devices ...............12

            4.    Plaintiffs Will Likely Be Forced to File Multiple Lawsuits to Stop NSO's Misconduct ..........................................14

            5.    NSO's Evasive Tactics Would Force Plaintiffs to Spend Additional Resources Detecting Future Unauthorized Activity by NSO ...............................................14

        B.    The Balance of Hardships Weighs in Favor of Injunctive Relief .................17

        C.    An Injunction Is in the Public Interest ................................18

    II.    The Court Should Enjoin NSO from Future Violations of the Law and the WhatsApp Terms of Service ................................................19

        A.    Prohibition on Using Plaintiffs' Platforms ............................19

        B.    Prohibition on Emulating Plaintiffs' Technologies ......................21

        C.    Prohibition on Collecting Data from Plaintiffs' Platforms ..................21

i

D.  Prohibition Against Conduct That Violates the WhatsApp Terms of Service.........................................................................................22

E.  Prohibition on New Account Creation.............................................23

F.  Requirement to Delete Computer Code and Improperly Obtained Data.......24

G.  Notice and Certification Requirements............................................25

CONCLUSION.......................................................................................................25

*and cert. denied*, 144 S. Ct. 682 (2024). Under these principles, a prevailing plaintiff is entitled to a permanent injunction if it can show that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In evaluating irreparable injury, the Court should consider the risk of future harm. *See Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1007 (9th Cir. 2023) ("The district court abused its discretion by discounting the relevance of future harm."), *cert. denied*, 144 S. Ct. 824 (2024). Because the "irreparable injury requirement for a permanent injunction overlaps with lack of an adequate remedy at law," *Rocawear Licensing, LLC v. Branco Enters., Inc.*, 2009 WL 10703523, at *9 (C.D. Cal. July 22, 2009) (citation omitted), courts often discuss them together, *see, e.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018).

## ARGUMENT

### I.    Plaintiffs Are Entitled to Injunctive Relief

Plaintiffs satisfy all four factors for awarding permanent injunctive relief. The Court has already found that there is no genuine dispute of material fact that NSO violated the CFAA, the CDAFA, and the WhatsApp Terms of Service. *See* Dkt. No. 494. The undisputed facts likewise show that Plaintiffs face irreparable harm that monetary damages cannot redress based on the threat of NSO's ongoing and future attacks against Plaintiffs' computers, client applications, and users. The hardship that Plaintiffs face from NSO's illegal behavior outweighs any interest that NSO has in continuing to violate the law. An evaluation of the public interest also warrants enjoining NSO from violating the law, as the record lacks any evidence that NSO's attacks on Plaintiffs' computers benefited the public in any way.

### A.    Plaintiffs Suffered Irreparable Injury for Which Monetary Damages Are Insufficient

Plaintiffs have established irreparable injury for which monetary damages are inadequate. As other courts in this district have concluded, violations of federal and state computer hacking laws give rise to irreparable harm. Moreover, NSO poses an ongoing and prospective threat to Plaintiffs'

7

security and the privacy of Plaintiffs' users. Not only did NSO refuse to stop its illegal conduct after Plaintiffs filed this lawsuit, but it also affirmatively invested in solutions to circumvent Plaintiffs' security measures, thus heightening the risk to Plaintiffs. NSO still possesses all the computer code that enabled it to attack Plaintiffs' servers and collect data from Plaintiffs' users, and NSO therefore remains capable of launching a new attack. Without an injunction, Plaintiffs will have to expend resources investigating and mitigating NSO's conduct, including by bringing additional cases—one of the harms that an injunction would prevent.

### 1. NSO's Violations of the CFAA and the CDAFA Establish Irreparable Harm

The Court's findings about NSO's past conduct alone establish that Plaintiffs have suffered irreparable harm. As described above, the Court's decision holding NSO liable for violating the CFAA and the CDAFA found that NSO hacked into WhatsApp servers so that NSO's Pegasus spyware could be covertly installed on the mobile devices of WhatsApp users. Dkt. No. 494 at 12–13. It is well-established that "some qualitative feature" about certain *past* illegal conduct can "elevate its status into the realm of 'irreparable harm.'" *Elohim EPF USA, Inc. v. Aceplus, Inc.*, 2015 WL 13753299, at *9 (C.D. Cal. Jan. 2, 2015) (citing *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1215 (C.D. Cal. 2007)).

Computer hacking falls within this category, and "[n]umerous courts have found that unauthorized access of computers and the acquisition of data . . . constitute irreparable harm." *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019). In *Power Ventures*, the court found that Facebook was irreparably harmed by the defendant's past violations of the CFAA and the CDAFA, which "interfered with Facebook's right to control access to its own computers." 252 F. Supp. 3d at 782; *see also, e.g.*, *Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686924, at *10 (N.D. Cal. Nov. 21, 2023) (finding that defendant's violations of CDAFA gave rise to irreparable injury even where defendant's "account takeover scheme" was stopped more than two years earlier); *Meta Platforms, Inc. v. Ates*, 2023 WL 4035611, at *2, 8 (N.D. Cal. May 1, 2023) (finding that defendant's violations of CDAFA gave rise to irreparable injury, even when defendant "represented that he had stopped all activity"), *report and recommendation adopted*, 2023 WL 4995717 (N.D. Cal. June 27, 2023); *Enargy Power Co. v. Wang*, 2013 WL

6234625, at *10 (D. Mass. Dec. 3, 2013) (finding irreparable harm for CFAA violation that "has prevented [plaintiff] from enjoying the uninterrupted use of its property"). Even without examining the undisputed facts about NSO's likelihood of ongoing and future violations, the findings of fact as to NSO's past violations suffice to establish that Plaintiffs have suffered irreparable harm.

### 2. Without an Injunction, Plaintiffs Face a Risk of Future Harm

There is no evidence that NSO will stop its illegal conduct without a court ordering it to do so. To the contrary, NSO has admitted that it continued its misconduct even after Plaintiffs filed this lawsuit. *See* Dkt. No. 399-4, Ex. 6 at 271:3–8. Though NSO has refused to provide discovery about its actions post-dating May 2020, the undisputed evidence leaves little doubt that NSO would continue its misconduct without an injunction. Just days after being found liable on all of Plaintiffs' claims, NSO confirmed its total lack of remorse, publicly stating that it did not "d[o] anything wrong" and maintaining that its illegal conduct was "important and essential." *See* Block Decl., Ex. A at 2–3. This current and future threat gives rise to irreparable harm that cannot be redressed with monetary damages.

"Generally, 'absent a great public injury, a permanent injunction will be granted when liability has been established and there is a threat of a continuing violations.'" *Michael Grecco Prods., Inc. v. 8 Decimal Cap. Mgmt., LLC*, 2021 WL 2534567, at *6 (N.D. Cal. June 1, 2021) (quoting *Michael Grecco Prods., Inc. v. WrapMarket, LLC*, 2017 WL 10434020, at *4 (C.D. Cal. Nov. 8, 2017)), *report and recommendation adopted*, 2021 WL 2531093 (N.D. Cal. June 21, 2021); *Adobe Sys., Inc. v. Taveira*, 2009 WL 506861, at *7 (N.D. Cal. Feb. 27, 2009) ("[I]f plaintiff has demonstrated a significant threat of future violations this Court will recommend that the injunction issue."). Here, at least four independent bases demonstrate a significant threat of ongoing and future violations.

***The nature of NSO's business.*** All the facts in the record suggest that NSO will continue to look for ways to install Pegasus on target devices, without regard that such conduct violates the CFAA, the CDAFA, and the WhatsApp Terms of Service. NSO still markets and sells Pegasus technology today. *See, e.g.*, Dkt. No. 396-3 ¶ 3; Dkt. No. 396-5, Ex. H at 233:5–7. Though NSO refused to provide any computer code for use in this litigation, let alone to show how Pegasus operates

9

today, Mr. Gazneli confirmed that Pegasus continues to "obtain information from target devices," and versions of Pegasus allow "[u]nlimited access to targets' mobile devices," and can "[r]emotely and covertly collect information about a target's relationships, locations, phone calls, plans and activities," "[a]ctivate the microphone," and "[t]urn on the camera to take snapshots and screenshots." Dkt. No. 399-4, Ex. 6 at 109:3–110:22.

NSO also maintains a research-and-development team that searches for new covert installation vectors. NSO's research-and-development team "constantly work[s] on research in order to find possible ways, rapid solutions." *Id.*, Ex. 6 at 266:3–7. As Mr. Gazneli puts it, "[t]his is [NSO's] business." *Id.*, Ex. 6 at 266:10. Mr. Shohat even went as far as acknowledging that NSO still relies on installation vectors for Pegasus. *Id.*, Ex. 10 at 49:19–21.

NSO's rapid response to Plaintiffs' own security fixes demonstrate just how quickly NSO will attempt to circumvent any technical restriction that it faces. On December 5, 2018, NSO's engineers concluded that Plaintiffs' security updates had permanently disabled NSO's Heaven installation vector. *Id.*, Ex. 9 at 1. By January 15, 2019, just six weeks later, NSO had developed the Eden installation vector, which circumvented these new updates and likewise attacked Plaintiffs' computers. *Id.*, Ex. 6 at 257:6–21. NSO's ability to quickly circumvent sophisticated technical obstacles exemplifies what one of NSO's own employees saw as the company's greatest strength: "along the years NSO has proven time after time that one of its biggest value is the ability to 'survive' this harsh enviorment [*sic*] of the cat and mouse game." *Id.*, Ex. 14 at 2.

***NSO's post-complaint conduct.*** The filing of this lawsuit did not deter NSO from continuing to access Plaintiffs' servers in violation of federal and state law, confirming that NSO will continue its misconduct without a stronger sanction. Plaintiffs closed the Eden installation vector on May 12, 2019, and filed their complaint against NSO on October 29, 2019. *See* Dkt. No. 1. Unbeknownst to Plaintiffs, by late 2019, NSO had developed the Erised installation vector, which built on the Eden installation vector and likewise exploited Plaintiffs' Platforms. *See* Dkt. No. 399-4, Ex. 6 at 266:11–22. NSO admitted that "with this lawsuit pending NSO was actively making available to its customers a zero-click exploit that involved the transmission of messages over WhatsApp servers." *Id.*, Ex.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION - CASE NO. 4:19-cv-07123-PJH

6 at 271:3–8.  Erised remained in use until at least May 2020—the date past which NSO refused to answer questions about its installation vectors.  *Id.*, Ex. 6 at 267:5–268:16.

In the specific context of unlawful computer access, "courts in this district . . . have granted injunctive relief upon a showing that a defendant continued to access a plaintiff's computers, in an unauthorized manner, regardless of [a victim's] attempts to halt the access."  *Chegg, Inc. v. Doe*, 2023 WL 7392290, at *8 (N.D. Cal. Nov. 7, 2023).  The plaintiff in *Chegg* demonstrated that there was a likelihood of irreparable harm from defendants who responded to cease-and-desist letters by conducting another cyberattack against the plaintiff.  *Id.*  Similarly, in *Power Ventures*, the defendant's historical conduct made it "very likely" that they would "they w[ould] not easily be deterred" and would "again attempt to access Facebook's servers without authorization . . .  unless they [we]re strongly deterred," making it "very likely that in the absence of a permanent injunction, Facebook will suffer irreparable harm again in the future."  252 F. Supp. 3d at 782–83.  The "high probability that Defendants will repeat their illegal conduct" also establishes that "money damages are inadequate to compensate for [Plaintiffs'] injury."  *Id.* at 783–84; *see also Craigslist, Inc. v. Kerbel*, 2012 WL 3166798, at *16 (N.D. Cal. Aug. 2, 2012) (finding that an award of damages would not prevent future harm based on defendant's refusal to respond to cease-and-desist letters and existing website); *Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 973 (N.D. Cal. 2015) ("Even after two cease-and-desist letters, Grunin continued to fraudulently obtain Facebook accounts and to access Facebook's services.").  Here, NSO not only refused to change its conduct after being named in Plaintiffs' lawsuit, but also affirmatively invested in new ways to access Plaintiffs' servers while litigating this case.  And now, after being found liable, NSO publicly denounced this Court's ruling and essentially committed to continue its unlawful conduct.  *See* Block Decl., Ex. A at 2 ("Certainly, it doesn't prove that we did anything wrong, because we really didn't.").

***NSO's inability to show that it halted its misconduct.***  Nothing in the limited evidence NSO produced or the deposition questions it answered suggests that it no longer accesses or uses WhatsApp and Plaintiffs' other technologies today.  NSO generally refused to provide discovery post-dating May 2020.  In particular, NSO's executives refused to answer deposition questions about the company's current operations.  For example, Mr. Gazneli refused to disclose "whether as we

speak NSO is actively working to develop installation vectors that would operate via WhatsApp." Dkt. No. 399-4, Ex. 6 at 63:4–7.  Mr. Shohat similarly refused to answer whether NSO "sought permission from any third party whose technology is involved in the provision of the installation vectors defendants used for Pegasus today." *Id*., Ex. 10 at 49:25–50:5.  The Court has already ruled that NSO should face "evidentiary sanctions when appropriate," Dkt. No. 494 at 9, and NSO should not be entitled to favorable inferences about its current conduct—especially without producing any supporting evidence—now that it has flouted its discovery obligations.

  ***The widespread use of Plaintiffs' products.***  Plaintiffs' products remain an appealing target for NSO's spyware.  WhatsApp's popularity means that it is downloaded on billions of mobile devices around the world, so developing a WhatsApp-based installation vector remains an important and effective goal for NSO.  *See* Dkt. No. 399-4, Ex. 24 at 1 ( REDACTED REDACTED ).  Even putting aside potential targets' use of the WhatsApp application, and NSO's misuse of WhatsApp as an installation vector, NSO will likely continue to test and demonstrate its products to its clients vis-à-vis Plaintiffs' Platforms, all in violation of the CFAA, the CDAFA, and the WhatsApp Terms of Service.  *See id*., Ex. 8 at 270:1–7 (acknowledging that NSO created WhatsApp accounts for test devices to demonstrate Pegasus's ability to obtain the contents of WhatsApp messages).[5]  For these reasons, Plaintiffs face a particularized risk that their infrastructure and users will again be targeted by NSO's illegal conduct.

  **3. NSO Still Possesses the Technologies Used to Access Plaintiffs' Servers and Install Spyware on Target Devices**

  In addition to the likelihood of ongoing or future attacks, Plaintiffs are likely to suffer irrep-

---

[5] Even accepting NSO's unsubstantiated position that its customers are responsible for its misconduct, NSO's "brazen plans to continue trafficking in" products that violate the law provides "evidence of irreparable harm," as "such trafficking has induced and would continue to induce third parties—namely, [NSO] customers" to violate the law, which "would result in the same harms" to Plaintiffs. *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 949 (N.D. Cal. 2009) (finding "this factor tilts heavily towards granting injunctive relief"), *aff'd*, 658 F.3d 1150 (9th Cir. 2011). The murky relationship between NSO and its customers, which NSO has pointedly blocked from discovery, therefore provides no reason to withhold a permanent injunction.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION - CASE NO. 4:19-CV-07123-PJH

arable harm that cannot be addressed by monetary damages because NSO still retains all the technology, infrastructure, and spyware that led to the current litigation. For example, NSO has admitted that it developed, extracted, and decompiled WhatsApp code, reverse-engineered WhatsApp server infrastructure and the WhatsApp client application, and designed and used the WIS to send malformed messages (which a legitimate WhatsApp client could not send) through WhatsApp servers, thereby causing target devices to install the Pegasus spyware agent. *See* Dkt. No. 399-4, Ex. 6 at 226:12–24 (decompiling and extracting); *id.*, Ex. 6 at 143:7–13 (reverse-engineering WhatsApp through recreating its "internal ecosystem"); *id.*, Ex. 6 at 161:22–23 ("[T]he WIS is not an actual WhatsApp client."); *id.*, Ex. 6 at 189:23–24 ("There is a connection between WIS and WhatsApp client on the target's device."). There is no evidence that NSO has deleted the WIS, despite the fact that it was created in violation of the WhatsApp Terms of Service and used to violate the CFAA and the CDAFA. Similarly, NSO maintains control over Pegasus and the installation vectors it uses to install Pegasus on target devices. *See* Dkt. No. 419-2 at 18–19 (describing NSO's purported oversight of Pegasus's use).

Courts have found a defendant's retention of the software used to illegally collect data established irreparable harm and formed the basis to issue an injunction. In *Facebook, Inc. v. Sluchevsky*, a court in this district entered a permanent injunction against defendants who developed software that obtained data from users in violation of the CFAA, the CDAFA, and their contract with Facebook. 2020 WL 5823277, at *1 (N.D. Cal. Aug. 28, 2020), *report and recommendation adopted*, 2020 WL 5816578 (N.D. Cal. Sept. 30, 2020). The *Sluchevsky* court found that the irreparable harm requirement was met because, among other things, "defendants retain the software, tools or means at issue to continue their harmful behavior." *Id.* at *9. Similarly, in *Power Ventures*, the court noted that the defendants "may still possess the software at issue in this litigation and the data illegally acquired from Facebook," which demonstrated the inadequacy of monetary damages, especially given the defendants' history of illegal conduct. 252 F. Supp. 3d at 783. Without forcing NSO to delete the WIS, which it made by violating the WhatsApp Terms of Service, and enjoining NSO from recreating such a technology, NSO can continue to identify new ways to attack Plaintiffs' computers.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION - CASE NO. 4:19-cv-07123-PJH

**ER-182**

**4.    Plaintiffs Will Likely Be Forced to File Multiple Lawsuits to Stop NSO's Misconduct**

The overwhelming evidence of NSO's past misconduct, its likelihood of ongoing and future misconduct, and its retention of its spyware tools all signal that Plaintiffs will be forced to file future lawsuits against NSO if the Court does not enter an injunction now, which provides another basis for finding irreparable harm that cannot be addressed with monetary damages.  Courts have found that monetary damages for past misconduct are insufficient to compensate plaintiffs for ongoing and future costs to prosecute such violations.  *See United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.,* 2012 WL 3861946, at *7 (S.D. Cal. Sept. 5, 2012) ("Where the plaintiff will have to litigate multiple suits in the future, monetary damages are deemed to be insufficient and thus, an injunction may issue."); *Metro-Goldwyn-Mayer Studios*, 518 F. Supp. 2d at 1219 (holding that "the very need to file multiple lawsuits as a consequence of [defendant's misconduct] is itself supporting of an irreparable harm finding").

Here, NSO's business, its conduct after Plaintiffs brought suit, and its statements about its ongoing activities—paired with the widespread use of Plaintiffs' applications—show the likelihood of ongoing and future harm.  Forcing Plaintiffs to bring new legal actions every time they discover one of NSO's violations, and forcing Plaintiffs to surmount the obstacles that NSO has constructed in this litigation, would be an inadequate alternative to entering a permanent injunction.  Without an injunction, Plaintiffs will be forced to sue NSO again and again to stop NSO's illegal activity.  This provides yet another reason to enter the proposed injunction.

**5.    NSO's Evasive Tactics Would Force Plaintiffs to Spend Additional Resources Detecting Future Unauthorized Activity by NSO**

Plaintiffs face additional irreparable injury because NSO has demonstrated a history of attempting to evade detection, creating a serious risk that Plaintiffs will be forced to expend resources monitoring, discovering, and remediating NSO's constant efforts to identify and use exploits on Plaintiffs' services.  This too provides a reason to enjoin NSO from future misconduct.

Other courts have concluded that a defendant's breach of online terms of use justifies a permanent injunction where the defendant has demonstrated an ability to evade detection.  *See Google,*

14

*Inc. v. Jackman*, 2011 WL 3267907, at *5–6 (N.D. Cal. July 28, 2011). In *Jackman*, the defendants had violated Google's advertising terms, and the court held that a permanent injunction was necessary in light of the defendants' prior attempts to "evade detection," including by "using different names and false contact information, even after their original accounts were suspended." *Id.* at *1. The court explained that, without an injunction, "Google will need to expend further resources to discover and eliminate Defendants' improper advertising," and that "Defendants' violations of the Ad Terms will persist unless they are prohibited from" evading Google's automatic monitoring systems. *Id.* at *5; *see also Power Ventures*, 252 F. Supp. 3d at 783 (granting injunction where defendants showed propensity to use "tactics to circumvent plaintiff's security measures") (citation omitted); *Disney Enters., Inc. v. Delane*, 446 F. Supp. 2d 402, 408 (D. Md. 2006) ("[T]here is no way to know how many times this content has been accessed and downloaded. . . . [B]ecause of the nature of [defendant's] Web site and trackers, further infringements are a continuing threat, making remedies at law insufficient to compensate for Plaintiffs' injuries.").

NSO's use of detection-evading strategies is undisputed. NSO designed the WhatsApp-based installation vectors to avoid technical detection. *See, e.g.*, Dkt. No. 399-4, Ex. 24 at 2 (

REDACTED

). As described in Plaintiffs' motion for summary judgment, NSO knew that WhatsApp searched for suspicious or malicious messages, *see, e.g.*, *id.*, and NSO took various steps to avoid its malicious messages being flagged for review, such as hiding its code in the "connecting_tone_desc" message field, and using a cipher to obfuscate the contents of its messages. *See id.*, Ex. 6 at 298:12–21. NSO also repeatedly changed the fields in which it hid code. *See id.*, Ex. 25 at 8–10 (demonstrating NSO using both "voip_settings" and "group_update" fields). NSO further identified ways to avoid detection by WhatsApp's anti-spam filters, *see, e.g.*, *id.*, Ex. 24 at 4 (      REDACTED

    REDACTED      ), some of which NSO admits it adopted, *id.*, Ex. 6 at 236:8–237:1; *see, e.g.*, Dkt. No. 436-4, Ex. 41 at 1 (after one "Eden installation," "another 2 attempts can be sent in the next two hours" and referring to "the limitations" explained in an email NSO failed to produce).

Similarly, NSO took steps to avoid having its exploits linked back to NSO or its customers. One of NSO's senior customer-facing executives testified that NSO's "White Services" team would

15

create anonymized WhatsApp accounts for NSO's customers to use in connection with Pegasus, so that NSO's customers could avoid detection. Dkt. No. 399-4, Ex. 8 at 17:13–23; *see id.*, Ex. 17 (listing 725 phone numbers installed on "white environment"). In addition, NSO would create an anonymized server infrastructure to make it difficult, if not impossible, to trace any actions back to the customer. *Id.*, Ex. 8 at 18:15–17 ("The entire infrastructure is anonymized to protect the customer and the infrastructure that they're using.").

The secretive nature of NSO's conduct heightens the risk that Plaintiffs will have to devote significant resources to monitoring and investigating NSO. Mr. Shohat admitted that he was not aware of any instance where NSO asked permission from a third party to use their system as part of an installation vector. *Id.*, Ex. 10 at 49:13–18. Mr. Shohat further admitted that NSO "prefer[red]" that companies whose technology is used in NSO's exploits "will not know about it, because they might make changes that will close it." Dkt. No. 436-4, Ex. 38 at 189:15–16.

In addition to its refusal to disclose details about its installation vectors, NSO affirmatively maintains an "OpSec" (operational security) team to "create[e] an assessment of the vector and all the measures required . . . for [the installation vector] to be as concealed in terms of the capability and in terms of the customer activity." Dkt. No. 399-4, Ex. 6 at 232:7–12.   **REDACTED**

*Id.*, Ex. 24 at 1. Despite having advanced knowledge of WhatsApp's technical defenses, NSO made no attempt to comply with the WhatsApp Terms of Service in developing NSO's installation vectors. *See id.*, Ex. 6 at 223:24–224:3. Presented with all this evidence, the Court found that NSO possessed an intent to defraud by continuing to attempt to evade WhatsApp's technical restrictions, Dkt. No. 494 at 12, and courts may consider "the degree of scienter involved" in determining whether there is a "cognizable danger of recurrent violations." *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 855 (9th Cir. 1995). NSO's intentional and considered deception makes it likely it will continue to violate the law in the absence of an injunction.

Just as it tried to evade Plaintiffs' technical barriers, NSO tried to hide its ongoing misconduct from the Court. For instance, NSO moved to dismiss Plaintiffs' claims for injunctive relief in 2020,

disingenuously suggesting its access to Plaintiffs' servers was limited to a two-week period. Dkt. No. 105 at 2 ("And since May 13, 2019? Nothing."). Based on this assertion, NSO later argued that the Court should impose a narrow discovery window. *See* Dkt. No. 176-2 at 13. What's more, NSO improperly instructed its witnesses to refuse to answer questions about its current conduct, in order to conceal its ongoing activities from Plaintiffs and from the Court. *See* Dkt. No. 405-2 at 14–15. All the while, NSO knew that it was continuing to deploy and market installation vectors that accessed Plaintiffs' servers long past the discovery cutoff that NSO proposed. *See* Dkt. No. 399-4, Ex. 6 at 271:3–8 ("[W]ith this lawsuit pending NSO was actively making available to its customers a 0-click exploit that involved the transmission of messages over WhatsApp servers. Correct? A Yes.").

NSO is the paradigmatic defendant that, having "frequently exhibited bad faith conduct that indicates that they will not easily be deterred from attempting to access Facebook's servers without authorization in violation of the CFAA and § 502," should be subject to a permanent injunction. *Power Ventures*, 252 F. Supp. 3d at 782; *see also Bd. of Trs. of Bay Area Roofers Health & Welfare Tr. Fund v. Westech Roofing*, 2014 WL 4383062, at *4 (N.D. Cal. Sept. 4, 2014) (entering permanent injunction, noting that "long history of non-compliance in the face of multiple court orders . . . reflects bad faith . . . and makes clear that legal remedies are not adequate as to this Defendant."). Because NSO employs tactics that make it difficult to detect its behavior, and has not been forthcoming about the extent of its activity, it would be especially inequitable to require Plaintiffs to file a new lawsuit each time NSO violates the CFAA, the CDAFA, or the WhatsApp Terms of Service.

**B.     The Balance of Hardships Weighs in Favor of Injunctive Relief**

The balance of hardships weighs in favor of granting Plaintiffs injunctive relief. The substantial and irreparable harm Plaintiffs will continue to suffer far outweighs any potential harm to NSO, which has willfully and repeatedly violated the CFAA, the CDAFA, and the WhatsApp Terms of Service for years. Plaintiffs face the real threat of ongoing harm given the "probability that [NSO] will engage in similar conduct in the future" and NSO's continued refusal to accept the Court's finding of liability. *See Power Ventures*, 252 F. Supp. 3d at 784 (finding that balance of hardships favored plaintiff).

Dated:  February 24, 2025          Respectfully Submitted,

DAVIS POLK & WARDWELL LLP

By:  */s/ Micah G. Block*
      Greg D. Andres
      Antonio J. Perez-Marques
      Gina Cora
      Craig T. Cagney
      Luca Marzorati
        (admitted *pro hac vice*)
      DAVIS POLK & WARDWELL LLP
      450 Lexington Avenue
      New York, New York 10017
      Telephone: (212) 450-4000
      Facsimile: (212) 701-5800
      Email:  greg.andres@davispolk.com
           antonio.perez@davispolk.com
           gina.cora@davispolk.com
           craig.cagney@davispolk.com
           luca.marzorati@davispolk.com

      Micah G. Block (SBN 270712)
      DAVIS POLK & WARDWELL LLP
      900 Middlefield Road, Suite 200
      Redwood City, California 94063
      Telephone: (650) 752-2000
      Facsimile:  (650) 752-2111
      Email: micah.block@davispolk.com

      *Attorneys for Plaintiffs*
      *WhatsApp LLC and Meta Platforms, Inc.*

26

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHNOLOGIES LIMITED and
Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS' REVISED OPPOSITION TO PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**<br><br><br><br>Date:   July 17, 2025<br>Time:   10:00 a.m.<br>Place:  Courtroom 3, Ronald V. Dellums Federal Building & U.S. Courthouse, 1301 Clay Street, Oakland, California<br><br>Action Filed: 10/29/2019 |

DEFENDANTS' REVISED OPPOSITION TO
MOTION FOR PERMANENT INJUNCTION

Case No. 4:19-cv-07123-PJH

**ER-188**

**TABLE OF CONTENTS**

I.    Introduction ................................................................................................ 1

II.   Background ................................................................................................. 2

      A.    NSO's Pegasus technology. ........................................................... 2

      B.    The history of this litigation. ......................................................... 5

III.  Argument ................................................................................................... 7

      A.    Plaintiffs do not satisfy the requirements for injunctive relief. ............... 7

            1.    Plaintiffs have not proved irreparable harm. ................................. 8

            2.    Plaintiffs have not proved they lack an adequate legal remedy. ............... 10

            3.    The balance of hardships does not favor an injunction. ........................... 13

            4.    The public interest would be disserved by an injunction. ......................... 15

      B.    Plaintiffs' requested injunction is grossly overbroad. ............................. 16

      C.    California law bars any injunction on Plaintiffs' contract claim. ............. 21

            1.    Plaintiffs seek an injunction to enforce WhatsApp's Terms. ................... 21

            2.    Plaintiffs may not receive an injunction to enforce WhatsApp's Terms. .. 23

IV.   Conclusion ............................................................................................... 25

DEFENDANTS' REVISED OPPOSITION TO                                    Case No. 4:19-cv-07123-PJH
MOTION FOR PERMANENT INJUNCTION

**I.      INTRODUCTION**

Defendants filed their initial Opposition to Plaintiffs' Motion for Preliminary Injunction on March 14, 2025 (Dkt. 605).  In light of subsequent events, including the jury trial and the Court's related evidentiary and procedural rulings, Defendants hereby submit this revised Opposition and supporting declarations of Joseph N. Akrotirianakis, Yaron Shohat, Tamir Gazneli and Joshua Minkler.  These replace Defendants' previous filings (Dkts. 604-606).[1]

This case involves three defunct versions of NSO's "Pegasus" technology.  The Court ruled that those versions violated the CFAA and CDAFA because, for short periods of time in the past, those versions exchanged information with end-user devices by sending messages through WhatsApp servers.  The Court also held that NSO breached WhatsApp's Terms of Service ("Terms") by decompiling and reverse-engineering WhatsApp.  Plaintiffs claimed that they suffered purely economic losses from that conduct.  At trial, the jury awarded Plaintiffs every cent of the losses they claimed they suffered.  That award fully remedies the only conduct by NSO that Plaintiffs challenged and that this Court found to be unlawful.

There is no justification *also* to grant Plaintiffs prospective injunctive relief.  The evidence shows that NSO cannot and will not again engage in the conduct this Court held to be unlawful.  Plaintiffs thus face no risk of harm, much less irreparable harm, in the absence of an injunction.  Yet Plaintiffs request an extraordinarily overbroad injunction that does not track their claims in this case, the Court's summary judgment order, or the conduct that this Court found to be unlawful.  Instead of seeking to enjoin the use of WhatsApp servers to install Pegasus, Plaintiffs seek an injunction that reaches the use of *any* technology to collect data from the phones of *any* user of *any* of Plaintiffs' platforms, without regard to whether that technology uses WhatsApp servers in any way.  Such an injunction would prohibit conduct that Plaintiffs have never challenged in this case.  It would force NSO out of business.  And it would arrogate to this Court the power to dictate permissible law-enforcement, counterterrorism, and military surveillance techniques for every country in the world.  If the Court were to issue Plaintiffs' requested injunction, it would unilaterally force numerous foreign governments to "go dark" on lawful, authorized surveillance of criminals

---

[1] Defendants have no objection to Plaintiffs filing a revised reply.

1

DEFENDANTS' REVISED OPPOSITION TO                                    Case No. 4:19-cv-07123-PJH
MOTION FOR PERMANENT INJUNCTION

and terrorists in their own countries.  That would be both bad for the world and beyond the limits of what a U.S. court can properly enjoin.  The Court should deny Plaintiffs' motion.

## II.      BACKGROUND

### A.      NSO's Pegasus technology.

**1.**  NSO develops and licenses cybersurveillance, lawful intercept, and other technologies.  Its flagship product, Pegasus, allows government law-enforcement and intelligence agencies to collect data from mobile devices as part of authorized law-enforcement and intelligence investigations.  (*See* Supp. Shohat Decl. ¶¶ 3-5.)

Pegasus is not synonymous with the use of WhatsApp servers to send code to target devices.  No current versions of Pegasus involve transmitting messages across WhatsApp servers or infrastructure or doing anything else that could possibly be construed as an attack on WhatsApp's systems.  (Supp. Shohat Decl. ¶ 46; Gazneli Decl. ¶¶ 3-5.)  For a brief period several years ago, NSO's covert-Android version of Pegasus involved sending messages through WhatsApp servers.  But NSO's "one-click Android," "covert ioS," and "one-click ioS" versions of Pegasus have never been installed through WhatsApp servers, and NSO's current covert-Android vectors do not use WhatsApp servers either.  The only contemporary connection between Pegasus and WhatsApp is that the numerous types of data that NSO's customers can access from the devices of the criminals and terrorists who are investigation targets include WhatsApp messages that criminals and terrorists commonly send or receive.  But Pegasus is no longer installed through WhatsApp servers, and no target data is sent over WhatsApp servers during the extraction process.

**2.**  Governments need Pegasus (and similar technologies) because WhatsApp's end-to-end encryption is commonly abused by heinous criminals. (Minkler Decl. Exh. A ¶¶ 41-49.)  WhatsApp puts powerful encryption technology into the hands of anyone who signs up for an account, and signing up does not even require users to provide their real name (or any name).  End-to-end encryption means that historical government surveillance tools are useless in fighting terrorism, sex trafficking, and other crimes committed via WhatsApp.  WhatsApp knows its platforms are used to recruit terrorists, plan terrorist attacks, and exchange child pornography.  Proof of WhatsApp's knowledge comes in the form of witness testimony about Plaintiffs' employees haplessly trying to

2

DEFENDANTS' REVISED OPPOSITION TO
MOTION FOR PERMANENT INJUNCTION

CASE NO. 5:24-cv-04660-EJD

stem the criminal abuse of Plaintiffs' platforms based on voluntary "user reports" made to Plaintiffs' "trust and safety," terrorism, and child exploitative-imagery teams. (Dkt. 596-10 at 37:18–46:13.) But Plaintiffs often choose not to cooperate with law enforcement requests for assistance.

