**No. 25-7380**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WHATSAPP INC., a Delaware corporation; META PLATFORMS, INC., FKA FACEBOOK INC.,

*Plaintiffs-Appellees*,

v.

NSO GROUP TECHNOLOGIES LIMITED; Q CYBER TECHNOLOGIES LIMITED,

*Defendants-Appellants*,

*On Appeal from the U.S. District Court for the Northern District of California, No. 4:19-cv-07123-PJH, Hon. Phyllis J. Hamilton*

## EXCERPTS OF RECORD VOLUME I OF III (ER-1-68)

STEPHEN A. BROOME
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

HOPE D. SKIBITSKY
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
295 5th Ave., 9th Floor
New York, NY 10016
(212) 849-7000

DEREK L. SHAFFER
RACHEL FRANK QUINTON
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
555 13th St. NW, Suite 600
Washington, DC 20004
(202) 538-8000

ALEX H. LOOMIS
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
111 Huntington Ave., Suite 520
Boston, MA 02199
(617) 712-7100

*Counsel for Defendants-Appellants*

February 11, 2026

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| WHATSAPP LLC and<br>META PLATFORMS, INC.,<br><br>           Plaintiffs,<br><br>   v.<br><br>NSO GROUP TECHNOLOGIES LIMITED<br>and Q CYBER TECHNOLOGIES LIMITED,<br><br>           Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**FINAL JUDGMENT** |

On December 20, 2024, the Court granted summary judgment as to liability in favor of Plaintiffs WhatsApp LLC and Meta Platforms, Inc. ("Plaintiffs") and against Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited ("Defendants").  Dkt. No. 494. The case subsequently proceeded to trial on the issue of damages only.

On May 6, 2025, a jury entered a unanimous verdict in favor of Plaintiffs and against Defendants in the total amount of $167,698,719, consisting of $444,719 in compensatory damages and $167,254,000 in punitive damages.  Dkt No. 736.  On October 17, 2025, the Court granted Plaintiffs' motion for a permanent injunction and remitted the punitive damages award to $4,002,471. Dkt. No. 802.  Plaintiffs accepted the remittitur on October 31, 2025.  On November 12, 2025, the Court entered its permanent injunction.

Accordingly, the Court hereby enters final judgment in favor of Plaintiffs as to Defendants in the amount of $4,447,190, consisting of $444,719 in compensatory damages and $4,002,471 in punitive damages.  Pursuant to 28 U.S.C. § 1961, post-judgment interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors for the Federal Reserve System, for the calendar week preceding the date of the judgment.  This final judgment shall also include the permanent injunction.

This document constitutes a judgment and a separate document for purposes of Federal Rule of Civil Procedure 58(a).  Without affecting the finality of the Court's judgment in any way, the Court retains jurisdiction over this matter for purposes of enforcing its judgment and considering any motions for attorney's fees or costs.  The Clerk is hereby directed to enter judgment forthwith.

SO ORDERED.

Dated:  November 12, 2025          By:      /s/ Phyllis J. Hamilton
                                                        Honorable Phyllis J. Hamilton
                                                        United States District Judge

1

FINAL JUDGMENT
CASE NO. 4:19-CV-07123-PJH

**ER-3**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| WHATSAPP LLC and<br>META PLATFORMS, INC.,<br><br>    Plaintiffs,<br><br>  v.<br><br>NSO GROUP TECHNOLOGIES LIMITED<br>and Q CYBER TECHNOLOGIES LIMITED,<br><br>    Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**ORDER GRANTING PLAINTIFFS'<br>MOTION FOR PERMANENT<br>INJUNCTION** |

The Motion for Permanent Injunction ("Motion") filed by Plaintiffs WhatsApp LLC and Meta Platforms, Inc. (collectively, "Plaintiffs") against Defendants NSO Group Technologies Limited and Q Cyber Technologies (collectively, "Defendants") is before the Court. Having considered the materials and arguments before the Court and for good cause appearing,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion is **GRANTED**. The Court determines that Plaintiffs have shown irreparable injury as a result of Defendants' violations of the law for which money damages are inadequate, that the balance of hardships weighs in favor of injunctive relief, and that an injunction is in the public interest. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

**IT IS FURTHER ORDERED** that Plaintiffs are entitled to a Permanent Injunction as follows:

1. Consistent with Federal Rule of Civil Procedure 65(d)(2), this Permanent Injunction binds Defendants; Defendants' officers, agents, servants, and employees; and all other persons who are in active concert or participation with Defendants and Defendants' officers, agents, servants, and employees (collectively, the "Prohibited Parties"). Notwithstanding anything herein, neither Defendants' foreign sovereign customers nor Defendants' outside counsel are Prohibited Parties.

2. This Permanent Injunction binds the Prohibited Parties with respect to the WhatsApp platform, including WhatsApp servers and the WhatsApp client applications (collectively, the "WhatsApp Platform").

3. The Prohibited Parties are immediately and permanently enjoined from:

   a. Developing, using, selling, offering for sale, distributing, transferring, or licensing, whether directly or through a third party, intermediary, or proxy, any technology that interacts with or emulates any aspect of the WhatsApp Platform in any way, including as a method or approach used to install and deploy the technology (an "installation vector"), without first requesting and obtaining Plaintiffs' express written permission;

1

ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION
CASE NO. 4:19-CV-07123-PJH

**ER-5**

b.    Collecting, or assisting others in collecting, data or information from the WhatsApp Platform, whether directly or through a third party, intermediary, or proxy, without first requesting and obtaining Plaintiffs' express written permission;

c.    Reverse engineering or decompiling code from the WhatsApp Platform, whether directly or through a third party, intermediary, or proxy, without first requesting and obtaining Plaintiffs' express written permission; and

d.    Creating accounts, whether directly or through a third party, intermediary, or proxy, on the WhatsApp Platform, without first requesting and obtaining Plaintiffs' express written permission.

4.    The Prohibited Parties are required to delete and destroy any and all computer code or technologies that use, access, or depend on the WhatsApp Platform, including the WhatsApp Installation Server ("WIS"), to delete all data obtained or derived from use of or access to the WhatsApp Platform in the Prohibited Parties' possession, and to disable customer access to any and all computer code or technologies maintained by the Prohibited Parties that use, access, or depend on the WhatsApp Platform.

5.    The Court will retain jurisdiction to enforce the terms of this Permanent Injunction and to address other matters arising out of or regarding this Permanent Injunction, including any allegations that Defendants have failed to comply with their obligations as set forth in this Permanent Injunction, and the parties shall submit to the Court's jurisdiction for those purposes.

**IT IS SO ORDERED.**

Dated:  November 12, 2025                          */s/ Phyllis J. Hamilton*
                                          Honorable Phyllis J. Hamilton
                                          United States District Judge

2

ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION
CASE NO. 4:19-CV-07123-PJH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

Plaintiffs,

v.

NSO GROUP TECHNOLOGIES LIMITED, et al.,

Defendants.

Case No. 19-cv-07123-PJH

**ORDER RESOLVING DEFENDANTS' RESPONSE AND OBJECTION TO PROPOSED INJUNCTION ORDER**

Re: Dkt. 805, 807

United States District Court
Northern District of California

Defendants filed a response and objection to plaintiffs' proposed injunction order, and plaintiffs filed a response.  See Dkt. 807.

Defendants first argue that the proposed injunction should "take into account the provisions of 18 U.S.C. § 1030(f)," covering United States law enforcement activity. However, as plaintiffs argue, defendants have provided no evidence that the United States has ever used Pegasus for law enforcement activities, nor was the law enforcement exception applicable to this litigation.  Defendants propose a "sweeping carveout" that is simply not supported by the evidence or findings in this case.  See Dkt. 805-1 at 4.  Accordingly, defendants' first objection is overruled.

Second, defendants argue that the injunction should not prohibit collection of data from target users' phones if no Whatsapp servers are accessed.  This is an argument that has been fully raised and considered throughout this case, particularly at the hearing on the motion for permanent injunction.  The court has already rejected this argument, and defendants present no basis for reconsidering it now – accordingly, their second objection is overruled.

United States District Court
Northern District of California

Defendants' third and final objection is that "the exclusion of foreign sovereign governments should be meaningful" by, for example, making clear that "the deletion of Whatsapp data does not apply to foreign customers."  While the court believes that paragraph 1 of the proposed injunction, as written, already makes clear that "[n]otwithstanding anything herein, neither Defendants' foreign sovereign customers nor Defendants' outside counsel are Prohibited Parties," for the sake of clarity, the court will make the following revisions to paragraph 4 (added language is underlined):

> The Prohibited Parties are required to delete and destroy any and all computer code or technologies that use, access, or depend on the WhatsApp Platform, including the WhatsApp Installation Server ("WIS"), to delete all data obtained or derived from use of or access to the WhatsApp Platform in the Prohibited Parties' possession, and to disable customer access to any and all computer code or technologies maintained by the Prohibited Parties that use, access, or depend on the WhatsApp Platform.

To the extent that defendants request further changes to paragraph 4, that objection is overruled.

The court will issue a separate order regarding defendants' request to stay the injunction order.

**IT IS SO ORDERED.**

Dated:  November 12, 2025

                       /s/ *Phyllis J. Hamilton*
                       PHYLLIS J. HAMILTON
                       United States District Judge

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

    Plaintiffs,

    v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

    Defendants.

Case No. 19-cv-07123-PJH

**ORDER RE MOTION FOR
PERMANENT INJUNCTION, MOTION
FOR REMITTITUR OR NEW TRIAL,
AND MOTION TO SEAL**

Re: Dkt. 558, 747, 790, 791, 797

Plaintiffs' motion for permanent injunction and defendants' motion for a remittitur or a new trial came on for hearing on August 28, 2025. Plaintiffs appeared through their counsel, Greg Andres, Antonio Perez-Marques, Luca Marzorati, and Micah Block. Defendants appeared through their counsel, Joseph Akrotirianakis, Aaron Craig, Matthew Noller, and Matthew Dawson. Having read the papers filed by the parties and carefully considered their arguments and relevant authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

The facts underlying this lawsuit have been presented in numerous previous orders, including this court's order granting partial summary judgment on the issue of liability. See Dkt. 494. In short, the court granted partial summary judgment in favor of plaintiffs under the Computer Fraud and Abuse Act ("CFAA") and the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), as well as for breach of contract. The evidence showed that defendants reverse-engineered Whatsapp's code to create a modified version of the Whatsapp client application, which they then used to install their software on target users' devices via WhatsApp's servers. The evidence

further showed that defendants repeatedly re-designed their software to avoid detection and circumvent plaintiffs' security fixes. See id.

After summary judgment, the court conducted a damages-only trial, in which a jury unanimously awarded plaintiffs the full amount of $444,719 they sought in compensatory damages. The jury also found that defendants acted with malice, oppression, or fraud, and awarded plaintiffs $167,254,000 in punitive damages. See Dkt. 736.

After trial, the court scheduled an evidentiary hearing on plaintiffs' motion for permanent injunction. Defendants filed a motion for new trial on the issue of punitive damages, which the court set for hearing on the same day as the evidentiary hearing regarding the injunction motion.

Before the hearing, defendants also filed a motion to strike to preclude plaintiffs' witnesses from testifying, on the basis that they had not been properly disclosed. See Dkt. 770. After allowing both parties to file briefs on the issue, the court denied the motion, concluding that any imperfect disclosure could be remedied by cross-examination at the hearing and, if necessary, by allowing defendants to depose the challenged witnesses either before or after the hearing. See Dkt. 781. At the hearing defendants advised that they had not taken the witnesses' depositions beforehand, but would depose them after the hearing and file supplemental briefing. They also declined to cross-examine the witnesses at the hearing because they needed document discovery before meaningful depositions could be conducted. Accordingly, the court heard only direct testimony from plaintiffs' challenged witnesses at the hearing, who testified that defendants continue to collect users' messages through Whatsapp and have been observed using Whatsapp as part of their research and development activities as recently as April 2025. Notwithstanding this testimony, plaintiffs argued, as they had in the past, that this additional testimony was really unnecessary to support their request for an injunction, as the record contained ample justification for injunctive relief.

After hearing much of the evidence, the court expressed surprise at how "most of the factual matters that have been brought forth today are matters about which I read

2

United States District Court
Northern District of California

over and over about in this case," and that "there's really nothing new, nothing that's materially new, that will affect the outcome of this case." See Dkt. 795 at 132. In that sense, the court agrees with the argument made by plaintiffs and by defendants' counsel in their reply brief, that "Pegasus's collection of WhatsApp messages is not a new fact, because all the documentary information produced by Defendants about the functionality of Pegasus touts this as a key feature, and Defendants have never stated or suggested that Pegasus ever stopped collecting WhatsApp messages." Dkt. 779 at 4. Indeed, as will be discussed in further detail below, many of the material facts in this case are undisputed – it is the legal significance of those facts that the parties dispute.

Thus, having determined that the testimony presented by plaintiffs' witnesses (namely, Andrew Blaich and Lander Brandt) at the evidentiary hearing was cumulative in nature, and in order to avoid reopening discovery to permit defendants to effectively depose witnesses not previously deposed, the court hereby STRIKES their testimony from the record. Defendants' counsel confirmed at the hearing that, if the court were to disregard the testimony of plaintiffs' witnesses, there would be no need for further discovery from the witnesses. See Dkt. 795 at 138-39.

Accordingly, the court will now address plaintiffs' motion for permanent injunction on the basis of the factual record presented up to and including trial, as well as defendants' expert witness Joshua Minkler, who testified at the evidentiary hearing. The court will then address defendants' motion for a new trial on the issue of punitive damages.