The public record teems with instances of terrorists and other criminals using WhatsApp to commit and shield their crimes from discovery. There have been numerous reports of child pornographers and sexual abusers using Plaintiffs' platforms to commit their crimes.[2] WhatsApp is the messaging app of choice for human traffickers.[3] The ISIS terrorist who attacked London's Westminster Bridge in 2017 used WhatsApp "two minutes before killing five" victims in the attack.[4] Plaintiffs refused to reveal the terrorist's message to authorities, a decision the United Kingdom's Home Secretary called "completely unacceptable."[5] Three months later, terrorists used WhatsApp to plan a "knife rampage" on London Bridge, which "may have prevented the authorities from identifying the plot."[6] Plaintiffs again refused to give authorities access to the terrorists' messages.[7] One of the 1,400 alleged "Target Users" in May 2019 was an Islamic State terrorist who was using WhatsApp to plan an attack; Plaintiffs' warning to the 1,400 users "killed" an investigation into that terrorist by a "team of European law enforcement officials" who had been

---

[2] *E.g.*, BBC, *David Wilson: Sex Offender Who Posed as Girls Online Jailed for 25 Years* (Feb. 10, 2021), https://tinyurl.com/3vxbbnmf; Virkram Dodd, *Facebook under Fire over Encryption Plans as Man Is Jailed for Abusing 52 Children*, The Guardian (Feb. 10, 2021), https://tinyurl.com/c3u569e8; Yahoo Finance, *'Nothing Stopping' Spread of Child Abuse Images on WhatsApp, Sys Safety Group* (Aug. 15, 2024), https://tinyurl.com/4htavrk7; Katherine Blunt, *Facebook and Instagram Steer Predators to Children, New Mexico Attorney General Alleges in Lawsuit*, Wall St. J. (Dec. 6, 2023), https://tinyurl.com/2ws78h7a; Jeff Horwitz & Katherine Blunt, *Meta Staff Found Instagram Tool Enabled Child Exploitation. The Company Pressed Ahead Anyway.*, Wall St. J. (Feb. 22, 2024), https://tinyurl.com/yc8nw6e7

[3] *See, e.g.*, Elizabeth Trovall, *WhatsApp Has Streamlined Business Communication for Human Smuggling*, Texas Public Radio (Aug. 2, 2023), https://tinyurl.com/yp8xy9da.

[4] Ryan Sabey, *Tool of Terror: Social Media Giants Will Be Made to Hand Over Encrypted WhatsApp Messages in Fight Against Terrorism*, The Sun (Sept. 29, 2019), https://bit.ly/2TuLNhK.

[5] Gordon Rayner, *WhatsApp Accused of Giving Terrorists 'A Secret Place to Hide' as It Refuses to Hand over London Attacker's Messages*, The Telegraph (Mar. 27, 2017), https://bit.ly/38uHkjl.

[6] Dipesh Gadher, *London Bridge Terror Attack Planned on WhatsApp*, Sunday Times (May 12, 2019), https://bit.ly/38xG2Uy.

[7] Dan Sabbagh, *Call for Backdoor Access to WhatsApp as Five Eyes Nations Meet*, The Guardian (July 30, 2019), https://bit.ly/2InSNpZ.

3

| DEFENDANTS' REVISED OPPOSITION TO MOTION FOR PERMANENT INJUNCTION | CASE NO. 5:24-cv-04660-EJD |

Dkts. 429-3–16).  Plaintiffs never moved to compel discovery related to any versions of Pegasus after May 2020, despite the Court having invited them to do so if warranted.  (Dkt. 292 at 4.)  Accordingly, this Court never ordered NSO to provide such discovery.  The Court may not make any inferences against NSO as a result of its non-production of evidence that the Court never ordered NSO to produce.  *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 367-68 (9th Cir. 1992); *Nida v. Allcom*, 2020 WL 2405251, at *6 (C.D. Cal. Mar. 11, 2020).

In any event, NSO's CEO testified without contradiction that NSO does not have any "installation vector for Pegasus . . . that uses [Plaintiffs'] technology in any way." (Dkt. No. 396-5, Exh. H at 51:23-52:2; *see* Supp. Shohat Decl. ¶ 46.)  NSO's witnesses also testified that they will abide by this Court's summary judgment order as long as it remains in effect.  (*See* Dkt. 751 at 808:24-809:4; Supp. Shohat Decl. ¶ 47.)  Plaintiffs have no evidence suggesting otherwise.  The mere fact that NSO's business involves creating government surveillance tools (Mot. 9-10) in no way suggests that NSO will again create a *WhatsApp* installation vector when this Court has found such conduct to be unlawful.[20]  Plaintiffs also seek an injunction pertaining to Plaintiffs' technologies other than WhatsApp, but this case has never involved Plaintiffs' "other technologies" (Mot. 11), and the record contains no evidence about them.  Whether or not those technologies are "widespread" (Mot. 12) has nothing to do with whether NSO will again engage in the only conduct Plaintiffs challenged: *using WhatsApp servers* to *install* Pegasus on user devices.

Nor are Plaintiffs harmed by NSO's mere possession of the "WIS." (Mot. 12-13.)  The "WIS" is a multipurpose technology with many uses other than crafting WhatsApp messages.  (Gazneli Decl. ¶¶ 5-6.)  That NSO used the "WIS" to craft WhatsApp messages *in the past* does not mean NSO will continue to do so in defiance of this Court's order.  *ValveTech*, 2024 WL 1984897, at *2-3; *Bansbach*, 2009 WL 10670230, at *5; *Castellano*, 2021 WL 3188432, at *10; *Allied Portables*, 2015 WL 6813669, at *4.  Even the unpublished default judgment Plaintiffs cite requires proof of a "reasonable likelihood of defendant's future violations," *Sluchevsky*, 2020 WL 5823277, at *9, and Plaintiffs offer *no* evidence that NSO will again use the "WIS" in any way that

---

[20] Neither do statements by a single NSO co-founder disagreeing with the Court's order.  (Mot. 9.)  Even if those statements could be attributed to NSO as an entity (which NSO denies), a mere statement of disagreement cannot be treated as evidence that a party is likely to defy a court order.

12

harms Plaintiffs. Without any such evidence, there is no basis for Plaintiffs' speculation that they will have to file multiple lawsuits or monitor NSO's conduct in the future. (Mot. 13-16.)

### 3. The balance of hardships does not favor an injunction.

The Court must balance any hardship to Plaintiffs if the injunction is withheld versus the hardship NSO will suffer if the injunction is granted. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Plaintiffs fail to identify any specific hardship that they would face without an injunction, beyond cursory references to irreparable harm. (Mot. 17.) NSO, by contrast, would suffer significant hardship from Plaintiffs' requested injunction.

***First***, the "threat of being driven out of business" constitutes irreparable harm, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022),[21] and Plaintiffs' requested injunction would put NSO's entire enterprise at risk. Pegasus is NSO's flagship product. (Supp. Shohat Decl. ¶ 48.) This case involves only a very limited subset of Pegasus versions that were installed through WhatsApp servers years ago. (Gazneli Decl. ¶¶ 3-5.) Yet Plaintiffs' injunction encompasses multiple Meta platforms that have nothing to do with this lawsuit. The injunction would broadly prohibit collecting data from terrorists and other law enforcement and intelligence targets from their WhatsApp mobile applications (which has not been held unlawful), as well as all of Plaintiffs' other platforms (which were not at issue in the litigation)—whether or not the collection was performed using a version of Pegasus installed through WhatsApp. (Dkt. No. 558-3 ¶¶ 2, 3(c).) There is no longer any version of Pegasus installed through WhatsApp (Supp. Shohat Decl. ¶ 46), so Plaintiffs' injunction would only interfere with the operation of products that are not even allegedly unlawful.

Such an injunction would force NSO out of business. (Supp. Shohat Decl. ¶¶ 48-51.) NSO has competitors that offer products, similar to Pegasus, that permit the remote collection of information from mobile devices. (*Id.*) Those competing products can collect WhatsApp messages, among other social media messages. (*Id.*) The proposed injunction, however, apparently would ban NSO from using *any* technology to collect information from user devices if the information is stored on one of Plaintiffs' platforms—even if the collection had nothing to do with WhatsApp servers.

---

[21] This is true even if the conduct at issue is unlawful. *Softketeers, Inc. v. Regal W. Corp.*, 2023 WL 2024701, at *11 (C.D. Cal. Feb. 7, 2023).

13

DEFENDANTS' REVISED OPPOSITION TO
MOTION FOR PERMANENT INJUNCTION

CASE NO. 5:24-cv-04660-EJD

**ER-194**

If NSO were banned from offering versions of Pegasus that could collect such data, even versions as to which there is no claim of a violation of U.S. or California law, it would impose a unique competitive disadvantage on NSO and undermine its entire business model. (*Id.*)

At a minimum, the proposed injunction would result in unchallenged versions of Pegasus abruptly becoming unavailable to NSO's government customers. (Gazneli Decl. ¶ 7; Supp. Shohat Decl. ¶ 50.) In addition to losing its revenues, NSO would likely violate its contracts with the customers who rely on its products to fight crime and terrorism. (Supp. Shohat Decl. ¶¶ 50-51.) Those customers would seek other options to avoid disruptions to their investigations. (*Id.*) Plaintiffs' injunction thus has the potential to cause NSO "irreversible loss of data, contracts, customers, and market share," *Softketeers*, 2023 WL 2024701, at *11, in addition to jeopardizing the jobs of NSO's 380 employees (Supp. Shohat Decl. ¶ 51). Plaintiffs are thus "simply incorrect that the 'only' hardship that Defendants will suffer from this injunction is preventing them 'from engaging in further illegal activity.'" *Softketeers*, 2023 WL 2024701, at *11. Such "dire ramifications" weigh "strongly against" the injunction. *Id.*

**Second**, the proposed injunction would prohibit NSO and its employees from "using Plaintiffs' Platforms *in any way*." (Mot. 19.) This would prohibit NSO employees from using WhatsApp for internal communications, which NSO employees currently do. (Dkt. 399-4, Exh. 6 at 252:12-253:14, Exh. 8 at 65:10-66:20, Exh. 21 at 91:10-92:4.) And the injunction is not limited to a prohibition on *commercial* uses, so it would forbid NSO employees from using Facebook, Instagram, WhatsApp, and other platforms even in their personal capacities—a substantial and unwarranted hardship. *Corelogic Sols., LLC v. Geospan Corp.*, 2020 WL 7786537, at *3 (C.D. Cal. Aug. 21, 2020) (TRO affecting defendants' personal devices and email accounts "would clearly impose significant hardships"). Facebook has conceded as much in another matter by revising injunction terms to prohibit only *commercial* activities. *Power Ventures*, 252 F. Supp. 3d at 781.

**Third**, the proposed injunction would chill NSO's ability to find legal representation across a variety of commercial, transactional, and litigation matters. Plaintiffs' injunction would bar NSO's "attorneys" from using any of Plaintiffs' various platforms in any way, whether personal or commercial. (Mot. 2 n.1, 19.) The injunction would thus prohibit any NSO attorney from

14

DEFENDANTS' REVISED OPPOSITION TO MOTION FOR PERMANENT INJUNCTION

CASE NO. 5:24-cv-04660-EJD

Greg D. Andres
Antonio J. Perez-Marques
Gina Cora
Craig T. Cagney
Luca Marzorati
  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:   greg.andres@davispolk.com
         antonio.perez@davispolk.com
         gina.cora@davispolk.com
         craig.cagney@davispolk.com
         luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email:   micah.block@davispolk.com

*Attorneys for Plaintiffs*
*WhatsApp LLC and Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| WHATSAPP LLC and META PLATFORMS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | ) Case No. 4:19-cv-07123-PJH<br>)<br>) **PLAINTIFFS' REVISED REPLY BRIEF**<br>) **IN SUPPORT OF MOTION FOR**<br>) **PERMANENT INJUNCTION**<br>)<br>) Date:   August 28, 2025<br>) Time:   10:00 am<br>) Ctrm:   3<br>) Judge:  Hon. Phyllis J. Hamilton<br>) Action Filed: October 29, 2019<br>)<br>) |

**ER-196**

# TABLE OF CONTENTS

PAGE

INTRODUCTION ..................................................................................................................1

PROCEDURAL HISTORY ....................................................................................................2

ARGUMENT ..........................................................................................................................2

     I.     Plaintiffs Satisfy the Requirements for Injunctive Relief ............................................2

          A.     NSO Threatens Plaintiffs with Ongoing Harm ...............................................2

          B.     There Is No Adequate Legal Remedy for Plaintiffs' Harm .............................6

          C.     The Balance of Hardships Favors an Injunction ............................................8

          D.     An Injunction Is in the Public Interest .........................................................10

     II.     The Scope of the Proposed Injunction Is Appropriate ...............................................11

     III.     California Law Does Not Preclude the Relief Plaintiffs Seek ....................................14

CONCLUSION .....................................................................................................................15

## INTRODUCTION

This Court should enter a permanent injunction prohibiting NSO from continuing its unauthorized access to Plaintiffs' Platforms and to the private messages of Plaintiffs' users. As the Court recognized in finding NSO liable for violating the Computer Fraud and Abuse Act ("CFAA") and the California Comprehensive Data Access and Fraud Act ("CDAFA"), the undisputed evidence established that NSO knowingly and with intent to defraud circumvented Plaintiffs' security measures and illegally accessed Plaintiffs' servers and infrastructure. It is undisputed that NSO did so repeatedly—despite knowing that Plaintiffs prohibited such activities—and that its conduct violated the law. In fact, NSO brazenly continued its unlawful conduct even after Plaintiffs filed this suit and after the Court concluded that NSO's conduct was illegal. The discovery record and evidence at trial confirmed that NSO's pattern of unlawful conduct, planned and executed over the course of years, was essential to NSO's business model—one that it admittedly continues to pursue to this day. Indeed, NSO's senior-most executives acknowledged the importance of secrecy to NSO's business, and the tens of millions of dollars that NSO continues to dedicate to finding new installation vectors and avoiding detection. These facts are undisputed, and they are more than sufficient to warrant a permanent injunction. At the upcoming evidentiary hearing, Plaintiffs will present further evidence demonstrating that Plaintiffs continue to face an ongoing threat from NSO, including evidence that NSO has not halted its illegal conduct on Plaintiffs' Platforms and has no intention of doing so without a court order.

The arguments in NSO's revised opposition brief are no more persuasive than the original version. First, NSO's assertions about the public interest in spyware lack any support in the evidentiary record, and are contradicted by the extensive evidence of Pegasus being used against journalists, political dissidents, and human rights lawyers. Second, NSO's attempt to paint Plaintiffs' proposed injunction as overbroad is both wrong on the law and confirmation that an injunction is necessary to prevent NSO from continually developing new ways to illegally access messages from Plaintiffs' users.

Having found that NSO has repeatedly violated federal and state law, this Court should issue a permanent injunction to prevent future illegal activity. While the record from discovery and trial

1

is sufficient for the issuance of an injunction, the evidence that Plaintiffs will present at the August 28, 2025 hearing will confirm the need for a court order to stop NSO's ongoing misconduct.

## PROCEDURAL HISTORY

Plaintiffs moved for a permanent injunction on February 24, 2025.  *See* Dkt. No. 557-3.  NSO filed its opposition on March 14, 2025, in part arguing that Plaintiffs' motion was "premature" and "procedurally improper."  Dkt. No. 604-2 at 3.  On March 25, 2025, Plaintiffs filed their reply.  Dkt. No. 637.  During a pretrial conference held on April 10, 2025, the Court postponed ruling on the permanent injunction motion until after trial.  Dkt. No. 684 at 19.

On May 6, 2025, after a six-day trial, a unanimous jury ruled in favor of Plaintiffs, awarding $444,719 in compensatory damages for NSO's violations of the CFAA and the CDAFA, and for NSO's breach of contract.  The jury also awarded Plaintiffs $167,254,000 in punitive damages, concluding that NSO acted with malice, oppression, or fraud in violating the CDAFA.  *See* Dkt. No. 736.

On June 18, 2025, NSO filed a revised opposition to Plaintiffs' motion for a permanent injunction.  Dkt. No. 759-2.  On August 1, 2025, the Court denied Plaintiffs' motion to strike NSO's revised opposition, but allowed Plaintiffs to file a revised reply brief in support of their motion for a permanent injunction.  Dkt. No. 781 at 1.

## ARGUMENT

### I.    Plaintiffs Satisfy the Requirements for Injunctive Relief

Plaintiffs have satisfied all four factors necessary to issue a permanent injunction.  First, the facts from discovery and from trial establish ongoing harm to Plaintiffs sufficient to warrant a permanent injunction against NSO.  Second, Plaintiffs face irreparable harm from NSO's unauthorized access that cannot be redressed with additional monetary damages.  Third, NSO's hardship claims merit no weight: the jury rejected NSO's portrayal of financial hardship in awarding punitive damages, and there is no justification to preserve a business built on breaking the law.  Fourth, NSO has failed to substantiate its repeated claim that the public benefits from illegal spyware, and the factual record contradicts this assertion.

### A.    NSO Threatens Plaintiffs with Ongoing Harm

Plaintiffs are irreparably injured by NSO's continuing and imminent threat of harm.  *See*

*Bowler v. Home Depot USA Inc.*, 2011 WL 166140, at *3 (N.D. Cal. Jan. 19, 2011) (irreparable injury occurs where "the threat of future harm is immediate"). The evidence revealed in discovery and at trial confirmed the nature of NSO's conduct, that obtaining unauthorized access to computers is the very essence of NSO's business, and that to this day NSO continues to devote massive resources to develop new means of secret, unauthorized installation of its spyware. The testimony of Plaintiffs' witnesses at the forthcoming evidentiary hearing will further confirm that Plaintiffs face an ongoing threat from NSO that only an injunction can stop.

***Evidence from discovery and trial.*** The evidence previously adduced about NSO's actions between January 2018 and May 2020 establishes that NSO poses an ongoing threat to Plaintiffs. *See* Dkt. No. 557-3 at 7–17. NSO secretly built a sophisticated spyware apparatus that enabled it to use WhatsApp's servers thousands of times without detection to install zero-click spyware on Plaintiffs' users' devices up to "tens of thousands" of times between April 2018 to May 2020. Dkt. No. 399-4, Ex. 6 at 83:10–11. To stay ahead of its competition and avoid being blocked, NSO continually modified Pegasus to solve for Plaintiffs' security updates, ensuring NSO's continued access to WhatsApp's servers—and thus the devices of Plaintiffs' users—in excess of its authorization. *See* Dkt. No. 557-3 at 9–11. During his deposition, NSO's head of research and development explained that NSO "constantly work[s] on research in order to find possible ways, rapid solutions." Dkt. No. 399-4, Ex. 6 at 266:3–7. When asked whether NSO continues to engage in this work today, he replied: "This is our business." *Id.*, Ex. 6 at 266:10.

The damages-only trial provided more evidence of the ongoing harm to Plaintiffs. For example, NSO *continues* to invest heavily in research and development, currently employing over 140 people dedicated to research and development and spending up to $52 million in 2023 and $59 million in 2024 to "find vectors, or ways to access the phone." Dkt. No. 758-2 at 886:4–5. Yaron Shohat, NSO's chief executive officer, testified that NSO consistently found an "alternative way to get—to allow the technology to get to the target device." *Id.* Tamir Gazneli, NSO's vice president of research and development, acknowledged that NSO's spyware was "undetectable by design." *Id.* at 28. Both admissions highlight the difficulty of trusting NSO's vow not to access WhatsApp's servers, and the need to ban NSO from Plaintiffs' Platforms altogether.

NSO does not contest this evidence. In fact, NSO admits that it continues to license Pegasus spyware and continues to rely on covert installation vectors. Dkt. No. 759-2 at 11; Dkt. No. 759-3 ¶¶ 5–6. NSO separately confirmed that its Pegasus spyware has been collecting WhatsApp messages from at least 2019 until the present. *See* Dkt. No. 779 at 4. Nor does NSO refute the extensive evidence about its ability to quickly circumvent sophisticated technical obstacles. *See* Dkt. No. 399-4, Ex. 14 at 2 ("NSO has proven time after time that one of its biggest value[s] is the ability to 'survive' this harsh enviorment [*sic*] of the cat and mouse game."). The undisputed evidence there-fore establishes that NSO maintains the technical expertise and commercial incentives not only to access Plaintiffs' servers, but also to hide any access from Plaintiffs. Given these facts, and the belief of NSO's co-founder, chairman, and current majority owner that NSO didn't do "anything wrong," *see* Dkt. No. 557-3 at 6, NSO's promises to follow this Court's orders ring hollow.[1]

As courts have found, companies in the business of accessing computers without authoriza-tion pose a risk of ongoing harm to their targets, even when they claim to have stopped their attacks. Dkt. No. 557-3 at 11 (citing cases). The cases that NSO cites in which courts have found no irrepa-rable harm all lack the facts established here. For instance, in *Sprint Nextel Corp. v. Welch*, the plaintiff made only "vague" allegations about the defendant's wrongdoing despite having "access to records that would identify specific misconduct." 2014 WL 68957, at *9 (E.D. Cal. Jan. 8, 2014), *re-port and recommendation adopted*, 2014 WL 2106683 (E.D. Cal. May 20, 2014). The remaining cases that NSO cites, *see* Dkt. No. 759-2 at 9 n.17, all involve singular instances of past unauthorized access. Here, in spite of NSO's sanctionable refusal to produce key evidence, Plaintiffs established that NSO repeatedly targeted Plaintiffs even after this litigation was filed, all pursuant to a business model that depends on continuously developing new means of unauthorized access. NSO's cases thus do not apply.[2]

---

[1] The damages-only trial also cast doubt on NSO's credibility. For instance, Mr. Shohat testified that NSO only became aware of Plaintiffs' lawsuit months after it was brought, even though NSO issued a statement on the lawsuit the day it was filed. *See* Dkt. No. 758-2 at 868:6–873:2.

[2] Plaintiffs did not delay in seeking a permanent injunction. NSO disclosed that its attacks had continued during the pendency of this lawsuit in September 2024. *See* Dkt. No. 399-4, Ex. 6 at 271:3–8. Even if there was a delay, it does not have "equal bearing in the permanent injunction

4

***Supplemental evidence.*** Plaintiffs intend to present additional evidence of ongoing harm at the upcoming evidentiary hearing.

*First*, NSO's continued collection of private information from Plaintiffs' users requires unauthorized access to Plaintiffs' client applications. Indeed, NSO admits that Pegasus is "capable of collecting a variety of both historical (existing) and current (incoming/outgoing) data from mobile devices," Dkt. No. 759-3 ¶ 35, and "collects information from users of WhatsApp" and "Plaintiffs' other platforms," Dkt. No. 759-2 at 17. Unsurprisingly, NSO has not described *how* it collects this information, nor did it provide any discovery on this topic. Lander Brandt, one of Plaintiffs' security engineers, will explain that NSO must access the WhatsApp client application to collect WhatsApp messages. And in order to collect "current" (i.e., real time) phone and video calls, Dkt. No. 759-3 ¶ 35, NSO would need to covertly inject harmful code into the WhatsApp client application. Regardless of whether NSO uses Plaintiffs' servers as an installation vector, NSO continues its unauthorized access to Plaintiffs' Platforms.

*Second*, Pegasus is still being installed via WhatsApp. As Plaintiffs' security engineer Andrew Blaich will explain, Plaintiffs have observed WhatsApp accounts associated with NSO use WhatsApp servers to send malicious links to other WhatsApp users. If the WhatsApp users were to click on the malicious link, it would cause the malware or spyware (likely Pegasus) to be installed on the user's device. This directly belies the representations made by Mr. Shohat that NSO lacks any "installation vector for Pegasus . . . that uses [Plaintiffs'] technology in any way, Dkt. No. 396-5, Exh. H at 51:23–52:2; *see also* Dkt. No. 759-3 ¶ 46, and highlights why this Court should issue an injunction and decline to credit NSO's assurances of future compliance with the law.

*Third*, NSO continues to use Plaintiffs' Platforms, including those besides WhatsApp, as part of its research and development activities. Mr. Blaich will testify about the evidence that Plaintiffs have gathered showing NSO's employees using Facebook and Instagram for testing and development purposes, rather than for "lawful business communications." Dkt. No. 759-2 at 18; *see* Decl. of Andrew Blaich in Supp. of Pls. Reply Br. in Supp. of Mot. for Permanent Injunction, Exs. A–C.

---

context." *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 824 (2024).

Without an injunction barring NSO from accessing all of Plaintiffs' Platforms, NSO is likely to continue to hunt for new ways to continue its misconduct.

While NSO's past conduct alone establishes a risk of ongoing harm, this contemporary evidence also justifies the issuance of a permanent injunction. Courts have held that "not only past violations" but also "ongoing violations" are sufficient to establish likelihood of future violations absent permanent injunctive relief. *Commodity Futures Trading Comm'n v. Ooki DAO*, 2023 WL 5321527, at *8 (N.D. Cal. June 8, 2023); *see also In re Google Play Store Antitrust Litig.*, 2024 WL 4438249, at *4 (N.D. Cal. Oct. 7, 2024) (ordering a permanent injunction after acknowledging that "harms are ongoing and cannot be made right simply by Google writing Epic a large check"). This is especially true where, as here, NSO has "continued to access [Plaintiffs'] servers after this action commenced"; under such circumstances, courts have found that "an injunction is necessary to prevent continued use." *Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686878, at *8 (N.D. Cal. Aug. 22, 2023), *report and recommendation adopted*, 2023 WL 8686913 (N.D. Cal. Oct. 10, 2023).

### B.    There Is No Adequate Legal Remedy for Plaintiffs' Harm

The harm that Plaintiffs face from NSO's ongoing misconduct is irreparable, as there "is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). NSO's claims that Plaintiffs' only alleged harms are "investigatory and remediation expenses," Dkt. No. 759-2 at 8, are baseless.

*First*, NSO fails to meaningfully distinguish the extensive case law finding that "unauthorized access of computers and the acquisition of data . . . constitute irreparable harm." *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019); *see* Dkt. No. 557-3 at 11 (citing cases).[3] NSO asserts that injunctive relief is appropriate only when the malicious actor acquired, stole, exploited, or retained the target's proprietary data. Dkt. No. 759-2 at 10. NSO is wrong, and the case law does not support the limitation that NSO posits. *See, e.g.*, *Craigslist, Inc. v. Kerbel*, 2012 WL 3166798, at *2 (N.D. Cal. Aug. 2, 2012) (enjoining defendant who posted ads on plaintiff's platform, and who was not alleged to have stolen, exploited,

---

[3] This harm is based on the specific nature of computer hacking violations, and thus beyond the "mere fact of a past violation." Dkt. No. 759-2 at 9.

PLAINTIFFS' REVISED REPLY BR. IN SUPP. OF MOT. FOR PERMANENT INJUNCTION - CASE NO. 4:19-CV-07123-PJH

Dated:  August 7, 2025                    Respectfully submitted,

                                          DAVIS POLK & WARDWELL LLP


                                          By:  /s/ Greg D. Andres
                                              Greg D. Andres
                                              Antonio J. Perez-Marques
                                              Gina Cora
                                              Craig T. Cagney
                                              Luca Marzorati
                                                (admitted *pro hac vice*)
                                              DAVIS POLK & WARDWELL LLP
                                              450 Lexington Avenue
                                              New York, New York 10017
                                              Telephone: (212) 450-4000
                                              Facsimile: (212) 701-5800
                                              Email: greg.andres@davispolk.com
                                                      antonio.perez@davispolk.com
                                                      gina.cora@davispolk.com
                                                      craig.cagney@davispolk.com
                                                      luca.marzorati@davispolk.com

                                              Micah G. Block (SBN 270712)
                                              DAVIS POLK & WARDWELL LLP
                                              900 Middlefield Road, Suite 200
                                              Redwood City, California 94063
                                              Telephone: (650) 752-2000
                                              Facsimile:  (650) 752-2111
                                              Email: micah.block@davispolk.com

                                              *Attorneys for Plaintiffs*
                                              *WhatsApp LLC and Meta Platforms, Inc.*

16

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHNOLOGIES LIMITED and
Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**SUPPLEMENTAL DECLARATION OF YARON SHOHAT IN SUPPORT OF DEFENDANTS' REVISED OPPOSITION TO PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**<br><br>**REDACTED VERISON OF DOCUMENT FILED UNDER SEAL**<br><br>Action Filed: 10/29/2019 |

SUPP. DECLARATION OF YARON SHOHAT                                              Case No. 4:19-cv-07123-PJH

**ER-205**

I, Yaron Shohat, hereby declare as follows:

1.      I am a citizen and resident of Israel. I served as Chief Operating Officer of Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited (together, "NSO") from approximately May 2018 until August 2022.  I have served as NSO's Chief Executive Officer since August 2022.  Q Cyber Technologies Ltd. is NSO Group Technologies Limited sole director and shareholder.  As Defendants' CEO, I am an employee of Q Cyber Technologies Ltd.. I am familiar with NSO's products, as well as its business practices, policies, and procedures.

2.      I have personal knowledge of the facts set forth in this declaration and, except as otherwise stated, could testify competently to each of them.

3.      NSO is a government contractor and technology company that designs and licenses technology exclusively to governments and government agencies for national security and law enforcement purposes.   The fact that NSO's customers are exclusively governments and government agencies has been confirmed by an Ernst & Young Global "Independent Accountant's Report." (Dkt. 45-13).  This remains true today.  Among NSO's products are a suite of different technologies and functions that are collectively branded and marketed as "Pegasus."

4.      NSO markets and licenses its Pegasus technology exclusively to sovereign governments and government agencies for the purposes above, and it does so only after receiving required export control licenses from the Israeli Ministry of Defense.  NSO does not now market or sell, and has never marketed or sold, its Pegasus technology for use by any non-governmental entity.

5.      The different technologies marketed under the "Pegasus" brand name provide NSO's foreign sovereign customers the ability to collect evidence and intelligence from different mobile devices. One subset of those technologies permitted governments and government agencies to collect evidence and intelligence from mobile devices that run the Android operating system and operate as "zero click," meaning the end user of the mobile device is not required to take any action, such as opening a link, for installation of Pegasus.  These "covert Android" technologies are completely different from the Pegasus technologies that can gather evidence and intelligence from

1

devices running other (i.e., non-Android) operating systems or that require some engagement by the end user of the mobile device (i.e., "one click").

6. I understand that earlier in the course of the lawsuit, the Court issued rulings that determined which NSO technologies were relevant to Plaintiffs' claims. Based on those rulings, NSO ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ These three covert installation vectors represent a very small fraction of Pegasus' overall capabilities with respect to obtaining information from Android devices.

7. Had the Court expanded those rulings, and the scope of information that NSO was required to produce, ██████████████████████████████████████████████

8. Access to NSO's Pegasus technology—including Heaven, Eden, and Erised—was and is subject to many legal, ethical, contractual, and technical safeguards. These safeguards function together to maximize the proven benefits of Pegasus, while minimizing the potential for its misuse. They are detailed below.

**Israel's Defense Export Control Law & Agency**

9. The marketing and licensing of NSO's Pegasus technology, and even its development, are strictly regulated and monitored by the Government of Israel under Israel's Defense Export Control Law ("DECL"). The DECL is administered by the Defense Export Control Agency ("DECA"), an agency within the Israeli Ministry of Defense.

10. Obtaining regulatory approval to market, and then to export, Pegasus involves a multi-step process.

11. First, NSO is required to maintain an active registration with DECA as a registered defense exporter.

12. ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████ The presentation of the software vulnerabilities proposed to be exploited by Pegasus, as those vulnerabilities are developed and on an ongoing

2

38. These same technical guardrails against misuse were also present in all versions of Pegasus licensed between mid-2018 and mid-2020—including Heaven, Eden, and Erised—as well as all versions of Pegasus licensed since.

39. NSO's technical safeguards also limit the number of target devices that can be monitored at any one time, ensuring that Pegasus cannot be used indiscriminately against improper targets or used to conduct mass surveillance.

**NSO's Monitoring & Auditing Process**

40. Finally, NSO itself ensures that customers are complying with their obligations and are not misusing the Pegasus system.

41. NSO compliance, legal, and customer teams review contractual obligations, advise customers on compliance obligations, and conduct investigations into potential misuses.

42. Misuse investigations may be triggered by whistleblower allegations (from internal or external individuals), reports from media or non-governmental organizations, and other sources.

43. NSO has conducted numerous investigations between 2018 and present. In some cases, the perceived misuse was found to be proper. In other cases, there was insufficient evidence to make a determination or evidence indicating misuse. In still other cases, NSO has made findings of misuse. In either of the latter cases, additional corrective actions would be taken. In some cases, the implementation of additional guardrails may be judged sufficient to mitigate future misuse. In other cases, suspension or termination of customer licenses has been deemed necessary.

44. Between 2018 and present, NSO has received over 100 reports of misuse, all of which went through a preliminary review, resulting in approximately 25 determinations of credible reports, all of which were thoroughly investigated. This led to 14 determinations of potential misuse, and 16 suspensions (some of which were temporary) or terminations of customers' access to the Pegasus system.

45. Attached as **Exhibit F** [Exh. A-2028], **Exhibit G** [Exh. A-1736] and **Exhibit H** are true and correct copies of NSO's 2021, 2023 and 2024 Transparency Reports, which contain additional information regarding its compliance and enforcement mechanisms.

*     *     *

7

SUPP. DECLARATION OF YARON SHOHAT          Case No. 4:19-cv-07123-PJH4:19-cv-07123-PJH

**ER-208**

46. My prior testimony that NSO no longer has any installation vectors for Pegasus that use WhatsApp, WhatsApp's servers, or WhatsApp's client application remains accurate. NSO currently has no products, either in use or development, that use WhatsApp as an installation vector.

47. Although NSO respectfully disagrees with the Court's order on summary judgment, and intends to appeal that ruling, NSO does not currently and will not in the future offer versions of Pegasus that use WhatsApp as an installation vector, absent any contrary ruling superseding this Court's ruling.

48. Pegasus is NSO's flagship product. It exists, however, in a competitive market. NSO has competitors that offer products, similar to Pegasus, that permit the remote collection of information from mobile devices. Those competing products can and do collect WhatsApp messages, among other social media messages. If NSO were banned from offering versions of Pegasus that have not been found to violate any law that allow its government customers to collect the same messages, it would quickly lose market share to competitors.

49. NSO's government customers rely on Pegasus to fight crime and terrorism and are likely to shift quickly to competing products that offer the widest range of capabilities. NSO's inability to match its competitors' offerings would result in a competitive disadvantage and loss of customers that NSO would be unlikely ever to overcome.

50. At a minimum, the injunction proposed by Plaintiffs would force changes to NSO's existing Pegasus products, including those that have not been part of this lawsuit. If all versions of Pegasus were rendered unavailable for any substantial period of time, NSO would be at risk of going out of business. In addition, NSO would be at risk of violating its contracts with the government customers who rely on its products to fight terrorism and investigate and prosecute crime. And, even if the disruption were not permanent, those customers would be likely to seek other options to avoid even temporary disruptions to their law-enforcement investigations, military operations, and intelligence activities. Once a customer transitions to a new competing solution, and begins collecting evidence or data, they would be unlikely to transition back to NSO's products.