**DISCUSSION**

Motion for Permanent Injunction

A.    Legal Standard

The CFAA provides that "any person who suffers damage or loss" under the statute can obtain "injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The CDAFA also provides for injunctive or other equitable relief. See Cal. Penal Code § 502(e)(1).

United States District Court
Northern District of California

A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief, and is required to show the following: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  eBay v. MercExchange, 547 U.S. 388 (2006).

B.      Analysis

        1.      Irreparable Injury

Plaintiffs argue that their "most important" purpose in this litigation is "protecting WhatsApp's platforms, servers, and users."  Dkt. 795 at 143:4-5.  Plaintiffs assert that "NSO admits that to this day they continue collecting WhatsApp messages, that that is something that cannot be accomplished without accessing parts of the devices and parts of the WhatsApp software that are not accessible to normal users."  Id. at 14:6-10.

As a general matter, "[n]umerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm."  See Facebook, Inc. v. Power Ventures, Inc., 252 F.Supp.2d 765, 782 (N.D. Cal. 2017) (internal citations omitted).

The Power Ventures case involved a claim that the defendant had used Facebook's proprietary data without permission by "inducing Facebook users to provide their login information and then using that information to 'scrape' Facebook's proprietary material" and display it on Power Ventures' own website.  See 252 F.Supp.2d at 768-69.

The district court concluded that Facebook had shown irreparable harm because "in accessing Facebook's computers without authorization, defendants have interfered with and acquired data to which the defendants have no lawful right" in violation of the CFAA and CDAFA.  See Power Ventures at 782.

The district court further concluded that "unless the court issues a permanent injunction, it is very likely that Facebook will suffer irreparable harm again," because

4

**ER-12**

United States District Court
Northern District of California

defendants' "bad faith conduct" indicated that "they will not easily be deterred from attempting to access Facebook's servers without authorization in violation of the CFAA" and CDAFA. Power Ventures at 782.

The Power Ventures injunction was affirmed by the Ninth Circuit; though, as defendants point out, the Ninth Circuit did not issue a detailed opinion on the case. 844 F.3d 1058 (9th Cir. 2016). However, the Ninth Circuit did cite and discuss Power Ventures with approval in a subsequent case in which it distinguished the "user data that was protected by Facebook's username and password authentication system" in Power Ventures from data that "was available to anyone with a web browser." See hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180, 1199 (9th Cir. 2022).

The unlawfully-accessed data in this case was not only protected with a username and password authentication system, but further protected by Whatsapp's end-to-end encryption. See Dkt. 795 at 86:16-19. Thus, in that sense, the injury in this case is even greater than in Power Ventures – because in addition to accessing plaintiffs' proprietary data and servers, defendants' access also prevents plaintiffs from delivering privacy and security to its users. As plaintiffs' counsel argued, "the expectation of privacy of users of the service is frustrated by bad actors like NSO who seek to collect messages that they're not entitled to." Dkt. 795 at 156:11-13.

Plaintiffs further argue that, as in Power Ventures, the defendants in this case have exhibited "bad faith conduct" indicating that "they will not easily be deterred from attempting to access [plaintiffs'] servers without authorization." See 252 F.Supp.3d at 782. As plaintiffs argue, the "central issue here and the reason that an injunction is so important is because the risk of future harm is so clear," as defendants "have already demonstrated and admitted a pattern of conduct whereby, when they were stopped from engaging in this conduct, they sought to resume it." Dkt. 795 at 143:7-12.

Plaintiffs argue that, absent an injunction, defendants would be "like a safecracker who still has all his tools. And they still have every economic and commercial incentive to target WhatsApp again." Dkt. 795 at 153:2-6. Plaintiffs point out that "[b]y their own

5

estimation, they engaged in these violations tens of -- up to tens of thousands of times," and "three different vectors [] were used, and each time one was stopped, either because we detected it or just because we changed our software in a way that frustrated it, they came back and they did it again." Id. at 148:11-17. "They were undeterred by our security measures. They were undeterred by their knowledge that WhatsApp did not want this conduct and would stop it if it was detected, and they were undeterred even by the filing of this lawsuit." Id. at 148:10-21.

Finally, plaintiffs argue that "the nature of their violations, including through the reverse engineering of this software, subjects us to an ongoing risk." Dkt. 795 at 155:14-16. Specifically, plaintiffs argue that defendants "have learned something that they weren't entitled to know, and it's information that they continue to possess that puts us at a risk of continued attacks." Id. at 155:17-19.

Indeed, the prospect of future harm is directly relevant to the irreparable injury inquiry. See, e.g., Y.Y.G.M. SA v. Redbubble, Inc., 75 F.4th 995, 1007 (9th Cir. 2023). And plaintiffs point to defendants' own testimony as evidence that the harm is ongoing.

In August 2024, NSO's CEO Yaron Shohat testified that defendants "have installation vectors for Pegasus today." Dkt. 399-4, Ex. 10 at 49.

In September 2024, NSO's vice-president of research and development Tamir Gazneli testified that Pegasus was still capable of obtaining "unlimited access to targets' mobile devices" and "remotely and covertly collect[ing] information about a target's relationships, locations, phone calls, plans and activities," and could also "activate the microphone to listen in on a target's environment" and "turn on the camera to take snapshots and take screenshots." Dkt. 399-4, Ex. 6 at 109.  When asked to clarify whether defendants still invested efforts in circumventing Whatsapp's security measures, Gazneli answered "this is our business." Id. at 266.

The latter statement is similar to that of the Power Ventures defendants, who responded to the plaintiffs' cease-and-desist letter with a statement that it had "made the business decision to not prevent the interruption of service to our millions of users." 252

6

**ER-14**

United States District Court
Northern District of California

F.Supp.3d at 782.

Defendants' own statements in their opposition brief lead to the same conclusion that plaintiffs face the risk of ongoing harm. Defendants argue that the requested injunction "would put NSO's entire enterprise at risk" and "force NSO out of business," as "Pegasus is NSO's flagship product." See Dkt. 759-2 at 21. And as quoted above, defendants' counsel expressly acknowledged that "Pegasus's collection of WhatsApp messages is not a new fact, because all the documentary information produced by Defendants about the functionality of Pegasus touts this as a key feature, and Defendants have never stated or suggested that Pegasus ever stopped collecting WhatsApp messages." Dkt. 779 at 4.

In other words, while the parties dispute whether plaintiffs have actually been harmed, they do not dispute that any such harm is ongoing. In defendants' view, because their software purportedly no longer uses Whatsapp servers as an installation vector, their conduct – though ongoing – is legal and not harmful. As an initial matter, the court agrees with plaintiffs that, "by not telling us how they're collecting WhatsApp messages - the burden is improperly put on the plaintiffs to try to figure out how they're doing it and whether they're accessing our servers, something that they've admitted they tried to conceal when they did it in the past." See Dkt. 795 at 168:9-13. But in addition, plaintiffs are harmed not only when their servers are improperly accessed, but also when they are not able to offer the end-to-end encryption that they have promised their users. See id. at 156:11-13 ("the expectation of privacy of users of the service is frustrated by bad actors like NSO who seek to collect messages that they're not entitled to.").

Defendants argue that plaintiffs are improperly seeking to establish irreparable injury by pointing to harms suffered by the users, rather than to harms suffered by plaintiffs themselves. Defendants argue that the court previously held that any harm to users was outside the scope of this case. See, e.g., Dkt. 747 at 11 ("This court held before trial . . . that the only relevant conduct was NSO's use of Whatsapp servers, not the downstream use of Pegasus on target user devices."). However, defendants'

7

United States District Court
Northern District of California

argument reaches too far.  While the court did indeed exclude "evidence of the identities and occupations of the ~1,400 targets" from the trial (see Dkt. 686 at 9), that ruling simply prevented the jury from considering targets' status as journalists, activists, etc. when deciding the issue of damages – it was not a ruling that the existence of the users and their data are completely irrelevant for all purposes.  See also Dkt. 358 at 3 ("Because NSO has not made even an initial showing that the [law enforcement] exception [to the CFAA] applies to any of the alleged victims in this case, the court concludes that the discovery sought in relation to those alleged victims would be disproportionate to the needs of the case.").

Consistent with its earlier rulings, the court is not considering the evidence that certain targets were members of 'civil society' – to the contrary, the court approaches this analysis as if the targets were ~1,400 individuals about whom nothing is known.  And in this scenario, where ~1,400 individuals' data was unlawfully accessed, and where Whatsapp has over 3 billion users to whom privacy and security were promised in the form of end-to-end encryption, the court concludes that such unlawful access does indeed constitute an irreparable injury to Whatsapp.

The idea of a business offering technological privacy as a service is a relatively new one, as evidenced by defendants' expert's discussion of the recent proliferation in end-to-end encryption technology.  Plaintiffs appear to have made such encryption, and the privacy and security that it entails, a significant part of its pitch to users, making it reasonable to conclude that users would be dissuaded from using Whatsapp if its encryption were ineffective.

And while it is true that the court's consideration of liability and damages was based on NSO's accessing of Whatsapp's servers, the ultimate purpose of defendants' actions was to obtain data from the target users.  Accordingly, when considering the issue of a forward-looking injunction, the court may consider the nature of any prospective harm, and how/whether that harm would affect plaintiffs.  In other words, when deciding whether to issue an injunction, the court may consider ways in which

8

**ER-16**

United States District Court
Northern District of California

plaintiffs have been harmed in the past or will be harmed in the future, which is a different standard than was applicable when considering the issue of compensatory and punitive damages.

In the court's view, any business that deals with users' personal information, and that invests resources into ways to encrypt that personal information, is harmed by the unauthorized access of that personal information – and it is more than just a reputational harm, it's a business harm. Essentially, part of what companies such as Whatsapp are 'selling' is informational privacy, and any unauthorized access is an interference with that sale. Defendants' conduct serves to defeat one of the purposes of the service being offered by plaintiffs, which constitutes direct harm.

Defendants argue that any finding of irreparable injury must be "grounded in [] evidence" specific to each case, rather than "cursory and conclusory." Herb Reed Enters., LLC v. Florida Ent. Mgmt., 736 F.3d 1239, 1250 (9th Cir. 2013). The court agrees, and places emphasis on the covert, undetectable nature of defendants' technology, as well as the repeated efforts to circumvent plaintiffs' security measures, as described above.

Plaintiffs have presented evidence regarding the "zero-click" nature of Pegasus, as well as the specific steps that defendants took to evade detection. See, e.g., Dkt. 557-3 at 21-22. Given the multiple design-arounds, the covert nature of NSO's work, and the designed undetectability of Pegasus itself, plaintiffs are unable to anticipate all the ways that defendants can access their platform, which is why they seek a broad injunction. As plaintiffs argue, "reverse engineering[1] is how they developed the exploit that was able to attack our servers," and that "the reason that they were hacking the servers was to get access to the messages." See Dkt. 795 at 165:2-8. In the court's view, this is the evidence that grounds the finding of irreparable injury in this case, and keeps any

---

[1] While reverse engineering is not expressly covered by the CFAA, the fact that defendants breached Whatsapp's terms of service by doing so is a fact that informs the court's understanding of the risk of ongoing harm and the scope of any injunction needed to prevent such harm.

9

**ER-17**

United States District Court
Northern District of California

findings from being "cursory and conclusory." Defendants reverse engineered plaintiffs' code to evade detection and to defeat encryption, and infected the target users' devices with spyware that no one wanted or expected. Defendants' arguments seem to presume the "right" to use Whatsapp for their intended purposes, notwithstanding the fact that neither Whatsapp nor the users invited or wanted NSO's software on their devices

This specific evidence regarding the undetectable nature of defendants' technology also shows the difficulty of preventing or mitigating such harm. See also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F.Supp.2d 1197, 1219 (C.D. Cal. 2007) ("the very need to file multiple lawsuits as a consequence of [defendants' conduct] is itself supportive of an irreparable harm finding."). In short, the court agrees with plaintiffs' argument that the evidence "establishes that NSO maintains the technical expertise and commercial incentives not only to access plaintiffs' servers, but also to hide any access from plaintiffs." See Dkt. 782 at 9.

Accordingly, having concluded that defendants' conduct causes irreparable harm, and there being no dispute that the conduct is ongoing, the court concludes that the first factor weighs strongly in favor of granting an injunction.

2.    Adequacy of Monetary Damages

Many courts have found that this factor overlaps with the 'irreparable harm' factor. See, e.g., Rocawear Licensing, LLC v. Branco Enterprises, Inc., 2009 WL 10703523, at *9 (C.D. Cal. July 22, 2009) ("the irreparable injury requirement for a permanent injunction overlaps with lack of an adequate remedy at law") (internal citations omitted).

And in this specific case, the same rationale applies – the irreparable nature of the injury also suggests that the injury cannot be remedied by monetary damages alone. Separate from any reputational damages, which are not properly part of this case, Whatsapp would suffer harm in the form of having its proprietary code and its users' data compromised, along with the loss of any users who migrate to a platform with better protection against unauthorized access. Technology companies are commonly sued based on allegations that their privacy protections are not strong enough. In short, as

10

mentioned above, a breach of plaintiffs' encryption serves to defeat one of the purposes of the service that they offer to users.

Moreover, as set forth above, defendants freely acknowledge that they continue to use Whatsapp to collect users' messages. In concluding that monetary damages were inadequate, the Power Ventures court noted that "defendants may still possess the software at issue in this litigation and the data illegally acquired from Facebook." See 252 F.Supp.3d at 783. The argument for an injunction is even stronger in this case, because there is no dispute that defendants still possess the software at issue in this litigation, as well as the source code and other data illegally acquired from Whatsapp. "Where the plaintiff will have to litigate multiple suits in the future, monetary damages are deemed to be insufficient and thus, an injunction may issue." United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp., 2012 WL 3861946 at *7 (S.D. Cal. Sept. 5, 2012); see also Metro-Goldwyn-Mayer, 518 F. Supp. 2d at 1220 ("A legal remedy is inadequate if it would require a multiplicity of suits."). Although defendants do dispute that they use plaintiffs' servers to access users' data, the court has previously concluded that plaintiffs themselves are harmed when its users' data is unlawfully accessed.