8

SUPP. DECLARATION OF YARON SHOHAT      Case No. 4:19-cv-07123-PJH4:19-cv-07123-PJH

**ER-209**

51.    NSO currently employs approximately 380 personnel, the vast majority of whom have responsibilities relating to NSO's Pegasus products.  Should NSO lose revenues, contracts, or customers, the employment of all those people would be at risk.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, this 18th day of June 2025, at Sde Warburg, Israel.

_____

YARON SHOHAT

9

SUPP. DECLARATION OF YARON SHOHAT              Case No. 4:19-cv-07123-PJH4:19-cv-07123-PJH

**ER-210**

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHNOLOGIES LIMITED and
Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, <br><br> Plaintiffs, <br> v. <br><br> NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, <br><br> Defendants. | Case No. 4:19-cv-07123-PJH <br><br> **DECLARATION OF JOSHUA J. MINKLER IN SUPPORT OF DEFENDANTS' REVISED OPPOSITION TO PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION** <br><br> Action Filed: 10/29/2019 |

DECLARATION OF JOSHUA J. MINKLER                    Case No. 4:19-cv-07123-PJH

**ER-211**

I, Joshua J. Minkler, hereby declare as follows:

1.      I am an attorney and am currently a partner at the law firm Barnes & Thornburg LLP.  In that role, I represent clients in matters relating to white-collar, compliance, and criminal investigations.  Before joining Barnes & Thornburg, I served in various state and federal prosecutorial positions for more than thirty years, culminating in a presidential appointment to the role of United States Attorney for the Southern District of Indiana.  I have personal knowledge of the facts in this declaration, and I could and would testify competently to these facts if called as a witness.

2.      I have been engaged by Defendants NSO Group Technologies, Limited and Q Cyber Technologies Limited (collectively "NSO") to offer testimony based on my experience, including conducting investigation and prosecuting criminal cases using surveillance technologies.

3.      In connection with my engagement, I considered a variety of government, industry, and media publications, as well as certain documents produced in this litigation.

4.      I then prepared a report setting forth (among other things) my qualifications, my opinions, the basis and reasons for my opinions, and the facts and data that I considered when forming my opinions.

5.      Attached as **Exhibit A** is a true and correct copy of the report that I prepared, dated December 18, 2024.

6.      I affirm that the information, statements, and opinions set forth in Exhibit A were, and are, true and correct.  If called as a witness at trial, I could and would testify to the information, statements, and opinions set forth in Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10th day of March 2025.

_____
JOSHUA J. MINKLER

1

DECLARATION OF JOSHUA J. MINKLER                    Case No. 4:19-cv-07123-PJH

# Exhibit A

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC, and FACEBOOK, INC., | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) Case No. 4:19-cv-07123-PJH |
| | ) |
| NSO GROUP TECHNOLOGIES LIMITED, | ) |
| and Q CYBER TECHNOLOGIES LIMITED, | ) |
| | ) |
| *Defendants.* | ) |

## REPORT OF JOSHUA J. MINKLER

## CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### I.   INTRODUCTION

1.      My name is Joshua James Minkler. I have been engaged to offer testimony based on my specialized experience conducting investigations and prosecuting criminal cases based on surveillance technology. The scope of my testimony includes: (1) the lawful interception and surveillance of communications by federal law enforcement officers; (2) the unique investigatory challenges presented to state and federal law enforcement by end-to-end encryption and endpoint encryption; and (3) the benefits of tools such as Pegasus in law enforcement and national security operations.

2.      This report explains my understanding of the technology in this case and details my testimony concerning using such lawful intercept capabilities. The views expressed herein are my own and are based on my investigation into

**ER-214**

messages from Mexican law enforcement was instrumental in securing arrests and convictions for several of the investigation's targets.

54.    Based on public reporting, Pegasus has been used by several Western-style democracies including Germany, Spain, Belgium, Poland, and Hungary. *See, How Democracies Spy on Their Citizens,* The New Yorker (April 18, 2022), https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens.  It has also been publicly reported that the United States has purchased Pegasus, or financed the purchase of Pegasus, to assist American allies in combating crime and terrorism.  This includes Djibouti and Colombia. *See* Michael Levenson, *F.B.I. Secretly Bought Israeli Spyware and Explored Hacking U.S. Phones*, New York Times (Jan. 28, 2022), https://www.nytimes.com/2022/01/28/world/middleeast/israel-pegasus-spyware.html; *Washington Financed Colombia's Purchase Of Pegasus Spy Software,* Barron's (Nov. 8, 2024), https://www.barrons.com/news/washington-financed-colombia-s-purchase-of-pegasus-spy-software-76d6550f.

### D. Interception Technologies Provide the Potential for Significant Benefits to Law Enforcement and the Public

55.    Based on my experience, lawful real-time access to devices and the data, communications, and information therein is imperative to public safety and national security. Criminal and terrorist actors continue to evolve in their communications to avoid detection, and law enforcement and the intelligence community must outpace this evolution technically.

**ER-215**

56.    I am not alone in this belief. Numerous United States Attorneys General—appointed by Democrat and Republican presidents—agree on this issue. *See, e.g., Statement from Attorney General William P. Barr on Introduction of Lawful Access Bill in Senate,* US Department of Justice Office of Public Affairs, (June 23, 2020), https://www.justice.gov/opa/pr/statement-attorney-general-william-p-barr-introduction-lawful-access-bill-senate#:~:text=While%20strong%20encryption%20provides%20enormous,their%20crimes%20and%20avoid%20detection ("While strong encryption provides enormous benefits to society and is undoubtedly necessary for the security and privacy of Americans, E2E encryption technology is being abused by child predators, terrorists, drug traffickers, and even hackers to perpetrate their crimes and avoid detection. Warrant-proof encryption allows these criminals to operate with impunity. This is dangerous and unacceptable."); Christina Carrega et al., *Merrick Garland Cites Domestic Terrorism and Civil Rights in Defending Budget to House Lawmakers,* CNN Politics (May 4, 2021), https://www.cnn.com/2021/05/04/politics/merrick-garland-hearing/index.html (quoting Attorney General Merrick Garland as stating that "[t]he consequence of the internet and encryption means that [criminals and terrorists] can send information and make plans much more swiftly and in greater secrecy than could have been done before. . . . So, we have an emerging and accelerating threat."). President Obama has made similar statements. *See* The White House Office of Press Secretary, *Remarks by the President at South By Southwest Interactive* (Mar. 11, 2016),

https://obamawhitehouse.archives.gov/the-press-office/2016/03/14/remarks-president-south-southwest-interactive ("You cannot take an absolutist view on this. So if your argument is strong encryption, no matter what, and we can and should, in fact, create black boxes, then that I think does not strike the kind of balance that we have lived with for 200, 300 years. And it's fetishizing our phones above every other value. And that can't be the right answer. I suspect that the answer is going to come down to how do we create a system where the encryption is as strong as possible, the key is as secure as possible, it is accessible by the smallest number of people possible for a subset of issues that we agree are important.").

57.     Existing lawful intercept capabilities are typically limited to methods that rely upon E911 data, cell tower pings, and Internet Protocol ("IP") data. As a result, law enforcement is often only able to incept traditional (and often antiquated) de-encrypted methods of communications, such as telephone calls and text messages, application messages, and emails. Currently, federal law enforcement does not have technology capable of intercepting E2E communications.

58.     Individuals engaging in organized crime, child exploitation, terrorism, and human trafficking continue to develop technologies to avoid detection by law enforcement, including detection of their illegal activities by lawful electronic surveillance. In my experience, using E2E encryption is one of the most common technologies utilized to defeat lawful electronic surveillance.

**ER-217**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

WHATSAPP LLC AND META          )   C-19-07123 PJH
PLATFORMS, INC.,               )
                               )   OAKLAND, CALIFORNIA
                  PLAINTIFFS,  )
                               )   MAY 5, 2025
            VS.                )
                               )   VOLUME 6
NSO GROUP TECHNOLOGIES LIMITED )
AND Q CYBER TECHNOLOGIES       )   PAGES 1176-1369
LIMITED,                       )
                               )
                  DEFENDANTS.  )
_____)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PHYLLIS J. HAMILTON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:     DAVIS POLK & WARDWELL
                        BY:  GREG D. ANDRES
                             ANTONIO J. PEREZ
                        450 LEXINGTON AVENUE
                        NEW YORK, NEW YORK  10017

                        BY:  MICAH G. BLOCK
                        900 MIDDLEFIELD ROAD, SUITE 200
                        REDWOOD CITY, CALIFORNIA  94063

OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
                             IRENE RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES (CONTINUED)


FOR THE DEFENDANTS:     KING & SPALDING
                       BY:  JOSEPH N. AKROTIRIANAKIS
                            AARON S. CRAIG
                       633 WEST FIFTH STREET, SUITE 1600
                       LOS ANGELES, CALIFORNIA  90071

                       BY:  MATTHEW V. NOLLER
                       50 CALIFORNIA STREET, SUITE 3300
                       SAN FRANCISCO, CALIFORNIA  94111


ALSO PRESENT:          CURT EVANS
                       BRIAN BAKALE

**ER-219**

INDEX OF WITNESSES

DEFENDANTS'

**SUSAN GLICK**
        VIDEOTAPED DEPOSITION PLAYED              P. 1186


PLAINTIFFS' REBUTTAL

**DANA TREXLER**
        DIRECT EXAM BY MR. BLOCK                  P. 1187
        CROSS-EXAM BY MR. AKROTIRIANAKIS          P. 1198
        REDIRECT EXAM BY MR. BLOCK                P. 1206


DEFENDANTS' REBUTTAL

**GREG PINSONNEAULT**
        DIRECT EXAM BY MR. CRAIG                  P. 1211
        VOIR DIRE EXAM BY MR. BLOCK              P. 1213
        DIRECT EXAM BY MR. CRAIG (RES.)           P. 1215
        CROSS-EXAM BY MR. BLOCK                   P. 1229




CLOSING ARGUMENT BY MR. ANDRES                   P. 1240

CLOSING ARGUMENT BY MR. AKROTIRIANAKIS            P. 1285

REBUTTAL ARGUMENT BY MR. ANDRES                  P. 1332

UNITED STATES COURT REPORTERS

**ER-220**

THINGS.

WHAT WE ASK IS THAT YOU, AND WE KNOW YOU WILL, PAY ATTENTION TO THOSE AND READ THOSE.  THEY'RE IMPORTANT.

NOW, TO QUALIFY FOR PUNITIVE DAMAGES, WHATSAPP MUST PROVE THAT NSO'S CONDUCT WAS DONE WITH MALICE OR OPPRESSION OR FRAUD. YOU DON'T HAVE TO FIND ALL THREE.  YOU HAVE TO FIND ONE OF THE THREE.  WE THINK WE HAVE PROVED ALL THREE.

WHATSAPP MUST PROVE THAT NSO'S EXECUTIVES, ITS OFFICERS, DIRECTORS, MANAGERS ACTED ON BEHALF OF NSO.

THAT'S NOT A COMPLICATED ISSUE.  YOU HEARD FROM THOSE PEOPLE HERE, THAT THEY EITHER ACTED ON BEHALF OF NSO, THAT THEY COMMITTED THESE ACTS, THAT THEY AUTHORIZED THEM, OR THAT THEY KNEW OF THEM AND ADOPTED THEM AND APPROVED THEM AFTER THE FACT.

SO THAT ISSUE WITH RESPECT TO MANAGING AGENTS OR EXECUTIVES, YOU KNOW THAT BECAUSE MR. SHOHAT PROUDLY TOLD YOU THAT HE'S THE CEO BOTH OF Q CYBER AND NSO, AND HE WAS INVOLVED IN THESE EVENTS, AND APPROVED OF THEM, AS HE DOES TODAY.

YOU ALSO HEARD FROM MR. GAZNELI.  I'LL COME BACK TO THAT IN A MINUTE.

LET'S TALK ABOUT MALICE.

MALICE.  MALICE, JUDGE HAMILTON WILL INSTRUCT YOU, MEANS THAT DEFENDANTS ACTED WITH INTENT TO CAUSE INJURY OR THAT DEFENDANTS' CONDUCT WAS DESPICABLE.  IT WAS KNOWING AND WAS DONE WITH A WILLFUL AND KNOWING DISREGARD OF WHATSAPP'S RIGHTS.

SHE'LL FURTHER INSTRUCT YOU THAT A PERSON ACTS WITH

KNOWING DISREGARD WHEN A PERSON IS AWARE OF THE PROBABLE DANGEROUS CONSEQUENCES OF A PERSON'S CONDUCT AND DELIBERATELY FAILS TO AVOID THAT CONDUCT.

JUDGE HAMILTON WILL ALSO TELL YOU THAT OPPRESSION MEANS THAT DEFENDANTS' CONDUCT WAS DESPICABLE, SUBJECTED THE PLAINTIFFS TO CRUEL AND UNJUST HARDSHIP IN KNOWING DISREGARD OF WHATSAPP'S RIGHTS.

AND SHE'LL DEFINE DESPICABLE CONDUCT AS SO VILE, BASE, OR CONTEMPTIBLE THAT IT WOULD BE LOOKED DOWN UPON OR DESPISED BY REASONABLE PEOPLE THE WAY THAT REASONABLE PEOPLE WOULD VIEW SPYING ON SOMEBODY'S PHONE IN THE WAY THAT NSO SPIES.

JUDGE HAMILTON WILL INSTRUCT YOU THAT FRAUD MEANS THAT THE DEFENDANTS INTENTIONALLY MISREPRESENTED OR CONCEALED A MATERIAL FACT.

YOU KNOW THAT THERE WAS FRAUD IN THIS CASE.  YOU KNOW THAT THERE WAS DECEIT AND CHEATING.

AGAIN, JUST WITH THIS ISSUE ABOUT MANAGING AGENTS, YOU HEARD THE TESTIMONY OF MR. SHOHAT.  YOU HEARD THE TESTIMONY OF MR. GAZNELI.  THEY ARE SENIOR EXECUTIVES.

YOU ALSO HEARD THE TESTIMONY OF MS. GIL.  SHE WAS BY VIDEO.  SHE TESTIFIED ABOUT THE FACT THAT THEY SELL, I THINK SHE SAID HAD A BUSINESS, A BUSINESS DEPARTMENT AND THEY SELL PEGASUS, ON AVERAGE, FOR $7 MILLION, AND SOMETIMES THEY HAVE TO CHARGE MORE THAN $7 MILLION IF THE PARTY BUYING IT WANTS TO BE ABLE TO SURVEIL PEOPLE OUTSIDE OF THEIR COUNTRY.

SO YOU HEARD FROM HER.

YOU ALSO HEARD FROM MR. ESHKAR, WHO'S A SENIOR EXECUTIVE.

SO LET ME TURN TO THE QUESTIONS OF WHETHER NSO ACTED WITH MALICE, OPPRESSION, OR FRAUD.  AND THEY DID.

FIRST, YOU KNOW WHAT NSO DID IN THIS CASE.  THEY ATTACKED WHATSAPP'S SERVERS.  I'M REPEATING MYSELF, BUT IT'S IMPORTANT THAT WE GO THROUGH THESE ONE BY ONE.

YOU KNOW THAT THEY DID THAT ATTACK ON WHATSAPP'S SERVERS HERE IN CALIFORNIA 43 TIMES.  ALL YOU NEED TO DO TO VERIFY THAT FACT IS READ THE JURY INSTRUCTIONS.

YOU KNOW THAT THE PURPOSE OF THE VECTORS NSO ATTACKED HERE WAS TO PUT THE SPYWARE ON THE PHONE.  ATTACKING FOR THE PURPOSE OF SPYING.

AND YOU KNOW THAT THEY TARGETED AND SENT THIS MALICIOUS SPYWARE ONTO THE PHONES OF 1400 PEOPLE.

NOW, LET ME STOP FOR ONE SECOND.

THAT'S 1400 PEOPLE IN A TWO-WEEK TIME PERIOD.  OKAY?  SO I'M NOT GOING TO DO THE MATH FOR YOU.  THAT'S NOT MY SPECIALTY.  BUT THAT 1400 PEOPLE THAT ARE THE VICTIMS OF THIS SPYWARE ATTACK HAPPENED IN A TWO-WEEK PERIOD.

NOW, THOSE VICTIMS, BY THE WAY, YOU'VE HEARD TESTIMONY, NSO DOES NOT KNOW WHO THOSE VICTIMS ARE, AND MR. SHOHAT TESTIFIED TO THAT.  I ASKED HIM THAT SPECIFICALLY ON CROSS-EXAMINATION.  I ASKED HIM, YOU'RE SAYING NO, NSO, AT THE TIME OF PEGASUS, DID NOT KNOW THE IDENTITIES OF PEOPLE WHOSE

PHONES ARE BEING SPIED UPON?

THIS IS A CORRECT STATEMENT.

AND JUDGE HAMILTON IS GOING TO TELL YOU THAT -- INSTRUCT YOU THAT THE IDENTITIES OF VICTIMS ARE NOT RELEVANT.

AND SO REGARDLESS OF WHATEVER GOVERNMENTS NSO SELLS TO, WHATEVER THAT MEANS, NSO IS NOT A GOVERNMENT, THEY'RE A FOR-PROFIT COMPANY, AND THEY DON'T KNOW WHO THEY'RE SPYING ON.

MR. SHOHAT TESTIFIED TO THAT.  YOU SHOULD RELY ON THAT, AND YOU CERTAINLY CAN RELY ON THE INSTRUCTION OF JUDGE HAMILTON.

NOW, YOU KNOW THAT THEY USED THIS ZERO-CLICK TECHNOLOGY THAT WE TALKED ABOUT.  YOU HAVE HEARD THAT THESE ATTACKS, THE MALWARE INSTALLATION, HEAVEN, EDEN, ERISED, THAT IS THE HEART OF NSO'S OPERATION, AND YOU SEE THAT THERE'S -- YOU CAN LOOK AT THESE DOCUMENTS, PLAINTIFFS' EXHIBIT 59, YOU'RE HAPPY TO LOOK AT THIS -- THIS IS A DOCUMENT WHERE YOU CAN SEE ALL OF THE, ALL OF THE CAPABILITIES OF PEGASUS.

YOU KNOW ABOUT THE PEGASUS INSTALLATION AND WHAT IT DOES AND HOW IT SPIES.  I'M NOT GOING TO DO THAT.

REMEMBER THIS.  THIS ONE CAME IN THROUGH A VIDEO, BUT RAMON ESHKAR, HE'S THE VICE PRESIDENT OF CLIENT EXECUTIVES, HE WAS ASKED, WHAT CAN PEGASUS DOWNLOAD FROM THE PHONE?

HE SAID -- WAS THE CASE WITH RESPECT TO THE OPERATION OF PEGASUS IN 2018 AND '19, EVERY KIND OF USER DATA ON THE PHONE AS IT EXISTS.  THIS IS MY UNDERSTANDING.

EVERYTHING ON THE PHONE.

NOW, YOU KNOW THAT THEY DO THIS FOR MONEY, AND WE'LL TALK ABOUT THAT IN A MINUTE.

BUT THERE'S ANOTHER DOCUMENT, PLAINTIFFS' EXHIBIT 264, WHERE YOU CAN LOOK AND SEE THE AMOUNT OF MONEY IN 2018 AND 2019, DURING THIS TIME PERIOD WHEN THE SPYING OCCURRED, THAT NSO SPENT MORE THAN $110 MILLION.  I BELIEVE THAT'S ON PAGE 5 OF 264.  TAKE IT, LOOK AT IT.

YOU'VE HEARD FROM MS. GIL, I SAID, ABOUT HOW MUCH MONEY THEY CHARGE.

MR. SHOHAT, WHEN HE WAS ASKED ABOUT HOW MUCH THEY CHARGE FOR PEGASUS, HE SAID BETWEEN 3 MILLION AND ANOTHER CUSTOMER COULD PAY TEN TIMES THAT.

SO THAT MATH I CAN DO.  MR. SHOHAT TESTIFIED BETWEEN $3 AND $30 MILLION THEY CHARGE FOR THE PEGASUS SOFTWARE.

NOW, HOW DO YOU KNOW THAT WHAT NSO DID BEARS ON MALICE, OPPRESSION, FRAUD?  BECAUSE THEY DID THIS DELIBERATELY.  THEY DID IT SECRETLY.  THEY DID IT KNOWINGLY IN DISREGARD OF WHATSAPP'S RIGHTS.

YOU KNOW THAT'S TRUE.  THEY DID IT DELIBERATELY.  THIS WASN'T AN ACCIDENT.  IT WASN'T SOME KID HACKING IN THEIR BASEMENT.

THIS IS THE MOST SIGNIFICANT, MOST SOPHISTICATED, AS MR. SHOHAT SAID, THE MARKET LEADER IN THIS TECHNOLOGY.

YOU KNOW ABOUT ALL THE MONEY THAT NSO SPENDS IN R&D.  YOU

AGAIN, WE ASKED THAT YOU SEND A MESSAGE BECAUSE NSO HASN'T STOPPED, AND HERE'S TESTIMONY FROM MR. GAZNELI THAT WHILE THIS LAWSUIT WAS PENDING THEY'RE ACTIVELY MAKING ITS CUSTOMERS A ZERO-CLICK EXPLOIT.

DO YOU SEE THAT?  AND HE ANSWERS YES.

SO THEY HAVEN'T STOPPED.

NEXT SLIDE.

THIS IS THE ISSUE OF THE RSU'S, RIGHT?  WHY WERE THEY INCLUDED BY MS. TREXLER?  SHE WASN'T TRYING TO INFLATE.  THIS IS HOW THE WHATSAPP EMPLOYEES GET PAID, AND YOU KNOW THAT TESTIMONY FROM MR. GHEORGHE AND FROM MR. ROBINSON.

NEXT SLIDE.

MR. AKROTIRIANAKIS ASKED FOR A DEFINITION OF SPYING.  THIS IS WHAT PEGASUS DOES, AND THIS IS IN EXHIBIT 59.  ASK TO SEE IT.  THIS IS WHAT SPYING IS, PLUS EVERY OTHER POSSIBLE THING. ASK TO SEE IT.  THIS IS WHAT SPYING IS.

YOU WANT A DEFINITION OF SPYING?  IT'S GLOBAL COVERAGE, UNLIMITED ACCESS, HANDLE ENCRYPTED CONTENT, UNCOVER VIRTUAL IDENTITIES, OPERATE TARGET DEVICES, INTERCEPT CALLS, PINPOINT TARGETS, MONITOR MOBILE APPLICATIONS.

THAT'S WHAT PEGASUS DOES.  YOU CAN CALL IT SPYWARE OR ANYTHING ELSE, BUT THAT'S WHAT THE PRODUCT AT ISSUE HERE IS, AND THAT'S WHY NSO HACKS INTO WHATSAPP'S SERVERS.

NEXT SLIDE.  THAT'S THE LAST ONE?  OKAY.

I JUST WANT TO REMIND YOU OF A FEW OTHER THINGS.

YOU'VE, AGAIN, HAD THIS ARGUMENT THAT NSO HAS NO ABILITY TO PAY BECAUSE THEY'RE POOR.

BUT YOU HEARD THE TESTIMONY, NOT ON DIRECT EXAMINATION, BUT ON CROSS-EXAMINATION.  MR. SHOHAT SAID THAT THEIR EXPENSES ARE $10 MILLION A MONTH.  THAT MEANS THAT THEY SPENT $120 MILLION A YEAR ON EXPENSES, ALL OF WHICH WOULD BE AVAILABLE WHEN YOU CONSIDER, CONSIDER PUNITIVE DAMAGES IN THIS CASE.

THERE WAS SOME DISCUSSION ABOUT THE SIZE OF THE COMPANIES. WHEN YOU READ THROUGH THE JURY INSTRUCTIONS, THERE IS NOTHING IN THOSE JURY INSTRUCTIONS THAT ASKS YOU TO COMPARE THE SIZE OF THE TWO PARTIES HERE.  THERE'S NOTHING IN THERE THAT ASKS YOU TO CONSIDER THE FINANCIAL CONDITION OF BOTH PARTIES.

THERE'S ONLY, IN THE PUNITIVE DAMAGES, ONLY DISCUSSION ABOUT THE DEFENDANT.  AND REMEMBER THAT AND DON'T BE DISTRACTED, OR DON'T BE CONFUSED BASED ON THE ARGUMENTS THAT NSO HAS MADE.

THERE WAS REFERENCE TODAY TO, IN THEIR CLOSING, ABOUT SUSAN GLICK.  I'M HAPPY TO HAVE YOU CONSIDER THE TESTIMONY OF SUSAN GLICK.  THEY PUT HER IN TODAY THROUGH VIDEO.  I THINK IT WAS ABOUT THREE MINUTES.

ALL SHE TESTIFIED ABOUT WAS THE DATE THAT, IN HER VIEW, WHICH SHE SAID SHE DIDN'T KNOW VERY MUCH ABOUT, THE SECURITY WAS, WAS CORRECTED.  BUT YOU HAVE THAT FROM A VARIETY OF OTHER PEOPLE AND AT THE END OF THE DAY, IT'S NOT PARTICULARLY

RELEVANT, NOT SOMETHING THAT YOU SHOULD SPEND A LOT OF TIME ON.

AT THE END OF THE DAY, LADIES AND GENTLEMEN -- BY THE WAY, THERE WAS ALSO QUITE A BIT OF VICTIM BLAMING IN THIS CLOSING. WHATSAPP IS THE VICTIM OF A CYBER ATTACK.  WE'RE NOT THE SAME -- WE'RE NOT ON THE SAME FOOTING WITH NSO IN THE CONTEXT OF THIS LAWSUIT.

WE -- THERE'S BEEN NO FINDING BY THIS COURT THAT WE VIOLATED THE LAW AT ALL.

THE COURT HAS FOUND THAT NSO VIOLATED THE LAW.  SO ALL THIS BLAMING THAT OUR SECURITY WASN'T ROBUST ENOUGH OR VULNERABILITIES OR WE LET THEM IN, WE DID NOT.  AND YOU KNOW THAT SPECIFICALLY BASED ON THE TESTIMONY OF THE ENGINEERS.

YOU KNOW ABOUT THE SPYING IN THIS CASE.  YOU KNOW WHAT IT MEANS.

YOU KNOW ABOUT THEIR FINANCIAL CONDITION.

AND, AGAIN, I ASK YOU TO LOOK AT THE EXHIBITS, PLAINTIFFS' EXHIBIT 1779, 1780, 1781, 1782.  THOSE ARE THE FINANCIAL DOCUMENTS AS THEY RELATE TO NSO AND Q CYBER.

LADIES AND GENTLEMEN, END THE CAT AND MOUSE GAME.  AWARD THE COMPENSATORY DAMAGES OF 444,719, $444,719, AND AWARD A PUNITIVE DAMAGES NUMBER THAT SENDS A MESSAGE THAT SPYING IS NOT OKAY.  IT'S NOT APPROPRIATE.

YOU KNOW THE COURT HAS FOUND IT VIOLATED THE LAW, THAT THIS HACKING AND SPYING IS NOT OKAY.

SEND THAT MESSAGE.

THANK YOU FOR YOUR TIME.

THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.

ALL RIGHT.  MEMBERS OF THE JURY, NOW IS THE TIME FOR ME TO GIVE YOU THE INSTRUCTIONS.  I AM REQUIRED TO READ THE INSTRUCTIONS IN THE RECORD, BUT WE HAVE FOUND IT HELPFUL FOR YOU TO HAVE A COPY OF THE INSTRUCTIONS SO THAT YOU CAN READ ALONG WITH ME, AND IT -- I THINK THE THINKING IS THAT IT WILL SINK IN MORE IF YOU'RE ABLE TO READ IT AS WELL.

SO MS. COLLINS WILL HAND EVERYBODY A COPY OF THE INSTRUCTIONS THAT APPLY IN THIS CASE.

(PAUSE IN PROCEEDINGS.)

THE COURT:  ALL RIGHT.

MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE EVIDENCE AND THE ARGUMENTS OF THE ATTORNEYS, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES TO THIS CASE.

EACH OF YOU HAS RECEIVED A COPY OF THESE INSTRUCTIONS THAT YOU MAY TAKE WITH YOU TO THE JURY ROOM TO CONSULT DURING YOUR DELIBERATIONS.

NOW, IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE EVIDENCE IN THE CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT TO YOU.  AND YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU, WHETHER YOU AGREE WITH IT OR NOT.  AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.  THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT

YOU TOOK AN OATH TO DO SO.

PLEASE DO NOT READ INTO THESE INSTRUCTIONS ANYTHING THAT I MAY SAY OR DO, OR HAVE SAID OR DONE, THAT I HAVE AN OPINION REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.  IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM AND NOT SINGLE OUT SOME AND IGNORE OTHERS; THEY ARE ALL IMPORTANT.

NOW, WHEN A PARTY HAS THE BURDEN OF PROOF BY A PREPONDERANCE OF THE EVIDENCE ON ANY ISSUE, IT MEANS THAT YOU MUST BE PERSUADED BY THE EVIDENCE THAT THE PARTY'S FACTUAL CONTENTION IS MORE PROBABLY TRUE THAN NOT TRUE.

YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE, REGARDLESS OF WHICH PARTY SUBMITTED IT.

WHEN A PARTY HAS THE BURDEN OF PROVING ANY CLAIM OR DEFENSE BY CLEAR AND CONVINCING EVIDENCE, IT MEANS THAT THE PARTY MUST PRESENT EVIDENCE THAT LEAVES YOU WITH A FIRM BELIEF OR CONVICTION THAT IT IS HIGHLY PROBABLE THAT THE FACTUAL CONTENTIONS OF THE CLAIM OR DEFENSE ARE TRUE.  THIS IS A HIGHER STANDARD OF PROOF THAN PROOF BY A PREPONDERANCE OF THE EVIDENCE, BUT IT DOES NOT REQUIRE PROOF BEYOND A REASONABLE DOUBT.

NOW, THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE FACTS CONSIST OF ARE:

THE SWORN TESTIMONY OF ANY WITNESS;

THE EXHIBITS THAT ARE ADMITTED INTO EVIDENCE;

ANY FACTS TO WHICH THE LAWYERS HAVE AGREED; AND,

CERTIFICATE OF REPORTERS


WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8076

_____

LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595


DATED:  MAY 5, 2025

UNITED STATES COURT REPORTERS

**ER-231**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| WHATSAPP LLC AND META PLATFORMS, INC., | ) | C-19-07123 PJH |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| PLAINTIFFS, | ) | |
| | ) | MAY 2, 2025 |
| VS. | ) | |
| | ) | VOLUME 5 |
| NSO GROUP TECHNOLOGIES LIMITED | ) | |
| AND Q CYBER TECHNOLOGIES | ) | PAGES 848-1175 |
| LIMITED, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PHYLLIS J. HAMILTON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:     DAVIS POLK & WARDWELL
                        BY:  GREG D. ANDRES
                             ANTONIO J. PEREZ
                        450 LEXINGTON AVENUE
                        NEW YORK, NEW YORK  10017

                        BY:  MICAH G. BLOCK
                        900 MIDDLEFIELD ROAD, SUITE 200
                        REDWOOD CITY, CALIFORNIA  94063

OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
                             IRENE RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES (CONTINUED)


FOR THE DEFENDANTS:     KING & SPALDING
                        BY:  JOSEPH N. AKROTIRIANAKIS
                             AARON S. CRAIG
                        633 WEST FIFTH STREET, SUITE 1600
                        LOS ANGELES, CALIFORNIA  90071

                        BY:  MATTHEW V. NOLLER
                        50 CALIFORNIA STREET, SUITE 3300
                        SAN FRANCISCO, CALIFORNIA  94111


ALSO PRESENT:           CURT EVANS
                        BRIAN BAKALE

**ER-233**

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 166 of 295
Case 4:19-cv-07123-PJH   Document 753   Filed 06/05/25   Page 3 of 329

850

INDEX OF WITNESSES

DEFENDANTS'


**YARON SHOHAT**
    CROSS-EXAM BY MR. ANDRES (RES.)        P. 865
    REDIRECT EXAM BY MR. AKROTIRIANAKIS    P. 896
    RECROSS-EXAM BY MR. ANDRES        P. 899


**TAMIR GAZNELI**
    DIRECT EXAM BY MR. AKROTIRIANAKIS     P. 903
    CROSS-EXAM BY MR. PEREZ         P. 942
    REDIRECT EXAM BY MR. AKROTIRIANAKIS    P. 982


**GREG PINSONNEAULT**
    DIRECT EXAM BY MR. CRAIG         P. 991
    VOIR DIRE EXAM BY MR. ANDRES      P. 995
    DIRECT EXAM BY MR. CRAIG (RES.)     P. 999
    CROSS-EXAM BY MR. ANDRES       P. 1024
    REDIRECT EXAM MR. CRAIG        P. 1056

AND I THINK IT'S THE TOP OF PAGE 10 THAT HAS THE -- LIKE, SOME COMPUTER CODE.  YES, PAGE 10.

OKAY.  AND ARE YOU ABLE TO SEE THAT ON THE SCREEN IN FRONT OF YOU, MR. GAZNELI?

A.   YES.

Q.   OKAY.  AND YOU RECOGNIZE THIS COMPUTER CODE?

A.   YES.

Q.   OKAY.  IT'S A -- SO YOU READ COMPUTER CODE YOURSELF?

A.   YES.

Q.   OKAY.  SO TO SOMEONE LIKE YOU WHO CAN READ COMPUTER CODE, THIS DOESN'T LOOK MAYBE LIKE IT DOES TO SOMEONE LIKE ME WHO DOESN'T READ COMPUTER CODE; RIGHT?

A.   RIGHT.

MR. PEREZ:  OBJECTION.  LEADING, YOUR HONOR.

THE COURT:  YES, IT IS A LITTLE LEADING, BUT IT'S ALL RIGHT.

BY MR. AKROTIRIANAKIS:

Q.   ALL RIGHT.  I THINK THIS SCREEN IS A LITTLE BRIGHT, SO TAKE IT DOWN.  THANK YOU.

SO WHEN I'M TALKING ABOUT THE COMPUTER CODE AND INSTALLATION MESSAGES, I'M TALKING ABOUT THE COMPUTER CODE THAT WE JUST LOOKED AT THERE.  OKAY?