Accordingly, the court concludes that the second factor weighs strongly in favor of granting an injunction.

3.     Balance of Hardships

The Power Ventures court held that "defendants will suffer no harm from being unable to develop software to engage in illegal conduct." Power Ventures, 252 F.Supp.3d at 785. Defendants argue that the court must consider the business hardships that they would suffer if an injunction were to issue, "even if the conduct at issue is unlawful." See Dkt. 759-2 at 21 (citing Softketeers, Inc. v. Regal W. Corp., 2023 WL 2024701, at *11 (C.D. Cal. Feb. 7, 2023)). As stated above, defendants argue that the requested injunction "would put NSO's entire enterprise at risk" and "force NSO out of business." See Dkt. 759-2 at 21.

Even if the court were to accept defendants' position and consider the hardship

11

**ER-19**

United States District Court
Northern District of California

they would suffer if an injunction were to issue, the court must also consider the harm to plaintiffs' business if an injunction were not to issue. As noted above, plaintiffs tout end-to-end encryption as a feature for users to protect their privacy and security, and their business would be significantly harmed if that feature was rendered ineffective.

Moreover, defendants' argument overlooks the fact that plaintiffs are free to revoke authorization from any user, let alone a user that has already been found liable for wrongdoing. In the previously-mentioned hiQ Labs case, the Ninth Circuit recognized that "Facebook has tried to limit and control access to its website" by requiring "its users to register with a unique username and password," in contrast to the LinkedIn website, which made data "available to anyone with a web browser." 31 F.4th at 1199. If, as in hiQ Labs, defendants were simply seeking to access the type of information that was "available to anyone with a web browser," they would have a stronger argument that they would suffer hardship as a result of an injunction. Instead, defendants are seeking to access data that plaintiffs have protected not only with a username-and-password requirement, but also with end-to-end encryption.

Accordingly, the court concludes that the third factor weighs in favor of granting an injunction.

4.    Public Interest

"Internet companies and the public do have a substantial interest in thwarting denial-of-service attacks and blocking abusive users, identity thieves, and other ill-intentioned actors." hiQ Labs, 31 F.4th at 1202. Defendants argue that they do not fall into the category of "ill-intentioned actors" because their software is used only for law enforcement purposes such as surveilling criminals and terrorists.

To support their argument, defendants presented testimony from their expert, Joshua Minkler. At the hearing, defendants' counsel made clear that "the issue for which he's been tendered as an expert is the challenges posed to law enforcement by end to end encryption," which is "directly related to one of the factors that they need to prove, which is that the injunction . . . would not disserve the public interest." Dkt. 795 at 105.

12

**ER-20**

United States District Court
Northern District of California

Minkler testified about his experience with state and federal law enforcement investigations in Indiana, with a focus on the undesirability of end-to-end encryption as it pertains to law enforcement investigations. Minkler conceded that he had not interviewed anyone at NSO, had not operated Pegasus or seen it in use, and had no knowledge of NSO's clients or the targets against whom Pegasus has been used. Dkt. 795 at 93.

During cross-examination, Minkler also conceded that his knowledge of Pegasus's use to combat crime and/or terrorism was based solely on publicly-available information, such as newspaper articles. See Dkt. 795 at 119-120. This exchange highlighted one of the unique aspects of this case – because of the sealed nature of much of defendants' evidence, defendants have sought to establish their law-enforcement defense with citations to newspaper articles and similar types of publicly-available, unverified evidence. See, e.g. Dkt. 759-2 at 11. However, when plaintiffs seek to undermine the law-enforcement defense by citing articles reporting that Pegasus has been misused for non-law-enforcement purposes, such as surveilling journalists, human rights activists, political dissidents, etc., defendants argue that the court should ignore such unverified evidence. It would violate basic principles of equity and fairness to allow defendants to rely on such evidence, but to prohibit plaintiffs from doing so. Accordingly, the court will not consider any such evidence from either party, consistent with the court's rejection of this material at trial.

Nor will the court consider evidence or argument about the use of Pegasus by foreign governments in foreign countries, because as will be further discussed in the next section (regarding the scope of the injunction), the court has already concluded that any foreign sovereign governments should be excluded or carved out from any injunctive relief. See Dkt. 111 at 34. Thus, even assuming that foreign governments do use Pegasus for legitimate law enforcement purposes, those uses are not relevant to the court's current analysis. In contrast, there is no evidence that Pegasus has been used for law enforcement purposes within the United States, and indeed, NSO remains on the U.S. Department of Commerce's Entity List after it was "determined by the U.S.

13

**ER-21**

Government to be acting contrary to the foreign policy and national security interests of the United States." See 86 Fed. Reg. 60759 (Nov. 4, 2021) ("Specifically, investigative information has shown that the Israeli companies NSO Group and Candiru developed and supplied spyware to foreign governments that used this tool to maliciously target government officials, journalists, businesspeople, activists, academics, and embassy workers.").

Accordingly, the court concludes that the public interest in the United States weighs in favor of an injunction.

5.      Scope of Injunction

"A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction." Hecox v. Little, 104 F.4th 1061, 1089 (9th Cir. 2024).

As an initial matter, defendants argue that the "proposed injunction improperly applies to NSO's government customers," and would "arrogate to this court the power to dictate permissible law-enforcement, counterterrorism, and military surveillance techniques for every country in the world." See Dkt. 759-2 at 9, 27.

In their reply, plaintiffs cite to the court's previous order stating that "the plaintiffs are not seeking injunctive relief against defendants' foreign sovereign customers." See Dkt. 782 at 19 (citing Dkt. 111 at 34).

Indeed, the court's previous order concluded that defendants' customers "are not required parties because the court can craft injunctive relief that excludes or carves out any sovereign nation." See Dkt. 111 at 34. Such a carve-out would allay defendants' concern about foreign countries' law-enforcement techniques.

Because defendants' foreign sovereign customers are not before the court and have not been named as defendants, and because the court expressly ruled that they are not necessary parties, of course an injunction in this case cannot apply to them. To the extent that defendants believe that an injunction would indeed cover their foreign sovereign customers, the injunction will be revised to specifically exclude them.

Accordingly, plaintiffs shall revise the proposed injunction to exclude defendants'

United States District Court
Northern District of California

foreign sovereign customers.  As stated in the proposed injunction, the court shall retain jurisdiction over any allegations that defendants have failed to comply with their obligations as set forth in the injunction, and the parties shall submit to the court's jurisdiction for those purposes.  See 18 U.S.C. § 1030(e)(2) (defining "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States"); see also In re Apple Inc. Device Performance Litig., 347 F.Supp.3d 434, 448 (N.D. Cal. 2018) ("the text of the CFAA provides a clear indication of extraterritorial application."); Alhathloul v. DarkMatter Group, -- F.Supp.3d ---, 2025 WL 2320474 (D. Or. 2025) ("Every court to consider the question has concluded that the CFAA applies extraterritorially.") (internal citations omitted).

Paragraph 2 of the proposed injunction defines its scope to include "all of plaintiffs' platforms."  See Dkt. 558-3, ¶ 2.  Defendants argue that any injunction should be limited to the Whatsapp platform.  Plaintiffs argue that the complaint included Facebook as a plaintiff and included allegations regarding Facebook Messenger.  See Dkt. 782 at 18.

While plaintiffs' description of the complaint is correct, the evidence throughout the course of the litigation has been focused solely on Whatsapp, and the court has no information about the other platforms and whether they have been or are in danger of being harmed in the same way by Pegasus.

Moreover, plaintiffs' inclusion of the language "but not limited to Whatsapp, Facebook, Instagram, Messenger, Meta AI, Threads, and Meta Horizon platforms" is unclear as to what unnamed platforms would also be covered by an injunction.  See Dkt. 558-3, ¶ 2 (emphasis added).  Accordingly, the injunction shall be limited to the Whatsapp platform.

Paragraph 3 of the proposed injunction sets forth the conduct from which defendants are enjoined: (a) developing, using, selling, offering for sale, distributing, transferring, or licensing any technology that uses plaintiffs' platforms in any way, (b)

15

**ER-23**

developing, using, selling, offering for sale, distributing, transferring, or licensing any technology that emulates plaintiffs' platforms in any way, (c) collecting data from plaintiffs' platforms, (d) reverse engineering or decompiling code from plaintiffs' platforms, (e) sending viruses or harmful code through plaintiffs' platforms, (f) using plaintiffs' platforms for illegal purposes, and (g) creating new accounts on plaintiffs' platforms. See Dkt. 558-3, ¶ 3.

Defendants argue that the proposed provisions against "using" Whatsapp or creating new accounts are impermissible because they seek to enjoin lawful activity. However, the Power Ventures court and others have observed that "it is well established that federal courts have the equitable power to enjoin otherwise lawful activity if they have jurisdiction over the general subject matter and if the injunction is necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct or to prevent continued violations of the law." See Power Ventures, 252 F.Supp.3d at 784 (internal citations and quotations omitted); see also Oracle USA, Inc. v. Rimini St., Inc., 81 F.4th 843, 857 (9th Cir. 2023) ("an injunction is proper if it restrains acts which are of the same type or class as unlawful acts which the court has found to have been committed."). Moreover, while the court relies only on the CFAA and CDAFA in issuing this injunction, the court notes that some courts have issued injunctions to enforce contractual terms, on the basis that it was preferable to having the plaintiff file "lawsuit after lawsuit" to enforce their rights. See Deerpoint Group, Inc. v. Agrigenix, LLC, 345 F.Supp.3d 1207, 1225-26 (E.D. Cal. 2018); Densmore v. Manzarek, 2008 WL 2209993 at *47 (2008); see also Cal. Civ. Code § 3422, subd. 3 (injunction may be granted when "necessary to prevent a multiplicity of judicial proceedings.").

Turning to specific provisions of paragraph 3, the court is unclear how provisions (a) and (b) are different from each other in practice, and also finds the phrasing of (a) to be confusing to the extent it contains the word "uses" multiple times (e.g., "using . . . any technology that uses plaintiffs' platforms . . . including as a method or approach used to install the technology"). Accordingly, the court directs plaintiffs to rephrase provision (a),

16

**ER-24**

and to consider combining it with provision (b).

Turning to provision (c), the court agrees that "collecting data" goes to the conduct at the heart of this lawsuit, but the court finds this provision to be vague to the extent that it enjoins "collecting . . . data or information from plaintiffs' platforms, whether directly or through a third party, intermediary, or proxy." Given that the parties have made arguments about whether defendants collect data from plaintiffs' servers or directly from the target users' devices, the court would prefer more clarity as to whether or not this provision is intended to cover the collection of data from users' devices.

As to provision (d), covering reverse engineering and decompiling, while the court acknowledges that "the CFAA is best understood as an anti-intrusion statute and not as an anti-misappropriation statute," the court nevertheless concludes that the activities such as reverse engineering or decompiling are sufficiently related to defendants' unlawful access of plaintiffs' and their users' data as to warrant injunctive relief on that basis. See, e.g., Dkt. 795 at 147:21-23 ("it was through reverse engineering that they developed these vectors. It's part and parcel of the CFAA and CDAFA violations."); 165:4-5 ("Reverse engineering is how they developed the exploit that was able to attack our servers."). Accordingly, provision (d) is approved.

Provision (e) covers the sending of harmful code, and provision (f) covers the use of plaintiffs' platforms for "illegal purposes." The court finds that provision (e) is vague and possibly overbroad, and that provision (f) is essentially circular in that it simply requires compliance with all relevant laws. Accordingly, provisions (e) and (f) shall be removed from any revised proposed injunction.

Finally, as to provision (g), while it may remain legal to create new Whatsapp accounts and to use Whatsapp, the facts in this case show that such activities have been used as a precursor to illegal activities, and thus, the court, in its discretion, concludes that such activity must be enjoined.

Paragraph 4 of the proposed injunction requires defendants to delete and destroy computer code related to plaintiffs' platforms. The court concludes that this provision is

17

**ER-25**

necessary to prevent future violations, especially given the undetectable nature of defendants' technology.

Paragraph 5 requires defendants to affirm that it provided notice of the injunction to all affected parties, and paragraph 6 requires defendants to certify compliance with the injunction. The court has not required defendants to provide such notice and certification in other cases, and will not do so in this case. Additionally, any deadline the court imposes will undoubtedly necessitate further motion practice once the inevitable appeals process begins. Accordingly, paragraphs 5 and 6 are to be removed from any revised proposed injunction.

Finally, defendants argue that the injunction would place an unreasonable burden on its outside counsel, to the extent it prevents them from using Whatapp, and plaintiffs' reply offers to "clarify the proposed permanent injunction to exclude NSO's outside counsel." Dkt. 782 at 14. Plaintiffs shall thus revise paragraph 1 to exclude defendants' outside counsel.

Accordingly, the court directs plaintiffs to file a revised proposed injunction order, making the changes specified above, namely: (1) exclude defendants' sovereign government customers from the scope of the injunction, and (2) narrow the scope of the injunction to apply only to the Whatsapp platform, (3) clarify paragraphs 3(a), 3(b), and 3(c), (4) remove paragraphs 3(e) and 3(f), (5) remove paragraphs 5 and 6, and (6) add language excluding defendants' outside counsel from the injunction. Plaintiffs shall file the revised proposed injunction order within 14 days of the date of this order.