A.   YEAH.

Q.   THE COMPUTER CODE AND THE INSTALLATION MESSAGES, WAS THAT DESIGNED TO RUN ON WHATSAPP SERVERS?

A.   NO.

Q.   ON WHAT, OR WHERE, I SHOULD SAY, WAS THAT COMPUTER CODE IN THE INSTALLATION MESSAGES DESIGNED TO RUN?

A.   IT WAS DESIGNED TO RUN ONLY ON ANDROID DEVICES.

Q.   OKAY.  SO THE TARGET DEVICE?

A.   YES.

Q.   COULD IT RUN ON WHATSAPP SERVERS?

A.   NO.

Q.   DID PEGASUS EVER EXECUTE ANY FOREIGN CODE ON ANY WHATSAPP SERVER?

A.   NO.

Q.   WERE THE INSTALLATION MESSAGES DESIGNED TO DAMAGE THE WHATSAPP SERVER OR SERVICE?

A.   NO.

Q.   WERE THE INSTALLATION MESSAGES DESIGNED TO SLOW DOWN THE WHATSAPP SERVERS OR SERVICE?

A.   NO.

Q.   WERE THE INSTALLATION MESSAGES DESIGNED TO ALTER OR DELETE ANY DATA FROM THE WHATSAPP SERVERS?

A.   NO.

Q.   WERE THE INSTALLATION MESSAGES DESIGNED TO DAMAGE THE FUNCTION OF THE WHATSAPP SERVERS OR SERVICE IN ANY WAY?

A.   NO.

Q.   AS THE LEADER OF NSO'S ANDROID SECURITY RESEARCH TEAM, DID YOU OVERSEE THE DESIGN OF THE HUMMINGBIRD VECTORS?

A.   YES.

Q.   WAS IT A GOAL OR OBJECTIVE OF THAT DESIGN TO DAMAGE OR DISTURB THE WHATSAPP SERVICE?

A.   NO.

Q.   CAN YOU PLEASE EXPLAIN?

A.   SO OUR MISSION IS TO CREATE THIS TYPE OF SOFTWARE TOOLS FOR GOVERNMENT AGENCY CUSTOMERS AND NOT HARM ANY WHATSAPP SERVERS, OR ANY OTHER SERVER, WHICH IS INVOLVED IN THE SENDING THIS TYPE OF MESSAGES, OR ANY TYPE OF MESSAGES, AND BUILDING THE INSTALLATION VECTORS.

THIS IS NOT THE MISSION.

AND EVEN BY DOING SO, IT WILL HARM THE INSTALLATION VECTORS THEMSELVES AND HARM THE MISSION IN A WAY THAT IT WILL MOTIVATE THE PLATFORM OWNERS TO BLOCK THE MESSAGES AND TO BLOCK THE FUNCTIONALITY OF THE INSTALLATION VECTOR.

SO IT'S PRACTICALLY UNDERMINING OUR MISSION AND THE FACT THAT WE ARE WORKING TO PROVIDE THIS TYPE OF TOOLS FOR THE CUSTOMERS.

Q.   SO THEN WAS IT A GOAL OF YOUR DESIGN NOT TO DAMAGE OR DISTURB THE WHATSAPP SERVERS?

A.   YEAH, ABSOLUTELY, YEAH.

Q.   AND CAN YOU PLEASE EXPLAIN THAT?

A.   YES.  WE INVEST A LOT IN UNDERSTANDING THE ECOSYSTEM IN A WAY THAT WE WILL OPERATE ACCORDING TO THE RULES OF THE ECOSYSTEM AND WILL NOT DISTURB ANYTHING IN THE WAY.

OF COURSE THIS ALSO SERVES THE PURPOSE OF OPERATING SYSTEMS FOR OUR CUSTOMERS IN ORDER TO BE ABLE TO, TO USE THIS TYPE OF VECTORS FOR LONGER TIMES.

BUT AS I SAID, THE -- IT COMES ALONG WITH THE FACT THAT THE IDEA IS TO ACT AS A NORMAL USER AND NOT HARM ANYTHING IN ANY WAY.

Q.   I REALIZE I ASKED YOU TO SIT CLOSE TO THE MICROPHONE, BUT MAYBE JUST SLIGHTLY BACK BECAUSE OF THE ACOUSTICS.

A.   OKAY.

Q.   THANK YOU.

ALL RIGHT.  SO WHAT, IF ANY, KINDS OF MEASURES DID NSO TAKE TO AVOID DISTURBING OR HARMING THE WHATSAPP SERVERS?

A.   OKAY.  SO WE DO SENSITIVE RESEARCH IN TERMS OF THE ECOSYSTEM, AS I SAID, IN ORDER TO REALLY INTERNALLY LEARN THE INTERNAL RULES THAT THE ECOSYSTEM HAS, AND AS I SAID, TO BE AS COMPLYING TO THEM AS POSSIBLE.

AND IN ADDITION, WE ALSO TRY TO MINIMIZE OUR FOOTPRINT IN THE ECOSYSTEM THAT IS INVOLVED IN THE INSTALLATION VECTORS, OF COURSE, IN THE WHATSAPP SERVERS, ALSO.

AND AS I SAID, IT ALSO SERVES THE OPERATION SECURITY GOALS THAT THE CUSTOMERS REQUIRE FROM US.

AND THAT'S -- AND ADDITIONALLY, LIKE, WE ALSO STARTED THE APPLICATIONS THAT MIGHT HAVE AND MIGHT BE ABLE TO SHINE ON THE WAY THAT THE ECOSYSTEM WORKS AND AS ANTI-SPAMMING RULES MAY BE ON THE ECOSYSTEM AND APPLY THOSE RULES IN ORDER NOT TO BE

BANNED OR BLOCKED, AND TO BE AS NORMAL A USER AS POSSIBLE.

Q.   AND THE OPERATIONAL SECURITY THAT YOU'RE TALKING ABOUT, IS THAT CALLED OPSEC IN YOUR INDUSTRY?

A.   YES.

Q.   AND YOU HAD TALKED ABOUT SPAMMING AND OTHER OPSEC MEASURES THAT YOUR CUSTOMERS WOULD -- AND YOURSELF -- WOULD REQUIRE.

CAN YOU GIVE ANOTHER EXAMPLE?

A.   YEAH.  SO THE OPSEC HAS TWO SIDES, BASICALLY.  THE ONE SIDE OF OPSEC IS TO BE AS NON-DETECTIBLE FOR THE TARGET, FOR THE CUSTOMER, FOR THE TARGETS, TOWARDS THE TARGET, AND THIS IS A REQUIREMENT OF THE INTELLIGENCE AGENCY'S, TO BE ABLE TO RUN THEIR INVESTIGATIONS ACCORDINGLY, AND THIS IS THE ONE PART OF THE OPERATIONAL SECURITY.

AND THE OTHER PART OF THE OPERATIONAL SECURITY IS, AS I SAID BEFORE, TO LEAVE AS LESS FOOTPRINT ON THE ECOSYSTEM AS POSSIBLE IN ORDER TO NOT DISTURB OR HARM ANYTHING IN ANY WAY.

Q.   AND DID THOSE MEASURES THAT YOU TOOK TO AVOID HARMING WHATSAPP'S SERVERS ENHANCE PEGASUS'S OPERATIONAL SECURITY?

A.   YES.

MR. PEREZ:  OBJECTION.  LEADING.

THE COURT:  OVERRULED.

BY MR. AKROTIRIANAKIS:

Q.   DID YOU GET THE ANSWER?  DID HE ANSWER?

THE COURT:  DID YOU GIVE THE ANSWER?

THE WITNESS:  YES.

CERTIFICATE OF REPORTERS


        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8076


_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595


DATED:  MAY 2, 2025


UNITED STATES COURT REPORTERS

**ER-240**

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 173 of 295
Case 4:19-cv-07123-PJH Document 751 Filed 06/05/25 Page 1 of 213

636

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| WHATSAPP LLC AND META PLATFORMS, INC., | ) | C-19-07123 PJH |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| PLAINTIFFS, | ) | |
| | ) | MAY 1, 2025 |
| VS. | ) | |
| | ) | VOLUME 4 |
| NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED, | ) | |
| | ) | PAGES 636-847 |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PHYLLIS J. HAMILTON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:     DAVIS POLK & WARDWELL
                        BY:  GREG D. ANDRES
                             ANTONIO J. PEREZ
                        450 LEXINGTON AVENUE
                        NEW YORK, NEW YORK  10017

                        BY:  MICAH G. BLOCK
                        900 MIDDLEFIELD ROAD, SUITE 200
                        REDWOOD CITY, CALIFORNIA  94063

OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
                             IRENE RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

ER-241

APPEARANCES (CONTINUED)


FOR THE DEFENDANTS:      KING & SPALDING
                        BY:  JOSEPH N. AKROTIRIANAKIS
                             AARON S. CRAIG
                        633 WEST FIFTH STREET, SUITE 1600
                        LOS ANGELES, CALIFORNIA  90071

                        BY:  MATTHEW V. NOLLER
                        50 CALIFORNIA STREET, SUITE 3300
                        SAN FRANCISCO, CALIFORNIA  94111


ALSO PRESENT:           CURT EVANS
                        BRIAN BAKALE

**ER-242**

INDEX OF WITNESSES

PLAINTIFFS'

**ANDREW ROBINSON**
        REDIRECT EXAM BY MR. BLOCK (RES.)        P. 647
        RECROSS-EXAM BY MR. AKROTIRIANAKIS        P. 656


**SARIT BIZINSKY GIL**
        VIDEOTAPED DEPOSITION        P. 664


**DANA TREXLER**
        DIRECT EXAM BY MR. BLOCK        P. 668
        CROSS-EXAM BY MR. AKROTIRIANAKIS        P. 709
        REDIRECT EXAM BY MR. BLOCK        P. 747
        RECROSS-EXAM BY MR. AKROTIRIANAKIS        P. 751




DEFENDANTS'

**YARON SHOHAT**
        DIRECT EXAM BY MR. AKROTIRIANAKIS        P. 752
        CROSS-EXAM BY MR. ANDRES        P. 809

DOCUMENT YOU JUST WALKED US THROUGH?

A.   YES.

MR. ANDRES:  APOLOGIES, YOUR HONOR.  I'M SORRY.  WHAT EXHIBIT NUMBER IS THIS?

MR. AKROTIRIANAKIS:  I'M SORRY IF I DIDN'T SAY THIS. IT'S 1780.

MR. ANDRES:  THANK YOU.

MR. AKROTIRIANAKIS:  IT'S THE Q CYBER BALANCE SHEET.

Q.   OKAY.  WHAT WERE Q CYBER'S CASH AT THE END OF -- EXCUSE ME.  WHAT WAS Q CYBER'S CASH AT THE END OF 2023 AND 2024?

A.   END OF 2023, WE HAD $3.2 MILLION IN THE BANK ACCOUNT. END OF '24, A LITTLE BIT LESS.

Q.   OKAY.  AND WOULD THIS MONEY, THIS CASH AVAILABLE, BE COMBINED WITH THE CASH SHOWN ON THE NSO BALANCE SHEET IN TERMS OF YOUR ABILITY TO MEET THAT $10 MILLION OF SALARIES AND SO ON THAT YOU MENTIONED?

A.   YES, EXACTLY.

Q.   IN ISRAEL, BY THE WAY, WHEN ARE -- WELL, WHEN WOULD BE THE SPECIFIC DATE OF THESE -- OR THE AS OF DATE OF THESE FINANCIAL DOCUMENTS WE'RE LOOKING AT?

A.   SO THIS IS THE LAST DAY OF THE YEAR, DECEMBER 31ST.

Q.   AND IN ISRAEL, IS -- WHAT'S THE NORMAL COURSE OF PAYROLL?

A.   YEAH.  SO IN ISRAEL, WE PAY ALL SALARIES ONCE A MONTH.  I KNOW HERE IT'S TWICE A MONTH.  WE PAY ONCE A MONTH, AND WE PAY, AT LEAST IN OUR COMPANIES, ON THE 9TH OF THE MONTH.

SO WE -- IN THIS CASE YOU SEE THE CASH ON THE FIRST DAY OF THE YEAR, AND NINE DAYS LATER, ON THE 9TH OF AUGUST -- OF JANUARY, SORRY, JANUARY 9TH, WE WOULD PAY SALARIES.

Q.    THE -- AFTER CASH, WE SEE AGAIN TRADE ACCOUNTS RECEIVABLE?

A.    CORRECT.

Q.    IS THAT THE SAME TYPE OF ASSET THAT YOU DESCRIBED WITH RESPECT TO NSO'S OWN TRADE ACCOUNTS RECEIVABLE?

A.    YES, CORRECT.  I THINK I EVEN CHECKED IT LAST NIGHT AND THE $8 MILLION THERE IS A DEBT OF Q CYBER TO NSO, OR THE OTHER WAY.  SO, YEAH.

Q.    OKAY.

A.    IT'S BETWEEN THE TWO COMPANIES.

Q.    AND WOULD THE AMOUNTS THAT WE SEE HERE IN THE TRADE ACCOUNTS RECEIVABLE LINE BE AVAILABLE TO Q CYBER FOR USE FOR ANY PURPOSE?

A.    NO.

Q.    DIRECTING YOU TO THE VERY LAST LINE OF THE BALANCE SHEET, AND IT READS TOTAL LIABILITIES?

A.    YES.

Q.    DOES EXHIBIT 1780 REFLECT THE -- Q CYBER'S TOTAL LIABILITIES AS OF 12/31/2023 AND 12/31/2024?

A.    CORRECT.

Q.    ALL RIGHT.  YOU UNDERSTAND THAT THE PLAINTIFFS IN THIS CASE ARE SEEKING PUNITIVE DAMAGES; RIGHT?

A.    I DO.

Q.   OKAY.  WOULD THE TWO COMPANIES TOGETHER, THE TWO DEFENDANT

COMPANIES, BE ABLE TO PAY A PUNITIVE DAMAGES AWARD?

A.   TO BE HONEST, I DON'T THINK WE'RE ABLE TO PAY ANYTHING.

WE ARE STRUGGLING TO KEEP OUR HEAD ABOVE WATER.  I'VE -- WE'RE

COMMITTING TO MY CFO JUST TO PRIORITIZE EXPENSES AND TO MAKE

SURE THAT WE HAVE ENOUGH MONEY TO MEET OUR COMMITMENTS, AND

OBVIOUSLY ON A WEEKLY BASIS.

WE DON'T HAVE ANY MONEY TO SPARE, TO BE HONEST.

Q.   YOU UNDERSTAND THAT THE PUNITIVE DAMAGES ALLEGATION IN

THIS CASE IS MADE PURSUANT TO A CALIFORNIA LAW CALLED THE

CDAFA, OR THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND

FRAUD ACT?

A.   I UNDERSTAND THAT.

Q.   OKAY.  PRIOR TO THIS LAWSUIT HAVING BEEN FILED, HAD YOU

EVER HEARD OF THAT CALIFORNIA LAW BEFORE?

A.   UM --

        MR. ANDRES:  OBJECTION, YOUR HONOR.

        THE COURT:  OVERRULED.

        THE WITNESS:  I DID NOT KNOW ABOUT THIS LAW BEFORE

THE LAWSUIT WAS MADE.

BY MR. AKROTIRIANAKIS:

Q.   DID NSO INTEND TO VIOLATE ANY LAWS WITH RESPECT TO ITS

DEVELOPMENT OR LICENSING OF PEGASUS?

A.   WE DON'T INTEND TO BREAK ANY LAWS AT ALL.

Q.   BUT YOU DO NOT CONTEST THE FACT THAT THE COURT IN THIS

CASE HAS FOUND YOU LIABLE UNDER THE STATUTES THAT HER HONOR HAS INSTRUCTED THE JURY; CORRECT?

A.   I UNDERSTAND WE WERE FOUND TO BE LIABLE, AND I RESPECT THAT AND ACCEPT THAT.

          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

          THE COURT:  ALL RIGHT.

     CROSS-EXAMINATION?

          MR. ANDRES:  THANK YOU, YOUR HONOR.

                    **CROSS-EXAMINATION**

BY MR. ANDRES:

Q.   GOOD AFTERNOON, MR. SHOHAT.

A.   GOOD AFTERNOON.

Q.   I JUST WANT TO ASK YOU A COUPLE OF QUESTIONS.

     YOU JUST WENT THROUGH A WHOLE SERIES OF FINANCIAL DOCUMENTS WITH MR. AKROTIRIANAKIS; ISN'T THAT RIGHT?

A.   CORRECT.

Q.   AND THOSE DOCUMENTS ARE YOUR INTERNAL DOCUMENTS; IS THAT CORRECT?

A.   YES, THIS IS OUR INTERNAL DOCUMENTS FOR THE FINANCIAL THINGS.

Q.   YEAH.  THEY'RE NOT AUDITED BY ANY THIRD PARTY?

A.   ACTUALLY, THE 2023 REPORT IS AUDITED.

Q.   THAT DOCUMENT THAT YOU PROVIDED US DIDN'T COME FROM OUTSIDE, ANY OUTSIDE AUDITOR?  THAT'S AN INTERNAL DOCUMENT?

A.   THIS IS CORRECT.  WE JUST RECENTLY, LIKE, GOT THE AUDITOR

APPROVAL, THE AUDITOR'S APPROVAL OF THE REPORTS.  IT'S THE SAME

NUMBER.

Q.   SO --

A.   SO THIS DOCUMENT IS NOT FROM AN AUDITED REPORT, IF THAT'S

YOUR QUESTION.

Q.   SO YOU HAVE THOSE DOCUMENTS AVAILABLE TO YOU NOW IN AN

AUDITED 2023 FINANCIAL REPORT?

A.   MY CFO SHOULD HAVE IT, TOLD ME YESTERDAY THAT SHE RECEIVED

THE AUDITOR'S SIGNATURE ON THE AUDITED REPORTS.

Q.   SO YOU NOW WERE NOT SURE ABOUT THOSE DOCUMENTS UNTIL

YESTERDAY?

A.   I AM SURE ABOUT THEM.

THE WAY IT WORKS, WE CREATE OR FOLLOW THESE REPORTS.  ON A

QUARTERLY BASIS I REVIEW THE REPORTS.

ONCE A YEAR, THEY NEED TO BE AUDITED.  WE HAVE A YEAR,

EVEN MORE SOMETIMES, TO GET THE AUDITOR'S APPROVAL ON THE

REPORTS.

SO I REVIEW THESE REPORTS QUARTERLY AT LEAST, IF NOT MORE.

IF YOU ASK ME ABOUT AUDITING OF THE REPORTS, THE 2023 WAS

AUDITED, AND WE GOT THE AUDITOR'S APPROVAL THIS WEEK.

THE 2024 REPORT WILL BE AUDITED IN A FEW MONTHS.

Q.   OKAY.  LET'S START OVER.

THE DOCUMENTS THAT MR. AKROTIRIANAKIS SHOWED YOU WERE NOT

PROVIDED BY ANY INDEPENDENT THIRD PARTY; IS THAT CORRECT?

A.   THIS IS CORRECT.

Q.   AND THOSE WERE NOT AUDITED OR PROVIDED BY AN AUDITOR?

A.   THEY WERE NOT PROVIDED BY AN AUDITOR.  WHAT I SAID IS THE 2023 REPORT IS IDENTICAL TO THE AUDITED REPORT.

Q.   I UNDERSTAND WHAT YOU SAID, BUT I'D LIKE YOU TO JUST ANSWER MY QUESTIONS.  YOU'LL HAVE A CHANCE TO SPEAK WITH YOUR LAWYERS.

THOSE DOCUMENTS COME FROM NSO AND Q CYBER; RIGHT?

A.   THAT'S CORRECT.

Q.   THEY DO NOT COME FROM AN AUDITOR?

A.   THEY DO NOT COME FROM AN AUDITOR.

Q.   AND THEY DO NOT COME FROM A THIRD PARTY?

A.   THE VERSION YOU SEE HERE, NO.

Q.   AND DURING MR. AKROTIRIANAKIS'S TIME TO ASK YOU ABOUT THE EXPENSES AND ISSUES, HE NEVER ASKED YOU ABOUT THE EXPENSES FOR R&D, DID HE?

A.   HE DID NOT.

Q.   AND THOSE ARE AMONG NSO'S LARGEST EXPENSES; ISN'T THAT RIGHT?

A.   YES, OF COURSE.

Q.   AND THAT R&D IS WHAT'S USED FOR PEGASUS AND TO INSTALL PEGASUS ON PEOPLE'S PHONES?

A.   THAT IS USED TO DEVELOP PEGASUS, YES, AMONG OTHER THINGS.

Q.   AND TO IMPROVE IT --

MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  I THINK WE ALREADY HAD A RULING ABOUT CURRENT THINGS.

CERTIFICATE OF REPORTERS

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8076

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  MAY 1, 2025

UNITED STATES COURT REPORTERS

**ER-250**

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 183 of 295
Case 4:19-cv-07123-PJH   Document 748   Filed 06/05/25   Page 1 of 265

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| WHATSAPP LLC AND META PLATFORMS, INC., | ) | C-19-07123 PJH |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| PLAINTIFFS, | ) | |
| | ) | APRIL 28, 2025 |
| VS. | ) | |
| | ) | VOLUME 1 |
| NSO GROUP TECHNOLOGIES LIMITED | ) | |
| AND Q CYBER TECHNOLOGIES | ) | PAGES 1-264 |
| LIMITED, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PHYLLIS J. HAMILTON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:      DAVIS POLK & WARDWELL
                         BY:  GREG D. ANDRES
                              ANTONIO J. PEREZ
                         450 LEXINGTON AVENUE
                         NEW YORK, NEW YORK  10017

                         BY:  MICAH G. BLOCK
                         900 MIDDLEFIELD ROAD, SUITE 200
                         REDWOOD CITY, CALIFORNIA  94063

OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
                             IRENE RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES (CONTINUED)


FOR THE DEFENDANTS:     KING & SPALDING
                        BY:  JOSEPH N. AKROTIRIANAKIS
                             AARON S. CRAIG
                        633 WEST FIFTH STREET, SUITE 1600
                        LOS ANGELES, CALIFORNIA  90071

                        BY:  MATTHEW V. NOLLER
                        50 CALIFORNIA STREET, SUITE 3300
                        SAN FRANCISCO, CALIFORNIA  94111


ALSO PRESENT:           MELINDA NEWELL
                        STEPHEN JOY
                        CURT EVANS
                        BRIAN BAKALE

MR. ANDRES:  I DON'T BELIEVE SO, YOUR HONOR.

THE COURT:  OKAY.  ALL RIGHT.  THANK YOU, MS. LOW.

WE'LL PURSUE THAT FURTHER WHEN WE GET TO YOU.

ALL RIGHT.

SO NO ONE ELSE HAS ANY FAMILIARITY WITH THE LAWYERS, THEIR CLIENT REPRESENTATIVES, OR THE LAW FIRMS THAT THEY COME FROM?  YES?  IS THAT A HAND UP OR --

PROSPECTIVE JUROR:  I'M NOT SURE IF THIS IS REALLY IMPORTANT OR NOT.

BUT ARE WE TALKING ABOUT META, THE --

THE COURT:  I'M GOING TO GET TO THAT NOW.  I'M GOING TO GET TO THAT NEXT.

I WAS JUST TALKING ABOUT THESE PEOPLE HERE IN THE COURTROOM.

OKAY.  ALL RIGHT.  NOW, LET ME TELL YOU JUST A LITTLE BIT ABOUT THE CASE AND WHAT YOUR JURY SERVICE WOULD BE ALL ABOUT IF YOU ARE SELECTED.

THIS IS A CIVIL TRIAL TO DETERMINE DAMAGES.  THE PLAINTIFFS ARE META PLATFORMS AND WHATSAPP.  THEY BROUGHT THIS LAWSUIT AGAINST NSO GROUP AND Q CYBER TECHNOLOGIES FOR VIOLATION OF A FEDERAL LAW CALLED THE COMPUTER FRAUD AND ABUSE ACT, ALSO REFERRED TO AS CFAA; AND FOR A VIOLATION OF THE CALIFORNIA LAW CALLED THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT, ALSO CALLED THE CDAFA; AND FOR BREACH OF CONTRACT WITH WHATSAPP, SPECIFICALLY WHATSAPP'S TERMS OF

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 186 of 295
Case 4:19-cv-07123-PJH   Document 748   Filed 06/05/25   Page 37 of 265

37

SERVICE.

THOSE ARE THE THREE VIOLATIONS.

THE DEFENDANTS DEVELOPED, MARKETED, AND LICENSED SOFTWARE CALLED PEGASUS.

I'VE ALREADY FOUND THE DEFENDANTS LIABLE FOR VIOLATING THE CFAA AND THE CDAFA, AND AT CERTAIN TIMES RELEVANT TO THIS CASE, THE DEFENDANTS' TECHNOLOGY SENT MESSAGES THROUGH WHATSAPP'S SERVERS THAT CALLED -- THAT CAUSED PEGASUS TO BE INSTALLED ON TARGET USERS' DEVICES.

I HAVE FOUND THAT THE DEFENDANTS BREACHED WHATSAPP'S TERMS OF SERVICE BY REVERSE ENGINEERING AND/OR DECOMPILING THE WHATSAPP COMPUTER CODE.

PLAINTIFFS SEEK COMPENSATORY DAMAGES FOR THE DEFENDANTS' VIOLATIONS OF THE CFAA, THE CDAFA, AND WHATSAPP'S TERMS OF SERVICE.

PLAINTIFFS ALSO SEEK PUNITIVE DAMAGES FOR THE DEFENDANTS' VIOLATIONS OF THE CDAFA.

NOW, DURING THE TRIAL, THE JURY WILL BE ASKED TO DETERMINE WHAT AMOUNT OF COMPENSATORY DAMAGES, IF ANY, PLAINTIFFS PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANTS OWE TO PLAINTIFFS.

AND, SECONDLY, TO DETERMINE WHETHER CLEAR AND CONVINCING EVIDENCE SHOWS THAT THE DEFENDANTS' CONDUCT WAS WILLFUL -- I'M SORRY -- WAS MALICIOUS, OPPRESSIVE, OR FRAUDULENT SUCH THAT PUNITIVE DAMAGES ARE WARRANTED.

CERTIFICATE OF REPORTERS

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8076

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  APRIL 28, 2025

UNITED STATES COURT REPORTERS

**ER-255**

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:    (213) 443-4355
Facsimile:    (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, | Case No. 4:19-cv-07123-PJH |
| Plaintiffs, | **DEFENDANTS' MOTION FOR REMITTITUR OR NEW TRIAL** |
| v. | Date:  July 17, 2025 |
| NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, | Time: 1:30 p.m.  Place: Courtroom 3, Ronald V. Dellums Federal Building & U.S. Courthouse, 1301 Clay Street, Oakland, California |
| Defendants. | |
| | Action Filed: 10/29/2019 |

DEFENDANTS' MOTION FOR                                            Case No. 4:19-cv-07123-PJH
REMITTITUR OR NEW TRIAL

**ER-256**

## TABLE OF CONTENTS

NOTICE OF MOTION ............................................................................................................. 1

POINTS AND AUTHORITIES............................................................................................... 1

      I.       The punitive damages award is unconstitutionally excessive................................. 3

      II.     The punitive damages award reflects the jury's reliance on improper factors. ....... 8

CONCLUSION ...................................................................................................................... 10

i

DEFENDANTS' MOTION FOR                                     Case No. 4:19-cv-07123-PJH
REMITTITUR OR NEW TRIAL

**PLEASE TAKE NOTICE** that Defendants NSO Group Technologies Ltd. and Q Cyber Technologies Ltd. (collectively "NSO") hereby requests remittitur or a new trial. NSO brings this motion under Rule 59 of the Federal Rules of Civil Procedure. The motion is based on the following Points and Authorities; the Declaration Joseph N. Akrotirianakis ("Akro. Decl.") and its exhibits; the pleadings, papers, and records on file in this case; and such oral argument as may be presented. NSO submits that the issues presented by this motion are straightforward, conclusively resolved by binding precedent, and do not require oral argument. As the Local Rules require that motions such as this be noticed for hearing, however, NSO has noticed this matter for a hearing on July 17, 2025, at 1:30 p.m., before the Honorable Phyllis J. Hamilton, United States District Judge, in the United States Courthouse, 1301 Clay Street, Courtroom 3, Oakland, California.

Under Rule 59, the Constitution requires the Court to remit the jury's award of punitive damages or, in the alternative, to order a new trial.[1] The jury awarded Plaintiffs $167,254,000 in punitive damages—***slightly more than 376 times*** the compensatory damages award of $444,719. That outrageous punitive award exceeds the maximum lawful punitive damages award in this case by many orders of magnitude. First, the jury's award egregiously violates Due Process limits on the amount of punitive damages awards, under which the jury could not properly award punitive damages greater than four times compensatory damages. Second, the jury's award is unlawful because it reflects the improper desire to bankrupt NSO out of general hostility toward its business activities other than the limited conduct for which punitive damages could be awarded in this case.

## POINTS AND AUTHORITIES

The Court should remit the jury's punitive damages award or, in the alternative, order a new trial on punitive damages. Rule 59 grants the Court broad discretion to order a new trial or alter or amend a judgment. Fed. R. Civ. P. 59(a), (e). A Rule 59 motion is the appropriate means to challenge a punitive damages award. *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*,

---

[1] NSO of course does not concede that *any* award of damages, whether compensatory or punitive, was appropriate in this case. NSO maintains its arguments, rejected by the Court on summary judgment, that Plaintiffs lacked sufficient evidence to prove the merits of their claims and that the Court lacks personal jurisdiction over NSO. NSO also maintains its objections to the Court's evidentiary rulings and jury instructions. But because the Court has already rejected NSO's arguments on those issues, NSO does not press them in this motion.

1

DEFENDANTS' MOTION FOR
REMITTITUR OR NEW TRIAL

Case No. 4:19-cv-07123-PJH

492 U.S. 257, 279 (1989); *ConsumerDirect, Inc. v. Pentius, LLC*, 2025 WL 819027, at \*7 (C.D. Cal. Jan. 9, 2025).  When a punitive damages award is excessive, a court may give the plaintiff a choice between a new trial or a remittitur of punitive damages.  *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983); *see, e.g.*, *ConsumerDirect*, 2025 WL 819027, at \*7; *Yates v. GunnAllen Fin.*, 2006 WL 1821194, at \*3 (N.D. Cal. June 30, 2006).

That is what the Court should do here.  NSO is entitled to remittitur or a new trial because the jury's punitive damages award of $167,254,000 is blatantly unlawful.

*First*, the amount of the punitive damages award is unconstitutionally excessive.  The Due Process Clauses of the Fifth and Fourteenth Amendments "prohibit[] the imposition of grossly excessive or arbitrary punishments on a tortfeasor."  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 562 (1996)).  That means "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 776 (9th Cir. 2005) (cleaned up) (quoting *State Farm*, 538 U.S. at 425).  Indeed, the Ninth Circuit has "limited punitive damages to a 4 to 1 ratio where there are significant economic damages but behavior is not particularly egregious," as is true here.  *Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 902 (9th Cir. 2022) (cleaned up).  Even for "more egregious behavior," punitive damages may not exceed "six to nine times compensatory damages."  *Id*.  Since *State Farm*, the Ninth Circuit has never approved any punitive damages award larger than nine times compensatory damages, and very few awards larger than four times compensatory damages.[2]  Here, the punitive damage award was *376 times* the compensatory damages award.  That award is flagrantly unconstitutional.

*Second*, the punitive damages award clearly reflects the jury's consideration of legally

---

[22] *See, e.g.*, *Estate of Hill ex rel. Grube v. NaphCare, Inc.*, 2025 WL 1098549, at \*4 (9th Cir. Apr. 14, 2025); *Hardeman v. Monsanto Co.*, 997 F.3d 941, 976 (9th Cir. 2021); *Mitri v. Walgreen Co.*, 660 F. App'x 528, 530 (9th Cir. 2016); *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1036 (9th Cir. 2020), *rev'd on other grounds*, 594 U.S. 413 (2021); *King v. Geico Indem. Co.*, 712 F. App'x 649, 650-51 (9th Cir. 2017); *S. Union Co. v. Irvin*, 563 F.3d 788, 791-92 (9th Cir. 2009); *Leavey v. Unum Provident Corp.*, 295 F. App'x 255, 259 (9th Cir. 2008); *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005).  The Ninth Circuit has authorized larger multipliers in nominal damages cases, *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (en banc), but Plaintiffs did not receive nominal damages here.

2

| DEFENDANTS' MOTION | Case No. 4:19-cv-07123-PJH |
| FOR REMITTITUR OR NEW TRIAL | |

improper factors. The only plausible explanation for the amount of the award is that the jury was attempting to bankrupt NSO. That is an improper purpose for a punitive damages award, and it resulted in an award that grossly exceeds NSO's ability to pay. The award also plainly reflects an improper desire to punish NSO for alleged conduct toward third parties not before the Court, specifically the WhatsApp users on whom Plaintiffs accused *NSO* of spying throughout Plaintiffs' opening and closing statements. That too is an unlawful basis for a punitive damages award.

For all these reasons, the Court should remit the punitive damages award to $444,719 (or, at most, to four times compensatory damages) or order a new trial.

## I.     The punitive damages award is unconstitutionally excessive.

Under Supreme Court and Ninth Circuit precedent on punitive damages, "this case is neither close nor difficult." *State Farm*, 538 U.S. at 418. Although courts reviewing compensatory damages awards usually weigh "three guideposts" for excessiveness, *State Farm*, 538 U.S. at 418, no such balancing is required here. An award of *376 times* compensatory damages far exceeds any award that any court has ever upheld under the Due Process Clause after *State Farm*. Nothing more is required for the Court to grant this motion.

Nonetheless, a consideration of the three *State Farm* guideposts only strengthens that conclusion. Those guideposts are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418; *see Bains*, 405 F.3d at 775. Here, applying those factors under the Supreme Court's and Ninth Circuit's binding precedent compels a conclusion that punitive damages greater than, at the most, four times the compensatory damages determined by the jury cannot constitutionally be assessed against NSO. The Ninth Circuit has "limited punitive damages to a 4 to 1 ratio where there are significant economic damages by behavior is not particularly egregious," which is the case here.[3] *Riley*, 51

---

[3] Even for "more egregious behavior," punitive damages should "rang[e] from six to nine times compensatory damages." *Riley*, 51 F.4th at 902; *accord Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003). In no event, therefore, could punitive damages in this case exceed nine times compensatory damages.