<u>Motion for Remittitur or a New Trial</u>

As stated above, the jury in this case awarded plaintiffs compensatory damages in the amount of $444,719, and punitive damages in the amount of $167,254,000, a ratio of over 376/1. Defendants have filed this motion under Rule 59, asking the court to order a new trial or alter/amend the judgment to reduce the punitive damages award.

A.    Legal Standard

The first question presented by defendants' motion is whether the $167.25M

United States District Court
Northern District of California

punitive damages award is excessive; and if so, the second question is by how much to reduce the award.

The seminal Supreme Court cases are BMW v. Gore (1996) and State Farm v. Campbell (2003), which prohibit the imposition of "grossly excessive or arbitrary punishments on a tortfeasor" as inconsistent with the due process requirements of the Fifth and Fourteenth Amendments.  BMW, 517 U.S. 559 (1996); State Farm, 538 U.S. 408 (2003).

A 2022 opinion from the Ninth Circuit provides a helpful distillation of the due process principles:

> The Supreme Court in BMW of North America, Inc. v. Gore established three guidelines governing whether punitive damage awards comply with due process: (1) the reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered by the claimant and his punitive damages; and (3) the difference between the punitive damages and any civil penalties authorized or imposed in comparable cases.

Riley v. Volkswagen Group of America, 51 F.4th 896, 900 (2022).

Those three prongs will guide the analysis.

B.     Analysis

1.     Reprehensibility

The Supreme Court has said that the degree of reprehensibility is "the most important indicium of the reasonableness of a punitive damages award."  State Farm, 538 U.S. at 419 (citing BMW at 575).  The Supreme Court went on to articulate how to conduct the reprehensibility analysis:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

State Farm at 419.

NSO argues that the only factors that possibly favor plaintiffs are the repeated nature of the conduct, and the fact that the jury found malice, oppression, or fraud.  NSO

19

argues that the other factors cut against reprehensibility, as all the harm was economic and caused no lasting damage.

Plaintiffs argue that (1) NSO repeatedly targeted plaintiffs, (2) NSO acted deliberately, (3) NSO sought to conceal its activity, and (4) NSO repeatedly acted with a knowing disregard of plaintiffs' rights.

Defendants cite to cases involving racial discrimination and threats to abortion providers, arguing that the conduct in this case is less reprehensible and thus worthy of a lower punitive damages ratio.  See Zhang v. Am. Gem. Seafoods, Inc., 339 F.3d 1020 (9th Cir. 2003); Bains LLC v. Arco Prods. Co., 405 F.3d 764 (9th Cir. 2005); Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists, 422 F.3d 949 (9th Cir. 2005).  However, these cases are far too different from the present case to support any sort of 'apples to apples' comparison.  Therefore, rather than trying to compare the reprehensibility of 'unlawful surveillance' vs. 'racial discrimination,' the court simply concludes that some of the reprehensibility factors support plaintiffs' argument, while some support defendants' argument, and then moves on to the next factor, which provides more guidance regarding the proper size of any punitive damages award in this case.

2.      Disparity

Courts have rejected any bright-line rule on this factor, but the Ninth Circuit in Riley articulated the relevant precedent regarding proportionality, and set forth three groups: (1) punitive damages are limited to 4/1 where there are significant economic damages and the behavior is not particularly egregious, (2) punitive damages can range from 4/1 to 9/1 where there are significant economic damages and the behavior is more egregious, and (3) punitive damages can exceed 10/1 only if there are insignificant economic damages and the behavior was particularly egregious.

The threshold argument between the parties is whether the $444,719

20

**ER-28**

compensatory damage award in this case is significant[2] or insignificant. Plaintiffs argue that the figure should be considered in the context of the size of the companies involved in the litigation – for both of which, $444,719 is a small amount, when compared to their overall capitalization. Defendants argue that the case law does not allow for such consideration of context, and that the test for whether economic damages are "significant" must be the same in all cases. Specifically, defendants cite cases in which individuals were awarded amounts such as $15,000, $50,000, and $88,000, and argue that, because those amounts were considered "significant" or "substantial" in those cases, then the award in this case must necessarily be "significant." See Bains, 405 F.3d at 776; Planned Parenthood, 422 F.3d at 963-64; Mitri v. Walgreen Co., 60 Fed App'x 528, 530 (9th Cir. 2016). Defendants then argue that, because economic damages were substantial, any punitive damages award ratio is limited to 4/1 under Riley. See Dkt. 747 at 9.

Having reviewed the authority cited by the parties, the court concurs with defendants that the Ninth Circuit has not held that courts may consider context, such as the financial conditions of the parties, when determining whether a compensatory damages award is "significant" or "substantial." However, in this court's view, an amount that would be "significant" to an individual plaintiff in a specific case may be very insignificant to a plaintiff such as Whatsapp or its parent company, Meta. Thus, to best apply the principles articulated in Riley, a "one size fits all" approach to determining significance should be avoided. And under that rationale, a compensatory damage award of $444,719 to a company the size of Whatsapp and/or Meta strikes the court as relatively insignificant.

However, the court is of course cognizant of stepping beyond Ninth Circuit precedent, and moreover, as will be discussed in further detail below, the court's result

---

[2] Some of the case law uses 'substantial' rather than 'significant' – the Riley case actually uses both at various times. See 51 F.4th at 902. The understanding of the court and the parties, as confirmed at hearing, is that the terms are effectively interchangeable in this context. See Dkt. 795 at 202-03.

United States District Court
Northern District of California

United States District Court
Northern District of California

on this motion would be the same regardless of whether the compensatory damage award is considered "significant" or insignificant." In short, under Riley, the "significant" vs. "insignificant" distinction comes into play only if a court seeks to approve a punitive damages ratio above 9/1 – in which case, economic damages must be insignificant and the behavior must be "particularly egregious." See 51 F.4th at 902. In this case, the court does not have a sufficient basis for determining that defendants' behavior is "particularly egregious," which means the punitive damages ratio is capped at 9/1, which means it does not matter whether the court concludes that the economic damages are "significant" or "insignificant" – under either conclusion, the ratio is limited to 9/1. Within that range, the court must determine whether defendants' behavior is either (1) "not particularly egregious" (in which case the ratio is capped at 4/1), or (2) "more egregious" (in which case the ratio can be extended up to 9/1). See id.

To be clear, other courts may later determine that behavior such as defendants' is indeed "particularly egregious" and capable of supporting a ratio of even higher than 9/1. In this court's view, at this time, there have simply not yet been enough cases involving unlawful electronic surveillance in the smartphone era for the court to be able to conclude that defendants' conduct was "particularly egregious." As time goes on, more of a shared societal consensus may emerge about the acceptability of defendants' conduct. For now, the court concludes only that defendants' conduct is not so innocuous as to fall in the category of "not particularly egregious," which means that "more egregious" is the most fitting category. Thus, the court concludes that this case falls within category (2) under the Riley framework, which means that the punitive damages ratio cannot exceed 9/1 – in other words, the punitive damages award cannot exceed a maximum of $4,002,471.

Accordingly, based on Riley, the court must conclude that the jury's award was excessive, as it vastly exceeds the $4,002,471, the maximum permissible under Riley. That leaves one question for the court – to what number should the damages award be reduced?

22

**ER-30**

3.    Comparable Civil Penalties

The parties appear to agree that this factor is "less important than the other two" in this case, and the court also believes that the lack of any similar cases involving civil penalties limits this factor's usefulness here.

Accordingly, the court's determination must be based on the reprehensibility of defendants' behavior and the disparity between the compensatory damages award and punitive damages award. And as stated above, based on the latter, the constitutional upper limit of any punitive damages award in this case is 9/1.

Within those constitutional guidelines, the court believes that a high-end award is justified. In particular, the repeated, deliberate, and covert nature of defendants' intrusions, and the fact that defendants specifically designed around plaintiffs' attempted fixes, persuade the court that the punitive damages award should not be further reduced.

Moreover, contrary to defendants' arguments, the court finds no basis to conclude that the jury relied on improper factors. To the contrary, in the court's view, the jury displayed an uncommonly high level of attention and engagement, and the court sees no reason to discredit the jurors' reasoning. In addition, the jury was instructed not to "be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy," and to "decide the case solely on the evidence before you," and the jury is presumed to follow the court's instructions. See Dkt. 737 at 2.

Accordingly, defendants' motion is GRANTED, and the jury's punitive damages award is remitted to the amount of **$4,002,471**. Plaintiffs may accept a remittitur to $4,002,471, or the court will order a new trial as to the amount of punitive damages, though the court will be bound by the same constitutional limit on the amount of punitive damages that are set forth in this order, i.e., the 9/1 ratio under Riley.

Remaining motions

Following the court's previous order on the parties' various motions to seal, the parties filed a narrowed joint omnibus motion to seal. See Dkt. 784, 797.

There is a general principle in favor of public access to federal court records.

23

**ER-31**

United States District Court
Northern District of California

United States District Court
Northern District of California

Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 602 (1978).  "[T]he proponent of sealing bears the burden with respect to sealing.  A failure to meet that burden means that the default posture of public access prevails."  Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1182 (9th Cir. 2006).

When a request to seal documents is made in connection with a motion, the court must determine whether the parties are required to overcome that presumption with "compelling reasons" or with "good cause."  A party seeking to seal materials submitted with a motion that is "more than tangentially related to the merits of the case"—regardless of whether that motion is "technically 'dispositive'"—must demonstrate that there are compelling reasons to keep the documents under seal.  Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1101–02 (9th Cir. 2016).  "That the records are connected to a Daubert motion does not, on its own, conclusively resolve the issue."  In re Midland Nat. Life Ins. Co. Annuity Sales Pracs. Litig., 686 F.3d 1115, 1119 (9th Cir. 2012).  For example, the "compelling reasons" standard applies where the "judicial records at issue were filed 'in connection' with pending summary judgment motions."  Id. at 1120 (citing San Jose Mercury News, Inc. v. U.S. Dist. Ct., 187 F.3d 1096, 1102 (9th Cir. 1999)).

"Under this stringent standard, a court may seal records only when it finds a compelling reason and articulates the factual basis for its ruling, without relying on hypothesis or conjecture.  The court must then conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret.  What constitutes a 'compelling reason' is best left to the sound discretion of the trial court.  Examples include when a court record might be used to gratify private spite or promote public scandal, to circulate libelous statements, or as sources of business information that might harm a litigant's competitive standing."  Ctr. for Auto Safety, 809 F.3d at 1096–97 (internal quotation marks and citations omitted).

The parties' joint omnibus motion to seal complies with the court's previous order regarding sealing, and has been sufficiently narrowed to cover only truly sealable material.  Therefore, the parties' joint omnibus motion to seal (Dkt. 797) is GRANTED.

24

**ER-32**

United States District Court
Northern District of California

There are two remaining motions, both filed by defendants.  The first is listed on the docket as a motion to seal (Dkt. 790), but that appears to be an error, because the filed document contains no sealed or redacted material, and is in fact a duplicate of the document filed at Dkt. 791, which is properly listed as a motion for leave to file a supplemental reply brief.

Accordingly, the erroneously-filed "motion to seal" at Dkt. 790 is denied as moot, and the motion for leave to file a supplemental reply brief (Dkt. 791) is granted.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for permanent injunction is GRANTED, and defendants' motion for remittitur is GRANTED.  The punitive damages award is remitted to the amount of $4,002,471, and plaintiffs shall have 14 days from the date of this order to file a notice stating whether it accepts or rejects the remittitur.

And as stated above, plaintiffs shall have 14 days from the date of this order to file a revised proposed injunction order.  Finally, plaintiffs shall file a proposed form of final judgment, to be filed no later than 14 days from the date of this order.

**IT IS SO ORDERED.**

Dated:  October 17, 2025

                        /s/ *Phyllis J. Hamilton*
                        PHYLLIS J. HAMILTON
                        United States District Judge

25

**ER-33**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHATSAPP INC., et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>NSO GROUP TECHNOLOGIES LIMITED, et al.,<br><br>      Defendants. | Case No. 19-cv-07123-PJH<br><br>**FINAL PRETRIAL ORDER**<br><br>Re: Dkt. 488, 491, 505, 506, 509, 510,<br><br>512, 514, 573, 593, 601 |

Pursuant to Rule 16(e) of the Federal Rules of Civil Procedure, this final pretrial order is hereby entered and shall control the course of the trial unless modified by a subsequent order.

I.    MOTIONS IN LIMINE

    A.    Plaintiffs' Motion in Limine No. 1

Plaintiffs' first motion in limine asks the court to preclude defendants from offering "evidence, testimony, or argument about the alleged identities or affiliations of its customers or prospective customers, including governments or law enforcement, military, or intelligence agencies." See Dkt. 593 at 6.

As an initial matter, such evidence is irrelevant to the issue of compensatory damages. The alleged identities of defendants' customers has no bearing on the costs incurred by plaintiffs in responding to the conduct at issue.

To the extent that the alleged identities of defendants' customers are relevant to punitive damages, the court first emphasizes that the punitive damages analysis does not look to defendants' conduct as a whole, it "must be tied to oppression, fraud, or malice <u>in</u>

**ER-34**

the conduct which gave rise to liability in the case." See Livingston v. ABB, Inc., 100 F.Supp.3d 894, 904 (C.D. Cal. 2015) (citing Medo v. Superior Court, 205 Cal.App.3d 64, 68 (1988)). In other words, the punitive damages analysis looks to defendants' intent with respect to the conduct alleged in this case.

At the pretrial conference, defendants' counsel maintained that defendants are "unable to turn over" much of the evidence regarding which client(s) conducted the specific intrusions at issue in this case because they are "not items that we have possession of or ever did." See Dkt. 684 at 49. In other words, defendants' counsel argues that they have not refused to produce the discovery, they argue that they are unable to produce the discovery because it is not in their possession.