3

DEFENDANTS' MOTION                                                    Case No. 4:19-cv-07123-PJH
FOR REMITTITUR OR NEW TRIAL

**ER-260**

F.4th at 902 (cleaned up); *accord Grube*, 2025 WL 1098549, at *4; *Mitri*, 660 F. App'x at 530; *Planned Parenthood*, 422 F.3d at 962.

***Reprehensibility***.  The conduct for which NSO was held liable under the CDAFA was not reprehensible.  To assess reprehensibility, courts "consider[] whether: [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419.  Even "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award." *Id.*

These "reprehensibility" factors favor NSO.  The conduct for which NSO was held liable under the CDAFA was the use of WhatsApp servers in California to transmit code for the Pegasus installation vector to, and receive limited metadata from, target devices between in April-May 2019.  Plaintiffs have admitted that this conduct did not damage or affect their servers or system in any way.  No WhatsApp information was taken or obtained from the servers, and no information was left on the servers.[4]  Plaintiffs claimed only economic harm in the form of investigation and remediation costs, not any physical or other noneconomic harm.  This Court has held that "the health or safety of others" is not at issue in this case, so NSO cannot be punished for allegedly disregarding third parties' health or safety. (*E.g.*, Akro Decl. Exh. A [Trial Day 5 Tr.] at 1115-1129.)  And Plaintiffs—Meta and WhatsApp—are obviously not financially vulnerable.

Therefore, the only factors that arguably apply are that Pegasus code traversed WhatsApp servers on more than one occasion and that the jury found that NSO acted with malice, oppression, or fraud. (Dkt. 736.)  But only one version of Pegasus (Eden) used California-based servers, so NSO's

---

[4] In rebuttal argument, WhatsApp argued that the jury should reject NSO's arguments about harm to WhatsApp servers because NSO "trespassed on to WhatsApp servers and took information.  It says that in the jury instructions." (Akro Decl. Exh. B [Trial Day 6 Tr.] at 1136.)  Every part of that assertion is improper.  The Court rejected WhatsApp's "trespass" theory even before its current counsel appeared in the case. (Dkt. 111 at 40-44.)  None of WhatsApp's information was taken from WhatsApp's servers, full stop. (*See* Dkt. 419-2 at 16.)  And the jury instructions of course, say neither of those things. (*See* Dkt. 737 at 15-18.)

4

DEFENDANTS' MOTION                                          Case No. 4:19-cv-07123-PJH
FOR REMITTITUR OR NEW TRIAL

creation of that version did not involve repeated conduct. (Akro Decl. Exh. A [Trial Day 5 Tr.] at 982-83.) And malice, oppression, or fraud must be found for *any* punitive damages award, so that alone is not enough to show "egregious" reprehensibility.

At a minimum, NSO's conduct does not reflect the *degree* of extreme malice or fraud that could support a substantial punitive damages award. In *Gore* itself, the Supreme Court held that the defendant's longtime concealment of damage to its cars, though fraudulent, was not "sufficiently reprehensible to warrant imposition of a $2 million exemplary damages award." *Gore*, 517 U.S. at 579-80. The Court emphasized that the plaintiff's harm was "purely economic in nature," the defendant's "conduct evinced no indifference to or reckless disregard for the health and safety of others," and "the omission of a material fact may be less reprehensible than a deliberate false statement, particularly when there is a good-faith basis for believing that no duty to disclose exists." *Gore*, 517 U.S. at 576, 580. Here too, Plaintiffs did not introduce any evidence that NSO ever made a deliberate false statement to them, relying instead on NSO's alleged "concealment" of its conduct. (*E.g.*, Akro Decl. Exh. B [Trial Day 6 Tr.] at 1242-43; Dkt. 494 at 12.) But Plaintiffs have never argued or established that NSO owed them a duty to disclose, and NSO had no such duty. (*See* Dkt. 732-5 at 4; Dkt. 732-3 at 3-5.) As in *Gore*, therefore, NSO's conduct was not "sufficiently egregious to justify a punitive sanction that is tantamount to a severe criminal penalty." *Gore*, 517 U.S. at 585.

The Ninth Circuit's precedent compels the same conclusion. For example, the Ninth Circuit limited punitive damages to 3.8 times compensatory damages in *Hardeman*, even though "four of the five factors support[ed] that [the defendant's] actions were reprehensible," including that the defendant caused "serious physical harm" through "repeated actions" that exhibited malice and "indifference to or a reckless disregard of the health or safety of others." 997 F.3d at 973-76 (cleaned up). The Ninth Circuit likewise limited punitive damages to four times compensatory damages in *Ramirez*, where the defendant engaged in "repeated and willful" misconduct "for more than a decade" against a class of "financially vulnerable" individuals but "there was no physical harm" or "an indifference to health or safety." 951 F.3d at 1036-37. In *Irvin* the Ninth Circuit limited punitive damages to a 3-to-1 ratio when the defendant caused $400,000 in economic harm to "a very large company" and did not "inflict[] egregious physical or economic harm upon the weak." 563 F.3d at

5

791-92.  And in *Grube* the Ninth Circuit held the "ratio of punitive to compensatory damages" could not "exceed four to one" even though the defendant caused the plaintiff's *death* through "reckless disregard of [his] safety."  2025 WL 1098549, at *4; *see also Mitri*, 660 F. App'x at 530 (limiting punitive damages to a 4-to-1 ratio when the defendant "placed [the plaintiff] in a financially vulnerable position" by firing him in retaliation for reporting Medicare fraud); *King*, 712 F. App'x at 649 (reducing punitive damages to four times compensatory damages where jury found defendant "act[ed] in bad faith" but plaintiff "suffered only economic and emotional harm").[5]

In the few cases where the Ninth Circuit has approved awards at a greater ratio than 4-to-1, it has found reprehensible conduct of an entirely different magnitude than NSO's conduct.  In *Zhang* and *Bains*, the defendants engaged in repeated acts of racial discrimination, which "is a different kind of harm, a serious affront to personal liberty" that "often results in large punitive damage awards."  *Zhang*, 339 F.3d at 1043; *see Bains*, 405 F.3d at 775-77 (finding "intentional, repeated ethnic harassment" to be "highly reprehensible").  And even in those cases, the Ninth Circuit limited to punitive damages to six to nine times compensatory damages.  *Zhang*, 339 F.3d at 1044 (seven times); *Bains*, 405 F.3d at 777 (six to nine times).  The Ninth Circuit also approved a 9-to-1 ratio in *Planned Parenthood*, where the defendants made "true threats" of violence against doctors, conduct the court held was "close[] to treading on personal liberty, which we [have] found seriously reprehensible in discrimination cases."  422 F.3d at 959.

NSO engaged in no remotely similar conduct.  The undisputed evidence—which this Court excluded from the jury's consideration—is that NSO licenses its technology exclusively for use in government investigations lawful under the laws of those governments' countries.  That the technology temporarily functioned by sending harmless messages through WhatsApp servers is hardly reprehensible.  Even under the evidence this Court permitted the jury to hear, there is no precedent for a ratio higher than 4-to-1.  As far as NSO is aware, the Ninth Circuit has never

---

[5] District courts within the Ninth Circuit agree.  *E.g.*, *McCray v. Westrock Servs., LLC*, 2024 WL 4579108, at *11 (C.D. Cal. Sept. 10, 2024) (reducing punitive damages to 1.2 times compensatory damages); *Yates*, 2006 WL 1821194, at *3 (three times compensatory damages); *Leavey v. UNUM/Provident Corp.*, 2006 WL 1515999, at *17 (D. Ariz. May 26, 2006) (1.5 times compensatory damages).

6

DEFENDANTS' MOTION                                          Case No. 4:19-cv-07123-PJH
FOR REMITTITUR OR NEW TRIAL

approved a ratio higher than 4-to-1 in any non-discrimination case where, as here, the defendant caused purely economic damages to a corporate entity.

***Ratio of Punitive to Compensatory Damages.*** As the above discussion shows, the absurd 376-to-1 ratio of punitive to compensatory damages in this case is many times greater than ratios the Supreme Court and Ninth Circuit have held to be unconstitutional. The Ninth Circuit has "limited punitive damages to a ***4 to 1*** ratio where there are significant economic damages by behavior is not particularly egregious," which is the case here. *Riley*, 51 F.4th at 902 (cleaned up and emphasis added) (citing *Planned Parenthood*, 422 F.3d at 962).[6] "A ratio higher than 4 to 1 may be upheld where a particularly egregious act has resulted in only a small amount of economic damages," but "when compensatory damages are substantial, a ratio lower than 4 to 1 may be the limit." *Ramirez*, 951 F.3d at 1037 (cleaned up). Indeed, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425.

Here, Plaintiffs' compensatory damages of $444,719 are substantial. The Ninth Circuit has described far smaller compensatory awards as "substantial." *See Mitri*, 660 F. App'x at 530-31 ($88,000); *Bains*, 405 F.3d at 776 ($50,000); *Planned Parenthood*, 422 F.3d at 963-64 (roughly $15,000). Accordingly, this clearly is not a case in which "a small amount of economic damages" could support a ratio greater than 4-to-1. *Bains*, 405 F.3d at 776 (cleaned up).[7] Rather, it is a case where a 4-to-1 ratio represents the outer limit of constitutionality. *Riley*, 51 F.4th at 902; *Hardeman*, 997 F.3d at 976.

***Civil Penalties.*** Although this guidepost is less important than the other two, the "civil penalties authorized or imposed in comparable cases," *State Farm*, 538 U.S. at 418, further show that the punitive damages award here is unconstitutionally excessive. Plaintiffs received punitive damages only under CDAFA, and the maximum fine under CDAFA is $10,000. Cal. Penal Code

---

[6] *See State Farm*, 538 U.S. at 425 (recognizing that the typical ceiling for punitive damages is four times compensatory damages); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 497-98 (2008) ("[B]y most accounts the median ratio of punitive to compensatory awards has remained less than 1:1.").

[7] Even in *Riley*, where the defendant's "reprehensibility was especially high" and the plaintiffs received "relatively low" compensatory damages ranging from $582 to $3,111, the Ninth Circuit held that punitive damages could not exceed an 8-to-1 ratio. 51 F.4th at 900 n.2, 902-03.

7

| DEFENDANTS' MOTION | Case No. 4:19-cv-07123-PJH |
| FOR REMITTITUR OR NEW TRIAL | |

not before the court." *Philip Morris USA v. Williams*, 549 U.S. 346, 349 (2007).  As this Court has recognized, the WhatsApp users whom governments may have monitored using Pegasus were not before the Court and are irrelevant to Plaintiffs' claimed injuries.  Plaintiffs thus could not seek or receive punitive damages based on any harm those users allegedly suffered as a result of Pegasus.  Yet that is exactly what Plaintiffs sought, and what the jury did.  That violated due process because "a defendant threatened with punishment for injury a nonparty victim has no opportunity to defend against the charge." *Philip Morris*, 549 U.S. at 353.  Here, in particular, the Court prohibited NSO from offering the evidence it would have introduced to rebut Plaintiffs' "spying" accusations, including evidence that the WhatsApp users against whom Pegasus has been deployed are overwhelmingly terrorists, drug traffickers, sex traffickers, pedophiles, and other criminals who Plaintiffs are very well aware use WhatsApp to commit unspeakable crimes and who are, therefore, lawful targets of government monitoring.  (Dkt 686 at 1-7.)[9]  For this reason as well, the punitive damages award should be set aside.

### Conclusion

The Court should remit the jury's award of punitive damages or, if Plaintiffs refuse the remittitur, order a new trial.

Dated: May 29, 2025

KING & SPALDING LLP

By: *Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG
*Attorneys for Defendants*
NSO GROUP TECHS. LTD. and
Q CYBER TECHS. LTD.

---

[9] This Court has acknowledged that this so-called "spying" (which is no more "spying" than the use of a wiretap) may well be legal in the countries in which it occurs—and indeed it is.  (Akro Decl. Exh. A [Trial Day 5 Tr.] at 1154.)  The only conduct this Court held unlawful under CDAFA was the use of WhatsApp servers in California, not governments' monitoring of user devices.  (Moreover, there is no evidence that any California WhatsApp server was ever used to install Pegasus *successfully*, and so no evidence that any California server was ever used in connection with "spying.")  It was entirely improper for Plaintiffs to ask the jury to punish NSO for alleged "spying" that neither this Court nor any other has held to be unlawful.

10

DEFENDANTS' MOTION
FOR REMITTITUR OR NEW TRIAL

Case No. 4:19-cv-07123-PJH

# EXHIBIT A

848

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| WHATSAPP LLC AND META PLATFORMS, INC., | ) | C-19-07123 PJH |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| PLAINTIFFS, | ) | |
| | ) | MAY 2, 2025 |
| VS. | ) | |
| | ) | VOLUME 5 |
| NSO GROUP TECHNOLOGIES LIMITED | ) | |
| AND Q CYBER TECHNOLOGIES | ) | PAGES 848-1175 |
| LIMITED, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PHYLLIS J. HAMILTON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:     DAVIS POLK & WARDWELL
                        BY:  GREG D. ANDRES
                             ANTONIO J. PEREZ
                        450 LEXINGTON AVENUE
                        NEW YORK, NEW YORK  10017

                        BY:  MICAH G. BLOCK
                        900 MIDDLEFIELD ROAD, SUITE 200
                        REDWOOD CITY, CALIFORNIA  94063

OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
                             IRENE RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

**ER-267**

APPEARANCES (CONTINUED)


FOR THE DEFENDANTS:        KING & SPALDING
                          BY:  JOSEPH N. AKROTIRIANAKIS
                               AARON S. CRAIG
                          633 WEST FIFTH STREET, SUITE 1600
                          LOS ANGELES, CALIFORNIA  90071

                          BY:  MATTHEW V. NOLLER
                          50 CALIFORNIA STREET, SUITE 3300
                          SAN FRANCISCO, CALIFORNIA  94111


ALSO PRESENT:             CURT EVANS
                          BRIAN BAKALE

INDEX OF WITNESSES

DEFENDANTS'


**YARON SHOHAT**
    CROSS-EXAM BY MR. ANDRES (RES.)          P. 865
    REDIRECT EXAM BY MR. AKROTIRIANAKIS      P. 896
    RECROSS-EXAM BY MR. ANDRES               P. 899


**TAMIR GAZNELI**
    DIRECT EXAM BY MR. AKROTIRIANAKIS        P. 903
    CROSS-EXAM BY MR. PEREZ                  P. 942
    REDIRECT EXAM BY MR. AKROTIRIANAKIS      P. 982


**GREG PINSONNEAULT**
    DIRECT EXAM BY MR. CRAIG                 P. 991
    VOIR DIRE EXAM BY MR. ANDRES             P. 995
    DIRECT EXAM BY MR. CRAIG (RES.)          P. 999
    CROSS-EXAM BY MR. ANDRES                 P. 1024
    REDIRECT EXAM MR. CRAIG                  P. 1056

CDAFA.

SO IT SHOULD CONTINUE, "OR THAT DEFENDANTS' CONDUCT WAS DESPICABLE AND WAS DONE WITH A WILLFUL AND KNOWING DISREGARD OF THE RIGHTS OR SAFETY OF PLAINTIFFS.  A PERSON ACTS WITH KNOWING DISREGARD WHEN THE PERSON IS AWARE OF THE PROBABLE DANGEROUS CONSEQUENCES OF THE PERSON'S CONDUCT AND DELIBERATELY FAILS TO AVOID THOSE CONSEQUENCES."

THE COURT:  IS THAT IN THE -- IN THE CACI INSTRUCTION?

MR. NOLLER:  YOUR HONOR, WE DEALT WITH THIS --

MR. PEREZ:  YES, YOUR HONOR.

THE COURT:  I'VE FORGOTTEN.

MR. NOLLER:  -- AT THE SECOND PRETRIAL HEARING AND YOUR HONOR RESOLVED IT IN THE SECOND FINAL PRETRIAL ORDER. THIS WAS DISCUSSED.

THE ISSUE IS THAT, AS YOUR HONOR NOTED AT THE HEARING, THAT LANGUAGE IS, YOU KNOW, DESIGNED FOR CASES WHERE THERE IS AN ISSUE OF HARM TO THIRD PARTIES OR DISREGARD OF THE HEALTH OR SAFETY OF THIRD PARTIES.

THAT'S NOT THIS KIND OF CASE.  YOUR HONOR HAS CLEARLY HELD THAT THIRD PARTIES AREN'T RELEVANT, WHATSAPP USERS AREN'T RELEVANT.

ALL THAT'S RELEVANT IS WHETHER THERE WAS INTENT TO HARM PLAINTIFFS, AND IN THE SECOND FINAL PRETRIAL ORDER, YOUR COURT ADOPTED -- YOUR HONOR ADOPTED OUR PROPOSED INSTRUCTION

NUMBER 5.

THE COURT: YEAH, I DID.

MR. PEREZ: YOUR HONOR, THE ISSUE IS TWO-FOLD. ONE IS WE'RE NOT TALKING ABOUT HARM TO OTHERS. WE'RE TALKING ABOUT HARM TO PLAINTIFF. THAT ISSUE WAS RESOLVED AT THE SECOND FINAL PRETRIAL.

ALL WE'RE ASKING FOR IS THE ADDITION OF "KNOWING DISREGARD OF THE RIGHTS OR SAFETY OF PLAINTIFFS," NOT "PLAINTIFFS OR OTHERS."

AND THE REASON THIS HAS BECOME VERY IMPORTANT IS THAT, AS THE COURT WILL REMEMBER, THERE'S BEEN A LOT OF TALK ABOUT, DID YOU BEAR THEM ANY ILL WILL? DID YOU -- THAT'S BEEN A MAJOR ISSUE IN THIS TRIAL IS WHETHER THEY ACTUALLY INTENDED HARM, OR DID THEY NOT INTEND HARM? BOTH SIDES HAVE ELICITED EVIDENCE ON THAT.

SO THE FACT THAT A KNOWING DISREGARD OF PLAINTIFFS' RIGHTS IS, PER THE CALIFORNIA CODE, INCORPORATED INTO CDAFA AND IS PART OF THE DEFINITION OF MALICE AND IS SOMETHING THAT THE JURY SHOULD HAVE AWARENESS OF.

THE COURT: WE DID TALK ABOUT THAT AND WE SUBSTITUTED "PLAINTIFFS" --

MR. PEREZ: IT WAS SUPPOSED TO BE --

THE COURT: -- AS OPPOSED TO "ANOTHER."

MR. PEREZ: EXACTLY. BUT IN THAT MALICE DEFINITION, IT DROPPED OUT ENTIRELY.

THE COURT:  OKAY.  LET ME SEE IF I HAVE THAT.

MR. PEREZ:  IT WAS IN 703-3, YOUR HONOR, AT PAGE 10 OF 12.

THE COURT:  I CAN'T -- I THINK I MUST NOT HAVE BROUGHT IT WITH ME.

MR. NOLLER:  I MEAN, YOUR HONOR, I THINK I'LL JUST REFER YOU BACK --

THE COURT:  HOLD ON.  LET ME JUST SEE.  I MEAN, I KNOW I MARKED UP THAT ONE, TOO.

OKAY.  IT'S LOST SOMEWHERE IN MY STACK OF PAPERS.

KELLY, CAN YOU JUST PULL UP THE DOCKET FOR ME?  IT'S --

WHAT'S THE PLAINTIFFS'?

MR. PEREZ:  IT WAS 703-3, PAGE 10, YOUR HONOR.

THE CLERK:  703-3, PAGE 7?

THE COURT:  707 --

MR. PEREZ:  I'M SORRY.  703-3.

THE COURT:  703-3?

MR. PEREZ:  YES, YOUR HONOR, PAGE 10.

SO THIS HAS RIGHTS OR SAFETY --

THE CLERK:  INSTRUCTION NUMBER 8?

MR. PEREZ:  I'M SORRY?

THE CLERK:  INSTRUCTION NUMBER 8?

MR. PEREZ:  YES, INSTRUCTION NUMBER 8, PUNITIVE DAMAGES.  IT'S ON PAGE 10.

THE COURT:  WOULD YOU PRINT OUT 10 AND 11?

THE CLERK:  YES.

MR. PEREZ:  SO THIS HAS THE LANGUAGE OF "RIGHTS OR SAFETY OF ANOTHER," AND WE HAD TALKED ABOUT CHANGING THAT TO "RIGHTS OR SAFETY OF PLAINTIFF."

THE COURT:  OKAY.  AND THE ORIGINAL CACI INSTRUCTION, DO YOU HAVE THAT?

MR. PEREZ:  WE DO, YOUR HONOR.  THIS LANGUAGE IS FROM THE CACI INSTRUCTION.  I'M NOT SURE I HAVE A COPY.

THE COURT:  OKAY.

MR. PEREZ:  BUT WE CAN GET ONE MOMENTARILY.

THE COURT:  ACTUALLY, I THINK I HAVE IT.

EXCUSE ME.  I'M JUST GOING TO GET MY PAPERS OFF MY DESK.

(PAUSE IN PROCEEDINGS.)

THE COURT:  I CANNOT FIND THE PAPERS THAT I WAS REFERRING TO, BUT I DID -- I JUST BROUGHT THE CACI INSTRUCTION WITH ME.

OKAY.  NOW, WE'RE LOOKING AT 703, AND YOURS WAS 703 DASH?

MR. PEREZ:  3, PAGE 10, YOUR HONOR.

THE COURT:  OKAY.  THAT'S NUMBER 8, YES.  OKAY.

OH, I SEE.

MR. PEREZ:  SO THAT HAS THE FULL DEFINITION OF MALICE TRACKING CACI.

THE COURT:  OKAY.

OH, I SEE.  OKAY.

AND WE DID ORIGINALLY CHANGE THAT TO "THE RIGHTS AND

SAFETY OF ANOTHER."

MR. PEREZ:  FROM "ANOTHER" TO "PLAINTIFFS."

THE COURT:  "TO PLAINTIFFS," RIGHT, "FROM ANOTHER" TO "PLAINTIFFS."

OKAY.  SO THAT IS ADDITIONAL LANGUAGE THAT'S IN THE INSTRUCTION.

AND WHAT'S YOUR VIEW ABOUT THAT GIVEN THAT WE CHANGED IT TO LIMIT IT TO THE PLAINTIFFS?

MR. NOLLER:  YEAH, SO I HAVE TWO THOUGHTS ON THAT, YOUR HONOR.

THE FIRST IS THAT I THINK CHANGING -- THAT'S OBVIOUSLY PREFERABLE TO HAVING IT SAY "ANOTHER."

THE PROBLEM, I THINK, IS THAT BY CHANGING "ANOTHER" TO "PLAINTIFFS," YOU'RE SORT OF SUBSTITUTING A WORD THAT ISN'T INTENDED TO CAPTURE, YOU KNOW, WHAT YOU'RE SUBSTITUTING IT WITH.

SO AS I THINK YOUR HONOR RECOGNIZED AT THE HEARING, THAT LANGUAGE, AND THE OTHER LANGUAGE THAT YOU AGREED WE COULD STRIKE FROM THE FACTORS FOR REPREHENSIBILITY, GOES TO, YOU KNOW, THE CASES OF HARM TO THIRD PARTIES, OR RISKS TO THIRD PARTIES WHERE THERE'S A DANGEROUS PRODUCT OR A CHEMICAL OR A POLLUTANT OR SOMETHING LIKE THAT.

AND, YOU KNOW, YOUR HONOR HAS HELD VERY CLEARLY THAT THIRD PARTIES AREN'T RELEVANT TO THIS CASE.

NOW, WITH THAT SAID, IF THE COURT WANTS TO --

THE COURT: YOU KNOW, IN READING THIS, I'M NOT SO SURE NOW, READING IT IN THE BOOK, THAT THE DISREGARD OF THE RIGHTS OR SAFETY OF ANOTHER COULDN'T APPLY, WOULD NECESSARILY ONLY APPLY TO A THIRD PARTY.

MR. NOLLER: OKAY.

THE COURT: I'M NOT SO SURE I AGREE WITH THAT NOW.

MR. NOLLER: OKAY. SO IN THAT RESPECT, I'LL GO TO THE SECOND THOUGHT I HAD, WHICH IS THAT IF THE COURT IS GOING TO CHANGE IT TO "PLAINTIFFS," WE THINK IT NEEDS TO BE SPECIFIED THAT IT'S THE PLAINTIFFS' RIGHTS UNDER CDAFA.

THE COURT: OH, RIGHT.

MR. NOLLER: I THINK WE HAD SOME ISSUES WITH SOME OF THE ARGUMENTS EARLIER WHERE THERE WAS SOME ATTEMPT TO ARGUE THAT DISREGARD, FOR EXAMPLE, OF CONTRACT RIGHTS WOULD SATISFY IT, AND THAT'S NOT CORRECT.

SO IF YOU'RE GOING TO SAY "DISREGARD OF PLAINTIFFS' RIGHTS," I MEAN, A, I DON'T THINK SAFETY SHOULD BE IN THERE, BECAUSE THEY'RE A COMPANY, AND THAT IT SHOULD SAY "RIGHTS UNDER CDAFA" AND NOT JUST "RIGHTS" GENERALLY.

THE COURT: I AGREE WITH THAT.

MR. PEREZ: CERTAINLY NO OBJECTION TO THE REMOVAL OF "SAFETY."

AND IF THE COURT --

THE COURT: "DISREGARD THE RIGHTS OF THE" --

MR. PEREZ: PLAINTIFF.

THE COURT:  -- "OF THE PLAINTIFF UNDER THIS PARTICULAR STATUTE."

IT'S -- I THINK IT'S GOING TO REALLY BE HARD FOR THE JURY TO SEPARATE WHICH -- I MEAN, EVEN THOUGH WE TELL THEM THAT IT DOESN'T MATTER THE THEORY, ALL THE DAMAGES ARE THE SAME, THAT THEY CAN ONLY FIND PUNITIVE DAMAGES UNDER THIS ONE STATUTE.

I KNOW WE SAY THAT AT THE BEGINNING, BUT I DON'T SEE THAT IT WOULD BE HARMFUL TO SAY IT AGAIN.

MR. NOLLER:  YEAH, YOUR HONOR, I AGREE IT PROBABLY IS BEST TO SAY IT SEVERAL TIMES.

THE COURT:  YEAH.

MR. PEREZ:  YOUR HONOR, WE --

THE COURT:  I DON'T DISAGREE.

MR. PEREZ:  WELL, THE MODEL LANGUAGE DOESN'T SAY -- IS NOT LIMITED TO RIGHTS UNDER THE STATUTE.  IT'S DISREGARD OF THE RIGHTS OF ANOTHER.  RIGHT?

THE START -- AND I'M NOT ARGUING TO GO BACK TO "ANOTHER."

BUT THE FACT THAT IT TALKS ABOUT THE RIGHTS OF ANOTHER IMPLIES STRONGLY THAT IT'S NOT LIMITED TO RIGHTS UNDER CDAFA.

THE POINT IS, WE'RE NOW TALKING ABOUT THE NATURE OF DEFENDANTS' CONDUCT IN THE CONTEXT OF A PUNITIVE DAMAGES ASSESSMENT, AND IT'S IN THE DEFINITION OF MALICE, AND IT'S "DISREGARD OF THE RIGHTS OF ANOTHER," "RIGHTS" OR "SAFETY."

CDAFA DOESN'T TALK ABOUT SAFETY.

SO THE FACT THAT THEY ARE TALKING ABOUT SAFETY IN THE

MODEL INSTRUCTION REALLY HAS TO BE READ AS SAYING, ALL RIGHT, WELL, THE RIGHTS THEY'RE TALKING ABOUT PLAINLY ARE LIMITED TO RIGHTS UNDER CDAFA BECAUSE SAFETY WOULDN'T BE IN THERE.

THE COURT:  BUT WOULD IT BE APPROPRIATE FOR THEM TO -- WOULD IT BE APPROPRIATE FOR THE JURY TO AWARD PUNITIVE DAMAGES FOR A DISREGARD OF THE PLAINTIFFS' RIGHTS UNDER THE TERMS OF SERVICE?

MR. PEREZ:  WE HAVE NOT ARGUED THE TERMS OF SERVICE ISSUE.  WE HEARD THE COURT'S RULINGS.

I COULD HAVE ASKED MR. GAZNELI THAT QUESTION.  HE'S THE ONE THAT TESTIFIED ABOUT THE --

THE COURT:  I KNOW.  BUT MY QUESTION IS, WOULD IT BE CORRECT FOR THEM TO MAKE THAT FINDING?

MR. PEREZ:  WE DON'T BELIEVE THERE'S ANYTHING IN THE INSTRUCTION THAT WOULD EXCLUDE THAT.  IT'S RIGHTS OR SAFETY OF ANOTHER.

YOUR HONOR, IT DOES NOT -- IT SORT OF -- THE FACT THAT IT REFERS TO SAFETY SORT OF, ON ITS FACE, CAN'T BE LIMITED TO UNDER CDAFA.

MR. NOLLER:  YOUR HONOR, THIS IS NOT A CDAFA INSTRUCTION.  IT'S A GENERAL PUNITIVE DAMAGES INSTRUCTION THAT IS, YOU KNOW, DESIGNED TO BE BROAD AND MODIFIABLE BASED ON HOW IT APPLIES TO ANY PARTICULAR CASE.

I MEAN, YOUR HONOR CERTAINLY KNOWS, GIVEN WHO KNOWS HOW MANY TRIALS YOU'VE HAD TO DEAL WITH THIS, THE PURPOSE OF JURY

INSTRUCTIONS IS TO BE, YOU KNOW, TWEAKED BASED ON THE PARTICULAR ISSUES.

AND SO WHEN YOU HAVE A CASE THAT IS SPECIFIC TO ONE STATUTE THAT EVERYBODY AGREES IS THE ONLY STATUTE UNDER WHICH PUNITIVE DAMAGES ARE AVAILABLE, YOU HAVE TO ASK, WELL, WHAT PART OF THE MODEL INSTRUCTION FITS THAT AND WHAT PART DOESN'T?

AND OBVIOUSLY SAFETY DOESN'T FIT THAT, AND BECAUSE THERE ARE THESE OTHER CLAIMS, IT NEEDS TO BE MADE CLEAR TO THE JURY THAT THE RIGHTS THAT MATTER ARE THE RIGHTS UNDER THE ONLY STATUTE IN THIS CASE THAT PERMITS THE AWARD OF PUNITIVE DAMAGES.

THE COURT:  YEAH, PUNITIVE -- IT WOULDN'T BE APPROPRIATE FOR THE JURY TO AWARD PUNITIVE DAMAGES FOR A VIOLATION OF THE CFAA.

MR. PEREZ:  WELL, FIRST OF ALL, THE CONDUCT THAT VIOLATES THE CFAA, OTHER THAN THE LOCATION OF THE SERVERS, IS EFFECTIVELY IDENTICAL TO THE CONDUCT THAT VIOLATES THE CDAFA, SO I THINK IN THE JURY'S MIND, IT'S THE UNLAWFUL ENCROACHMENT OF THE SERVERS.

IF THE QUESTION IS, DOES THE CONDUCT THAT VIOLATES THE CONTRACT, IS THAT PROPERLY TAKEN INTO ACCOUNT, NOT FOR PURPOSES OF LIABILITY, BUT FOR PURPOSES OF THE HOLISTIC ANALYSIS OF THE NATURE OF DEFENDANTS' CONDUCT FOR PURPOSES OF ASSESSING WHETHER IT ENTAILED DISREGARD OF PLAINTIFFS' RIGHTS, WHETHER IT ENTAILED MALICE, OPPRESSION, OR FRAUD, WE VIEW THAT AS

ABSOLUTELY FAIR GAME.

NOW, WE HAVEN'T PRESENTED EVIDENCE ON IT, WE HAVEN'T ARGUED IT TO THE JURY BECAUSE THE COURT DIDN'T PERMIT US TO DO SO.

BUT WE DON'T THINK THAT THE INSTRUCTION SHOULD BE CABINED IN THAT WAY.

THE COURT:  WELL, THE CONDUCT IS THE CONDUCT, AND THE CONDUCT ACTUALLY FORMS THE BASIS FOR LIABILITY FOR ALL THREE, ALL THREE VIOLATIONS.  THE CONDUCT IS THE SAME.  IT'S THE INCURSION OF THE STATUTE FOR THE TWO, YOU KNOW, THE TWO STATUTES, AND OBVIOUSLY THE BREACH OF CONTRACT IS THE REVERSE ENGINEERING AND DECOMPILING.

SO THAT ARGUMENT IS FINE WITH REGARD TO THOSE TWO STATUTES.

BUT IT'S NOT FINE WITH REGARD TO THE CONDUCT UNDERLYING THE BREACH OF CONTRACT.

MR. PEREZ:  ANOTHER PROBLEM HERE, YOUR HONOR, IS THAT IF WE START TALKING ABOUT PLAINTIFFS' RIGHTS UNDER CDAFA, THE JURY DOESN'T HAVE A DEFINITION OF WHAT THAT MEANS.

SO THE CONCEPT OF JUST PLAINTIFFS' RIGHTS, THERE'S BEEN ALL THIS ARGUMENT ABOUT, WAS THERE ILL WILL, WAS THERE INTENT TO HARM?

THE FACT THAT THE MODEL INSTRUCTION TALKS ABOUT KNOWING DISREGARD OF RIGHTS IN THAT LEVEL OF GENERALITY --

THE COURT:  WELL, YOU'RE THE ONE THAT WANTS THIS

LANGUAGE. WHAT RIGHTS ARE WE TALKING ABOUT?

MR. PEREZ: WELL --

THE COURT: WHAT RIGHTS DOES THIS EVEN REFER TO?

MR. PEREZ: CERTAINLY THE RIGHT TO BE FREE FROM INCURSION, THE RIGHT TO NOT HAVE SPYWARE BEING INSTALLED THROUGH WHATSAPP SERVERS.

YOU KNOW, SOME OF THOSE RIGHTS ARE ARTICULATED IN THE TERMS OF SERVICE. WE'RE NOT POINTING TO THE VIOLATION OF THE TERMS OF SERVICE AS A BASIS FOR PUNITIVE DAMAGES. BUT IT IS PART AND PARCEL OF THEIR CONDUCT, WHAT THEY DID AND HOW THEY DID IT.

AND THE FACT THAT YOU HAVE WITNESSES WHO HAVE TESTIFIED THAT THEY FULLY UNDERSTOOD -- YOU KNOW, SENIOR OFFICERS OF THE DEFENDANTS WHO TESTIFIED THAT THEY UNDERSTOOD THAT WHATSAPP DID NOT WANT THIS ACTIVITY ON THEIR SERVERS, AT THAT LEVEL OF GENERALITY.