Over the course of the pretrial conference, defendants' counsel maintained that defendants do not have information about which of their client(s) were responsible for accessing the 1400 target devices at issue in this suit, or the client's reason(s) for the access. See Dkt. 684 at 41 ("We would not know who are the specific customers who are targeting those 1400."); id. at 65 ("what I think you're looking for is do you -- do you have evidence about what your customers did with the -- with your system and who they investigated and where those people are and what numbers of the target devices were being used, and so on. And the answer to that remains, as I've said earlier, Your Honor, that that is not information that NSO ever had.").

Defendants' counsel reiterated that they do not have specific information about the attacks at issue in this case:

> To the extent that that was requested in discovery and ordered by the Court, we provided whatever we had. We do not have discovery about who our clients target, what their criminal investigations are. As you would expect, we don't know what client X is investigating. It would be totally inappropriate for a software provider to be exposed to what criminal investigations or what counterterrorism investigations are being conducted by a foreign nation state. They wouldn't want us to know that and we wouldn't want to know that.

See Dkt. 684 at 66-67.

On other occasions, defendants' counsel implied that, to the extent that

defendants did have information that was not produced, any non-production was due to national security reasons. See Dkt. 684 at 15-16 ("generally speaking what the customers, you know, the details of their operations, to the extent it's known to NSO, Your Honor is correct that that has not -- that is not a subject that the witnesses were allowed to testify about or that we were allowed to produce evidence of for national security reasons.")

Defendants also point out, correctly, that the court previously concluded that they "need not disclose the identities of their third-party clients." See Dkt. 292 at 5. However, the court simultaneously concluded that, while "plaintiffs need not discover the specific identities of the third parties, they were "permitted to discover information about what actions were taken by those third parties," because "defendants have raised the actions of those third-party clients as a defense." See id. (emphasis in original).

Regardless of the reason, the fact remains that plaintiffs have not had a meaningful opportunity to review evidence regarding which of defendants' clients were responsible for the alleged attacks. Defendants argue that plaintiffs' own documents identify "at least four countries as NSO customers," but it does not appear that defendants have confirmed that those countries are indeed their customers, nor – more importantly – have defendants confirmed that any of those countries were responsible for the attacks alleged in this suit. Defendants rely on generalized evidence about their business practices, stating that they have a practice of licensing Pegasus only for lawful purposes and terminating the license of any client found to be misusing Pegasus, but there is an absence of specific evidence tying those general business practices to the specific events of this case.

The end-result of all of this discussion is that neither party has non-speculative evidence about the identities of which NSO customers were responsible for the attacks alleged in this case. As a result, it would be improper for the court to allow evidence of NSO's other customers and their supposed intent, entirely unrelated to the events of this lawsuit. While plaintiffs' motion largely frames the argument as defendants' refusal to

**ER-36**

provide relevant discovery, the pretrial conference clarified defendants' position that they are not in possession of the discovery at issue in this motion in limine, as can be seen in the transcript quotations above.  Accordingly, any ruling by the court is based purely on the <u>absence</u> of evidence, not on alleged discovery misconduct.

Defendants cite a number of cases broadly allowing intent-related evidence for reasons of "background" or "context."  But the reasoning of those cases cannot be directly applied here, because those cases did not involve the same sort of discovery limitations due to the necessity of applying the <u>Richmark</u> analysis.  <u>See</u> <u>Richmark Corp. v. Timber Falling Consultants</u>, 959 F.2d 1468 (9th Cir. 1992).  The Richmark court noted that "we are not unmindful of the difficulties foreign corporations face in doing business in the United States, nor of the rather delicate nature of relations between sovereign states," but that  "international business requires the accommodation of different legal climates." <u>Id.</u> at 1478-79.  The Ninth Circuit made clear that, "just as United States companies doing business in" a foreign country must expect to abide by that country's laws, when a foreign company "availed itself of business opportunities in this country, it undertook an obligation to comply with the lawful orders of United States courts."  <u>Id.</u> at 1479.

Like the <u>Richmark</u> court, this court does "not minimize the difficult situation in which" defendants have been placed due to their competing legal obligations, but the fact remains that, in this case, plaintiffs have not had a full opportunity to test and scrutinize evidence regarding which of defendants' clients were responsible, or the actions taken or motivations for the attacks at issue, thus distinguishing this case from more-typical punitive damages cases in which discovery is unfettered by <u>Richmark</u> considerations.

Importantly, even if the evidentiary record did establish which of defendants' client(s) were responsible for the attacks at issue, defendants would not be permitted to impute the law enforcement/military purposes <u>of those clients</u> to defendants themselves.[1]

---

[1] Because defendants argue that both the identity of their clients, as well as their clients' purposes, are relevant to the punitive damages analysis, the court discusses them both here, and notes that the discussion overlaps with the analysis of plaintiffs' second motion in limine.

**ER-37**

While it may be true that the clients' intent was "solely" investigatory, NSO is a for-profit company and thus does not have congruent intent with a government client.

Moreover, it would be inconsistent to allow defendants to argue that it has the exact same purpose as its clients while simultaneously arguing that defendants have nothing to do with the decision of who to target and no control over when and where Pegasus is used. Defendants cannot claim, on the one hand, that its intent is to help its clients fight terrorism and child exploitation, and on the other hand say that it has nothing to do with what its client does with the technology, other than advice and support. Additionally, there is no evidence as to the specific kinds of crimes or security threats that its clients actually investigate and none with respect to the attacks at issue.

There are also references in the record to uses of Pegasus that do not meet defendants' proffered description of how it is used (such as the cited media report regarding Dubai), and plaintiffs' evidence suggests that members of 'civil society' have been a target of Pegasus hacks. While defendants admit there are abuses and misuses and have a protocol for investigating them, they were unable to provide a coherent explanation for how they are able to detect misuses if they don't monitor the use of Pegasus or know when it is being used.

Finally, just as defendants seek to exclude evidence of their alleged conduct unrelated to this lawsuit in connection with their sixth motion in limine, the court believes that the principle must be consistently applied. Defendants argue that NSO's alleged conduct towards non-parties, such as the late Jamal Khashoggi, is "irrelevant to damages" as well as "inadmissible under Rule 403 because the risk of unfair prejudice and confusion of the issues would substantially outweigh even if there were any negligible probative value," as they "could serve only to inflame the passions of the jury and unfairly prejudice it." See Dkt. 596-3 at 21. The court finds this reasoning convincing, and concludes that it operates to bar not only allegations regarding NSO's conduct as to Jamal Khashoggi, but also NSO's conduct as to other parties unrelated to this suit. In addition, just as the court is not admitting plaintiffs' evidence and argument

regarding the alleged 'civil society' status of its hacked users, the proper balance under Federal Rule of Evidence 403 favors excluding such evidence/argument from both sides.

At the hearing, the court discussed the difficulty in line-drawing, allowing defendants to describe their business on one hand, without delving into the insufficiently-supported evidence regarding any law enforcement purposes. Plaintiffs' counsel offered a suggestion that defendants could say that they license their products to foreign governments, among others, without starting down the slippery slope of arguing that every target of Pegasus must be a criminal. While the court will still need to address objections to specific evidence as they arise, the court for now adopts plaintiffs' counsel's suggestion and will allow defendants to argue that they licensed Pegasus to governments and their agencies, but will not allow them to argue about those governments' purported motives related to crime, terrorism, child exploitation, or similar topics. Depending on the evidence, testimony, and argument presented, the court may also require that a jury instruction be given on this topic. Accordingly, with the above caveat, plaintiffs' first motion in limine is GRANTED.

B.     Plaintiffs' Motion in Limine No. 2

Plaintiffs' second motion in limine seeks to preclude defendants from offering "evidence, testimony, or argument that Pegasus is used, can be used, or is needed to investigate crime, including child sex exploitation and terrorism, including because of end-to-end encryption." See Dkt. 593 at 9.

The court resolves this motion in largely the same way that it resolved plaintiffs' first motion in limine. Discovery showing that the specific intrusions on plaintiffs' systems were the result of an investigation into criminal activity or terrorism is not in the evidentiary record, and thus, such testimony may not presented at trial. Plaintiffs' second motion in limine is GRANTED.

C.     Plaintiffs' Motion in Limine No. 3

Plaintiffs' third motion in limine seeks to preclude defendants from offering "evidence, testimony, or argument regarding its purported efforts to screen potential

customers and regulate its existing customers' use of its spyware." <u>See</u> Dkt. 593 at 11.

Again, the limited nature of the discovery in this case requires that this motion be granted. As discussed above, in connection with plaintiffs' first motion in limine, the evidentiary record is opaque as to which of defendants' clients were responsible for the attacks at issue, and thus plaintiffs were unable to discover evidence about whether screening procedures were followed with respect to those clients. Moreover, to the extent that the parties discuss facts regarding clients who were found to have misused Pegasus, those facts appear to have come from media reports, rather than from defendants.

Accordingly, in the absence of specific evidence of instances where screening procedures were not effective, the court concludes that it would be improper to allow generalized evidence of screening procedures that may or may not have relevance to the conduct alleged in this case. Accordingly, plaintiffs' third motion in limine is GRANTED.

D.     Plaintiffs' Motion in Limine No. 4

Plaintiffs' fourth motion in limine seeks to preclude defendants from presenting any "evidence, testimony, or argument suggesting it lacked control over its customers' use of Pegasus." <u>See</u> Dkt. 593 at 13.

The court views this issue as similar to the one presented by plaintiffs' third motion in limine. Because there is an absence of evidence as to which of defendants' client(s) were responsible for the attacks at issue, there is no way to establish defendants' relative level of control as to those specific client(s). In other words, as before, defendants attempt to rely on generalized evidence about their business practices, without any specific evidence tying those business practices to the facts of this case. Accordingly, plaintiffs' fourth motion in limine is GRANTED.

E.     Plaintiffs' Motion in Limine No. 5

Plaintiffs' fifth motion in limine seeks to preclude defendants from offering "evidence, testimony, or argument about the alleged insufficiency of Whatsapp's security measures, including that Whatsapp purportedly 'created' the vulnerability NSO exploited."

**ER-40**

See Dkt. 593 at 14.

In essence, to the extent defendants intend to offer such evidence, it would be an attempt to re-litigate the issue of causation that was already determined in the court's order granting summary judgment. Thus, plaintiffs' fifth motion in limine is GRANTED. Defendants of course remain able to argue that the costs incurred by plaintiffs were unreasonable, as they argue in their response to plaintiffs' motion.

F.    Plaintiffs' Motion in Limine No. 6

Plaintiffs' sixth motion in limine seeks to preclude "evidence, testimony, or argument about the alleged use of Whatsapp by terrorists, criminals, or other bad actors, including characterizing the Whatsapp users who were targeted in NSO's attacks as actual or suspected bad actors." See Dkt. 593 at 15.

The court resolves this motion in the same way that it resolved plaintiffs' first and second motions in limine. In the absence of evidence showing that the specific intrusions on plaintiffs' systems were the result of actual investigations into terrorist or criminal activity, any such arguments or testimony may not be presented at trial. Plaintiffs' sixth motion in limine is GRANTED.

G.    Plaintiffs' Motion in Limine No. 7

Plaintiffs' seventh motion in limine seeks to preclude "evidence, testimony, or argument about plaintiffs' reputation, including references to irrelevant disputes, legal allegations, and controversies involving plaintiffs or their officers." See Dkt. 593 at 18.

As discussed at the pretrial conference, as reputational damages are not at issue in this case, neither party will be permitted to introduce evidence, testimony, or argument regarding plaintiffs' reputation or any harm to it. Accordingly, plaintiffs' seventh motion in limine is GRANTED, and as will be discussed below, defendants' first motion in limine is granted for the same reason.

H.    Plaintiffs' Motion in Limine No. 8

Plaintiffs' eighth motion in limine seeks to preclude testimony from defendants' experts Shepard and Minkler "because the entirety of their opinions concern irrelevant

**ER-41**

policy matters, lack any evidentiary foundation, and are more prejudicial than probative." See Dkt. 593 at 19. Plaintiffs also seek to exclude much of the testimony of defendants' expert McGraw based on the same rationale.

Plaintiffs acknowledge that they seek the same relief here that they seek via their Daubert motions, and the court will address all expert testimony together, in section II of this order. Thus, plaintiffs' eighth motion in limine is DENIED as moot.

I.      Defendants' Motion in Limine No. 1

Defendants' first motion in limine seeks to exclude "evidence of purported injury to Whatsapp's reputation." See Dkt. 601 at 9.

As discussed above, in connection with plaintiffs' seventh motion in limine, defendants' first motion in limine is GRANTED.

J.      Defendants' Motion in Limine No. 2

Defendants' second motion in limine seeks to exclude "testimony of witnesses not disclosed during discovery period." See Dkt. 601 at 11.

Plaintiffs' response states that they do not intend to call any witnesses that were not identified on initial disclosures or made available for deposition, and thus, defendants' second motion in limine is GRANTED, and the court will not permit any undisclosed witnesses to testify.

K.      Defendants' Motion in Limine No. 3

Defendants' third motion in limine seeks to exclude "evidence of the identities and occupations of ~1,400 targets referenced in complaint." See Dkt. 601 at 13.

Plaintiffs' response argues that they do not intend to introduce such evidence as part of their case, but would want to respond if defendants were to put on evidence of Whatsapp's users being criminals or terrorists. As discussed above, defendants will not be permitted to introduce such evidence, and thus plaintiffs will not need to use evidence regarding the targets' identities in response. Accordingly, defendants' third motion in limine is GRANTED.