WE WOULD ARGUE TO THE JURY THAT REFLECTS A KNOWING DISREGARD OF PLAINTIFFS' RIGHTS.

AND SO TO NOW MAKE THE SURE TRY TO PARSE, YES, BUT, IS THAT A RIGHT UNDER CDAFA, IT'S JUST -- THIS ISN'T A LAW SCHOOL EXAM. IT GETS A LITTLE TOO COMPLICATED.

THE COURT: HMM.

MR. PEREZ: AND THE LANGUAGE IN THE MODEL INSTRUCTION IS SIMPLER AND EASIER FOR THE JURY TO WORK WITH.

THE COURT: THE FACT THAT WE'RE CONTINUING TO ARGUE

THIS, THOUGH, MAKES IT LESS AND LESS CLEAR TO ME WHAT THIS EVEN MEANS.  WHAT DOES THIS EVEN MEAN, THE KNOWING DISREGARD OF THE RIGHTS OF THE PLAINTIFFS?  WHAT'S -- IT'S NOT DEFINED ANYWHERE.

MR. NOLLER:  I MEAN, YOUR HONOR, I THINK THE ONLY WAY TO UNDERSTAND IT, IF YOU LOOK AT THE PARAGRAPH THAT PRECEDES -- SO ON PAGE 7 OF DOCUMENT 703-5.

I CAN MAYBE TURN TO --

THE COURT:  703 DASH?

MR. NOLLER:  -- 703-3, BECAUSE I THINK IT WILL BE THE SAME FOR THE POINT I'M GOING TO MAKE.

YEAH, SO IF YOU'RE ON 703-3 STILL, YOUR HONOR, ON PAGE 10 -- AND, AGAIN, THIS IS THE LANGUAGE THE PLAINTIFFS PROPOSED -- THE THIRD PARAGRAPH ON PAGE 10 THAT SORT OF KICKS OFF THE LIST OF SOME OF THE REQUIREMENTS, "YOU MAY AWARD PUNITIVE DAMAGES ONLY IF YOU FIND THAT PLAINTIFFS HAVE PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT DEFENDANTS' CONDUCT THAT VIOLATED THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT WAS DONE WITH MALICE, OPPRESSION, OR FRAUD."

SO IT'S NOT THIS SORT OF HOLISTIC ANALYSIS OF ALL OF DEFENDANTS' CONDUCT.  IT'S AN ANALYSIS OF THE SPECIFIC CONDUCT THAT THIS COURT FOUND VIOLATED THAT STATUTE.

SO IN THIS CONTEXT, THE RIGHTS THAT ARE AT ISSUE HAVE TO BE, AND CAN ONLY BE, THE RIGHTS UNDER THAT STATUTE.

THE COURT:  OKAY.  SO WHY DOES IT NEED TO BE REPEATED AGAIN THEN?  I MEAN, NOW -- NOW YOU POINTED OUT, WE'VE ALREADY

GOT IT IN PARAGRAPH 1 AND WE'VE GOT IT IN PARAGRAPH 3.  NOW YOU'RE ASKING TO PUT IT IN THE NEXT FULL PARAGRAPH AS WELL?

MR. NOLLER:  WELL, BECAUSE I THINK, YOUR HONOR, THAT THE PHRASING IN THE PARAGRAPH I JUST QUOTED ISN'T TIED TO THAT PARTICULAR POINT.  IT'S A MORE GENERAL POINT THAT SUPPORTS WHAT I'M SAYING.

BUT I THINK IT'S STILL IMPORTANT, PARTICULARLY IN RESPECT NOW THAT WE'VE -- MR. PEREZ ARTICULATING THAT THEY WANT THE JURY TO CONSIDER EVERYTHING, THAT IN TERMS OF, YOU KNOW, SPECIFICALLY STATING WHAT THE RIGHTS ARE AND, AS YOUR HONOR SAID, THIS IS PROBABLY GOING TO BE DIFFICULT FOR THE JURY, IT CAN ONLY HELP THE JURY TO BE MORE PRECISE ABOUT WHAT SPECIFICALLY IS AT ISSUE WITH RESPECT TO THOSE RIGHTS.

AND IF PLAINTIFFS AREN'T GOING TO TRY TO ARGUE THAT THEY SHOULD GET PUNITIVE DAMAGES FOR THE CONDUCT THAT BREACHED THE TERMS OF SERVICE, THEN I FRANKLY DON'T UNDERSTAND WHAT THE OBJECTION IS.

MR. PEREZ:  YOUR HONOR, I THINK THE COURT IS ABSOLUTELY CORRECT.  I HADN'T FOCUSSED ON THAT LANGUAGE.

BUT IT'S ALREADY COVERED.  IT'S DEFENDANTS' CONDUCT THAT VIOLATED CDAFA.

THE COURT:  RIGHT.

MR. PEREZ:  IT DOESN'T NEED TO BE SAID AGAIN.

THE COURT:  IT DOESN'T NEED TO BE SAID AGAIN.  I DIDN'T REALIZE IT WAS IN PARAGRAPH 3 AS WELL.  I DON'T SEE WHY

WE SHOULD SAY IT AGAIN IMMEDIATELY AFTER THE -- YOU KNOW, THE LIST OF AGENTS, DIRECTORS, ET CETERA, THAT QUALIFY.

MR. NOLLER:  I MEAN, YOUR HONOR --

THE COURT:  SO, YEAH.  OKAY.  OKAY.

SO WHAT ABOUT THE SECOND SENTENCE?  IS THAT NECESSARY?

MR. PEREZ:  "A PERSON ACTS WITH KNOWING DISREGARD," YOUR HONOR?  IS THAT THE ONE?

THE COURT:  YEAH.

MR. PEREZ:  YES, I THINK THE "KNOWING DISREGARD," TO HAVE THAT CONCEPT DEFINED IS HELPFUL.

MR. NOLLER:  I THINK IF YOUR HONOR IS GOING TO INCLUDE "KNOWING DISREGARD," IT'S PROBABLY BEST TO HAVE THE DEFINITION OF THAT.

THE COURT:  TO HAVE THE DEFINITION.  OKAY.  ALL RIGHT.

THEN WE'LL GO WITH THAT, 70 -- 703-3, PAGE 10 OF 12.

WHEN WE LOOK AT PAGE 11, I THINK I ALREADY APPROVED, OR INDICATED I WAS INCLINED TO APPROVE THE REMOVAL OF SECTION 2 UNDER SUBSECTION A --

MR. NOLLER:  YES, THAT'S WHAT --

THE COURT:  -- BECAUSE IT DIDN'T APPLY.

MR. NOLLER:  THAT'S WHAT YOUR HONOR HELD IN THE SECOND FINAL PRETRIAL CONFERENCE.

MR. PEREZ:  THAT'S FINE, YOUR HONOR.

THE COURT:  OKAY.  SO NOW WE CAN GET TO HOW WE SORT

OF DIFFERENTIATE THE INTENT REQUIRED IN ORDER TO FIND MALICE, FRAUD, AND OPPRESSION FROM THE INTENT FOUND BY THE COURT TO EXIST IN THE UNDERLYING CONDUCT.  OKAY?

SO I'M THINKING SOMETHING ALONG THESE LINES, AND WE MIGHT HAVE TO TWEAK IT A LITTLE BIT, OBVIOUSLY.  "EVEN THOUGH THE COURT HAS ALREADY DETERMINED THAT DEFENDANTS ACCESSED PLAINTIFFS' SERVERS INTENTIONALLY, KNOWINGLY, AND WITH AN INTENT TO DEFRAUD AS EXPLAINED IN INSTRUCTION NUMBERS," AND WE'LL NUMBER THE TWO INSTRUCTIONS THAT HAVE THOSE FINDINGS IN THEM, "IT IS UP TO THE JURY TO DECIDE WHETHER PLAINTIFFS HAVE PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT DEFENDANTS ACTED WITH EITHER INTENT TO CAUSE INJURY," AND WE CAN EXTEND THAT, "TO SHOW MALICE, KNOWING DISREGARD OF PLAINTIFFS' RIGHTS TO SHOW OPPRESSION, OR INTENT TO HARM TO SHOW FRAUD."

MR. PEREZ:  AND, YOUR HONOR, WOULD THAT BE ADDITIONAL LANGUAGE, OR WOULD THAT BE REPLACING ANYTHING?

THE COURT:  THAT WOULD BE ADDITIONAL LANGUAGE THAT WE WOULD PUT IN AFTER -- LET'S SEE -- PERHAPS AFTER THE DEFINITIONS OF "FRAUD" AND "MANAGING AGENT" AND BEFORE WE GO TO "THERE IS NO FIXED FORMULA."

MR. PEREZ:  YOUR HONOR, THE -- I'M OBVIOUSLY REACTING ON THE FLY, BUT THE STRUCTURE OF THE POINT I THINK IS REASONABLE, EVEN THOUGH THE COURT ALREADY FOUND A, B, AND C, IT'S UP TO THE JURY TO DECIDE BLANK.

MY ONLY CONCERN IS THAT WHEN YOU GET TO THE BLANK, I WOULD

CERTIFICATE OF REPORTERS

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8076

_____

LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  MAY 2, 2025

UNITED STATES COURT REPORTERS

**ER-285**

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| WHATSAPP LLC AND META PLATFORMS, INC., | ) | C-19-07123 PJH |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| PLAINTIFFS, | ) | |
| | ) | MAY 5, 2025 |
| VS. | ) | |
| | ) | VOLUME 6 |
| NSO GROUP TECHNOLOGIES LIMITED | ) | |
| AND Q CYBER TECHNOLOGIES | ) | PAGES 1176-1369 |
| LIMITED, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PHYLLIS J. HAMILTON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:    DAVIS POLK & WARDWELL
                       BY:  GREG D. ANDRES
                            ANTONIO J. PEREZ
                       450 LEXINGTON AVENUE
                       NEW YORK, NEW YORK  10017

                       BY:  MICAH G. BLOCK
                       900 MIDDLEFIELD ROAD, SUITE 200
                       REDWOOD CITY, CALIFORNIA  94063

OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
                             IRENE RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES (CONTINUED)


FOR THE DEFENDANTS:     KING & SPALDING
                        BY:  JOSEPH N. AKROTIRIANAKIS
                             AARON S. CRAIG
                        633 WEST FIFTH STREET, SUITE 1600
                        LOS ANGELES, CALIFORNIA  90071

                        BY:  MATTHEW V. NOLLER
                        50 CALIFORNIA STREET, SUITE 3300
                        SAN FRANCISCO, CALIFORNIA  94111


ALSO PRESENT:           CURT EVANS
                        BRIAN BAKALE

INDEX OF WITNESSES

DEFENDANTS'

**SUSAN GLICK**
    VIDEOTAPED DEPOSITION PLAYED                P. 1186


PLAINTIFFS' REBUTTAL

**DANA TREXLER**
    DIRECT EXAM BY MR. BLOCK                    P. 1187
    CROSS-EXAM BY MR. AKROTIRIANAKIS            P. 1198
    REDIRECT EXAM BY MR. BLOCK                  P. 1206


DEFENDANTS' REBUTTAL

**GREG PINSONNEAULT**
    DIRECT EXAM BY MR. CRAIG                    P. 1211
    VOIR DIRE EXAM BY MR. BLOCK                 P. 1213
    DIRECT EXAM BY MR. CRAIG (RES.)             P. 1215
    CROSS-EXAM BY MR. BLOCK                     P. 1229




CLOSING ARGUMENT BY MR. ANDRES                 P. 1240

CLOSING ARGUMENT BY MR. AKROTIRIANAKIS         P. 1285

REBUTTAL ARGUMENT BY MR. ANDRES                P. 1332

THINGS.

WHAT WE ASK IS THAT YOU, AND WE KNOW YOU WILL, PAY ATTENTION TO THOSE AND READ THOSE.  THEY'RE IMPORTANT.

NOW, TO QUALIFY FOR PUNITIVE DAMAGES, WHATSAPP MUST PROVE THAT NSO'S CONDUCT WAS DONE WITH MALICE OR OPPRESSION OR FRAUD. YOU DON'T HAVE TO FIND ALL THREE.  YOU HAVE TO FIND ONE OF THE THREE.  WE THINK WE HAVE PROVED ALL THREE.

WHATSAPP MUST PROVE THAT NSO'S EXECUTIVES, ITS OFFICERS, DIRECTORS, MANAGERS ACTED ON BEHALF OF NSO.

THAT'S NOT A COMPLICATED ISSUE.  YOU HEARD FROM THOSE PEOPLE HERE, THAT THEY EITHER ACTED ON BEHALF OF NSO, THAT THEY COMMITTED THESE ACTS, THAT THEY AUTHORIZED THEM, OR THAT THEY KNEW OF THEM AND ADOPTED THEM AND APPROVED THEM AFTER THE FACT.

SO THAT ISSUE WITH RESPECT TO MANAGING AGENTS OR EXECUTIVES, YOU KNOW THAT BECAUSE MR. SHOHAT PROUDLY TOLD YOU THAT HE'S THE CEO BOTH OF Q CYBER AND NSO, AND HE WAS INVOLVED IN THESE EVENTS, AND APPROVED OF THEM, AS HE DOES TODAY.

YOU ALSO HEARD FROM MR. GAZNELI.  I'LL COME BACK TO THAT IN A MINUTE.

LET'S TALK ABOUT MALICE.

MALICE.  MALICE, JUDGE HAMILTON WILL INSTRUCT YOU, MEANS THAT DEFENDANTS ACTED WITH INTENT TO CAUSE INJURY OR THAT DEFENDANTS' CONDUCT WAS DESPICABLE.  IT WAS KNOWING AND WAS DONE WITH A WILLFUL AND KNOWING DISREGARD OF WHATSAPP'S RIGHTS.

SHE'LL FURTHER INSTRUCT YOU THAT A PERSON ACTS WITH

KNOWING DISREGARD WHEN A PERSON IS AWARE OF THE PROBABLE DANGEROUS CONSEQUENCES OF A PERSON'S CONDUCT AND DELIBERATELY FAILS TO AVOID THAT CONDUCT.

JUDGE HAMILTON WILL ALSO TELL YOU THAT OPPRESSION MEANS THAT DEFENDANTS' CONDUCT WAS DESPICABLE, SUBJECTED THE PLAINTIFFS TO CRUEL AND UNJUST HARDSHIP IN KNOWING DISREGARD OF WHATSAPP'S RIGHTS.

AND SHE'LL DEFINE DESPICABLE CONDUCT AS SO VILE, BASE, OR CONTEMPTIBLE THAT IT WOULD BE LOOKED DOWN UPON OR DESPISED BY REASONABLE PEOPLE THE WAY THAT REASONABLE PEOPLE WOULD VIEW SPYING ON SOMEBODY'S PHONE IN THE WAY THAT NSO SPIES.

JUDGE HAMILTON WILL INSTRUCT YOU THAT FRAUD MEANS THAT THE DEFENDANTS INTENTIONALLY MISREPRESENTED OR CONCEALED A MATERIAL FACT.

YOU KNOW THAT THERE WAS FRAUD IN THIS CASE.  YOU KNOW THAT THERE WAS DECEIT AND CHEATING.

AGAIN, JUST WITH THIS ISSUE ABOUT MANAGING AGENTS, YOU HEARD THE TESTIMONY OF MR. SHOHAT.  YOU HEARD THE TESTIMONY OF MR. GAZNELI.  THEY ARE SENIOR EXECUTIVES.

YOU ALSO HEARD THE TESTIMONY OF MS. GIL.  SHE WAS BY VIDEO.  SHE TESTIFIED ABOUT THE FACT THAT THEY SELL, I THINK SHE SAID HAD A BUSINESS, A BUSINESS DEPARTMENT AND THEY SELL PEGASUS, ON AVERAGE, FOR $7 MILLION, AND SOMETIMES THEY HAVE TO CHARGE MORE THAN $7 MILLION IF THE PARTY BUYING IT WANTS TO BE ABLE TO SURVEIL PEOPLE OUTSIDE OF THEIR COUNTRY.

SO YOU HEARD FROM HER.

YOU ALSO HEARD FROM MR. ESHKAR, WHO'S A SENIOR EXECUTIVE.

SO LET ME TURN TO THE QUESTIONS OF WHETHER NSO ACTED WITH MALICE, OPPRESSION, OR FRAUD.  AND THEY DID.

FIRST, YOU KNOW WHAT NSO DID IN THIS CASE.  THEY ATTACKED WHATSAPP'S SERVERS.  I'M REPEATING MYSELF, BUT IT'S IMPORTANT THAT WE GO THROUGH THESE ONE BY ONE.

YOU KNOW THAT THEY DID THAT ATTACK ON WHATSAPP'S SERVERS HERE IN CALIFORNIA 43 TIMES.  ALL YOU NEED TO DO TO VERIFY THAT FACT IS READ THE JURY INSTRUCTIONS.

YOU KNOW THAT THE PURPOSE OF THE VECTORS NSO ATTACKED HERE WAS TO PUT THE SPYWARE ON THE PHONE.  ATTACKING FOR THE PURPOSE OF SPYING.

AND YOU KNOW THAT THEY TARGETED AND SENT THIS MALICIOUS SPYWARE ONTO THE PHONES OF 1400 PEOPLE.

NOW, LET ME STOP FOR ONE SECOND.

THAT'S 1400 PEOPLE IN A TWO-WEEK TIME PERIOD.  OKAY?  SO I'M NOT GOING TO DO THE MATH FOR YOU.  THAT'S NOT MY SPECIALTY. BUT THAT 1400 PEOPLE THAT ARE THE VICTIMS OF THIS SPYWARE ATTACK HAPPENED IN A TWO-WEEK PERIOD.

NOW, THOSE VICTIMS, BY THE WAY, YOU'VE HEARD TESTIMONY, NSO DOES NOT KNOW WHO THOSE VICTIMS ARE, AND MR. SHOHAT TESTIFIED TO THAT.  I ASKED HIM THAT SPECIFICALLY ON CROSS-EXAMINATION.  I ASKED HIM, YOU'RE SAYING NO, NSO, AT THE TIME OF PEGASUS, DID NOT KNOW THE IDENTITIES OF PEOPLE WHOSE

PHONES ARE BEING SPIED UPON?

THIS IS A CORRECT STATEMENT.

AND JUDGE HAMILTON IS GOING TO TELL YOU THAT -- INSTRUCT YOU THAT THE IDENTITIES OF VICTIMS ARE NOT RELEVANT.

AND SO REGARDLESS OF WHATEVER GOVERNMENTS NSO SELLS TO, WHATEVER THAT MEANS, NSO IS NOT A GOVERNMENT, THEY'RE A FOR-PROFIT COMPANY, AND THEY DON'T KNOW WHO THEY'RE SPYING ON.

MR. SHOHAT TESTIFIED TO THAT.  YOU SHOULD RELY ON THAT, AND YOU CERTAINLY CAN RELY ON THE INSTRUCTION OF JUDGE HAMILTON.

NOW, YOU KNOW THAT THEY USED THIS ZERO-CLICK TECHNOLOGY THAT WE TALKED ABOUT.  YOU HAVE HEARD THAT THESE ATTACKS, THE MALWARE INSTALLATION, HEAVEN, EDEN, ERISED, THAT IS THE HEART OF NSO'S OPERATION, AND YOU SEE THAT THERE'S -- YOU CAN LOOK AT THESE DOCUMENTS, PLAINTIFFS' EXHIBIT 59, YOU'RE HAPPY TO LOOK AT THIS -- THIS IS A DOCUMENT WHERE YOU CAN SEE ALL OF THE, ALL OF THE CAPABILITIES OF PEGASUS.

YOU KNOW ABOUT THE PEGASUS INSTALLATION AND WHAT IT DOES AND HOW IT SPIES.  I'M NOT GOING TO DO THAT.

REMEMBER THIS.  THIS ONE CAME IN THROUGH A VIDEO, BUT RAMON ESHKAR, HE'S THE VICE PRESIDENT OF CLIENT EXECUTIVES, HE WAS ASKED, WHAT CAN PEGASUS DOWNLOAD FROM THE PHONE?

HE SAID -- WAS THE CASE WITH RESPECT TO THE OPERATION OF PEGASUS IN 2018 AND '19, EVERY KIND OF USER DATA ON THE PHONE AS IT EXISTS.  THIS IS MY UNDERSTANDING.

RELEVANT, NOT SOMETHING THAT YOU SHOULD SPEND A LOT OF TIME ON.

AT THE END OF THE DAY, LADIES AND GENTLEMEN -- BY THE WAY, THERE WAS ALSO QUITE A BIT OF VICTIM BLAMING IN THIS CLOSING. WHATSAPP IS THE VICTIM OF A CYBER ATTACK.  WE'RE NOT THE SAME -- WE'RE NOT ON THE SAME FOOTING WITH NSO IN THE CONTEXT OF THIS LAWSUIT.

WE -- THERE'S BEEN NO FINDING BY THIS COURT THAT WE VIOLATED THE LAW AT ALL.

THE COURT HAS FOUND THAT NSO VIOLATED THE LAW.  SO ALL THIS BLAMING THAT OUR SECURITY WASN'T ROBUST ENOUGH OR VULNERABILITIES OR WE LET THEM IN, WE DID NOT.  AND YOU KNOW THAT SPECIFICALLY BASED ON THE TESTIMONY OF THE ENGINEERS.

YOU KNOW ABOUT THE SPYING IN THIS CASE.  YOU KNOW WHAT IT MEANS.

YOU KNOW ABOUT THEIR FINANCIAL CONDITION.

AND, AGAIN, I ASK YOU TO LOOK AT THE EXHIBITS, PLAINTIFFS' EXHIBIT 1779, 1780, 1781, 1782.  THOSE ARE THE FINANCIAL DOCUMENTS AS THEY RELATE TO NSO AND Q CYBER.

LADIES AND GENTLEMEN, END THE CAT AND MOUSE GAME.  AWARD THE COMPENSATORY DAMAGES OF 444,719, $444,719, AND AWARD A PUNITIVE DAMAGES NUMBER THAT SENDS A MESSAGE THAT SPYING IS NOT OKAY.  IT'S NOT APPROPRIATE.

YOU KNOW THE COURT HAS FOUND IT VIOLATED THE LAW, THAT THIS HACKING AND SPYING IS NOT OKAY.

SEND THAT MESSAGE.

THANK YOU FOR YOUR TIME.

THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.

ALL RIGHT.  MEMBERS OF THE JURY, NOW IS THE TIME FOR ME TO GIVE YOU THE INSTRUCTIONS.  I AM REQUIRED TO READ THE INSTRUCTIONS IN THE RECORD, BUT WE HAVE FOUND IT HELPFUL FOR YOU TO HAVE A COPY OF THE INSTRUCTIONS SO THAT YOU CAN READ ALONG WITH ME, AND IT -- I THINK THE THINKING IS THAT IT WILL SINK IN MORE IF YOU'RE ABLE TO READ IT AS WELL.

SO MS. COLLINS WILL HAND EVERYBODY A COPY OF THE INSTRUCTIONS THAT APPLY IN THIS CASE.

(PAUSE IN PROCEEDINGS.)

THE COURT:  ALL RIGHT.

MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE EVIDENCE AND THE ARGUMENTS OF THE ATTORNEYS, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES TO THIS CASE.

EACH OF YOU HAS RECEIVED A COPY OF THESE INSTRUCTIONS THAT YOU MAY TAKE WITH YOU TO THE JURY ROOM TO CONSULT DURING YOUR DELIBERATIONS.

NOW, IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE EVIDENCE IN THE CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT TO YOU.  AND YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU, WHETHER YOU AGREE WITH IT OR NOT.  AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.  THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT

CERTIFICATE OF REPORTERS

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8076

_____

LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  MAY 5, 2025

FILED

MAY 6 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

        Plaintiffs,

    v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

        Defendants.

Case No. 19-cv-07123-PJH

**FINAL JURY INSTRUCTIONS**

Dated:  May 5, 2025

United States District Court
Northern District of California

**Instruction No. 15**
**OBTAINING INFORMATION BY COMPUTER - SECTION 1030(A)(2)**

The Court has already determined that Defendants violated the federal Computer Fraud and Abuse Act by intentionally exceeding authorized access to a computer and thereby obtaining information from any protected computer.

Specifically, the Court has determined that:

First, Defendants intentionally accessed WhatsApp's servers. Defendants acted "intentionally," which means that it was Defendants' conscious desire or purpose to act in a certain way or to cause a certain result, or Defendants knew they were acting in that way or would be practically certain to cause that result.

Second, Defendants exceeded their authorized access to WhatsApp's servers, which means that Defendants accessed WhatsApp's servers with authorization and used such access to obtain or alter information on the WhatsApp servers and target devices that Defendants are not entitled to obtain or alter.

Third, Defendants' WhatsApp Installation Server or 'WIS' sent messages through WhatsApp servers that caused Pegasus to be installed on target users' devices, and the WIS was able to obtain protected information by having it sent from the target users, through the WhatsApp servers, and back to the WIS. The Court concluded that the sending of protected information through the servers constituted obtaining it from the servers; and

Fourth, the information was from a protected computer, which means a computer used in or affecting interstate or foreign commerce or communication.

**ER-298**

## Instruction No. 16

## ACCESSING A PROTECTED COMPUTER WITH AN INTENT TO DEFRAUD – SECTION 1030(A)(4)

The Court has already determined that Defendants violated the federal Computer Fraud and Abuse Act by knowingly and with intent to defraud exceeding authorized access to a protected computer, and by means of such conduct furthering the intended fraud and obtaining anything of value.

Specifically, the Court has determined that:

First, Defendants accessed WhatsApp's servers, which are protected computers. A protected computer means a computer used in or affecting interstate or foreign commerce or communication.

Second, Defendants exceeded their authorized access to WhatsApp's servers, which means that Defendants accessed WhatsApp's servers with authorization and used such access to obtain or alter information on the WhatsApp servers and target devices that Defendants are not entitled to obtain or alter.

Third, Defendants acted knowingly and with intent to defraud. Defendants acted "knowingly," which means that they were aware of the act and did not act through ignorance, mistake, or accident. Defendants acted with an "intent to defraud," which means an intent to deceive and cheat, meaning the intent to deprive a victim of money or property by deception. Defendants acted with an intent to defraud based on the fact that Defendants redesigned Pegasus to evade detection after Plaintiffs first fixed the security breach.

Fourth, by exceeding authorized access to WhatsApp's servers, NSO furthered the intended fraud and obtained anything of value.

Instruction No. 26

## PUNITIVE DAMAGES

In addition to compensatory damages, you may, but are not required, to award Plaintiffs punitive damages under the California Comprehensive Computer Data Access and Fraud Act. Punitive damages may not be awarded for Defendants' violations of the Computer Fraud and Abuse Act or WhatsApp's Terms of Service.

The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future. Punitive damages may not be awarded to compensate Plaintiffs.

Even though the Court has already determined, by a preponderance of the evidence, that Defendants accessed Plaintiffs' servers intentionally, knowingly, and with an intent to defraud under the federal Computer Fraud and Abuse Act, as explained in Instruction Numbers _ and _, it is up to the jury to decide whether Plaintiffs have proven by clear and convincing evidence that Defendants acted with malice, oppression, or fraud as defined below in connection with the conduct that violated the California Computer Data Access and Fraud Act.

You may award punitive damages only if you find that Plaintiffs have proven by clear and convincing evidence that Defendants' conduct that violated the California Computer Data Access and Fraud Act was done with malice, oppression, or fraud. To do this, Plaintiffs must prove one of the following by clear and convincing evidence:

1. That the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants; or

2. That the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of Defendants; or

3.  That one or more officers, directors, or managing agents of Defendants knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

"Malice" means that Defendants acted with intent to cause injury or that Defendants' conduct was despicable and was done with a willful and knowing disregard of the rights of Plaintiffs. A person acts with knowing disregard when the person is aware of the probable dangerous consequences of the person's conduct and deliberately fails to avoid those consequences.

"Oppression" means that Defendants' conduct was despicable and subjected Plaintiffs to cruel and unjust hardship in knowing disregard of Plaintiffs' rights.

"Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

"Fraud" means that Defendants intentionally misrepresented or concealed a material fact and did so intending to harm Plaintiffs.

An employee is a "managing agent" if the employee exercises substantial independent authority and judgment in corporate decisionmaking such that the employee's decisions ultimately determine corporate policy.

There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages.

If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be in an amount sufficient to fulfill their purposes of punishment and deterrence but should not reflect bias, prejudice, or sympathy toward any party.

If you decide to award punitive damages, you should consider all of the following factors in determining the amount:

(a) How reprehensible was Defendants' conduct? In deciding how reprehensible Defendants' conduct was, you may consider, among other factors:

1. Whether the conduct caused physical harm;

2. Whether Plaintiffs were financially weak or vulnerable and Defendants knew Plaintiffs were financially weak or vulnerable and took advantage of them;

3. Whether Defendants' conduct involved a pattern or practice; and

4. Whether Defendants acted with trickery or deceit.

(b) Is there a reasonable relationship between the amount of punitive damages and Plaintiffs' harm?

(c) In view of Defendants' financial condition, what amount is necessary to punish them and discourage future wrongful conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because Defendants have substantial financial resources. Any award you impose may not exceed Defendants' ability to pay.

Punitive damages may not be used to punish Defendants for the impact of their misconduct on persons other than Plaintiffs or for acts committed outside of California, although out-of-state conduct may be probative if it has a nexus to the specific harm suffered by Plaintiffs and demonstrates the deliberateness and culpability of the Defendants' actions in California.

**FILED**

MAY 6 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

      Plaintiffs,

      v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

      Defendants.

Case No. 19-cv-07123-PJH

**VERDICT**

United States District Court
Northern District of California

**ER-303**

Instructions: When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Please refer to the Jury Instructions for guidance on the law applicable to the subject matter covered by each question.

In this verdict form, "WhatsApp" refers collectively to Plaintiffs WhatsApp LLC and Meta Platforms, Inc., and "NSO" refers collectively to Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited.

## QUESTIONS AND ANSWERS

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this court as our verdict in this case:

## FINDINGS ON DAMAGES

1. What amount of compensatory damages has WhatsApp proven that NSO should pay?

$ 444,719 ___ USD

2. (a) Has WhatsApp proven by clear and convincing evidence that NSO engaged in malice, oppression, or fraud in violating the California Comprehensive Data Access and Fraud Act?

___X___ YES          _____ NO

If you answered "YES" to question 2(a), then please proceed to question 2(b). If you answered "NO" to question 2(a), then please skip to the last paragraph, which is after question 3.

1

(b) Should punitive damages be imposed based on the factors set forth in Jury Instruction 27?

____X____ YES          _____ NO

If you answered "YES" to both questions 2(a) and 2(b), then please proceed to question 3. If you answered "NO" to question 2(b), then please skip to the last paragraph, which is after question 3.

3.  What is the amount of punitive damages that NSO should pay?

$ ~~167,254~~ 167,254,000 ____ USD

You have now reached the end of the verdict form and should review it to ensure it accurately reflects your unanimous determinations. The Presiding Juror should then sign and date the verdict form in the spaces below and notify the court personnel that you have reached a verdict. The Presiding Juror should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

DATE: 5/6/25

PRESIDING JUROR SIGNATURE: _____

2

**ER-305**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

      Plaintiffs,

      v.

NSO GROUP TECHNOLOGIES LIMITED, et al.,

      Defendants.

Case No. 19-cv-07123-PJH

**ORDER DENYING MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION**

Re: Dkt. 687

Before the court is defendants' motion for leave to file a motion for reconsideration. See Dkt. 687. The court issued an order directing plaintiffs to respond to defendants' motion, and plaintiffs have filed a response. See Dkt. 698, 707.

As the court noted in its prior order, the arguments raised by defendants were not raised in their opposition to plaintiffs' motion in limine, nor were they raised during the course of pretrial conference. See Dkt. 698 at 1. However, even though the arguments were untimely, out of an abundance of caution, the court opted to fully hear and consider the competing arguments before issuing a ruling. Having now fully considered the arguments, the court concludes that defendants' motion for leave to file a motion for reconsideration must be DENIED.[1]

As an initial matter, the court is fully mindful of the need for equity in its evidentiary rulings, and to the extent defendants' motion articulates that general principle, the court

---

[1] By considering the parties' competing briefs, the court has addressed the arguments that would have been raised if the court had granted defendants' motion for leave and allowed them to file a motion for reconsideration.

United States District Court
Northern District of California

United States District Court
Northern District of California

doubtlessly agrees.  However, the specific relief requested by defendants' motion goes too far, and fails to recognize that the court has already balanced the need for equity in issuing its rulings on the motions in limine.  In particular, the court notes that it granted defendants' third, sixth, and ninth motions in limine (seeking exclusion of the targets' identities and occupations, allegations regarding Jamal Khashoggi, and the Entity List, respectively), even though such evidence would need to be admitted if defendants' requested evidence were admitted.

Moreover, the relief requested by defendants' motion seeks more than just equivalence.  As plaintiffs point out, "[t]here is no equivalence between generalized evidence about why Defendants' and their customers' may have hacked WhatsApp, and specific and actual evidence showing what Defendants' WhatsApp-based exploit did," and defendants' motion seeks to present testimony and argument about matters for which there is no evidence of record, or evidence that is simply not tethered to the conduct at issue in this case.  See Dkt. 707 at 2.  Accordingly, defendants' motion for leave to file a motion for reconsideration is DENIED.

Because there remain some outstanding issues that were not fully discussed at the pretrial conference, the court sets a videoconference hearing for **Thursday, April 24, 2025**, at **10:30am**.  Further details will be provided via clerk's notice on the court's docket.  The parties should be prepared to discuss jury instructions, deposition and discovery excerpts, and trial exhibits and any sealing issues.

**IT IS SO ORDERED.**

Dated:  April 23, 2025

_/s/ Phyllis J. Hamilton_
PHYLLIS J. HAMILTON
United States District Judge

2

**ER-307**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

        Plaintiffs,

        v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

        Defendants.

Case No. 19-cv-07123-PJH

**ORDER CLARIFYING SUMMARY
JUDGMENT ORDER RE
CONSPIRACY**

Re: Dkt. 494

During the course of the pretrial conference's discussion of jury instructions and
the issue of whether to include an instruction regarding conspiracy to violate the
Computer Fraud and Abuse Act in violation of 18 U.S.C. § 1030(b), it came to the court's
attention that the summary judgment order was unclear as to whether it included an
express finding regarding conspiracy. Specifically, plaintiffs request an instruction stating
that "the court has already determined that NSO engaged in a conspiracy to violate the
federal Computer Fraud and Abuse Act," while defendants argue that the court made no
such determination. See Dkt. 587-3 at 8, Dkt. 590 at 6-7.