**ER-42**

L.      Defendants' Motion in Limine No. 4

Defendants' fourth motion in limine seeks to exclude the "argument that NSO 'used' Pegasus." See Dkt. 601 at 15.

The court attempted to gain additional clarity on the intended scope of this motion from the parties at the pretrial conference, with mixed results. In connection with summary judgment, the court has already determined that defendants are liable for the attacks at issue in this case and will not allow testimony that contradicts that determination. Thus, defendants' fourth motion in limine is DENIED as moot.

M.      Defendants' Motion in Limine No. 5

Defendants' fifth motion in limine seeks to exclude "testimony on topics about which plaintiffs refused to produce a Rule 30(b)(6) witness." See Dkt. 601 at 16. Specifically, defendants seek to exclude testimony on these topics: (1) defendants' actions constituting malice, oppression, or fraud, (2) plaintiffs' cooperation with law enforcement and efforts to address whether WhatsApp hampers efforts to stop crime, terrorism, and child exploitation imagery, and (3) damages theories other than the actions plaintiffs took and the time plaintiffs' employees spent responding to NSO's exploit in May 2019."

Starting with topic (2), in light of the court's ruling excluding defendants' evidence that Pegasus was used to combat crime, terrorism, and child exploitation, the court does not see how evidence of plaintiffs' cooperation would be relevant to any claim or defense in the action. Thus, as to (2), defendants' fifth motion in limine is DENIED as moot.

As to topic (1), plaintiffs are not required to designate a witness to lay out their legal theories of punitive damages. To the extent that plaintiffs attempt to show malice, oppression, or fraud using documents or witnesses that were not produced in discovery, those documents or witnesses will be excluded, but the court finds no basis for excluding all testimony on the topic as a whole, especially since the relevant inquiry looks to defendants' conduct, and thus the relevant discovery would seem to be in defendants' possession, not plaintiffs'. Thus, as to (1), defendants' fifth motion in limine is DENIED.

**ER-43**

As to topic (3), again, to the extent that plaintiffs attempt to establish damages using documents or witnesses that were not produced in discovery, those documents or witnesses will be excluded, but the court finds no basis for a broader exclusion based on the argument that plaintiffs did not designate a witness to outline their legal theories. Thus, as to (3), defendants' fifth motion in limine is DENIED.

N.    Defendants' Motion in Limine No. 6

Defendants' sixth motion in limine seeks to exclude "evidence about other lawsuits against NSO and the use of Pegasus being related to the death of Jamal Khashoggi." See Dkt. 601 at 20.

Plaintiffs do not oppose defendants' sixth motion in limine, and thus, it is GRANTED.

O.    Defendants' Motion in Limine No. 7

Defendants' seventh motion in limine seeks to exclude "evidence of Israeli national security proceedings and related information."  See Dkt. 601 at 22.

Plaintiffs' response states that they "do not intend to affirmatively offer" such evidence, but may do so to "impeach the credibility of NSO's witnesses and to rebut NSO's presentation of evidence."  See Dkt. 644-3 at 15.

The court does not see a scenario where plaintiffs would need to present such evidence, and thus GRANTS defendants' seventh motion in limine.

P.    Defendants' Motion in Limine No. 8

Defendants' eighth motion in limine seeks to exclude "evidence of 'Black Cube' and its purported 'intimidation.'"  See Dkt. 601 at 25.

Plaintiffs state that they do not intend to introduce evidence of Black Cube, and thus, defendants' eighth motion in limine is GRANTED.

Q.    Defendants' Motion in Limine No. 9

Defendants' ninth motion in limine seeks to exclude "evidence of the Entity List and President Biden's executive order."  See Dkt. 601 at 26.

Plaintiffs' response argues that they do not oppose the motion as long as

defendants are precluded from offering evidence about the purported benefit to law enforcement.  In light of the court's earlier rulings on defendants' evidence, the court sees no need for plaintiffs to introduce the evidence challenged here, and thus, defendants' ninth motion in limine is GRANTED.

R.      Defendants' Motion in Limine No. 10

Defendants' tenth motion in limine seeks to exclude "evidence of pretrial sanctions."  See Dkt. 601 at 28.

Plaintiffs argue that the jury needs to be instructed on pretrial sanctions to ensure that defendants do not benefit from their refusal to meaningfully participate in discovery.  However, given that the jury is considering only issues of damages – not liability – the court sees no need for the jury to be instructed on defendants' discovery conduct.  Instead, the appropriate remedy is exclusion of any unproduced evidence.  Accordingly, defendants' tenth motion in limine is GRANTED.


II.     EXPERT TESTIMONY

The parties have filed a total of nine motions related to expert testimony, seven of which are motions to exclude under Federal Rule of Evidence 702 and Daubert v. Merrell Dow, and two of which are motions to strike supplemental expert reports as untimely under Federal Rule of Civil Procedure 26.  The court will start with the Daubert motions.

Federal Rule of Evidence 702 permits experts qualified by "knowledge, experience, skill, expertise, training, or education" to testify "in the form of an opinion or otherwise" based on "scientific, technical, or other specialized knowledge" if that knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements are met.  See Fed. R. Evid. 702, Advisory Committee Notes.  Although there is a presumption of admissibility, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588 (1993), the trial court is obliged

**ER-45**

to act as a "gatekeeper" with regard to the admission of expert scientific testimony under Rule 702.  Id. at 597.

Daubert requires a two-part analysis.  First, the court must determine whether an expert's testimony reflects "scientific knowledge," whether the findings are "derived by the scientific method," and whether the work product is "good science"—in other words, whether the testimony is reliable and trustworthy.  Id. at 590 & n.9, 593.  Second, the court must determine whether the testimony is "relevant to the task at hand."  Id. at 597.

As a threshold matter, many of the Daubert motions relate to experts whose testimony is relevant only to liability issues, not to damages issues.  Specifically, the court refers to these motions: (1) plaintiffs' motion to exclude the testimony of Ty Shepard (Dkt. 505), who offers testimony on "the use of encrypted messaging applications by threat actors, the utility of tools like NSO's Pegasus for the United States and its allies to counter such threats, related military and intelligence practices, and the market for cybersurveillance tools" (see Dkt. 617 at 6); (2) plaintiffs' motion to exclude the testimony of Terrance McGraw (Dkt. 514), who offers testimony on the "lawful intercept" industry and the extent to which any harm suffered by plaintiffs was not caused by defendants; (3) plaintiffs' motion to exclude the testimony of Joshua Minkler (Dkt. 573), who opines that "tools such as Pegasus benefit law enforcement by filling a rapidly increasing gap in law enforcement's  ability to intercept the communications of criminals using end-to-end encrypted services such as WhatsApp" (see Dkt. 613 at 7); (4) defendants' motion to exclude the testimony of Anthony Vance (Dkt. 509), who offers technical testimony about the steps taken by defendants to access plaintiffs' servers and plaintiffs' steps to circumvent access, as well as policy-related testimony about end-to-end encryption; and (5) defendants' motion to exclude the testimony of David Youssef (Dkt. 512), who offers technical testimony on the capabilities of defendants' software and defendants' efforts to deliver malware to plaintiffs' users.

As discussed at length at the pretrial conference, the court finds that the testimony of defendants' non-damages experts (i.e., Shepard, McGraw, and Minkler) is overly

reliant on the type of generalized testimony regarding law enforcement, military, and intelligence purposes that are not sufficiently tethered to the conduct alleged in this case. Accordingly, plaintiffs' motions to exclude the testimony of Shepard, McGraw, and Minkler are GRANTED, as their testimony is not relevant to the issues to be considered at trial and thus not "relevant to the task at hand."

Regarding plaintiffs' experts, plaintiffs argue that Youssef and Vance's testimony is relevant to punitive damages.  However, as defendants argue, plaintiffs previously opposed a request for additional time for defendants to depose Youssef, arguing that it was "likely moot" in light of the summary judgment order resolving all liability issues. While plaintiffs maintained that they "cannot agree to forgo calling Youssef under any circumstances, including, for example, if NSO is permitted to call its technical expert," the court's order made clear that it "cannot envision a circumstance in which either party will be permitted to put on testimony from their technical experts," and denied defendants' request as moot.  See Dkt. 498 at 5, Dkt. 519 at 3.  Defendants argue that principles of judicial estoppel require that Youssef's testimony be excluded, as the court relied on plaintiffs' representation regarding the non-presentation of Youssef's testimony, his testimony will not be permitted at trial.  Accordingly, defendants' motion to exclude Youssef's testimony is GRANTED.

As to Vance, aside from rebutting testimony of defendants' experts, he offers testimony only as to the narrow issue of defendants' circumvention of plaintiffs' security measures, which is more appropriately presented by a fact witness.  Because defendants' policy-related experts will not be permitted to testify, Vance will not need to rebut their testimony, and thus, defendants' motion to exclude Vance's testimony is GRANTED.

That leaves two Daubert motions remaining:  (1) plaintiffs' motion to exclude the testimony of defendants' damages expert Gregory Pinsonneault (Dkt. 510), and (2) defendants' motion to exclude the testimony of plaintiffs' damages expert Dana Trexler (Dkt. 506).  Each party has also filed a motion to strike as untimely the supplemental

**ER-47**

damages report of the opposing party's expert.  See Dkt. 488, 491.

The court starts with defendants' motion to exclude the testimony of plaintiffs' damages expert Dana Trexler.  Defendants seek to exclude opinions (1) related to costs incurred by 14 employees who Trexler did not interview, (2) including stock grants as part of labor costs, and (3) related to disgorgement.

As to (3), plaintiffs have confirmed that they are no longer seeking damages based on disgorgement.  Thus, the court believes dispute (3) to be moot.  Plaintiffs' counsel stated that they still intend to "put into the record evidence regarding NSO's finances and the enormous revenues that they obtained from the product and the unlawful conduct," (see Dkt. 684 at 18), but it appears that the full disgorgement analysis no longer needs to be presented to the jury.

As to (1), there is no requirement that an expert personally interview all employees who incurred labor costs.  The Ninth Circuit has held that an expert's opinion can rely on "facts or data in the case that the expert has been made aware of or personally observed."  Stephens v. Union Pacific R.R. Co., 935 F.3d 852, 856 (9th Cir. 2019).  The Federal Rules of Evidence also expressly allow an expert to rely on hearsay if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  FRE 703.  Defendants of course remain free to cross-examine Trexler about her reliance on hearsay and any other aspects of her analysis that they see as lacking, but defendants have not presented any basis for entirely excluding this portion of her testimony.  Thus, defendants' motion is denied as to (1).

As to (2), similarly, defendants may certainly disagree with the inclusion of RSUs, but they have no basis for excluding the opinion entirely.  Trexler relied on a spreadsheet created by plaintiffs, and she reviewed the source documents upon which the spreadsheet was created.  Again, defendants may certainly cross-examine Trexler on the inclusion of RSUs in general, and to criticize their specific valuations, but exclusion is not the proper remedy.   Thus, defendants' motion is denied as to (2).

The court now turns to plaintiffs' motion to exclude certain opinions of defendants'

**ER-48**

damages expert Gregory Pinsonneault.

As an initial matter, plaintiffs challenge Pinsonneault's report to the extent he offers legal conclusions. Although plaintiffs' motion is not entirely clear in identifying the extent of Pinsonneault's purported legal opinions, the motion does identify at least one instance in which Pinsonneault offers an opinion about damages and causation.

The court takes this opportunity to make clear that neither party's expert will be permitted to offer legal conclusions, and plaintiffs' motion is granted on that limited basis.

Plaintiffs then challenge Pinsonneault's opinions based on lack of expertise, but the court disagrees, finding that the jury should resolve any disagreement between the experts. Also, to the extent that plaintiffs challenge Pinsonneault's calculations of defendants' profits, it is unclear whether that testimony still needs to be presented to the jury in light of plaintiffs' withdrawal of their disgorgement claim. Accordingly, to the extent that plaintiffs seek exclusion of Pinsonneault's non-legal opinions, their motion is denied.

As mentioned above, both parties have also filed a motion to strike as untimely the supplemental expert report of the opposing damages expert. See Dkt. 488, 491. Although the court recognizes that the disputes are distinguishable, the court will nevertheless allow both supplemental damages reports to be admitted and DENIES both motions to strike.

III.   VOIR DIRE

As discussed at the pretrial conference, the court will incorporate the parties' jointly-proposed questions into the voir dire which will be conducted primarily by the court. The parties will each be allotted up to 20 minutes for followup questions but will not be permitted to use their questions to argue the case.

IV.   JURY INSTRUCTIONS

At the pretrial conference, the court indicated it will accept the parties' jointly submitted jury instructions.

**ER-49**

Regarding the disputed instructions, the court addresses two preliminary issues first.  The court first concludes that there is no need for a separate instruction on willfulness in conjunction with the punitive damages instruction.  While the court agrees with defendants that the statute expressly permits a party to seek punitive damages only for "willful conduct", the court also agrees with plaintiffs that a finding of willfulness was necessarily implied by its summary judgment order.  Specifically, the order found defendants liable under both section (a)(2) and section (a)(4).  Section (a)(2) requires intent (whoever 'intentionally accesses a computer…'), and section (a)(4) requires knowledge and 'intent to defraud.'  Intentional and knowing conduct that was clearly committed without permission and not negligently or by accident is, in the court's view, sufficient to establish that the conduct was willful.  As the Supreme Court has observed, "willful" is a word of many meanings" and "its construction [is] often…influenced by its context."  Ratzlaf v. United States, 510 U.S. 135, 141 (1994).  Moreover, the court finds that defendants' proffered instruction would serve only to increase jury confusion to require a separate finding on 'willfulness' when it is not being asked to decide liability.