As a threshold matter, the lack of clarity regarding conspiracy is due to the same
issue identified in the court's final pretrial order – namely, the absence of evidence
regarding the specific conduct at issue in this case, due to various international
restrictions and the resultant discovery limitations necessitated by the Richmark
balancing analysis. As a result, the evidentiary record did not show (at the time of
summary judgment, nor now) the specific details about how exactly the relevant attacks
were conducted. Based on that unclear record, the court concluded that even the limited

**ER-308**

conduct to which defendants admit (i.e., developing Pegasus and providing it to their clients, as well as providing training and ongoing support) along with evidence that appears undisputed that they updated Pegasus to circumvent plaintiffs' security updates, sufficed to establish liability even before reaching the issue of whether evidentiary sanctions were necessary.

Even now, as discussed at length at the pretrial conference, the specific details regarding how the relevant attacks were conducted remain outside the evidentiary record. As a result, the court could not – and still cannot – definitively determine whether direct liability or co-conspirator liability is a better fit to the facts of the case. That said, when viewed in conjunction with the court's ruling on plaintiffs' motion for sanctions, the court concludes that there is a sufficient basis to establish direct liability, and arguably co-conspirator liability. While the court's order left open the possibility that defendants engaged in conspiracy to violate the CFAA, as the relevant evidence may indeed support that conclusion –based on the state of the evidentiary record, the court stopped short of an express finding that defendants engaged in conspiracy to violate the CFAA. Accordingly, as relevant to the jury instructions dispute, the court will not give plaintiffs' proposed sixth instruction regarding conspiracy.

**IT IS SO ORDERED.**

Dated:  April 21, 2025

_/s/ Phyllis J. Hamilton_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
Northern District of California

2

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:    (213) 443-4355
Facsimile:    (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, <br><br> Defendants. | Case No. 4:19-cv-07123-PJH <br><br> **DEFENDANTS' MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION [L.R. 7-9(a)]** <br><br> Judge:   Hon. Phyllis J. Hamilton <br><br> Action Filed:   10/29/2019 |

DEFENDANTS' MOTION FOR LEAVE                    1                    Case No. 4:19-CV-07123-PJH
RE RECONSIDERATION

**ER-310**

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited (collectively, "NSO") hereby move under Local Rule 7-9(a) for leave to file a motion for reconsideration of the Court's April 15, 2025, Final Pretrial Order (Dkt. 686). Reconsideration is justified because that Order, in granting Plaintiffs' MILs and *Daubert* motions, reflects "[a] manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court."  L.R. 7-9(b).

By seeking to hold NSO liable for punitive damages, Plaintiffs have, throughout this litigation, squarely put at issue what NSO intended with respect to its Pegasus technology. Moreover, Plaintiffs' case has always been (and this Court's summary judgement ruling was) based on "generalized" evidence of how NSO's Pegasus technology functioned and "generalized" evidence of how NSO interacts with its customers.  Plaintiffs have also consistently taken the position that their claims are *not* limited to the attempted use of Pegasus against 1,400 target devices in April and May 2019.  Accordingly, Plaintiffs sought summary judgment on liability without presenting any specific evidence about the customers involved in the alleged use of Pegasus against 1,400 target devices in April and May 2019, or those customers' specific actions during that time frame.[1]  Nor, this Court concluded, did Plaintiffs need such evidence; the Court granted summary judgment based on Plaintiffs' generalized evidence.

Because Plaintiffs have been permitted to rely on generalized evidence in presenting their case, NSO must be permitted to rely on generalized evidence in response.  By way of proffer, NSO would seek to introduce the following evidence that reflects its intent in creating and licensing Pegasus and which therefore bears directly on Plaintiffs' claim for punitive damages: (1) Exhibits A-1908 and A-2005, exemplar NSO contracts that require the customer to represent that it will use

---

[1] Indeed, Plaintiffs have admitted that they cannot establish that Pegasus was successfully installed on *any* of the 1,400 target devices.  (Trial Exhs. A-1034 ("We are not in a position to confirm whether your account (or any other user's account) was compromised"); A-1063 ("We can't know for certain whether Pegasus was installed on your phone, and being targeted does not necessarily mean that attackers succeeded in placing spyware on your phone.").)  Trial Exhibits A-1036, A-1039, A-1064, A-1065, A-1067 all contain similar admissions from Plaintiffs and Citizen Lab.

DEFENDANTS' MOTION FOR LEAVE        1        Case No. 4:19-CV-07123-PJH
RE RECONSIDERATION

**ER-311**

Pegasus "only for the prevention and investigation of crimes and terrorism and ensure that the System will not be used for human rights violations" (as do end-user certifications of NSO's customers affirming the same thing to Israel's Ministry of Defense, Exhibits A-2087 and A-2088)[2]; and (2) the testimony of CEO Yaron Shohat (a) that all of NSO's customer contracts in effect during the applicable period, and all times since, contain this language; (b) that all of NSO's customers are governments approved by the Government of Israel; (c) that NSO follows the same due diligence processes for every one of its customers (including all customers who had licenses active in April-May 2019); and (d) about what NSO's due diligence and customer investigation processes entails. Plaintiffs can rebut such evidence, and the jury will evaluate it and decide on whether NSO has acted with malice, oppression or fraud. Plaintiffs are free to cross-examine NSO's witnesses, as Plaintiffs have done at depositions, with their own generalized evidence about misuse of Pegasus and the role NSO plays in setting up and supporting its customers' uses of Pegasus.

The Court's Final Pretrial Order, however, precludes NSO from offering this evidence, creating an artificial and one-sided trial in which the Court will permit Plaintiffs to rely on "generalized" evidence about "the purpose of Pegasus" (Dkt. 595 at 12) to impute bad motives to NSO and to describe NSO as selling malicious "spyware"—despite the fact that Pegasus "spying" on target devices is not relevant under the Court's framework because it is not the "conduct which gave rise to [CDAFA] liability" (Dkt. 686 at 1-2)—while the Court simultaneously precludes NSO from presenting any evidence of its intent in a case where Plaintiffs have put Defendants' intent squarely at issue. The Court should reconsider that ruling because it reflects "[a] manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court." L.R. 7-9(b). In particular, the Court's ruling and rationale are inconsistent with its summary judgment order, the positions Plaintiffs have taken throughout this litigation, and with the history of discovery in this case. The Court should therefore reconsider its Order and permit NSO to present

_____

[2] NSO does not seek to "impute" its customers' intentions to itself. (Dkt. 686 at 4.) NSO seeks to introduce evidence of *its own* intent in designing and licensing Pegasus, irrespective of how any particular customer has used Pegasus. That is not "inconsistent" with NSO's lack of control over its customers or with NSO's status as a for-profit enterprise (*id.*), but whether it is or not is a question for Plaintiffs to probe on cross-examination and for the jury, not the Court, to resolve.

DEFENDANTS' MOTION FOR LEAVE          2                    Case No. 4:19-CV-07123-PJH
RE RECONSIDERATION

**ER-312**

evidence related to its intent in creating Pegasus and licensing it solely to vetted government customers, which bear directly on whether NSO acted with intent to cause injury or in willful and knowing disregard of the rights or safety of another.  CACI No. 3945, Punitive Damages - Entity Defendant - Trial Not Bifurcated.

In the alternative, the Court should make clear that Plaintiffs are equally limited at trial to presenting only evidence directly related to the "specific intrusions on *plaintiffs'* systems" that allegedly occurred in April-May 2019.  (Dkt. 686 at 2, 6, 8 (emphasis added).)  If the Court believes that the record does not contain sufficient evidence to support that approach, it should—as it suggested at the Final Pretrial Conference—reopen discovery to cure any "unfairness" that the Court believes would occur by allowing Defendants to provide evidence of its intentions in developing, testing, promoting, and licensing, Pegasus or the numerous "guardrails" that surround its use.  That evidence is the direct opposite of having acted with malice.  *See* CACI No. 3945 (defining "knowing disregard" as "aware[ness] of the probable dangerous consequences of the person's conduct" coupled with a "deliberate[] fail[ure] to avoid those consequences").

## I.  The Court's MIL Order Is Inconsistent with Plaintiffs' Prior Arguments and with the Court's Summary Judgment Order.

Throughout this case, Plaintiffs have consistently *denied* this Court's current view that the "conduct alleged in this case" is only "the specific intrusions" into WhatsApp's servers through which NSO's customers allegedly attempted to "access[] the 1400 target devices at issue in this suit" in April-May 2019.  (Dkt. 686 at 2.)  Contrary to NSO's arguments that Plaintiffs' claims *were* so limited, Plaintiffs have consistently and strenuously maintained that they sue NSO for "*all* of NSO's unauthorized access to WhatsApp servers," including NSO's "probing Plaintiffs' servers and vulnerabilities" while designing its technologies and "selling" those technologies, whether or not any particular technology was ever used by any particular customer at any particular point in time. (Dkt. 109 at 2 n.1, 6 (emphasis added); *accord, e.g.*, Dkt. 116 at 17-19; Dkt. 144 at 11; Dkt. 235-2 at 7-9; Dkt. 260-3 at 1-2, 5-6.)  For example, Plaintiffs successfully opposed NSO's motion to dismiss their claim for injunctive relief in part by arguing that their claims were not limited to uses of Pegasus in April-May 2019.  (Dkt. 109.)  Plaintiffs also partially succeeded on a motion to compel

**CONCLUSION**

For the foregoing reasons, the Court should grant NSO leave to file a motion for reconsideration of the Court's Final Pretrial Order.

DATED: April 18, 2025                    KING & SPALDING LLP

                                         By: /s/ *Joseph N. Akrotirianakis*
                                             JOSEPH N. AKROTIRIANAKIS
                                             AARON S. CRAIG

                                             Attorneys for Defendants NSO GROUP
                                             TECHNOLOGIES LIMITED and Q
                                             CYBER TECHNOLOGIES LIMITED

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  jakro@kslaw.com
AARON S. CRAIG (Bar No. 204741)
  acraig@kslaw.com
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S NOTICE OF PUBLIC FILING OF REDACTED EXHIBITS K, L, AND W IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 396-5); REDACTED EXHIBITS A, B, AND C IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DKT. 419-5); AND REDACTED EXHIBITS AA AND BB IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (DKT. 433-5)**<br><br>Action Filed:   10/29/2019 |

DEFENDANTS' NOTICE OF PUBLIC
FILING OF REDACTED EXHIBITS

Case No. 4:19-cv-07123-PJH

**ER-315**

# Exhibit B

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

- - - - - - - - - - - - - - - x

WHATSAPP INC., a Delaware      :

corporation, and FACEBOOK,     :

INC., a Delaware corporation, :

          Plaintiffs,          :   CASE NO.

v.                             :   4:19-cv-07123-PJH

NSO GROUP TECHNOLOGIES LIMITED:

And Q CYBER TECHNOLOGIES       :

LIMITED,                       :

          Defendants.          :

- - - - - - - - - - - - - - - x

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES

VIDEOTAPED DEPOSITION OF ANDREW ROBINSON

Thursday, September 19, 2024

9:36 a.m.

JOB NO.:  44484

Pages 1 through 389

Reported By:  CASSANDRA E. ELLIS, CSR-CA #14448,

CSR-HI #475, CCR-WA #3484, RPR, RMR, RDR, CRR,

Realtime Systems Administrator #823848

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. This is the beginning of media in the deposition of Andrew Robinson, taken in the matter of WhatsApp, Inc., a Delaware corporation, and Facebook, Inc., a Delaware corporation, plaintiffs, versus NSO Group Technologies Limited and Q Cyber Technologies Limited, defendants, Case Number 4:19-cv-07123- -- DJH -- PJH, held in the United States District Court, Northern District of California, Oakland division. Today's date is September 19th, 2024, and the time on the monitor is 9:36 a.m.

My name is Robyn Ellis, and I am the legal videographer. The court reporter is Cassandra Ellis. We are representing Olender Reporting.

Counsel appearances will be noted on the stenographic record.

Will the court reporter please swear in the witness, then you may proceed.

(Witness sworn)

MR. AKROTIRIANAKIS: Good morning. Joe Akrotirianakis and Jonathan Weinberg on behalf of the defendants.

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 251 of 295
Case 4:19-cv-07123-PJH    Document 675    Filed 04/04/25    Page 119 of 237
WhatsApp Inc. vs NSO Group Technologies Limited et al.                Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024

MR. MARZORATI:  Good morning.  Luca Marzorati from Davis Polk and Wardwell, on behalf of the plaintiffs.  With me here is Michael Chmelar from META Platforms, Inc.

MR. AKROTIRIANAKIS:  We don't have a remote deal today, do we?

MR. MARZORATI:  No.

MR. AKROTIRIANAKIS:  All right.

ANDREW ROBINSON

having been duly sworn, testified as follows:

EXAMINATION

BY MR. AKROTIRIANAKIS:

Q.   Good morning, Mr. Robinson.  My name is Joe Akrotirianakis.  We met outside the room.  I am the attorney for the defendants in this case; do you understand that?

A.   I do.

Q.   Okay.  Your first name is Andrew, but you generally go by Drew; do I understand correctly?

A.   That is correct.

Q.   And would it be appropriate to address you as Mr. Robinson?

A.   Sure.

Q.   In other words, you don't have,

utilize Facebook for or WhatsApp or other Facebook properties, there's a separate interface that the businesses would use.

Q.   Okay.

A.   But it would all still come through in the client.

Q.   When you say:  The client, you're referring to the WhatsApp app that you would download from the Google Play store or the IOS app store; right?

A.   That is correct.

Q.   How is messaging or calling using WhatsApp different from messaging using, like, the text message app on your phone or the network phone calling?

MR. MARZORATI:  Objection to form, lacks foundation.

A.   So I'm certainly not terribly well versed in the internals of WhatsApp, but my understanding of it is that we -- WhatsApp does not leverage the cellular network in the same way that cellular calls or cellular text messages relate, it is a separate protocol.

Q.   And it uses the internet as opposed to cellular networks; correct?

**ER-320**

WhatsApp Inc. vs NSO Group Technologies Limited et al.                     Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024

A.    That would be correct.

Q.    And the texts and voice calls and video calls that are used, that are sent and completed using WhatsApp, are encrypted in their content; correct?

A.    Could you repeat the question? Sorry.

Q.    Yeah, what is encryption?

A.    Encryption is the mechanism of taking a plain text and running it through a series of mathematical operations, such that you cannot get back to derive a cypher text, such that you cannot get back to the plain text without having the key which was used to derive the cypher text from the plain text.

Q.    So just to give an example, if you and I were sending written messages to each other, using WhatsApp, I would write it in actual characters, letters on my phone, and you would see it in letters, the same letters, on your phone; right?

MR. MARZORATI:  Objection to form.

A.    Two clients communicating by WhatsApp would see both the plain text end of the communication.

ER-321

Case 4:19-cv-07123-PJH    Document 675    Filed 04/04/25    Page 131 of 237
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024

Q.   But while the message is in transit between our two cell phones, it would be encrypted; is that right?

MR. MARZORATI:  Objection to form, lacks foundation.

A.   That would be correct, the content of what would pass between the clients would be -- have been the encrypted text.

Q.   Okay.  And so to the extent that it was intercepted in transit, that would just be gobbledygook, it wouldn't be understandable to anyone, even with the assistance of technology; correct?

MR. MARZORATI:  Objection to form.

A.   Not necessarily, if there are weaknesses in the encryption algorithm or mathematical flaws you could exploit, you could potentially get back to a plain text or if you had the key you could get back to a plain text.

Q.   Do you know of such weaknesses in WhatsApp's encryption algorithm?

A.   I'm not aware of any.

Q.   And the keys are WhatsApp's keys; right?

MR. MARZORATI:  Objection to form,

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024

lacks foundation.

A.    The keys are actually derived, I believe, on a client-to-client basis.

MR. MARZORATI:  Counsel, we've been going for about an hour, whenever you get to a good stopping point I would like to take a break.

MR. AKROTIRIANAKIS:  Sure.  Can we go on for a couple minutes or do you need a break right now?

MR. MARZORATI:  Sure.

BY MR. AKROTIRIANAKIS:

Q.    So the same would be the case in terms of the encryption with voice calls and video calls?

MR. MARZORATI:  Objection to form, lacks foundation.

A.    To my knowledge.

Q.    So in other words, I call you using WhatsApp, the content of our communication, meaning the words that you and I speak to each other, would be encrypted in transmission; right?

MR. MARZORATI:  Same objections.

A.    To my knowledge.

**ER-323**

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024

Q.    Okay.  And so while I would hear your voice, and you would hear my voice, someone who's sort of listening in, in the middle, would not hear voices, they would hear gobbledygook?

A.    That is correct.

Q.    And the same is true with video calls?

A.    Well, I should say, in the middle being if they were not on the device which -- so the device that is receiving the transmission, the call or the text would be the device which decrypts it, so if somebody had a mechanism for running code or an implant, like Pegasus, on that device then they would be able to access the clear text of that communication.

Q.    And if they didn't have something like Pegasus then they wouldn't be able to access it?

MR. MARZORATI:  Objection to form, calls for speculation.

A.    If they had physical access to the phone, they could also retrieve the clear text there.

Q.    Okay.  If they didn't have physical access to the phone, and they didn't have remote

Case 4:19-cv-07123-PJH   Document 675   Filed 04/04/25   Page 134 of 237

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024

access to the phone, through something like Pegasus, would they be able to access the content of the communication?

MR. MARZORATI:  Objection to form, calls for speculation.

A.   Barring -- barring access to some other mathematical flaw or encryption algorithm that I'm unaware of they would not have access to that communication.

MR. AKROTIRIANAKIS:  Okay.  We can take that break now.

MR. MARZORATI:  Thank you.

THE VIDEOGRAPHER:  The time is now 11:57.

We're off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is now 12:12.

We're back on the record.

(Previously marked Exhibit No. 1167 was identified for the record.)

BY MR. AKROTIRIANAKIS:

Q.   All right.  Mr. Robinson, you remain under oath; do you understand that?

A.   I understand that.

**ER-325**

CERTIFICATE OF SHORTHAND REPORTER

I, Cassandra E. Ellis, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 23RD day of September 2024.

*Cassandra E. Ellis*

CASSANDRA E. ELLIS, CSR-CA #14448, CCR-WA #3484, CSR-HI #475, RPR, RMR, RDR, CRR, REALTIME SYSTEMS ADMINISTRATOR #823848

**ER-326**

# Exhibit C

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

_____

WHATSAPP INC., a Delaware                )
corporation, and FACEBOOK, INC.,         )
a Delaware corporation,                  )
a Delaware corporation,                  )
                                         )
            Plaintiffs,                  )
    v.                                   ) Case No.
                                         ) 4:19-cv-07123-PJH
NSO GROUP TECHNOLOGIES LIMITED           )
and Q CYBER TECHNOLOGIES LIMITED,        )
                                         )
                                         )
            Defendants.                  )
_____)


HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEO-RECORDED 30(b)(6) and 30(b)(1)

DEPOSITION OF

WHATSAPP INC., by and through its Designated

Representative,

CLAUDIU GHEORGHE

Palo Alto, California 94304

Friday, August 16, 2024


Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 3296
PAGES 1-295

ER-328

joining remotely. I think that Matt Dawson -- Matthew Dawson is probably joining remotely.

ATTORNEY MARZORATI: It looks like Terry McGraw also.

ATTORNEY CRAIG: Yeah, Terry -- Terrence, T-E-R-R-E-N-C-E, for the record. McGraw, M-C-G-R-A-W.

ATTORNEY WEINBERG: All right.

ATTORNEY BLOCK: I'm Micah Block from Davis Polk for Plaintiffs.

With me from Davis Polk is Luca Marzorati.

We likely will be joined later in the deposition by Meenu Matthews in person and by Craig Cagney on the Zoom, neither of whom are yet present.

Also with us from META Platforms, Arif Dhilla in person. And we may have Michael Chmelar on Zoom at this point.

And I will provide you spellings at a break.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness.

CLAUDIU GHEORGHE,

Being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024

A    My understanding of what happened is that Jesus -- Jesus added the logging that led to the discovery of the -- of the attack.

Q    (BY ATTORNEY WEINBERG) All right.  And before he added it, there was no logging that validated that connecting_tone_description variable?

ATTORNEY BLOCK:  Object to the form of the question.

A    Before he added the logging, I don't know whether we had any logging for this or not.

Q    (BY ATTORNEY WEINBERG) Did you have any enforcement of this connecting_tone_description variable --

ATTORNEY BLOCK:  Object to form.

Q    (BY ATTORNEY WEINBERG) -- as of May 1, 2019?

ATTORNEY BLOCK:  Same objection.

A    As of May 1, 2019?

Q    (BY ATTORNEY WEINBERG) Did you enforce the value -- the validity of this connecting_tone_description variable?

ATTORNEY BLOCK:  Object to form; vague.

A    We were just rolling out the system, so we were only logging at that point and not enforcing.

Q    (BY ATTORNEY WEINBERG) Okay.  This

**ER-330**

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 263 of 295
Case 4:19-cv-07123-PJH    Document 675    Filed 04/04/25    Page 202 of 237
WhatsApp Inc. vs NSO Group Technologies Limited et al.
WHATSAPP INC. on 08-16-2024
Job 3296

variable tone -- connecting_tone_description, it's followed by what looks like, a -- is that a shell script of some sort?

ATTORNEY BLOCK:  Object to form.

Q    (BY ATTORNEY WEINBERG) Maybe I'll just open it up generally.

What is this variable value?

ATTORNEY BLOCK:  Object to form.

A    I'm not an expert in malware or shell scripts, but it looks like some malicious code.

Q    (BY ATTORNEY WEINBERG) You don't know what it does?

A    I don't understand all the things that it does.

Q    Did this code -- when you say "malicious code," you mean something that's executable?

ATTORNEY BLOCK:  Object to form.

A    It's a technical term for user security engineering for a piece of text that it's meant to be executed as -- in shell on Linux.

Q    (BY ATTORNEY WEINBERG) Did the chatdserver execute this malicious code?

A    No.

Q    So it passed it on to the -- the callee, what's labeled the "victim" here; is that correct?

A    The memory on the client.  And prepare the memory for the -- for hijacking the execution at the end.

So the messages -- like, what you see here are not the actual, like, malicious messages.  Like, the malicious message in this case not like a -- I don't know if I'm explaining this properly, but it's not like a script or anything like that.

The only thing that happens in these steps is just memory manipulation.

Q    On the client?

A    By the attacker, yes.

Q    The memory of the client?

A    The --

ATTORNEY BLOCK:  Object to form.

Q    (BY ATTORNEY WEINBERG) Just when you say "memory manipulation," I want to confirm that you're talking about the client device and not the servers.

ATTORNEY BLOCK:  Object to form; vague.

A    Yes, I meant the memory of the client.

Q    (BY ATTORNEY WEINBERG) And so on the third -- sorry -- page 4 of this.  It's this "Context" slide on the beginning of the --

A    This one?

Q    -- the next one.  The four bullet points.

WhatsApp Inc. vs NSO Group Technologies Limited et al.

WHATSAPP INC. on 08-16-2024

Job 3296

So the fourth bullet point -- I think this goes to what you were just saying -- the WhatsApp servers were not compromised by this attack?  You agree with that?

ATTORNEY BLOCK:  Object to form.

A    What do you mean by "compromised"?

Q    (BY ATTORNEY WEINBERG) Well, did it -- this operation impaired the availability of those servers to perform their normal functions?

ATTORNEY BLOCK:  Object to form.

A    This does not impair the availability of the servers.

Q    (BY ATTORNEY WEINBERG) Did it impair the availability of any data on the servers?

ATTORNEY BLOCK:  Object to form.

A    What data are you referring to?

Q    (BY ATTORNEY WEINBERG) Data stored in the servers.

A    I think that's too general.

Q    Did it impair the integrity of any data that's stored in the servers?

ATTORNEY BLOCK:  Object to form.

A    The integrity of the data?

Q    (BY ATTORNEY WEINBERG) Yeah.  If WhatsApp's servers stored some data that it needs to

Case 4:19-cv-07123-PJH    Document 675    Filed 04/04/25    Page 205 of 237

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024

make available for its normal operation, did this operation of Pegasus corrupt that data --

ATTORNEY BLOCK:  Object to form.

Q    (BY ATTORNEY WEINBERG) -- on the servers?

ATTORNEY BLOCK:  Object to form.

A    So this did not corrupt any data on the signaling or the relay servers.

ATTORNEY BLOCK:  It's been a little more than 15 minutes since we said 5 or 10, and I'm going to need a bio break.

ATTORNEY WEINBERG:  Okay.

ATTORNEY BLOCK:  Thank you.  I appreciate it.

THE VIDEOGRAPHER:  Off the record, 3:06 p.m.

(A break was taken from 3:06 p.m. to 3:25 p.m.)

THE VIDEOGRAPHER:  Back on the record at 3:25 p.m.

ATTORNEY BLOCK:  As I just mentioned off the record, Mr. Gheorghe identified a correction he wanted to make to some of his testimony while we were on break.

Q    (BY ATTORNEY WEINBERG) I believe the correction was on the location of the data centers

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 267 of 295
Case 4:19-cv-07123-PJH    Document 675    Filed 04/04/25    Page 206 of 237
WhatsApp Inc. vs NSO Group Technologies Limited et al.                Job 3296
WHATSAPP INC. on 08-16-2024

used for VoIP in 2019?

A       Yes.

Q       And where are those data centers of servers located?

A       They are located in Prineville, Oregon; Altoona, Iowa; and Forest City, North Carolina.

Q       And this is the location of the physical chatdservers, correct?

A       Yes.

Q       Okay.  If you could take a quick look at the final slide in Exhibit 1083.

It's -- I don't know if this is -- slide is showing this, but it's my understanding from the documents that ultimately the callee phone begins to interact with a third party-server that's not controlled by WhatsApp.

Is this being shown here?

ATTORNEY BLOCK:  Object to form.

A       I'm trying to understand what this slide means.  The slide was some kind of appendix.  I don't even know if it was even presented.

Q       (BY ATTORNEY WEINBERG) Okay.

A       Yeah, I really don't know what is the purpose of this.  I think it could be just somewhat unrelated with the attack.

**ER-335**

by having an official WhatsApp application that starts a voice or a video call.  That's the only way.

Q    (BY ATTORNEY WEINBERG) Okay.  But the choice of which authorization tokens a client is provided is made by the chatdserver that's controlled by WhatsApp?

ATTORNEY BLOCK:  Object to form; misstates.

A    It's the chat -- it's the VoIP signaling logic that runs inside the chatdserver, yes.

Q    (BY ATTORNEY WEINBERG) Okay.  I want to return to the effects, if any, of this -- of Pegasus's operation on the effectiveness of the chatdservers or the signaling servers or any of WhatsApp's server infrastructure.

You recall that in the White Paper PowerPoint, at page 4 there was statement that the WhatsApp servers were not compromised by this attack.  And I just wanted to take off exactly what that means.  I think we started doing this earlier.

So for example, WhatsApp doesn't have any reason to believe that the operation of Pegasus slowed down materially, the operation of WhatsApp servers?

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 269 of 295
Case 4:19-cv-07123-PJH    Document 675    Filed 04/04/25    Page 208 of 237
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024

ATTORNEY BLOCK:  I object to the preamble, and I object to a form of the question that followed the preamble.

A     What do you mean by "slow down"?

Q     (BY ATTORNEY WEINBERG) Well, you know computers, when they get a lot of work to do, they slow down.  So when you have a server and the server has too many server -- requests to service it, it would probably slow down.

So my question is:  Do you have any reason to believe that the operation of Pegasus slowed down in any material way, any of WhatsApp's servers?

ATTORNEY BLOCK:  Same objections.

A     No, I don't believe the suspicious attack that we observed slowed down the WhatsApp servers.

Q     (BY ATTORNEY WEINBERG) The volume of the -- of these suspicious stanzas was quite small compared to the size of WhatsApp's user base, wasn't it?

ATTORNEY BLOCK:  Object to form.

A     Yes.

Q     (BY ATTORNEY WEINBERG) As far as WhatsApp knows, Pegasus didn't delete any of WhatsApp's data from WhatsApp's servers, correct?

ATTORNEY BLOCK:  Object to form.

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 270 of 295
Case 4:19-cv-07123-PJH   Document 675   Filed 04/04/25   Page 209 of 237
WhatsApp Inc. vs NSO Group Technologies Limited et al.
WHATSAPP INC. on 08-16-2024                                    Job 3296

A    I'm not aware of any data being deleted.

Q    (BY ATTORNEY WEINBERG) Is WhatsApp aware of any WhatsApp data that Pegasus altered on WhatsApp's servers --

ATTORNEY BLOCK:  Object to form; vague.

Q    (BY ATTORNEY WEINBERG) -- other than accessing the server in its usual way?

ATTORNEY BLOCK:  Same objection.  And a partial scope objection, to the extent it seeks testimony about the operation of Pegasus, which has not been fully exposed to META.

Q    (BY ATTORNEY WEINBERG) Well, it's just that sometimes servers will store data owned by a company; and if there's some malicious cyberattack, maybe the data gets wiped, maybe the data gets locked out such that the owner can't access it anymore.

Was there any such effect on WhatsApp servers by the Pegasus software that you're aware of?

ATTORNEY BLOCK:  Same objections.

You can answer, to the extent of what META was able to observe.

A    Yeah, I'm not aware.

Q    (BY ATTORNEY WEINBERG) Is WhatsApp aware

**ER-338**

Case: 25-7380, 02/11/2026, DktEntry: 29.3, Page 271 of 295
Case 4:19-cv-07123-PJH   Document 675   Filed 04/04/25   Page 210 of 237
WhatsApp Inc. vs NSO Group Technologies Limited et al.
WHATSAPP INC. on 08-16-2024                                    Job 3296

of any evidence that Pegasus caused the deletion of any data owned by WhatsApp from target devices?

ATTORNEY BLOCK:  Objection to form.  And the same partial objection as to scope and the operation of Pegasus.

A    So we have reason to believe that the data -- the memory of the application -- of the gen -- like, the WhatsApp application running on victims' devices, the memory of that application was altered.

Q    (BY ATTORNEY WEINBERG) Memory is altered any time an application runs, right?

A    No, not in this way.

So it was done in a way where it altered the normal execution -- the normal behavior of the -- of the application.  Like, it made the application do things it was not supposed to do.

Q    Okay.  But I think I'm getting at:  Did -- are you aware of Pegasus deleting people's data off their phone?

ATTORNEY BLOCK:  Same objections.

A    The data in the memory is data, so -- and I believe they altered that data.

Q    (BY ATTORNEY WEINBERG) Isn't it true that every time an application runs on a computer, it

I, MARY J. GOFF, CSR No. 13427, Certified Shorthand Reporter of the State of California, certify;

That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript ( ) was (XX) was not requested:    (    ) that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct, dated this    day of       , 2024.

_Mary Goff_
_____
MARY J. GOFF

ER-340

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, <br><br> Defendants. | Case No. 4:19-cv-07123-PJH <br><br> **DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S NOTICE OF PUBLIC FILING OF EXHIBITS J, M, P, Q, R, S, T, U, AND V IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 396-5)** <br><br> Action Filed:  10/29/2019 |

DEFENDANTS' NOTICE OF PUBLIC
FILING OF EXHIBITS

Case No. 4:19-cv-07123-PJH

**ER-341**

# Exhibit P

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Technical analysis of the WhatsApp 0-click exploit

Highly Confidential - Attorneys' Eyes Only          **ER-343**          WA-NSO-00125122

# Agenda

- Context & topic of this presentation

- Previous security work

- Vulnerability details

- Mitigation and fixes

- Going forward

Highly Confidential - Attorneys' Eyes Only

ER-344

WA-NSO-00125123

# Context

## WhatsApp voice calls used to inject Israeli spyware on phones

Messaging app discovers vulnerability that has been open for weeks



WhatsApp said teams of engineers had worked around the clock to close the vulnerabili
montage/Dreamstime

**Mehul Srivastava** in Tel Aviv MAY 13 2019

m.facebook.com/security/a...

**Facebook**

**CVE-2019-3568**

**Description:** A buffer overflow vulnerability in WhatsApp VOIP stack allowed remote code execution via specially crafted series of RTCP packets sent to target phone number.

**Affected Versions:** The issue affects WhatsApp for Android prior to v2.19.134, WhatsApp Business for Android prior to v2.19.44, WhatsApp for iOS prior to v2.19.51, WhatsApp Business for iOS prior to v2.19.51, WhatsApp for Windows Phone prior to v2.18.348, and WhatsApp for Tizen prior to v2.18.15.

**Last Updated:** 2019-08-13

💬 337 🖨

Highly Confidential - Attorneys' Eyes Only

WA-NSO-00125124

# Context

- This talk is about an incident back in May 2019 which resulted from **a client-side vulnerability** (CVE-2019-3568) combined with lax server-side validation of certain signalling messages

- A client-side vulnerability was an unchecked assumption in the code that comprises the mobile application

- WhatsApp messages are protected by end-to-end encryption, but exploiting this vulnerability gave access to one of the "ends"

- The WhatsApp servers were not compromised by this attack

Highly Confidential - Attorneys' Eyes Only    **ER-346**    WA-NSO-00125125

Greg D. Andres
Antonio J. Perez-Marques
Gina Cora
Craig T. Cagney
Luca Marzorati
  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:   greg.andres@davispolk.com
         antonio.perez@davispolk.com
         gina.cora@davispolk.com
         craig.cagney@davispolk.com
         luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email:   micah.block@davispolk.com

*Attorneys for Plaintiffs*
*WhatsApp LLC and Meta Platforms, Inc.*

Joseph N. Akrotirianakis (Cal. Bar No. 197971)
Aaron S. Craig (Cal. Bar No. 204741)
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Email: jakro@kslaw.com
       acraig@kslaw.com

*Attorneys for Defendants NSO Group*
*Technologies Limited and Q Cyber*
*Technologies Limited*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| WHATSAPP LLC and META PLATFORMS, INC., | Case No. 4:19-cv-07123-PJH |
| Plaintiffs, | **JOINT PRETRIAL STATEMENT** |
| v. | Pretrial Conference Date: April 10, 2025<br>Time:   2:00 p.m.<br>Ctrm:   3 |
| NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, | Judge:  Hon. Phyllis J. Hamilton<br>Trial Date: April 28, 2025 |
| Defendants. |  |

**ER-347**

Pursuant to the Court's Case Management and Pretrial Order, Dkt. No. 168, Plaintiffs WhatsApp LLC and Meta Platforms, Inc. ("Plaintiffs") and Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited ("Defendants," and with Plaintiffs, the "Parties"), respectfully submit this Joint Pretrial Statement.