Regarding the parties' dispute over compensatory damages and the inclusion of investigatory costs, the court is persuaded by the reasoning of another court in this district in Meta Platforms, Inc. v. BrandTotal, Ltd., in which the court considered and rejected the view that the Van Buren line of cases should be "construed as abrogating a slew of previous district court decisions holding that investigative costs are recoverable under the CFAA" particularly given the way that modern unlawful intrusions are committed.  See 605 F.Supp.3d 1218, 1264 (N.D. Cal. 2022) ("The Court declines to construe Van Buren and hiQ as foreclosing a loss based on Facebook's investigative costs.").

The parties are directed to meet and confer, and to submit revised jointly proposed jury instructions in light of this order and the court's statements at the pretrial conference regarding issues such as nominal damages, by **April 21, 2025**.  A further written order will be issued if needed, and of course, there will be a formal charge conference before

**ER-50**

case specific jury instructions are finalized.

## V.    VERDICT FORM

Regarding the verdict form, the parties are directed to meet and confer and to submit a jointly proposed verdict form consistent with this order by **April 21, 2025**.

## VI.    DISCOVERY DESIGNATIONS

Both parties have submitted extensive lists of deposition excerpts and other discovery responses.  Given the rulings contained in this order, and the time limits that will be imposed on the presentation of evidence, the court expects a reduction in the volume of deposition excerpts and other discovery.  The parties are directed to revise their respective lists and to file them by **April 21, 2025**.  The court will require that from these lists each party identify the witnesses to be called the following day so that objections may be considered in advance of the trial day.

## VII.    MOTIONS TO SEAL DOCUMENTS AND TRIAL EVIDENCE

As discussed at the pretrial conference, the court DENIES any request to close the courtroom to the public.  And while it is disinclined to seal any exhibits that are used for trial, the court will address those exhibits as they arise during the course of trial.  And as stated at the pretrial conference, the parties are directed to meet and confer and to submit a filing, no later than **April 21, 2025**, which identifies any provisionally-sealed documents that either party intends to introduce as trial exhibits along with the location of the document in the record.

## VIII.    TRIAL SCHEDULE AND TIME LIMITS

The duration of the trial shall be 5 days commencing on Monday, **April 28, 2025**. The trial schedule will be Monday through Friday, from 8:30 a.m. to 1:30 p.m., with two 15-minute breaks each day, except for the first and last of trial which will run to 4:00 pm.

**ER-51**

Jury selection will occur on the first day, as will opening statements and as much of the

presentation of evidence as possible.  Each side will be allotted 9 hours to present its

case, not including closing arguments for which May 5, 2025, is available if needed.

IX.    <u>FINAL COMMENTS</u>

As discussed at the pretrial conference, the parties are directed to submit a brief

joint case description, a joint witness list, and a list of all participating attorneys for the

court's use during voir dire.  These documents must be filed by **April 24, 2025**.

**IT IS SO ORDERED.**

Dated:  April 15, 2025

_/s/ Phyllis J. Hamilton_
PHYLLIS J. HAMILTON
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

      Plaintiffs,

      v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

      Defendants.

Case No. 19-cv-07123-PJH

**ORDER RE MOTIONS FOR
SUMMARY JUDGMENT, MOTION
FOR SANCTIONS, AND DISCOVERY
LETTER BRIEFS**

Re: Dkt. 381, 383, 387, 397, 401, 406,
408, 409, 411

Plaintiffs' motion for summary judgment, defendants' motion for summary judgment/motion to dismiss, and plaintiffs' motion for sanctions came on for hearing on November 7, 2024. Plaintiffs appeared through their counsel, Antonio Perez-Marques, Craig Cagney, Micah Block, Greg Andres, Gina Cora, and Luca Marzorati. Defendants appeared through their counsel, Joseph Akrotirianakis, Matthew Dawson, and Matthew Noller. Having read the papers filed by the parties and carefully considered their arguments and relevant authority, and good cause appearing, the court hereby rules as follows.

**BACKGROUND**

On October 29, 2019, plaintiffs filed this lawsuit, alleging that defendants sent malware, using WhatsApp's system, to approximately 1,400 mobile phones and devices designed to infect those devices for the purpose of surveilling the users of those phones and devices. Dkt. 1, ¶ 1. The complaint alleges four causes of action: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; (2) violation of the California

**ER-53**

Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502; (3) breach of contract; and (4) trespass to chattels.

The court dismissed plaintiffs' fourth cause of action under Rule 12(b)(6), and no amended complaint was filed. See Dkt. 111. That leaves only the first three causes of action as operative claims in this case. The allegations underlying the complaint are set forth in detail in the court's previous order on defendants' motion to dismiss. See Dkt. 111. As relevant to this order, the parties' briefs further explain some technical details regarding the parties' respective technologies. To summarize, when users communicate via plaintiffs' software, plaintiffs use a "signaling server" to create an initial connection between two users, and then use a "relay server" to send the communication data between the parties.

Defendants' relevant software products, collectively referred to as "Pegasus," allow defendants' clients to use a modified version of the Whatsapp application – referred to as the "Whatsapp Installation Server," or "WIS. The WIS, among other things, allows defendants' clients to send "cipher" files with "installation vectors" that ultimately allow the clients to surveil target users. As mentioned above, plaintiffs allege that defendants' conduct was a violation of the CFAA, the CDAFA, and a breach of contract.

Plaintiffs now move for partial summary judgment seeking a finding of liability on all claims, leaving only the issue of damages for trial. Defendants move to dismiss or for summary judgment based on lack of personal jurisdiction and for partial summary judgment on the merits of the asserted claims. Plaintiffs also seek sanctions based on defendants' discovery conduct.

## DISCUSSION

A.   Legal standard

    1.   Motion for summary judgment

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may

2

**ER-54**

affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. "A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (citation omitted).

Courts recognize two ways for a moving defendant to show the absence of genuine dispute of material fact: (1) proffer evidence affirmatively negating any element of the challenged claim and (2) identify the absence of evidence necessary for plaintiff to substantiate such claim. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.")

"Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or by the depositions, answers to interrogatories, and admissions on file, come forth with specific facts to show that a genuine issue of material fact exists." Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam). "When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." Id.

The court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. See Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014); Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). However, when a non-moving party fails to produce evidence rebutting defendants' showing, then an order for summary adjudication is proper. Nissan Fire, 210 F.3d at 1103 ("If the nonmoving party

3

**ER-55**

United States District Court
Northern District of California

fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."

### 2. Motion for sanctions

Federal Rule of Civil Procedure 37(b)(2)(A) provides for sanctions for not obeying a discovery order, specifically providing that "if a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders," including "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims," or "rendering a default judgment against the disobedient party."

### B. Legal analysis

The court will first address the threshold jurisdictional issue raised by defendants' motion, and will then address the merits of the three claims asserted by plaintiffs.

### 1. Personal jurisdiction

Defendants' summary judgment motion and their opposition to plaintiffs' motion both argue that the court lacks personal jurisdiction. As an initial matter, defendants' opposition to the sanctions motion also contains a single sentence (without elaboration or citation) stating that five cases were filed against defendants, four of which have been dismissed, three of which were for lack of personal jurisdiction and/or forum non conveniens. At the hearing, the court asked defendants for clarification as to which cases they were referring. Defendants identified a case in this district that was voluntarily dismissed by Apple (case no. 21-9078), as well as three other cases:

- Corallo v. NSO, N.D. Cal. (Seeborg, J.), case no. 22-5229, dismissed on September 30, 2024 based on lack of personal jurisdiction and/or forum non conveniens, as plaintiff was a native of Italy and citizen of the Netherlands who resided in St Maarten in the Caribbean at the time of the alleged attacks. ("Corallo is a foreign citizen suing other foreign citizens for conduct initiated from foreign locations. The litigation does not belong in the courts of this state.")

- Dada v. NSO, N.D. Cal. (Donato, J.), case no. 22-7513, dismissed on March 8,

4

**ER-56**

2024 based on forum non conveniens, as plaintiffs were journalists for a newspaper based in El Salvador. ("The nub of this case is entirely foreign, and concerns the use of software produced in Israel to hack devices owned by a Salvadoran news service and used by journalists in El Salvador. Every incident described in the complaint involved Salvadoran journalists covering Salvadoran news stories while working primarily in El Salvador.")

- <u>Elatr Khashoggi v. NSO</u>, E.D. Va., case no. 23-0779, dismissed on October 26, 2023 based on lack of personal jurisdiction, as plaintiff was a citizen of Egypt and had not adequately alleged that she was in Virginia during the alleged attacks.

The key distinction in all of those cases appears to be the citizenship/residency of the plaintiffs. In this case, defendants do not dispute that plaintiffs are citizens of the United States and residents of this district, making the cited cases inapposite.

Turning to the merits of defendants' jurisdictional argument, as was laid out in the court's previous order at the pleadings stage, personal jurisdiction can be established through consent, or by either showing that defendants purposefully directed conduct at the forum state, or that they purposefully availed themselves of the state's laws. <u>See</u> Dkt. 111 at 15-32. The court's previous order concluded that plaintiffs had adequately alleged purposeful direction, <u>see</u> Dkt. 111 at 28, but defendants now argue that the allegations are not supported by the evidence.

As to purposeful direction, the court's previous order went through the relevant analysis, explaining that the test has three elements (1) defendants committed an intentional act, (2) expressly aimed at the forum state, and (3) caused harm that the defendant knew was likely to be suffered in the forum state. Dkt. 111 at 18 (citing <u>Calder v. Jones</u>, 465 U.S. 783, 789-90 (1984)).

The key arguments – both then and now – go to the second element, express aiming. Plaintiffs allege that defendants expressly aimed their conduct at plaintiffs' servers, a significant number of which are in California. Defendants now argue that, while the court was obligated to accept that allegation as true at the pleadings stage,

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

United States District Court
Northern District of California

discovery has shown that none of plaintiffs' signaling servers are in California and only some of their relay servers are in California, and more importantly, the choice of which server to use was made by plaintiffs, and thus defendants could not have engaged in any express aiming of servers.

Plaintiffs argue that, because defendants did not produce Pegasus code, there is no way of confirming exactly how the WIS chose which server to use. Defendants self-servingly claim that the WIS functioned in the same way as the official Whatsapp client, but there is no evidence to support that claim. Plaintiffs also argue that, even if the WIS did indeed function in the same way, that was still an intentional choice made by defendants. See Dkt. 418-3 at 15-16.

The limited evidentiary record before the court does show that defendants' Pegasus code was sent through plaintiffs' California-based servers 43 times during the relevant time period in May 2019. See, e.g., Dkt. 418-3 at 13. The evidence before the court is consistent with the court's earlier conclusion, at the pleading stage, that defendants "caused a digital transmission to enter California, which then effectuated a breaking and entering of a server in California." See Dkt. 111 at 23. Accordingly, the court finds that the evidentiary record supports the conclusion that defendants are subject to personal jurisdiction in this district.

Because plaintiffs' argument also implicates defendants' discovery conduct, the court will now address plaintiffs' motion for sanctions.

2.      Motion for sanctions

The crux of plaintiffs' sanctions motion is that defendants have failed to produce Pegasus source code in a manner that can be used in this litigation, failed to produce internal communications (i.e., email), and wrongfully imposed temporal limitations on their production/testimony. Plaintiffs ask for terminating sanctions, or in the alternative, evidentiary sanctions.

With regard to the Pegasus source code, plaintiffs point out the history of the court's orders regarding defendants' discovery obligations. In November 2023, the court

6

issued an order balancing (under Richmark) defendants' discovery obligations with its need to comply with Israeli government restrictions, and concluded that defendants would not be entirely excused from discovery, and instead would be required to produce information that was "sufficiently specific and important to the asserted claims in this case." Dkt. 233 at 9.

In February 2024, the court considered specific discovery disputes between the parties, one of which involved defendants' argument that they were required to produce only the "installation layer" of the source code, showing how Pegasus was installed on the target users' devices. The court rejected that argument, because "the complaint contains numerous instances alleging not only that spyware was installed on users' devices, but also that information was accessed and/or extracted from those devices." Dkt. 292 at 4 (emphasis added). Accordingly, the court held that defendants "must produce information concerning the full functionality of the relevant spyware." Id. The court went on to say:

> Defendants' proposal of producing information showing the functionality of only the installation layer of the relevant spyware would not allow plaintiffs to understand how the relevant spyware performs the functions of accessing and extracting data, and thus, the court directs defendants to provide information sufficient to show the full functionality of all relevant spyware. Under Richmark, that information is sufficiently important and specific such that compliance with discovery obligations may not be excused.

Id. at 4-5.

Then, a few months later, plaintiffs moved to compel production of one of defendants' computer servers containing Pegasus source code (referred to as the "AWS" (Amazon web services) server). Defendants claimed that production was not warranted, arguing that the court never technically used the word "granted" in its previous order with respect to the Pegasus code. Defendants argued that they were prepared to file a motion for reconsideration/clarification to pursue their argument that production of source code was not actually required. The court instead issued an order granting plaintiffs' motion to compel the AWS server and "clarify[ing] that the previous order's reference to

7

**ER-59**

'full functionality' was indeed intended to require NSO to produce Pegasus computer code." Dkt. 358 at 5-6. The court then further clarified:

> Accordingly, the court now clarifies that its previous order, dated February 23, 2024, should be read to encompass Pegasus computer code, as well as code that shows the full functionality of any other "relevant spyware." To the extent that information on the AWS server as of November 2020, and which has since been moved to a different server, reflects such computer code, the court orders production of that code under Richmark, as the information is sufficiently important and specific to require production despite the existence of foreign legal restrictions. To be clear, the court is not rebalancing the Richmark factors on this motion, it is simply reiterating the balance that was struck in the previous order. The information showing the full picture of how Pegasus functions – which squarely includes Pegasus computer code – is discoverable under Richmark despite the various restrictions that have been cited.