## BRIEF DESCRIPTION OF THE SUBSTANCE OF THE
## CLAIMS AND DEFENSES WHICH REMAIN TO BE DECIDED

**I.      Plaintiffs' Position**

The Court has already ruled that Defendants are liable for violating the Computer Fraud and Abuse Act ("CFAA"), the California Comprehensive Data Access and Fraud Act ("CDAFA"), and for breaching the WhatsApp Terms of Service.  Dkt. No. 494 at 12–15.

In its order granting Plaintiffs' motion for partial summary judgment, the Court first found that Defendants violated Sections 1030(a)(2) and 1030(a)(4) of the CFAA, holding that Defendants exceeded authorized access to Plaintiffs' computers by using its WhatsApp Installation Server ("WIS") to "sen[d] messages through WhatsApp servers that caused Pegasus to be installed on target users' devices," and that the WIS then obtained information by "having it sent from the target users, through the What[s]App servers, and back to the WIS."  *Id.* at 12–13.  The Court next found that Defendants violated the CDAFA "for the same reasons as the CFAA claim."  *Id.* at 13.

The Court also found Defendants liable for breaching the WhatsApp Terms of Service.  *Id*. at 13–15.  The Court recognized that Plaintiffs' "breach of contract claim is based on violation of the terms of service, specifically the provisions prohibiting users from 'reverse engineering' or 'decompiling' Whatsapp products, from sending 'harmful code' through Whatsapp, and from collecting user information, from accessing or attempting to access Whatsapp without authorization, and from using Whatsapp for illegal purposes."  *Id*. at 13.  In evaluating NSO's argument, the Court noted that "NSO offers only about two pages of opposition regarding breach."  *Id*. at 14; *see* Dkt. No. 419-2 at 6–8 (two pages in Defendants' opposition to Plaintiffs' motion for summary judgment addressing "whether NSO breached the TOS").

The Court's summary judgment order started by rejecting NSO's first argument: "that plaintiffs cannot prove when they reverse-engineered or decompiled the Whatsapp program," which

1

3. Whether Defendants committed a "willful" violation of CDAFA or are guilty of "oppression, fraud or malice" with respect to a violation of CDAFA.

4. If Defendants have been guilty of "oppression, fraud or malice," and committed a "willful" violation of CDAFA, the amount of punitive damages, if any, that Defendants should owe Plaintiffs.

5. Such issues of fact as the Court may need to resolve in order to determine the appropriate scope of equitable relief, including at least[3] the following:

    a. Whether, for each element of the injunction requested by Plaintiffs, that Plaintiffs will suffer irreparable harm without it

    b. Whether, for each element of the injunction requested by Plaintiffs, the balance of hardships resulting from issuance or non-issuance of that injunction favors Plaintiffs or Defendants

    c. Whether, for each element of the injunction requested by Plaintiffs, that injunction is in the public interest

    d. Whether any injunctive relief should be ordered and, if so, its scope.

**STATEMENT OF STIPULATIONS REQUESTED OR PROPOSED**

1. Plaintiffs do not intend to seek reputational damages or other damages related to goodwill, public trust and good will, and the relationships and goodwill between Plaintiffs and their users and potential users. Plaintiffs do not intend to make arguments about injury to Plaintiffs' reputation or goodwill in support of the injunctive relief that Plaintiffs' seek.

2. The Parties are continuing to work together to reach agreement on additional stipulations regarding, among other things, the authenticity of documents, and the admissibility of documents prepared by the parties' experts.

---

[3] Plaintiffs seek an injunction "with respect to all of Plaintiffs' computer systems and platforms" . . . "include[ing] but are not limited to the WhatsApp, Facebook, Instagram, Messenger, Meta AI, Threads, and Meta Horizon platforms, as well as each of those platforms' related client applications." Only WhatsApp, as a "platform" or "related client application," has in any way been involved in this case.

11

JOINT PRETRIAL STATEMENT- CASE NO. 4:19-CV-07123-PJH

**ER-349**

Dated:   March 13, 2025

DAVIS POLK & WARDWELL LLP

By:   /s/ Greg D. Andres

Greg D. Andres
Antonio J. Perez-Marques
Craig T. Cagney
Gina Cora
Luca Marzorati
  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: greg.andres@davispolk.com
        antonio.perez@davispolk.com
        gina.cora@davispolk.com
        craig.cagney@davispolk.com
        luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email: micah.block@davispolk.com

*Attorneys for Plaintiffs*
*WhatsApp LLC and Meta Platforms, Inc.*

KING & SPALDING LLP

By:   /s/ Joseph N. Akrotirianakis

Joseph N. Akrotirianakis
Aaron S. Craig
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Email: jakro@kslaw.com
        acraig@kslaw.com

*Attorneys for Defendants NSO Group*
*Technologies Limited and Q Cyber*
*Technologies Limited*

20
JOINT PRETRIAL STATEMENT- CASE NO. 4:19-CV-07123-PJH
**ER-350**

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:    (213) 443-4355
Facsimile:    (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.


UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br>    v. <br><br> NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, <br><br> Defendants. | Case No. 4:19-cv-07123-PJH <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:  November 7, 2024 <br> Time:  1:30 p.m. <br> Place:  Courtroom 3, Ronald V. Dellums Federal Building & U.S. Courthouse, 1301 Clay Street, Oakland, California <br><br> Action Filed: 10/29/2019 |


**ER-351**

## TABLE OF CONTENTS

**Page(s)**

Introduction .................................................................................................................. 1

Argument ...................................................................................................................... 3

    I.     The Court lacks personal jurisdiction over NSO. ....................................... 3

    II.    Plaintiffs are not entitled to summary judgment on their breach of contract claim. 3

        A.     Plaintiffs do not prove NSO agreed to the WhatsApp TOS. ............................... 3

        B.     There is a material dispute over whether NSO breached the TOS. .................... 6

        C.     There is a material dispute over whether any breach damaged Plaintiffs. .......... 8

    III.   Plaintiffs are not entitled to summary judgment on their CFAA claims. ................. 9

        A.     NSO did not access "target devices" at all. ........................................................ 9

        B.     NSO did not access WhatsApp servers "without authorization." ....................10

        C.     NSO did not "exceed authorized access" to WhatsApp servers. ......................15

        D.     NSO did not conspire with its government customers to violate CFAA. .........18

        E.     Plaintiffs cannot assert or prove a "password-trafficking" claim. ....................21

        F.     There is a material dispute over NSO's intent. .................................................22

        G.     There is a material dispute over whether Plaintiffs suffered "damage" or "loss." .......................................................................................................23

    IV.   Plaintiffs are not entitled to summary judgment on their CDAFA claim. ............. 24

    V.    There is a material dispute over whether Plaintiffs have unclean hands. .............. 25

Conclusion ................................................................................................................. 25

**INTRODUCTION**

Plaintiffs provide WhatsApp, an encrypted messaging service that terrorists, human traffickers, and other criminals use to plan and commit serious crimes. Plaintiffs know this, but they purposely collect no information about who their users are and trumpet that they have no ability to review the messages or calls of the criminals to whom they provide powerful encryption technology, free of charge. As a result, governments that wish to stop crime and terrorism must use surveillance technology like Pegasus, a product NSO created and licenses exclusively to governments. Pegasus provides those governments—and only governments, never NSO—access to criminals' mobile devices to obtain evidence that services like WhatsApp would otherwise hide.

During the period relevant here, Pegasus functioned in part by sending WhatsApp messages to the mobile phones of targets of government investigations. When the target device processed the messages, the processing would cause the target device to download surveillance software from the government's servers. The government would then use the software to collect evidence from the target's device. Plaintiffs admit these messages did not impair the WhatsApp service, execute any foreign code on WhatsApp's servers, or compromise or damage WhatsApp's servers in any way. The messages simply passed through WhatsApp servers, like letters passing through the mail, in full compliance with the servers' technical rules and limitations.

Yet Plaintiffs, who have never sued anyone who used WhatsApp to promote terrorism, plan mass shootings, or exploit children for sex, has sued NSO for designing Pegasus and licensing it to governments who wish to stop those crimes. Cutting through Plaintiffs' obfuscation and technical jargon, the gist of their complaint is simple: Pegasus sent messages over WhatsApp that Plaintiffs did not *want* sent. Plaintiffs claim this harmless conflict with their subjective desires breached WhatsApp's Terms of Service ("TOS") and violated the Computer Fraud and Abuse Act ("CFAA") and California Comprehensive Computer Data Access and Fraud Act ("CDAFA").

Those claims are bunk, both legally and factually. And the thread holding them together is Plaintiffs' mischaracterization of how Pegasus worked. In Plaintiffs' telling, NSO created a phony WhatsApp program that sent phony WhatsApp messages disguised as real ones, messages that WhatsApp's servers would have rejected had they not been disguised. That is pure fantasy. The

**ER-353**

truth, as revealed in the very evidence Plaintiffs cite, is that NSO developed an interface called the WhatsApp Installation Server ("WIS").  WIS created WhatsApp messages—*real* WhatsApp messages—containing code that would be executed on target devices.  Pegasus then sent those real WhatsApp messages with WhatsApp's "official" application, using valid security credentials tied to real WhatsApp accounts.  Those credentials authorized Pegasus to send the messages drafted by WIS, which passed harmlessly through WhatsApp servers in the same way as any other message.  Although the messages contained Pegasus code, that fact would have been clear to anyone who looked.[1]  The reason WhatsApp servers allowed those messages, therefore, is not that Pegasus hid their nature.  It is that WhatsApp *wrote its server code* to allow them, to permit WhatsApp users to send messages containing the exact same content as the messages sent by Pegasus.

For that reason alone, Plaintiffs cannot prove their claims.  But even if Plaintiffs' fictional description of Pegasus were true, they *still* could not prove that Pegasus's use of WhatsApp servers was "unauthorized" in any relevant sense.  That is because Plaintiffs *concede* that, at a minimum, NSO was *always* allowed to send ordinary WhatsApp messages through WhatsApp servers using the WhatsApp application.  That permission, however limited, gave NSO "authorized access" both to WhatsApp's servers as a whole and to the areas of those servers that process WhatsApp messages. 18 U.S.C. § 1030(a)(2), (a)(4).[2]  Even if Plaintiffs could prove NSO used its authorized access in an unauthorized *way* or for an unauthorized *purpose*, that is not illegal hacking actionable under CFAA.[3]  At worst, it might constitute a breach of WhatsApp's TOS, *if* Plaintiffs could prove NSO agreed to the TOS and the TOS prohibited its conduct.  But Plaintiffs cannot prove that, either.

For all those reasons—plus, more fundamentally, the fact that this Court lacks personal jurisdiction over NSO—the Court should grant NSO's pending motion for summary judgment. (Dkt. 396-2.)  At least, though, the Court should deny Plaintiffs' motion and hold that a reasonable jury could find in NSO's favor on all of Plaintiffs' claims.

---

[1] And *was* immediately clear to Plaintiffs once they did look.  (Akro. Exh. A at 127:9-129:24, 131:2-132:16, 139:51-140:2, 151:16-152:9.)

[2] Unless noted, all statutory citations are to Title 18, U.S. Code and all emphases thereto are added.

[3] *Van Buren v. United States*, 593 U.S. 374, 389-90 (2021); *United States v. Nosal* (*Nosal I*), 676 F.3d 854, 862-63 (9th Cir. 2012) (en banc); *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133-35 (9th Cir. 2009).

# ARGUMENT

## I.    The Court lacks personal jurisdiction over NSO.

The Court should deny Plaintiffs' motion because, as explained in NSO's motion, Plaintiffs cannot prove NSO purposefully directed any case-related conduct at California or the United States. (Dkt. 396-2 at 8-18.)  This Court thus "lacks personal jurisdiction" over NSO and cannot "enter[] a final judgment against [it]." *Wages v. IRS*, 915 F.2d 1230, 1234 n.5 (9th Cir. 1990).

## II.    Plaintiffs are not entitled to summary judgment on their breach of contract claim.

Plaintiffs cannot prove as a matter of law what they identify as the elements of their breach claim. (Dkt. 399-2 ("MSJ") at 5.[4])  A reasonable jury could find that (1) NSO never agreed to the WhatsApp TOS, (2) NSO did not breach the TOS, (3) Plaintiffs waived the contractual provisions they seek to enforce, and (4) any breach did not cause damage to Plaintiffs.

### A.    Plaintiffs do not prove NSO agreed to the WhatsApp TOS.

Plaintiffs' evidence is not sufficient to prove NSO agreed to the WhatsApp TOS.  They rely on a bare assertion "that agreeing to the Terms is necessary to create a WhatsApp account." (MSJ 6.) "[T]he act of setting up an account," however, "is insufficient evidence that [a user] manifested assent to the terms of use." *Marshall v. Hipcamp Inc.*, 2024 WL 2325197, at *5 (W.D. Wash. May 22, 2024).  Rather, to prove consent to a company's TOS, the company must prove "a consumer has actual knowledge" or "inquiry notice" of the contract's terms.  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  Plaintiffs do not claim, and submit no evidence, that NSO had actual knowledge of the WhatsApp TOS.  So they must rely on inquiry notice, which requires them to prove that "(1) [they] provide[d] reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer t[ook] some action, such as clicking a button or checking a box, that unambiguously manifest[ed] his or her assent to those terms." *Id.*

Plaintiffs do not submit sufficient evidence on either requirement for inquiry notice. The "inquiry notice standard demands conspicuousness tailored to the ordinary user, not to the expert user," and determining whether notice is conspicuous requires a fact-specific, detail-oriented assessment how contractual terms are presented to a consumer. *Id.* at 856-57.  Any notice "must

---

[4] MSJ and evidentiary citations omit internal quotation marks and alterations and add emphasis.

**ER-355**

be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," which requires a factfinder to analyze the font, size, and color of a disclosure, as well as how the disclosure compares to the surrounding text and the overall design of a webpage. *Id.* A factfinder must also consider whether the terms are disclosed in a pop-up window or indirectly through a hyperlink, and whether the hyperlink is made "readily apparent" through "design elements" such as "the use of a contrasting font color (typically blue) and the use of all capital letters." *Id.* But even a "conspicuous hyperlink" in "close proximity … to relevant buttons" is insufficient when other design elements suggest a lack of conspicuousness. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177-79 (9th Cir. 2014). Courts do not hesitate to find disclosures inadequate when they fail these requirements.[5]

Plaintiffs submit *no* evidence from which a factfinder could determine that they provided "reasonably conspicuous notice" of the WhatsApp TOS. *Berman*, 30 F.4th at 856. Plaintiffs do not submit any images of the WhatsApp sign-up process at any time, let alone from 2018-2019. They provide no evidence of whether or how a user is informed that creating a WhatsApp account constitutes consent to the TOS; of the font, size, or color of any notice; of how any notice is presented within the context of the WhatsApp application or website; or of whether or how the hyperlink to the TOS was highlighted for users. Without such evidence, Plaintiffs cannot prove they adequately disclosed the WhatsApp TOS. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099-1100 (9th Cir. 2023) ("Amazon failed to meet its burden to demonstrate mutual assent" when it "did not provide the court with a copy or description of any [contract] notice").

Plaintiffs similarly lack evidence that WhatsApp users "unambiguously manifest[] [their] assent" to the TOS. *Berman*, 30 F.4th at 856. Plaintiffs' assertion that users "have to click a button" (MSJ 6) is insufficient. "[M]erely clicking on a button … does not signify a user's agreement to anything," so "[t]he presence of an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound is critical." *Berman*, 30 F.4th at 857-58 (cleaned

_____

[5] *Massel v. SuccessfulMatch.com*, 2024 WL 802194, at *5 (N.D. Cal. Feb. 27, 2024); *Rocha v. Urban Outfitters, Inc.*, 2024 WL 393486, at *4-5 (N.D. Cal. Feb. 1, 2024); *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *9-11 (N.D. Cal. July 31, 2023); *Chabolla v. ClassPass Inc.*, 2023 WL 4544598, at *4-7 (N.D. Cal. June 22, 2023); *Williams v. DDR Media, LLC*, 2023 WL 2314868, at *5 (N.D. Cal. Feb. 28, 2023); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 480-82 (2021).

up).[6]  The notice must be conspicuous, and it "must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858.  But Plaintiffs submit no evidence of the content or presentation of any supposed notice that "click[ing] a button" will "demonstrate agreement of the [TOS]." (MSJ 6.)  Without such evidence, Plaintiffs cannot prove WhatsApp users unambiguously consent to the TOS. *Jackson*, 65 F.4th at 1099-1100.

What little evidence Plaintiffs do submit is inadmissible.  First, Plaintiffs cannot rely on Meghan Andre as a declarant because they did not disclose her as a witness under Rule 26. (Akro. Exh. G.)  As a result, they are "not allowed to use" her "to supply evidence on [their] motion." Fed. R. Civ. P. 37(c)(1); *Chisolm v. 7-Eleven, Inc.*, 814 F. App'x 194, 196 (9th Cir. 2020); *Benjamin v. B&H Educ., Inc.*, 877 F.3d 1139, 1150 (9th Cir. 2017).[7]  Next, Plaintiffs cannot rely on the testimony of their own corporate designee, Jonathan Lee, because it was not based on his personal knowledge. *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907-08 (5th Cir. 2010); *Tijerina v. Alaska Airlines, Inc.*, 2024 WL 270090, at *2-3 (S.D. Cal. Jan. 24, 2024).[8]  Mr. Lee testified he has no personal knowledge of the sign-up process and was "entirely relying" on "verbal[]" descriptions by two WhatsApp employees. (Block Exh. 2 at 175:2-10, 176:23-177:13, 185:14-19.)  His testimony about those descriptions, therefore, is hearsay that Plaintiffs may not use for their own motion.  Plaintiffs also may not rely on their experts' reports because they are all unsworn. (Block Exhs. 1, 12, 25, 26, 29); *Progressive Sols., Inc. v. Stanley*, 2018 WL 1989547, at *8 (N.D. Cal. Mar. 8, 2018); *A.C. v. City of Santa Clara*, 2015 WL 5350412, at *9 n.4 (N.D. Cal. Sept. 14, 2015).  And to the extent Plaintiffs' witnesses purport to describe the "contents" of the WhatsApp application or website, that testimony violates the Best Evidence Rule.  Fed. R. Evid. 1002; *Sonico v. Charter Commc'ns, LLC*, 2021 WL 268637, at *6 (S.D. Cal. Jan. 27, 2021).

Even if it were admissible, Plaintiffs' evidence does not provide *any* information about how WhatsApp visually notified users of its TOS, much less show that any such notice was conspicuous.

---

[6] Plaintiffs say a TOS provision provides this notice (MSJ 6), but that is circular. That provision could bind WhatsApp users only if they agreed to the TOS in the first place, so notice must come from *outside* the TOS. *Jackson*, 65 F.4th at 1100-01; *Berman*, 30 F.4th at 857-58.

[7] The failure to disclose Ms. Andre is anything but harmless; NSO would have taken her deposition to learn what basis, if any, she has for her claims.

[8] *See* Fed. R. Civ. P. 32(a)(3) (only "[a]n adverse party" may use corporate designee testimony).

They simply assert *that* users agreed to the TOS, which is a bare legal conclusion. *Jackson*, 65 F.4th at 1099-1100; (*see* Dkt. 399-5; Block Exh. 8 at 70:16-72:25; Exh. 16 at 326:9-327:9). Mr. Lee testified he did not even *review* any evidence and so knows nothing about the appearance of WhatsApp's sign-up process. (Block Exh. 2 at 176:23-177:3, 180:22-25.) Moreover, he admitted that users did not need to click on or read the TOS to sign up. (*Id.* at 177:15-178:8.)[9]

In sum, Plaintiffs' evidence is insufficient to prove it properly notifies consumers that signing up for WhatsApp constitutes consent to the WhatsApp TOS. Plaintiffs thus cannot receive summary judgment on whether NSO agreed to the TOS. If anything, *NSO* is entitled to summary judgment on that issue. Fed. R. Civ. P. 56(f)(1).

**B.      There is a material dispute over whether NSO breached the TOS.**

Plaintiffs also cannot prove as a matter of law that NSO breached the TOS. As an adhesion contract, the TOS must be interpreted against Plaintiffs. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). So interpreted, there is a dispute whether the TOS prohibited NSO's conduct.

**1.** Plaintiffs first claim NSO breached TOS provisions against "reverse-engineering" or "decompiling" the WhatsApp application (in tech-speak, the "WhatsApp client"). (MSJ 8.) But reverse-engineering, as commonly understood, involves commercial competition through "manufacturing a similar product." Oxford English Dictionary, *"Reverse-Engineer."* NSO did not do that. Moreover, Plaintiffs cannot prove NSO created WhatsApp accounts *before* reverse-engineering or decompiling the client. Plaintiffs' corporate designee testified that the WhatsApp client can be downloaded *without* first creating an account. (Akro Exh. B at 111:15-113:11.) Then, free tools allow the client to be decompiled, again without creating a WhatsApp account. (*Id.* at 113:6-114:6; McGraw Exh. B ¶ 51.) If NSO decompiled or reverse-engineered the "official" WhatsApp client *before* creating WhatsApp accounts, then Plaintiffs have no basis to argue NSO was bound by any contractual prohibition on such conduct. But Plaintiffs submit no evidence as to *when* NSO decompiled (or, as Plaintiffs claim, "reverse-engineered") the "official" WhatsApp

---

[9] Plaintiffs reference the deposition testimony of NSO employee Ramon Eshkar and third-party witness Joshua Shaner, but neither testified they agreed to WhatsApp's TOS or that signing up for WhatsApp required them to do so. (MSJ 6; Block Exh. 8 at 70:16-72:25; Exh. 16 at 326:9-327:9.) Also, Mr. Shaner worked for Westbridge (not NSO) so his testimony cannot prove what *NSO* did.

client, so they cannot prove as a matter of law that NSO was prohibited from doing so at that time.

Plaintiffs also claim NSO breached TOS provisions prohibiting collecting user data "in any impermissible or unauthorized manner"; requiring WhatsApp use "only for legal, authorized, and acceptable purposes"; and prohibiting "illegal" uses. (MSJ 8-11.) But because NSO never operated Pegasus (Akro. Exh. H ¶ 14), it never took or assisted any of the actions Plaintiffs contend would violate these provisions. Moreover, the words "impermissible," "unauthorized," and "acceptable" are vague and must be interpreted against Plaintiffs. While Plaintiffs claim *they* did not authorize Pegasus to use WhatsApp servers, that use *was* authorized by Israel, the laws of NSO's government customers, and the FBI. (*Id.* ¶¶ 6-12.) In addition, WhatsApp's system allowed Pegasus to send all the messages it sent, and NSO's conduct did not violate any law. (*Infra* 9-23.)

Similarly, a jury could find NSO did not send "viruses or other harmful code" through WhatsApp. (MSJ 8-9.) NSO, as distinct from its government customers, *never* transmitted *any* code to nonconsenting WhatsApp users. And "harmful code" is a subjective term that does not naturally cover Pegasus. Pegasus is a law-enforcement tool, at heart no different than wiretaps and other lawful intercept tools used by governments throughout history. (Town Exh. A ¶¶ 27-41, 64; McGraw Exh. A ¶¶ 19-26.) Indeed, the United States and other democracies commonly use digital surveillance tools just like Pegasus. (Shepard Exh. A ¶¶ 26-33; Town Exh. A ¶¶ 27, 48-53, 67-68; Akro. Exhs. I-J.) Such tools are not "viruses" and do not "harm[]" computers.

**2.** Even if NSO had breached any TOS provisions, Plaintiffs do not argue they are entitled to summary judgment on NSO's affirmative defense that Plaintiffs waived those provisions. "The existence of waiver is usually a fact question," *CBS Inc. v. Merrick*, 716 F.2d 1292, 1295 (9th Cir. 1983), and the facts would support a finding of waiver because there is no evidence Plaintiffs have *ever* enforced *any* of the relevant TOS provisions against *any* WhatsApp user. NSO sought discovery about WhatsApp's enforcement of those provisions, and Plaintiffs failed to provide a single example of enforcement. (Akro. Decl. ¶ 12 & Exh. K.)[10] That failure is particularly conspicuous when the conduct that Plaintiffs claim violates the TOS is so widespread. Decompilers and information about

---

[10] Plaintiffs have also improperly refused to provide testimony relevant to waiver, which is the subject of a discovery dispute. (Dkt. 381.) The Court should not grant Plaintiffs summary judgment on breach of contract without allowing additional discovery on waiver. Fed. R. Civ. P. 56(d).

had *nothing to do with NSO*. Plaintiffs admit WhatsApp was responding to "an issue identified …

by an external security researcher," and the updates' effect on Pegasus was incidental and

"[u]nbeknownst to WhatsApp at the time." (Akro. Exh. L at 6; *see* McGraw Exh. B ¶ 87.) Nor

could NSO have known of any revocation merely because one of Pegasus's installation vectors

malfunctioned.[14] With the 2018 updates, the only information NSO received was an error code

reading "error='403'." (Block Exh. 25 at 9-10.) That "403" code means only that a server rejected

a message for any number of possible reasons; it contains no explanation of the error, much less an

explicit statement that NSO's access to WhatsApp servers had been completely revoked. (McGraw

Exh. B ¶¶ 87-91, 98.) *Power Ventures* recognized that such a nonspecific "block" would not trigger

CFAA's restriction on "unauthorized use" because it does not provide sufficient "notice that … the

block was imposed and that authorization was revoked." 844 F.3d at 1068 n.5.

This lawsuit likewise did not clearly or unequivocally revoke *all* of NSO's authorization to

use WhatsApp servers. The Complaint challenged only Pegasus as it existed in 2019, not *all* uses

of WhatsApp servers through *any* means for *any* purpose. Plaintiffs' inclusion of an injunction in

their prayer for relief cannot plausibly be read as an explicit revocation akin to the cease-and-desist

letter and IP block in *Power Ventures*, particularly when Plaintiffs did not seek a preliminary

injunction or claim NSO's use of WhatsApp servers other than through Pegasus was unauthorized.

In any event, Plaintiffs cannot seek summary judgment based on a legal theory and factual

assertions they did not plead in the Complaint. If Plaintiffs wanted to claim NSO violated CFAA

by continuing to use WhatsApp servers after they filed suit, they had to file an amended complaint

alleging as much. They may not raise unpleaded theories and allegations for the first time on

summary judgment. *Pickern v. Pier 1 Imports*, 457 F.3d 963, 968-69 (9th Cir. 2006); *Barrilleaux

v. Mendocino Cty.*, 2018 WL 3585133, at *9 (N.D. Cal. July 26, 2018).

### C.      NSO did not "exceed authorized access" to WhatsApp servers.

**1.** Plaintiffs' argument that NSO "exceed[ed] authorized access" to WhatsApp servers (MSJ

19-20) ignores that the statutory definition of that phrase limits it to "the unauthorized procurement

---

[14] Plaintiffs update their code frequently, and those updates can "break" third-party app developers' use of Plaintiffs' services, requiring those third parties to rewrite their code without any suggestion that their access has been revoked. (McGraw Exh. B ¶¶ 95-97; Akro. Exh. B at 134:4-144:22.)

or alteration of information," not merely the unapproved use of a computer. *Nosal I*, 676 F.3d at 862. Under CFAA, "exceeds authorized access" means "to access a computer with authorization *and* to use such access *to obtain or alter information in the computer* that the accesser is not entitled so *to obtain or alter*." § 1030(e)(6). Plaintiffs do not argue NSO "obtain[ed] or alter[ed]" information from WhatsApp servers it was "not entitled" to access. *Id.* To the contrary, Plaintiffs admit NSO did not "compromise[]" the servers or "corrupt," "alter," "impair," or "delete" any information on them. (Akro. Exh. B at 249:7-250:10; Exh. C at 183:7-184:7, 250:22-251:24; Exh. N at 4.)

Elsewhere, Plaintiffs claim NSO received "information regarding whether a user has an active WhatsApp account directly from WhatsApp's servers" (MSJ 20-21), but they do not argue NSO was "not entitled" to that information. § 1030(e)(6). That is because *every WhatsApp user* is entitled to that information. Whenever a WhatsApp user sends a call request, a WhatsApp server checks whether the callee has a WhatsApp account and provides that information to the caller's device. (Gazneli Decl. ¶ 11.) That is a necessary first step for *every WhatsApp call*, as WhatsApp servers obviously cannot initiate a call with a callee who does not have WhatsApp. (*Id.*) (As an easy proof, try using WhatsApp to call a landline.) When Pegasus initiated a WhatsApp call, therefore, it received the exact same information that any other WhatsApp user was entitled to receive. (*Id.*; Akro. Exh. E at 294:10-15, 296:15-19; McGraw Exh. A ¶ 75.)

Plaintiffs also claim NSO received information from target devices "via the WhatsApp servers" (MSJ 21), but that is false because NSO never operated Pegasus. More fundamentally, that information was not stored in WhatsApp's servers, and § 1030(e)(6) defines "exceeds authorized access" to require a defendant to "obtain or alter information in *the computer*"—the *same* computer—the defendant "access[ed]." § 1030(e)(6). [15] Plaintiffs thus cannot prove NSO exceeded authorized access to a WhatsApp server without proving NSO "obtain[ed] or alter[ed] information" *on the server* that it was "not entitled so to obtain or alter." *Id.* Plaintiffs cannot make that showing.

**2.** Plaintiffs also ignore that CFAA's "exceeds authorized access" prong applies only when

---

[15] Plaintiffs argue in support of their § 1030(a)(2)(C) claim that "Section 1030(a)(2)(C) prohibits … obtaining information 'from *any protected computer*,'" whether or not it was the unlawfully accessed computer. (MSJ 21.) While that may be true of § 1030(a)(2)(C), it is *not* true of § 1030(e)(6)'s separate definition of "exceeds authorized access."

a defendant "access[es] a computer with permission but then … enter[s] an *area of the computer* to which that authorization does not extend." *Van Buren*, 593 U.S. at 389-90 (cleaned up and emphasis added). As with the "without authorization" prong, "authorization" to enter a particular area of a computer is an all-or-nothing inquiry: "one either can or cannot access a computer system, and one either can or cannot access certain areas within the system." *Id.* If "a user is permitted to be on a particular 'area within the system' for *some* purposes," then "the user's access to the [area] is 'authorized'" for *all* purposes. *Abu*, 107 F.4th at 508 (emphasis added).

For that reason, Plaintiffs' assertion that NSO was authorized to send WhatsApp messages using the "official" client is just as fatal to their "exceeds authorized access" claim as to their "without authorization" claim. Plaintiffs admit NSO was at least authorized to access the "areas" of WhatsApp servers a WhatsApp message passes through when it is sent using the official client. And there is no dispute that those are the *only* areas of WhatsApp servers that NSO accessed. Although Plaintiffs object to the *content* of the messages Pegasus sent, they do not dispute that those messages were transmitted through the exact same areas of WhatsApp servers as any other WhatsApp message. (Akro Exh. C 129:15-130:23; McGraw Exh. A ¶¶ 123-34, Exh. B ¶¶ 41, 93; Gazneli Decl. ¶ 10.) Plaintiffs' argument is only that NSO used those areas of the servers in an unapproved *way*—yet another "purpose-based limit[] on access" that cannot support a CFAA claim. *Van Buren*, 593 U.S. at 396. Therefore, even if Pegasus had "circumvented technological, code-based limitations" to send messages (MSJ 19), NSO did not thereby access any "*area* of the [server] to which [its] authorization d[id] not extend." *Van Buren*, 593 U.S. at 390 (cleaned up).[16]

**3.** In all events, however, the undisputed evidence proves NSO did *not* circumvent restrictions on access to WhatsApp servers. Plaintiffs invoke "WhatsApp's Terms and policies" (MSJ 19), but those are irrelevant because the "exceeds authorized access" prong applies only to "technological access barriers," not contractual "use restrictions." *Nosal I*, 676 F.3d at 863; *see Chegg, Inc. v. Doe*, 2023 WL 4315540, at *2 (N.D. Cal. July 3, 2023). And, as explained above, Pegasus messages complied with *every* technological restriction in WhatsApp's server code.

---

[16] *Kiser v. Moyal*, 2024 WL 4229936, at *9 (M.D. La. Sept. 18, 2024) (even if defendant "violated the 'understanding' that [its] improper behavior could not continue, this does not mean that [it] exceeded [its] authorized access to the computer … under *Van Buren*").

users' devices because a CDAFA claim can only be brought by a computer's "owner or lessee," Cal. Penal Code § 502(e)(1), and Plaintiffs do not own or lease WhatsApp users' devices. In all events, however, Plaintiffs do not argue they should receive summary judgment on their CDAFA claim if they do not receive it on their CFAA claims. (MSJ 25.) Plaintiffs are not entitled to summary judgment on their CFAA claims, so the same is true for their CDAFA claim.

## V.   There is a material dispute over whether Plaintiffs have unclean hands.

Finally, Plaintiffs are not entitled to summary judgment because they do not seek judgment on NSO's affirmative defenses, including unclean hands. "[U]nclean hands may provide a complete defense to an action in law," *Albert's Organics, Inc. v. Holzman*, 2020 WL 3892861, at *5 (N.D. Cal. July 10, 2020) (Hamilton, J.) (cleaned up), when the plaintiff "dirtied [his hands] in acquiring the right he now asserts," *Brewster v. City of L.A.*, 672 F. Supp. 3d 872, 1003 (C.D. Cal. 2023). Here, logs produced by Plaintiffs from an Amazon Web Services server leased by NSO reveal that a "Michael S." accessed the AWS server on May 2, 2019, when Plaintiffs began investigating Pegasus. (Akro. Exh. O at 25.) That appears to refer to Meta employee Michael Scott, whose role in the investigation included "analyzing … the exploit and determining how it was conducted." (Block Exh. 12 at 24.) In addition, Plaintiffs' corporate designee Andrew Robinson testified that he received information about the AWS server's contents from AWS. (Akro. Exh. B at 375:9-377:24.) Neither Mr. Scott, Mr. Robinson, nor any other employee of Plaintiffs had any authorization from NSO to access the AWS server or obtain information stored by NSO on the server. Accordingly, it appears that Plaintiffs, when gathering evidence for this lawsuit, violated CFAA and CDAFA by accessing the AWS server and induced AWS to breach its confidentiality obligations to NSO. That supports NSO's unclean hands defense.

## CONCLUSION

The Court should deny Plaintiffs' motion.

Dated: October 11, 2024

KING & SPALDING LLP

By: */s/ Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG
*Attorneys for Defendants*

**ER-363**