Id. at 6.

Plaintiffs now argue that defendants have produced Pegasus code in a manner that is unusable in this litigation, as it is viewable only by Israeli citizens while in Israel. And even that production is limited to Pegasus code that was on the one specific AWS server mentioned above, rather than the full set of Pegasus code that would show its full functionality. Plaintiffs cite cases from this district and C.D. Cal. holding that production of source code in a foreign country or "distant" or "relatively inaccessible" location was not compliant with the federal rules. See Dkt. 405 at 19-20 (citing Rambus v. Hynix, 2007 WL 9653194 (N.D. Cal. 2007); Satya v. Martin, 2019 WL 666722 (N.D. Cal. 2019); InTouch Techs. v. VGO, 2012 WL 7783405 (C.D. Cal. 2012)).

Beyond source code, plaintiffs also argue that defendants refused to produce internal communications, including communications about Whatsapp vulnerabilities and about NSO's interactions with the US company Westbridge. Plaintiffs also argue that defendants refused to produce key financial information and refused to answer certain deposition questions.

As mentioned above, plaintiffs ask for terminating sanctions, and alternatively ask for evidentiary sanctions on the following topics: (1) targeting of plaintiffs' California-based servers, (2) location of third-party servers, (3) relationship with Westbridge, (4) use

8

**ER-60**

of Pegasus by NSO's customers, as well as "additional issues to be determined."

Defendants' opposition makes a number of different arguments, including an argument that the court never ordered them to produce any Pegasus source code beyond what was on the AWS server.  See, e.g., Dkt. 429-2 at 8, 17-18.

Defendants also argue that production of the AWS server in Israel is fully compliant with discovery obligations, as plaintiffs could either use Israeli counsel to view the code, or they could seek an export license from the Israeli government to use the code in the US.

Overall, the court concludes that defendants have repeatedly failed to produce relevant discovery and failed to obey court orders regarding such discovery.  Most significant is the Pegasus source code, and defendants' position that their production obligations were limited to only the code on the AWS server is a position that the court cannot see as reasonable given the history and context of the case.  Moreover, defendants' limitation of its production such that it is viewable only by Israeli citizens present in Israel is simply impracticable for a lawsuit that is to be litigated in this district.

Accordingly, the court concludes that plaintiffs' motion for sanctions must be GRANTED.  And while the court concludes that terminating sanctions may be reasonably warranted given that defendants' discovery non-compliance goes to the key facts at issue in this case, the court prefers not to issue such a harsh sanction where lesser ones are available.  Thus, the court will impose evidentiary sanctions when appropriate, but will only address the issue of terminating sanctions if plaintiffs are unable to establish their claims in their absence.

The first topic of possible evidentiary sanctions, mentioned above, is defendants' alleged targeting of plaintiffs' California-based servers.  The court concludes that, because defendants did not produce Pegasus code in a way that was meaningfully accessible to plaintiffs or to the court, plaintiffs were unable to obtain detailed evidence of how the WIS chose which server(s) to use, and thus, an evidentiary sanction is warranted such that the court will conclude that the use of plaintiffs' California-based servers was a

purposeful choice made by defendants. Accordingly, the court reiterates its previous conclusion that the record supports a finding that defendants are subject to personal jurisdiction in this district.

>    3.    Merits of the asserted claims

As mentioned above, plaintiffs assert claims for violation of the CFAA, for violation of the CDAFA, and for breach of contract.

>        a.    CFAA

As to the CFAA, plaintiffs allege that defendants violated sections (a)(2) and (a)(4), and also conspired with their clients in violation of section (b). The relevant provisions are as follows:

> (a) Whoever—
>
>    …
>
>    (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—
>
>        (A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) [1] of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);
>
>        (B) information from any department or agency of the United States; or
>
>        (C) information from any protected computer;
>
>    …
>
>    (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.
>
>    …
>
> (b) Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030.

10

**ER-62**

Plaintiffs' motion also argues that defendants have violated section (a)(6), which prohibits trafficking in password-like information, but they acknowledge that they did not plead section (a)(6).  See Dkt. 399-2 at 30, n. 10.  Because any claim under section (a)(6) was not pled in the complaint, the court will not consider it now.

The first big dispute on the CFAA, briefly alluded to above, is that plaintiffs now seek to proceed under either a "without authorization" or "exceeds authorization" theory, even though the court's previous order limited them to the "exceeds authorization" theory. See Dkt. 111 at 35-39.  The court reasoned that, because all Whatsapp users are authorized to send messages, defendants did not act without authorization by sending their messages, even though the messages contained spyware.  Instead, the court held that the complaint's allegations supported only an "exceeds authorization" theory.

The nub of the fight here is semantic.  Essentially, the issue is whether sending the Pegasus installation vector actually did exceed authorized access.  Defendants argue that it passed through the Whatsapp servers just like any other message would, and that any information that was 'obtained' was obtained from the target users' devices (i.e., their cell phones), rather than from the Whatsapp servers themselves.  (Defendants also argue that any 'obtaining' was done by their government clients, rather than by defendants, but that's a separate argument – and in the court's view, fully addressed by section (b) which assigns liability to co-conspirators).

Defendants point to the statutory definitions set forth in § 1030(e)(6), specifically the definition of "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  Defendants argue that the definition shows that the alleged violator must "obtain or alter" information from the same computer that he "access[es]," as shown by the language "the computer."

For their part, plaintiffs point to section (a)(2) itself, which imposes liability on whoever "accesses a computer" in excess of authorized access, and "thereby obtains information from any protected computer," pointing to the word "any."

11

**ER-63**

United States District Court
Northern District of California

Neither party cites any case law, either controlling or even persuasive, with a definitive answer to this statutory interpretation question.  Plaintiffs, relying on section (a)(2)(C), argue that liability is present if defendants obtain information from any computer, i.e., either from Whatsapp servers or from the target users' devices directly.  Defendants, pointing to section (e)(6), argue that any information was obtained from the target users, not from Whatsapp's servers, and thus the CFAA does not apply.

However, the court need not resolve this statutory interpretation question in order to rule on the summary judgment motions.  As the parties clarified at the hearing, while the WIS does obtain information directly from the target users' devices, it also obtains information about the target users' device via the Whatsapp servers.  See Dkt. 464 at 44 ("before Pegasus is on the device, in the process of getting the Pegasus agent installed on the target device, there is a whole lot of signaling that goes on. . . . They had to fingerprint the device which used a pretty sophisticated set of messaging to get information back to the WIS via the Whatsapp servers about the precise operating system and memory structure of the [target] phone."); see also Dkt. 399-2 at 27 ("NSO also obtained information via the Whatsapp servers from the target device, such as the structure of its operating system and the location of crucial memory files, which a regular Whatsapp user using the Whatsapp client app cannot obtain.").

The analysis for section (a)(4) is largely the same, as it uses the same statutory definition found in section (e)(6).  Plaintiffs argue that the information's value is established by defendants' clients' willingness to pay for Pegasus.  Defendants challenge the mens rea showing for the 'intent to defraud' (as well as the 'intent' requirement of section (a)(2)), but the fact that defendants redesigned Pegasus to evade detection after plaintiffs first fixed the security breach is enough to prove intent.

Thus, the court GRANTS summary judgment in plaintiffs' favor on the CFAA claim under both section (a)(2) and (a)(4), on the theory that defendants exceeded their authorization.  Defendants appear to fully acknowledge that the WIS sent messages through Whatsapp servers that caused Pegasus to be installed on target users' devices,

12

**ER-64**

and that the WIS was then able to obtain protected information by having it sent from the target users, through the Whatapp servers, and back to the WIS.  Defendants' only arguments go to statutory interpretation (addressed above), and their delegation of Pegasus operation to their clients (addressed by § 1030(b)).  The court need not address plaintiffs' alternative argument, that defendants acted without authorization.

b.     CDAFA

The CDAFA is the state-law equivalent of the CFAA, with the additional requirement that a computer be unlawfully accessed in California.  See, e.g., Meta Platforms, Inc. v. BrandTotal Ltd., 605 F.Supp.3d 1218, 1260 (N.D. Cal. 2022).  In the court's view, plaintiffs' evidence regarding California relay servers is sufficient, even without more, and to the extent the statute requires an intent to target a California server, the outcome is the same as it was with respect to the jurisdictional analysis – because defendants' failure to produce Pegasus source code is at least one reason why there is no evidence of exactly how the WIS chose servers, an evidentiary sanction is appropriate to conclude that the WIS did indeed target California servers.  Thus, the court concludes that summary judgment must be GRANTED on the CDAFA claim for the same reasons as the CFAA claim.

c.     Breach of contract

The elements of a breach of contract claim are (1) the existence of a contract, (2) plaintiff's performance or excused non-performance, (3) defendant's breach, and (4) resulting damages.  See, e.g., EDC Techs. v. Seidel, 216 F.Supp.3d 1012, 1015 (N.D. Cal. 2016).

As mentioned above, the breach of contract claim is based on violation of the terms of service, specifically the provisions prohibiting users from "reverse engineering" or "decompiling" Whatsapp products, from sending "harmful code" through Whatsapp, and from collecting user information, from accessing or attempting to access Whatsapp without authorization, and from using Whatsapp for illegal purposes.

Defendants argue that no contract exists because there is no evidence that they

13

agreed to the terms of service.  However, defendants cannot meaningfully dispute that agreeing to the terms of service was necessary to create a Whatsapp account and to use Whatsapp, and moreover, defendants have refused to produce information about the phones that were used to create Whatsapp accounts on defendants' behalf.  See Dkt. 408.  Based on controlling Ninth Circuit case law regarding agreement to terms of service, the court concludes that a contract was indeed formed between plaintiffs and defendants.  See, e.g., Laatz v. Zazzle, Inc., 2024 WL 377970 at *7 (N.D. Cal. Jan. 9, 2024); Sellers v. JustAnswer LLC, 73 Cal.App.5th 444, 472 (2021).

Defendants do not dispute that plaintiffs performed their obligations under the contract.  That leaves the last two elements, breach and damages.

NSO offers only about two pages of opposition regarding breach.  First, they argue that plaintiffs cannot prove when they reverse-engineered or decompiled the Whatsapp program, and therefore it could have been done before any agreement to the terms of service.  But as plaintiffs point out, they offer no evidence as to when they did such reverse-engineering or decompiling.

Next, defendants argue that Pegasus was operated by their clients, and thus defendants did not collect any information.  Defendants further argue that terms such as 'illegal,' 'unauthorized,' and 'harmful' as used in the terms of service are vague and ambiguous.  Finally, defendants argue that plaintiffs waived those contractual provisions by failing to enforce them against any other users.  See Dkt. 419-2 at 15-17.

The court finds no merit in the arguments raised by defendants.  Defendants do not dispute that they must have reverse-engineered and/or decompiled the Whatsapp software in order to develop the WIS, but simply raise the possibility that they did so before agreeing to the terms of service.  However, as discussed above, defendants have withheld evidence regarding their agreement to the terms of service.  Moreover, common sense dictates that defendants must have first gained access to the Whatsapp software before reverse-engineering and/or decompiling it, and they offer no plausible explanation for how they could have gained access to the software without agreeing to the terms of

United States District Court
Northern District of California

14

service. Accordingly, the court concludes that plaintiffs have sufficiently established breach.

Finally, as to damages, defendants do not dispute that plaintiffs incurred costs investigating and remediating defendants' breaches, which are sufficient to establish the fourth and final element of a breach of contract claim. Accordingly, the court GRANTS summary judgment on plaintiffs' claim for breach of contract.

4.      Discovery letter briefs

For the reasons set forth above, the court concludes that summary judgment is warranted even without resolving the disputes raised by the parties' various discovery letter briefs. Thus, the discovery letter briefs (Dkt. 381, 383, 387, 408, 409, 411) are all DENIED as moot, as is the related motion for clarification (Dkt. 404).

5.      Motions to seal

At the hearing, the court stated to the parties that it would not seal the material in the parties' briefs, and directed the parties to file unredacted versions of the briefs on the public docket. See Dkt. 464 at 5-6, 94. The parties have since filed unredacted versions of the summary judgment briefs, and have filed briefs on the sanctions motion with limited redactions, with plaintiffs having filed a narrowed motion to seal based on defendants' confidentiality designations. See Dkt. 471.

In light of the court's decision not to seal the summary judgment briefs, the parties are now directed to meet and confer with the purpose of filing an omnibus motion to seal that would cover all material sought to be sealed in the exhibits and declarations in connection with the summary judgment motions. The parties shall have until **January 17, 2025** to file the omnibus sealing motion. Any opposition shall be filed by **January 24, 2025**.

The motion to seal the limited material in the briefing on the motion for sanctions (Dkt. 471) is GRANTED. For the exhibits and declarations filed in connection with the sanctions motion, the parties are similarly directed to meet and confer and to file an omnibus motion with the same briefing schedule as above.

15

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for partial summary judgment is GRANTED, defendants' motion for summary judgment is DENIED, and plaintiffs' motion for sanctions is GRANTED in part and DENIED in part.

Because this order resolves all issues regarding liability, a trial will proceed only on the issue of damages. The parties have already filed motions related to their experts – specifically, a motion to substitute and a motion to strike – the parties are directed to meet and confer to determine if any expert-related motions are mooted by this order, and to notify the court by **January 17, 2025** which, if any, expert-related motions need to be resolved by the court prior to the trial on damages.

**IT IS SO ORDERED.**

Dated:  December 20, 2024

_____/s/ *Phyllis J. Hamilton*_____
PHYLLIS J. HAMILTON
United States District Judge

**ER-68**