**No. 25-7380**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WHATSAPP LLC; META PLATFORMS, INC.,

*Plaintiffs-Appellees,*

v.

NSO GROUP TECHNOLOGIES LIMITED;

Q CYBER TECHNOLOGIES LIMITED,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Northern District of California, No. 4:19-cv-07123, Hon. Phyllis J. Hamilton

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

Greg D. Andres
Antonio J. Perez-Marques
Luca Marzorati
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

Micah G. Block
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, CA 94063
(650) 752-2000

*Attorneys for Plaintiffs-Appellees*

May 13, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs-Appellees Meta Platforms, Inc. and WhatsApp LLC state:

- Meta Platforms, Inc. is a publicly traded company and has no parent corporation; and to its knowledge no publicly held company owns 10% or more of its stock as of its most recent proxy statement; and

- WhatsApp LLC is a wholly owned subsidiary of Meta Platforms, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................iv

INTRODUCTION .......................................................................................... 1

ISSUES PRESENTED ................................................................................... 4

STATEMENT OF THE CASE ........................................................................ 5

   I.    WhatsApp's Platform and Terms of Service ............................... 5

   II.   NSO and Pegasus ...................................................................... 7

   III.  NSO's Exploitation of WhatsApp's Infrastructure ..................... 8

       A.    Reverse-Engineering and Development of the
            WhatsApp Installation Server .......................................... 8

       B.    Operation of the Exploit ................................................. 10

       C.    NSO's Knowledge of and Disregard for WhatsApp's
            Terms of Service ............................................................ 11

       D.    WhatsApp Stops the Attacks and NSO Responds ........... 12

   IV.  NSO Continues Its Conduct After This Lawsuit Was Filed ...... 14

   V.   Proceedings Below .................................................................. 16

       A.    Discovery and Sanctions .................................................. 16

       B.    Summary Judgment ......................................................... 17

       C.    Trial ................................................................................ 17

       D.    Post-Trial Proceedings .................................................... 18

SUMMARY OF THE ARGUMENT ............................................................ 19

ARGUMENT .............................................................................................. 22

   I.    Summary Judgment Was Proper .............................................. 22

       A.    Summary Judgment Was Proper on WhatsApp's
            CFAA and CDAFA Claims .............................................. 23

       B.    Summary Judgment Was Proper on WhatsApp's
            Contract Claim ............................................................... 43

   II.   The District Court Ordered a Carefully Tailored
       Permanent Injunction .............................................................. 49

A.    The District Court's Finding of Irreparable Harm Was Not Clearly Erroneous.................................................50

B.    The District Court Did Not Abuse Its Discretion in Balancing the Hardships...................................................59

C.    The District Court Did Not Abuse Its Discretion in Concluding that the Public Interest Favors Injunctive Relief..................................................................60

D.    The Scope of the Permanent Injunction Is Well Within the District Court's Discretion.............................63

III.  The Remitted Punitive Damages Award Properly Punished NSO for Its Conduct and Was Not Excessive............67

A.    The District Court Did Not Abuse Its Discretion in Excluding NSO's Client-Screening Evidence...................67

B.    The Remitted Award Satisfies Constitutional Requirements................................................................70

CONCLUSION ...................................................................................77

iii

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Adibzadeh v. Best Buy,*
2021 WL 4440313 (N.D. Cal. Mar. 1, 2021) ................................... 47

*AK Futures LLC v. Boyd St. Distro, LLC,*
35 F.4th 682 (9th Cir. 2022) ................................................. 53, 54, 66

*Berman v. Freedom Fin. Network, LLC,*
30 F.4th 849 (9th Cir. 2022) ....................................................... 45, 48

*BMW of N. Am. v. Gore,*
517 U.S. 559 (1996) ..................................................................... 67

*Chabolla v. Classpass Inc.,*
129 F.4th 1147 (9th Cir. 2025) ...................................................... 47

*Deerpoint Grp., Inc. v. Agrigenix, LLC,*
345 F. Supp. 3d 1207 (E.D. Cal. 2018) ........................................... 50

*Disney Enters., Inc. v. VidAngel, Inc.,*
869 F.3d 848 (9th Cir. 2017) ......................................................... 60

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006) ................................................................. 49–50

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) .............................................. 58, 59, 61

*Escriba v. Foster Poultry Farms, Inc.,*
743 F.3d 1236 (9th Cir. 2014) ....................................................... 73

*Facebook, Inc. v. Power Ventures, Inc.,*
252 F. Supp. 3d 765 (N.D. Cal. 2017) ..................................... *passim*

*Facebook, Inc. v. Power Ventures, Inc.,*
844 F.3d 1058 (9th Cir. 2016) ............................................... *passim*

*Fiber Sys. Int'l v. Roehrs*,
  470 F.3d 1150 (5th Cir. 2006) ........................................................ 56

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
  98 F.4th 1180 (9th Cir. 2024) ........................................................ 63

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
  771 F.3d 1119 (9th Cir. 2014) ........................................................ 23

*FTC v. Publ'g Clearing House, Inc.*,
  104 F.3d 1168 (9th Cir. 1997) ........................................................ 28

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ........................................................ 54

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ........................................................ 68

*Godun v. JustAnswer LLC*,
  135 F.4th 699 (9th Cir. 2025) ................................................ 47, 48

*In re Google Play Store Antitrust Litig.*,
  147 F.4th 917 (9th Cir. 2025) ........................................................ 50

*Hansen v. United States*,
  7 F.3d 137 (9th Cir. 1993) ........................................................ 31

*Hardeman v. Monsanto Co.*,
  997 F.3d 941 (9th Cir. 2021) ........................................... 71, 74, 76

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt.*,
  736 F.3d 1239 (9th Cir. 2013) ................................................ 49, 54

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) ................................................ *passim*

*Houtchens v. Google .LLC*,
  649 F. Supp. 3d 933 (N.D. Cal. 2023) ........................................... 47

*Keebaugh v. Warner Bros. Ent. Inc.*,
  100 F.4th 1005 (9th Cir. 2024) ........................................................ 43

v

*Laatz v. Zazzle, Inc.*,
  2024 WL 377970 (N.D. Cal. Jan. 9, 2024) .................................. 45, 47

*Lam v. City of San Jose*,
  869 F.3d 1077 (9th Cir. 2017) ........................................ 73

*Leisek v. Brightwood Corp.*,
  278 F.3d 895 (9th Cir. 2002) ......................................... 22

*McComb v. Jacksonville Paper Co.*,
  336 U.S. 187 (1949) ................................................. 67

*Meyer v. Portfolio Recovery Assocs., LLC*,
  707 F.3d 1036 (9th Cir. 2012) ........................................ 57

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................... 59

*Morning Star, LLC v. Canter*,
  2023 WL 5092764 (9th Cir. Aug. 9, 2023) ......................... 57

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  886 F.3d 803 (9th Cir. 2018) ..................................... 49, 55

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ....................................... 49

*Oracle USA, Inc. v. Rimini St., Inc.*,
  81 F.4th 843 (9th Cir. 2023) ......................................... 65

*Ramirez v. TransUnion LLC*,
  951 F.3d 1008 (9th Cir. 2020) .................................... 74, 76

*Richmark Corp. v. Timber Falling Consultants*,
  959 F.2d 1468 (9th Cir. 1992) ....................................... 16

*Riley v. Volkswagen Grp. of Am., Inc.*,
  51 F.4th 896 (9th Cir. 2022) ................................ 71, 74, 76

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ..................................................................... *passim*

*Stephens v. Union Pac. R.R. Co.*,
  935 F.3d 852 (9th Cir. 2019) ......................................................... 32

*Surrell v. Cal. Water Serv., Co.*,
  518 F.3d 1097 (9th Cir. 2008) ....................................................... 23

*Swift v. Zynga Game Network, Inc.*,
  805 F. Supp. 2d 904 (N.D. Cal. 2011) ........................................... 45

*Theofel v. Farey-Jones*,
  359 F.3d 1066 (9th Cir. 2004) ............................................ 35, 41, 42

*United States v. Cabrera*,
  83 F.4th 729 (9th Cir. 2023) .......................................................... 68

*United States v. Nosal*,
  844 F.3d 1024 (9th Cir. 2016) ............................................ 35, 38, 41

*United States v. Sullivan*,
  159 F.4th 579 (9th Cir. 2025) .................................................. 35, 36

*United States v. U.S. Gypsum Co.*,
  340 U.S. 76 (1950) ..................................................................... 64, 65

*Van Buren v. United States*,
  593 U.S. 374 (2021) ............................................... 25, 29, 33, 61

STATUTES & RULES

18 U.S.C. § 1030(a)(2)(C) ....................................................... 38, 39, 41

18 U.S.C. § 1030(a)(4) ................................................................. 38, 39

18 U.S.C. § 1030(e)(1) ........................................................................ 41

18 U.S.C. § 1030(e)(6) ........................................................................ 29

18 U.S.C. § 1030(e)(8) ........................................................................ 34

18 U.S.C. § 1030(e)(11) ...................................................................... 34

18 U.S.C. § 1030(f) ............................................................................. 62

18 U.S.C. § 1030(g) ............................................................... 34, 49

Cal. Civ. Code § 3422(3) ............................................................ 50

Cal. Penal Code § 502(e)(1) ....................................................... 49

OTHER AUTHORITIES

86 Fed. Reg. 60,759 (Nov. 4, 2021) ......................................... 63

## INTRODUCTION

Unable to break WhatsApp's end-to-end encryption, NSO built Pegasus—a spyware system designed to commandeer WhatsApp's servers and silently extract data from WhatsApp users. To install Pegasus on a target device, NSO reverse-engineered WhatsApp's application and server architecture and built a fake WhatsApp client— one that looked legitimate to WhatsApp's own servers but could generate messages containing malicious code that the real application never could. NSO used that fake WhatsApp client application to trick WhatsApp's servers into delivering these attack messages, causing thousands of targeted devices worldwide to install Pegasus— automatically, covertly, and without the knowledge or authorization of WhatsApp or its users.

When WhatsApp detected NSO's intrusions and deployed security updates to stop them, NSO engineered new attack methods to replace the ones WhatsApp had disabled. NSO cycled through at least three successive "installation vectors"—technical mechanisms that exploit software vulnerabilities to remotely deliver and install Pegasus on a target device—each engineered to circumvent WhatsApp's successive

security updates. NSO continued to deploy Pegasus over WhatsApp even after this lawsuit was filed. NSO's own senior executives, testifying as corporate representatives, admitted every one of these facts, and NSO's business records confirm them.

The district court correctly held, on a record built substantially from NSO's own admissions, that NSO violated the federal Computer Fraud and Abuse Act ("CFAA") and the California Comprehensive Computer Data Access and Fraud Act ("CDAFA") and breached WhatsApp's Terms of Service. A jury awarded compensatory and punitive damages, and the district court—after reducing the jury award by more than 97 percent—entered final judgment. The district court also entered a permanent injunction barring NSO from accessing WhatsApp's systems without authorization, collecting data from the platform, and engaging in the reverse-engineering and key extraction through which it developed and deployed its installation vectors in the first place. That relief, carefully tailored to the mechanisms of NSO's violations and the documented risk of their recurrence, is exactly what the statutes authorize and the equities demand.

NSO's own witnesses testified at trial that circumventing security measures is, in their words, "our business." NSO's CEO confirmed that the company continues to look for "vectors, or ways to access the phone," and has admitted that this research extends beyond WhatsApp to browsers, operating systems, and other applications. NSO urges reversal on the theory that governments need surveillance tools like Pegasus and that affirmance would imperil law enforcement operations around the world. That policy-based argument, however, is not a ground for reversal. It disregards the limited exception Congress carved out for U.S. law enforcement in the CFAA—an exception that does not apply to NSO and its exclusively foreign customers—and the constitutional guardrails that govern domestic surveillance. Nothing in the record, the governing statutes, or relevant case law supports NSO's position. The question before this Court is not whether surveillance technology can serve a legitimate purpose in the abstract. It is whether NSO violated federal and state law in developing and deploying this particular spyware system in this particular manner. Based on the undisputed evidence, the district court concluded that it did. That judgment should be affirmed.

## ISSUES PRESENTED

1. NSO reverse-engineered WhatsApp's application and server architecture, extracted authorization keys from real accounts, and built a fake WhatsApp client application capable of generating attack messages that no legitimate WhatsApp user using the official WhatsApp application could send. NSO used that system to obtain information from WhatsApp's servers and covertly install Pegasus on the devices of at least 1,400 WhatsApp users. When WhatsApp deployed security updates blocking NSO's installation vectors, NSO circumvented them. Did the district court correctly hold NSO liable under the CFAA and CDAFA?

2. NSO created at least fifty WhatsApp accounts, each time affirmatively selecting a button labeled "Agree and Continue" positioned immediately below a link to WhatsApp's Terms of Service—terms that NSO's internal documents show it reviewed and knew prohibited reverse-engineering. NSO nevertheless reverse-engineered WhatsApp's client application. Did the district court correctly hold NSO liable for breach of contract?

4

3.      NSO cycled through three successive installation vectors in response to WhatsApp's security updates—repeating the conduct described above even after this lawsuit was filed—and its own witnesses testified that circumventing platform security measures is "our business" and that NSO devotes tens of millions of dollars annually to developing new ways to access target devices.  Did the district court abuse its discretion in entering a permanent injunction?

4.      A jury found by clear and convincing evidence that NSO's conduct—repeated, covert intrusions carried out by dedicated teams at NSO whose explicit mandate was to evade detection, including after NSO learned it was being sued—constituted malice, oppression, or fraud, and awarded $167 million in punitive damages. The district court reduced that award by more than 97 percent to a 9:1 ratio.  Is the remitted award constitutionally sound?

## STATEMENT OF THE CASE

## I.      WhatsApp's Platform and Terms of Service

Plaintiff WhatsApp LLC, a wholly owned subsidiary of Plaintiff Meta Platforms, Inc., operates one of the world's largest end-to-end encrypted messaging platforms, serving billions of users worldwide.

3-ER-476. Both companies are headquartered in California. 3-ER-474. Users access WhatsApp through the official WhatsApp client application: software that communicates with WhatsApp's server infrastructure using authentication tokens generated during installation and registration. SER-144-47. WhatsApp designed its servers to accept only communications generated by that official client. SER-147-48.

To create a WhatsApp account, a user must accept WhatsApp's Terms of Service. SER-139-40. The account registration screen presents the Terms as a blue hyperlink immediately above a prominently labeled "Agree and Continue" button, and instructs users: "Read our Privacy Policy. Tap 'Agree and Continue' to accept the Terms of Service." SER-5. A user cannot proceed further in the application, including to create an account, without agreeing to the WhatsApp Terms. SER-3-4. The Terms prohibit reverse-engineering WhatsApp software, sending malicious code through WhatsApp services, accessing WhatsApp systems without authorization, and using WhatsApp to conduct unlawful activities. SER-154.

6

## II.    NSO and Pegasus

Defendant NSO Group Technologies Limited and its parent company Defendant Q Cyber Technologies Limited are Israeli surveillance technology companies.  3-ER-474-75.  NSO's principal product, Pegasus, is a spyware system that includes, among other components, a software "agent" that NSO implants on a target device to extract data, and "installation vectors"—technical mechanisms that NSO designs to remotely deliver and install the Pegasus agent.  2-ER-120-21.[1]  Once installed, the Pegasus agent can covertly access and exfiltrate messages, contacts, and files; track device location; activate microphones and cameras; and monitor communications, effectively giving operators complete control over a target device.  *Id.*

NSO claims that it licenses Pegasus exclusively to government customers, but has never disclosed its list of customers.  1-ER-36-37.  NSO provides its customers with ongoing technical support for Pegasus deployments, and maintains dedicated infrastructure for its operations.  SER-40-41.  NSO also had an "OpSec" team focused on "minimiz[ing]

---

[1]    The installation vectors at issue here are "zero-click" vectors, meaning the Pegasus agent installs on a target device without any action by the user.  SER-93.

7

the risk of detection" by platforms like WhatsApp, and a "White Services" team to procure anonymized infrastructure—including creating anonymous WhatsApp accounts and procuring hard-to-trace servers—for its customers. SER-40-41, 74-76.

NSO engineered Pegasus to be "undetectable" not only to the targets of surveillance but also to WhatsApp and other intermediaries, because NSO understood that platforms like WhatsApp would move to block its installation vectors the moment they detected them. SER-76. NSO's internal assessment ranked the WhatsApp installation vector as "the most important asset we want to protect," ranking it above even the identities of NSO's customers. 2-ER-122. The same document categorized WhatsApp itself as one of three "Threat Actors" against which the exploit had to be defended. SER-20-21. NSO actively catalogued WhatsApp's anti-spam policies, watchlists, and detection. SER-21-23.

## III.   NSO's Exploitation of WhatsApp's Infrastructure

### A.   Reverse-Engineering and Development of the WhatsApp Installation Server

To develop Pegasus installation vectors targeting WhatsApp, NSO decompiled and reverse-engineered WhatsApp's client application code.

SER-11-12, 72. NSO analyzed WhatsApp's internal protocols and messaging architecture, and identified the security measures built into the official WhatsApp client application and WhatsApp's servers. SER-23-24. Through that reverse-engineering, NSO developed its own modified fake WhatsApp client application, which NSO called the "WhatsApp Installation Server" or "WIS." 2-ER-122-23.

NSO designed the WIS to impersonate the official WhatsApp client—extracting authorization keys from WhatsApp accounts created on the official WhatsApp client by NSO's White Services team and embedding the addresses of WhatsApp's servers directly into its attack software to do so. SER-13, 25-26. By impersonating WhatsApp's official client application, the WIS was able to access WhatsApp servers, while generating and transmitting messages that no legitimate user using the official WhatsApp client could send—including the attack messages containing concealed code that triggered the Pegasus agent installation. SER-16-19, 73-74. NSO's head of R&D, who served as NSO's corporate representative in this litigation, confirmed that "every transmission" had "to be transmitted through WhatsApp servers," that NSO developed its own servers designed to replicate WhatsApp

9

signaling server functionality, and that the installation vectors were engineered to "[c]ommunicate through that WhatsApp signaling server." SER-16, 31-32. He also testified that NSO's own fake WhatsApp client—not the official WhatsApp client application— transmitted the attack messages. SER-16-17. In violation of the district court's orders, NSO never produced the Pegasus code itself. 1-ER-61.

### B. Operation of the Exploit

Once an NSO customer entered a target phone number into the Pegasus interface, NSO designed its system to instruct the WIS to initiate installation of the Pegasus agent on the target device. 2-ER-138. According to NSO, the entire process—executing the intrusion, installing the agent, and extracting data—was "a matter for NSO and the system to take care of, not a matter for customers to operate." SER-45. The customer's only role was to identify the target, by specifying a phone number. 2-ER-138. Once installed, the Pegasus agent extracted information from the target device and transmitted it back through NSO's infrastructure to NSO's customers. 2-ER-119.

Using Pegasus, NSO retrieved information directly from WhatsApp's servers, including—as NSO itself admitted—information that "a regular WhatsApp user using the WhatsApp client app cannot obtain." SER-35-36. This included information about the structure of a target device's operating system and the location of memory files, as well as confirmation of whether a phone number had an active WhatsApp account. SER-33-34. NSO admitted that it installed Pegasus on "between hundreds and tens of thousands" of target devices it did not own or control. 2-ER-118-19. NSO admitted that Pegasus was responsible for the attack described in the Complaint. SER-45.

## C. NSO's Knowledge of and Disregard for WhatsApp's Terms of Service

NSO also created at least fifty WhatsApp accounts on NSO-owned devices around April 2018 to test its installation vectors. SER-8-10, 24. Each WhatsApp account that NSO created required NSO to click "Agree and Continue" on the WhatsApp account registration screen. SER-3-5. NSO's internal documents reflect that NSO analyzed WhatsApp's Terms of Service, identified the restrictions they imposed, and specifically noted the prohibition on reverse-engineering. SER-23. NSO's head of R&D nonetheless admitted that he made no effort to

comply with those Terms when developing the installation vectors. SER-23-24.

### D.     WhatsApp Stops the Attacks and NSO Responds

In September and December 2018, WhatsApp deployed security updates to harden its servers against unauthorized access.  SER-28. Even though WhatsApp had not yet discovered NSO's secret attacks, the security updates disabled NSO's active installation vector—which NSO referred to internally as "Heaven."  As a result, "NSO customers couldn't use the 0-click Android installation vectors anymore."  SER-29. Instead, after the December 2018 update, WhatsApp's servers returned "403" error codes—the standard signal that access is forbidden—when NSO sent attack messages using the WIS.  NSO received those error codes and circulated them internally.  SER-49-51.  Yet NSO did not stop its conduct *vis-à-vis* WhatsApp.  Within six weeks of WhatsApp permanently disabling NSO's "Heaven" installation vector on December 5, 2018, NSO deployed a replacement vector called "Eden."  SER-28-29.

In early May 2019, WhatsApp discovered NSO's unauthorized activity on its servers in the course of routine server maintenance work. SER-98-99, 114-136.  A WhatsApp engineer auditing server traffic

12

noticed something unusual: incoming messages whose underlying code did not match the format WhatsApp's own software was designed to generate, and contained what the team recognized as malicious attack code. SER-99-103. NSO hid this malicious attack code in a part of the message that WhatsApp's own application never used—the digital equivalent of finding a forged entry in a field on a form that legitimate users cannot even see, let alone modify. SER-103-05. WhatsApp initiated a dedicated security investigation and began logging these attack messages. SER-105. Across just four days in May 2019, that logging captured 1,568 instances of NSO's malicious code traversing WhatsApp's servers—nearly 400 attempted installations per day. SER-105-07. Because WhatsApp began logging only after it identified the attack messages, the full volume of prior intrusions remains unknown. SER-108.

WhatsApp traced the attacks to NSO's infrastructure, and attributed the activity to NSO. SER-90-91. On May 10, WhatsApp deployed a security update that stopped NSO's "Eden" installation vector from functioning without alerting NSO that it had been detected. SER-27, 30, 149-50. On May 13, WhatsApp issued updated versions of

13

its Android and iOS client applications and a further server patch that blocked the attack messages entirely. SER-92-94, 112-13.

Again, NSO did not stop. NSO responded by developing "Erised"—a third installation vector that built on "Eden" and, like its predecessors, used WhatsApp's servers to transmit attack messages that triggered the installation of the Pegasus agent on target devices. 2-ER-124-25. NSO acknowledged internally that the company's greatest strength has always been its ability to "survive" the "cat and mouse game" by creating new vectors once one was identified and blocked. 2-ER-124.

## IV. NSO Continues Its Conduct After This Lawsuit Was Filed

WhatsApp filed this action on October 29, 2019. 3-ER-473. In moving to dismiss WhatsApp's request for injunctive relief on June 24, 2020, NSO represented to the district court that after May 13, 2019, there had been "Nothing"—meaning no further attacks on WhatsApp's servers. SER-156. By that date, however, NSO was actively deploying "Erised," its third zero-click exploit transmitting attack messages through WhatsApp's servers. 2-ER-125-26. "Erised" remained in use

14

through at least May 2020, the date past which NSO refused to answer questions during depositions. *Id*.

NSO has admitted that it "constantly work[s]" on "possible ways" and "rapid solutions" to circumvent any technical restriction it encounters—including WhatsApp's security updates. 2-ER-125. In August 2024, NSO's CEO testified that NSO has "installation vectors for Pegasus today." 2-ER-134. The next month, NSO's head of R&D confirmed that Pegasus remained capable of obtaining "unlimited access to targets' mobile devices," covertly activating microphones and cameras, and tracking a target's relationships, locations, calls, and activities. 2-ER-120-22. When asked whether NSO continued to invest in finding new zero-click installation vectors, he answered without qualification: "this is our business." 2-ER-124-25. As of May 2025, NSO employed over 140 people in research and development. SER-70-71. It spent $52 million in 2023 and $59 million in 2024 on research-and-development, including ways to "find vectors, or ways to access the phone." SER-66, 85-87. In a declaration later that year, NSO's CEO admitted that the company continued to engage in the "remote

15

collection of information from mobile devices" but refused to disclose how. 2-ER-209.

## V. Proceedings Below

### A. Discovery and Sanctions

During discovery, NSO refused to produce Pegasus source code and other technical materials showing the full functionality of the installation vectors and agent. 1-ER-61. NSO also refused to answer deposition questions about whether it was actively developing WhatsApp-based installation vectors at the time of testimony. 2-ER-125-26. NSO sought to shield these materials by citing Israeli law restrictions, but the district court, applying the Ninth Circuit's decision in *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992), rejected those arguments and ordered production. 1-ER-58-61. NSO did not comply.

On December 20, 2024, the district court granted WhatsApp's motion for evidentiary sanctions, finding that NSO had "repeatedly failed to produce relevant discovery," the "[m]ost significant" of which was its refusal to produce Pegasus source code. 1-ER-61.

16

## B.    Summary Judgment

On December 20, 2024, the district court granted summary judgment on WhatsApp's CFAA, CDAFA, and breach of contract claims. 1-ER-68.  The court found that NSO violated the CFAA and CDAFA by sending attack messages through WhatsApp's servers that caused Pegasus to be installed on target users' devices and enabled the WIS to obtain protected information.  1-ER-64-65.  The court next found that NSO acted with an intent to defraud because it "redesigned Pegasus to evade detection after plaintiffs first fixed the security breach."  1-ER-64. The court also found that NSO breached WhatsApp's Terms of Service by reverse-engineering and decompiling WhatsApp code, and rejected NSO's affirmative defenses and efforts to shift liability to its customers. 1-ER-65-67.

## C.    Trial

On April 28, 2025, the case proceeded to a six-day damages trial. The jury unanimously awarded WhatsApp $444,719 in compensatory damages—the full amount WhatsApp sought—and $167,254,000 in punitive damages after finding by clear and convincing evidence that NSO acted with malice, oppression, or fraud in violating the CDAFA.  2-ER-304-05.

17

### D.    Post-Trial Proceedings

The district court denied NSO's motion for a new trial and reduced the jury's punitive damages award by more than 97 percent to $4,002,471—a 9:1 ratio relative to compensatory damages.  1-ER-26-31. The district court determined that a 9:1 ratio was appropriate based on its findings that NSO's intrusions were "repeated, deliberate, and covert" and that NSO "specifically designed around plaintiffs' attempted fixes."  1-ER-31.  The district court also entered a permanent injunction barring NSO from accessing WhatsApp's systems without authorization, collecting data from the platform, creating WhatsApp accounts, and engaging in the reverse-engineering and authorization key extraction through which it developed and deployed its installation vectors.  1-ER-11-26.  The court found that NSO's conduct caused ongoing irreparable harm, that monetary damages were inadequate, and that the public interest favored injunctive relief, noting that there is "no evidence that Pegasus has been used for law enforcement purposes within the United States" and that NSO remains on the U.S. Department of Commerce's Entity List because it "act[ed] contrary to

18

the foreign policy and national security interests of the United States."
1-ER-21-22.

## SUMMARY OF THE ARGUMENT

The district court correctly held NSO liable, entered a permanent injunction, and upheld a punitive damages award calibrated to the deliberate and systematic nature of NSO's conduct. Each of those rulings should be affirmed.

*First*, summary judgment on the CFAA and CDAFA claims was proper. NSO's appeal rests on two arguments, neither of which finds support in the record. NSO first portrays itself as a passive technology licensor whose government customers bear sole responsibility for any unauthorized access. NSO's own testimony refutes that: NSO designed and operated the system that executed every intrusion, and its customers did nothing more than enter a target's phone number. NSO next argues that, even if it accessed WhatsApp's servers, it did not exceed any authorization because the attack messages traveled the same path as legitimate WhatsApp messages. That argument confuses the route with the gate. NSO reverse-engineered WhatsApp's client, extracted authorization keys, and built a fake client application capable

19

of generating attack messages the official client could not send—precisely the kind of technological circumvention this Court's precedents recognize as violating the CFAA. The "obtaining information" element is satisfied on NSO's own concession that it obtained data from WhatsApp's servers during the development and operation of the installation vectors.

Summary judgment on the breach of contract claim was likewise proper. NSO created at least fifty WhatsApp accounts through an account registration flow that presented the Terms of Service immediately above a prominently labeled "Agree and Continue" button—an interface this Court's precedents consistently uphold. Moreover, NSO's internal documents confirmed the company had actual notice of the WhatsApp Terms of Service. NSO's internal documents showed that NSO analyzed the Terms, found that they prohibited reverse-engineering, and proceeded to reverse-engineer anyway. A sophisticated commercial actor that studied and deliberately violated the Terms cannot hide behind a doctrine designed to protect ordinary consumers.

20

*Second*, the permanent injunction should be affirmed.  The district court's irreparable harm finding rests on a documented pattern: NSO engineered new installation vectors each time WhatsApp disrupted an existing NSO installation vector, continued developing installation vectors after this litigation began, and admitted through its own witnesses that circumventing security measures was "our business."  The balance of hardships favors WhatsApp because equity does not protect an interest in continuing unlawful conduct, and the public interest favors enforcement of anti-computer-hacking laws against a defendant whose conduct the U.S. Department of Commerce has deemed contrary to national security.  The injunction's scope is well within the district court's discretion: it targets the mechanisms NSO used to conduct the intrusions—including accessing WhatsApp's systems, collecting WhatsApp messages and user data, and reverse-engineering the WhatsApp client—as well as the steps that enabled them.  The record warranted broad relief given NSO's demonstrated pattern of designing around whatever restriction it most recently encountered.

***Third,*** the remitted punitive damages award of $4,002,471—a 9:1 ratio reached after the district court reduced the jury's verdict by more than 97 percent—is constitutionally sound. NSO's conduct falls squarely within *Riley*'s "more egregious" category: the intrusions were repeated, deliberate, and covert by design; NSO maintained a dedicated team to minimize the risk of detection; and NSO specifically engineered new attacks in direct response to WhatsApp's security measures, including after learning it had been sued. The district court also acted within its discretion in excluding NSO's generalized client-screening evidence, which had no demonstrated connection to the specific attacks at issue and could not negate malice that NSO's own witnesses established. The judgment below should be affirmed in full.

## ARGUMENT

### I.  Summary Judgment Was Proper

Summary judgment must be affirmed where there is no genuine dispute of material fact and where the district court correctly applied the substantive law. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). "A fact is material only if it might affect the outcome of the case, and a dispute is genuine only if a reasonable trier of fact could

22

resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).[2] "Conclusory statements without factual support are insufficient to defeat a motion for summary judgment." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008). The Court reviews the district court's grant of summary judgment de novo, and may affirm the judgment on any ground supported by the record and presented to the district court. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1064 (9th Cir. 2016).

### A. Summary Judgment Was Proper on WhatsApp's CFAA and CDAFA Claims

The district court correctly held that no genuine dispute of material fact existed as to NSO's liability under the CFAA and the CDAFA.[3] On each of the three elements at issue—access, exceeding authorized access, and obtaining protected information—the undisputed

---

[2] All internal quotation marks, citations, alterations, and emphasis are omitted unless otherwise noted.

[3] The CDAFA and CFAA are coextensive for purposes of this appeal. California courts interpret the CDAFA in harmony with the CFAA, and NSO raises no argument under the CDAFA that is distinct from its CFAA arguments. This brief therefore addresses the two statutes together except where otherwise noted.

record establishes NSO's liability. NSO admitted that it designed Pegasus to exploit WhatsApp's infrastructure, extracted and used authorization keys to bypass WhatsApp's access controls, operated the systems that delivered the Pegasus agent to a target device and delivered data back to a customer, and continued developing and deploying new installation vectors even after this lawsuit was filed. In its appeal, NSO portrays itself as a passive technology licensor whose government customers bear sole responsibility for any statutory violations. As explained below, NSO's own testimony and business records contradict that characterization at every turn, and the district court properly rejected it. To the extent the record lacks some technical details, that gap is the product of NSO's own failure—in defiance of the district court's orders—to produce Pegasus source code, for which the district court imposed evidentiary sanctions. NSO cannot benefit on appeal from evidentiary gaps of its own creation.

### 1. NSO Intentionally Accessed WhatsApp Servers and Target Devices

NSO does not dispute that Pegasus transmitted unauthorized attack messages through WhatsApp's servers to install spyware on target devices. NSO argues instead that those interactions should be

24

attributed to its customers rather than to NSO itself. That argument fails. Under the CFAA, "access" refers to entering a computer system or a particular part of that system. *Van Buren v. United States*, 593 U.S. 374, 388 (2021). This Court has held that when a company builds and runs a system that carries out intrusions, that company—not its users—bears responsibility for the access. *Power Ventures*, 844 F.3d at 1067. The undisputed record shows that to use Pegasus, NSO's customers only entered the phone number of a target device; NSO and the system it designed and controlled did the rest.

***WhatsApp servers.*** There is no dispute that NSO accessed WhatsApp servers—NSO admits it, including in its brief. For example, NSO acknowledges that Pegasus "used WhatsApp's relay servers," Br. at 28, and was sent "through WhatsApp relay servers," Br. at 29. Those admissions resolve this element. The record below confirms what NSO has admitted: NSO engineered the Pegasus installation vectors specifically to interact with WhatsApp server infrastructure, hard-coded WhatsApp server names into its attack messages, and wrote code designed to speak WhatsApp's own internal language. SER-31-32. NSO did all this so that its spyware would communicate with

25

WhatsApp servers because, as NSO's head of R&D testified, the attack messages had "to be transmitted through WhatsApp servers." SER-16.

*Target devices.* The undisputed record, including NSO's own admissions, shows that NSO's Pegasus installation vectors directly interacted with the target devices. There is therefore no genuine dispute that NSO accessed the target devices themselves—including the WhatsApp client application that resides on them. In addition to this access during operational attacks, NSO admits that it accessed target devices—without any customer involvement—while developing and testing Pegasus. Br. at 34 n.1. NSO's own admission confirms that Pegasus operated by directly interacting with target devices. Thus, NSO's footnote suggesting that its R&D and demonstration access involved only its own devices, Br. at 34 n.1, does not help it. NSO does not contend (nor could it) that the operational attacks—including the 1,400 WhatsApp attacks specified in the complaint—were limited to NSO-owned devices. NSO's admission that it accesses target devices via Pegasus applies to the operational attacks as well as the development efforts.

For the operational use of Pegasus, NSO seeks to hide behind its customers. *Power Ventures* forecloses that argument. There, Power's users clicked a button that caused Power's system to generate automated messages through Facebook's infrastructure. This Court treated those interactions as Power's access, not the users', because Power designed and operated the system that carried out the interaction. 844 F.3d at 1064-67. The same principle applies here. Once a customer entered a target phone number into the Pegasus interface, NSO's system—which NSO designed and controlled— automatically executed the intrusion, instructing the WIS to deliver the attack messages, installing the Pegasus agent, and extracting data back through infrastructure that NSO controlled. 2-ER-119, 138. NSO supplied the WhatsApp accounts, leased the servers used in the attacks, and provided ongoing technical support; the entire process was "a matter for NSO and the system to take care of, not a matter for customers to operate." SER-45. NSO's contrary assertion—that its customers "deploy Pegasus" and "make all decisions relative to target devices," Br. at 33; 2-ER-105-06, 139—does not create a genuine dispute of material fact. At most, the cited evidence shows that customers

27

selected surveillance targets; it does not show that customers performed the technical exploitation of those devices. Unsupported assertions cannot defeat summary judgment. *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

NSO's "locksmith" analogy, Br. at 33-34, is inapt. NSO engineered the exploit, supplied the WhatsApp accounts, leased and operated the delivery servers, and extracted the data from the target device—all automatically, once a customer entered a target number. If anything, the better analogy is to a thief for hire who locates the bank, identifies its vault and security systems, picks the lock, cleans out the contents, and delivers the proceeds—the customer need only name a target. By contrast, a locksmith opens a lock for a customer who claims the right to open it. NSO had no such defense. It knew WhatsApp had not authorized access to its servers and that the targeted users had not authorized access to their devices.

### 2. NSO Exceeded Its Authorized Access

Under the CFAA, a person "exceeds authorized access" when he "access[es] a computer with authorization and . . . use[s] such access to obtain or alter information in the computer that the accesser is not

entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). The Supreme Court has explained that this provision targets circumvention of technological limits—the "gates-up-or-down" inquiry the Supreme Court described in *Van Buren*. 593 U.S. at 378-80, 390. This Court has held that a violation occurs when a person "circumvents a computer's generally applicable rules regarding access permissions, such as username and password requirements." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022).

The authorization NSO possessed was the authorization any WhatsApp user receives upon accepting the Terms of Service and receiving an authorization credential: the right to use the WhatsApp platform through the official WhatsApp client application. That authorization is defined by WhatsApp's technical architecture. WhatsApp's servers are engineered to accept only communications generated by the official client, authenticated through credentials issued during registration. SER-147-48. NSO's authorization was therefore coextensive with what an ordinary user, operating the official client, could do. The district court so held at the pleading stage, 3-ER-459-460, and NSO does not challenge that ruling here.

29

NSO exceeded its authorized access in two independent ways, either of which is sufficient to affirm. First, NSO's authorization did not permit the conduct at issue, which included impersonating the official WhatsApp client, extracting authorization keys from the official WhatsApp client, and generating attack messages no legitimate user could send. Second, any authorization NSO initially possessed was explicitly revoked when WhatsApp deployed security updates blocking Pegasus installation vectors, after which NSO responded by engineering new vectors to circumvent those updates despite the revocation— precisely the "technological gamesmanship" that *Power Ventures* holds cannot excuse liability under the CFAA. 844 F.3d at 1067.

***Circumventing technical barriers.*** WhatsApp restricts access to its servers through a client-authentication system: the system requires clients to register using authentication keys it issues only to the official WhatsApp client, which by design can generate messages only in approved formats. SER-147-48. That two-part restriction—keys issued only to the official client, and a client engineered to produce only approved messages—is the relevant technical gate. NSO bypassed it.

30

To do so, NSO reverse-engineered the WhatsApp application, extracted authorization keys from the official WhatsApp client for real WhatsApp accounts that NSO created, and built its own modified client application (the WIS) capable of generating attack messages that the official WhatsApp client could not send.  SER-13-21.  These attack messages were sent to WhatsApp servers by "a client that NSO developed," not by the official WhatsApp client.  SER-14.  NSO does not dispute any of these facts.[4]

Nor does the legal analysis of one of NSO's experts create a factual dispute.  *See* Br. at 28-29.  NSO's technical expert does not dispute any of the underlying facts—not the reverse-engineering, not the extracted

---

[4]  NSO submitted a declaration asserting that the attack messages were transmitted using "a genuine WhatsApp client and genuine WhatsApp credentials."  2-ER-138.  That declaration does not create a genuine dispute of material fact: it contradicts NSO's own deposition testimony and was submitted only after the significance of that admission became apparent.  *See Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).  In any event, the declaration confirms the point.  By NSO's own account, the WIS "created" the attack messages and caused a separate client to transmit them—meaning, if the declaration were credited, the authentic client merely passed along messages that only the WIS could generate.  The official client could not generate the attack messages, and credentials issued only to official clients were used to authenticate messages no official client could have produced.  SER-17–18.

credentials, not the modified client. The expert merely *opines* from those same facts that "NSO and its customers did not access any WhatsApp signaling server in a manner that exceeded their authorization." 2-ER-84. That is a legal conclusion, not a factual assertion, and expert testimony that accepts the record as given while disputing only its legal significance cannot create a genuine issue of material fact. *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856-57 (9th Cir. 2019).

Circumventing generally applicable technical access controls violates the CFAA. *hiQ*, 31 F.4th at 1201. The statute targets conduct analogous to "breaking and entering"—bypassing technological restrictions that mark the boundary between authorized and unauthorized access. *Id.* at 1197. NSO exceeded that boundary here. By reverse-engineering WhatsApp, extracting authorization keys, and operating a fake WhatsApp client application capable of generating attack messages the official client could not send, NSO bypassed the "technical gate," Br. at 31, that functioned as precisely the kind of "necessary barrier that divides open spaces from closed spaces," *hiQ*, 31 F.4th at 1197.

32

NSO's reliance on *Van Buren* is misplaced. That case held that a defendant who used permitted database access for an improper purpose did not exceed his authorization, because he accessed only information he was otherwise entitled to obtain and the "gates-up-or-down" inquiry was not implicated. 593 U.S. at 390, 396. NSO's conduct is categorically different: it did not misuse permitted access—it circumvented the gate that defined the scope of its access entirely. NSO reads *Van Buren*'s reference to "particular areas" ("files, folders, or databases") as requiring a folder-level barrier, Br. at 28, but the relevant inquiry is whether the defendant circumvented a technological restriction governing access, not at which layer of the system that restriction operated. *hiQ*, 31 F.4th at 1201. WhatsApp's client-authentication system is precisely that kind of gate; NSO bypassed it.

NSO's remaining arguments also miss the point. That the attack messages "traveled through WhatsApp [relay] servers in the same way as any other message," Br. at 28, conflates the route the messages took with whether NSO was authorized to generate them and access the WhatsApp server using them. The relevant barrier was not the network path but the client-authentication gate—keys issued only to

33

the official client, and a client engineered to produce only approved messages—which NSO bypassed by building the WIS to transmit attack messages through WhatsApp's servers. And that WhatsApp's servers were not "compromised" or damaged is equally beside the point. The CFAA's civil action provision requires a plaintiff to show "damage or loss," 18 U.S.C. § 1030(g), (e)(8), (e)(11)—not server corruption. WhatsApp suffered both: NSO's intrusions caused WhatsApp to expend resources investigating and remediating the attacks, and NSO obtained valuable data from WhatsApp's servers and target devices through its unauthorized access. *See* 3-ER-461-62. The absence of physical damage to WhatsApp's servers is irrelevant to any element of WhatsApp's CFAA claims.

NSO's theory of CFAA liability collapses to the absurd principle that any hack that succeeds must be lawful because the relevant technological barriers failed to stop it. At a minimum, NSO's theory would mean that a user who misappropriates apparently valid credentials and uses them to take actions no legitimate user could take has not "exceed[ed] authorized access." That is not the law. This Court has recognized that "[a] hacker's use of stolen credentials to access

34

protected, private servers" is a paradigmatic CFAA violation, *United States v. Sullivan,* 159 F.4th 579, 589 (9th Cir. 2025), and that the use of "legitimate access credentials" does not negate unauthorized access, *United States v. Nosal*, 844 F.3d 1024, 1035 (9th Cir. 2016). NSO's conduct was more brazen still: it extracted authorization keys through reverse-engineering specifically to impersonate the official WhatsApp client and generate attack messages that client could never send. This Court has ruled that misappropriating credentials to access a protected computer is "the paradigm of what [the CFAA] sought to prohibit." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1073-74 (9th Cir. 2004).

NSO also misinterprets the district court's observation that the evidentiary record did not reveal every "specific detail[] about how exactly the relevant attacks were conducted." 2-ER-308-09. The absence of some implementation details—a consequence of NSO's own discovery misconduct, *see infra* pp. 42-43—does not create a genuine dispute of material fact. The dispositive facts were undisputed: NSO reverse-engineered the WhatsApp client, extracted authorization keys from the official WhatsApp client, and operated the WIS to generate attack messages the official client could not send.

***Revocation of permission.*** Even if NSO had initially possessed some form of authorization, it exceeded that authorization by continuing to access WhatsApp servers after WhatsApp revoked permission. As this Court explained in *Power Ventures*, a defendant violates the CFAA when it continues accessing a computer system after permission has been explicitly revoked. 844 F.3d at 1067. Once authorization is withdrawn, "technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability." *Id.* More recently, this Court reaffirmed that authorization under the CFAA turns on whether the actor had permission "at the moment of access." *Sullivan*, 159 F.4th at 589.

WhatsApp revoked any authorization when it deployed security updates that blocked Pegasus attack messages. In September and December 2018, WhatsApp implemented updates that caused its servers to reject Pegasus installation vectors and return "403" error codes indicating that access was forbidden. SER-49-51. NSO received those error codes and circulated them internally—and could not have misunderstood their significance. NSO's own documents classified WhatsApp as a "Threat Actor[]," whose role was to "detect and . . .

36

prevent the exploit." SER-21. NSO knew that WhatsApp would shut it out if it discovered what NSO was doing. SER-21-22. When it implemented security updates in December 2018, WhatsApp disabled NSO's "Heaven" installation vector, after which "NSO customers couldn't use the 0-click Android installation vectors anymore." SER-28-29.

NSO responded by developing new installation vectors to bypass the technical gates WhatsApp had implemented. *Id.* NSO repeated this cycle three times: developing "Heaven," then "Eden" after WhatsApp disabled "Heaven," then "Erised" after WhatsApp disabled "Eden." SER-28-30. That NSO treated those notices as engineering challenges confirms that it was engaged in precisely the kind of "technological gamesmanship" that the CFAA was enacted to address. *Power Ventures*, 844 F.3d at 1067.

Following the May 2019 attacks, WhatsApp took two steps that together unambiguously revoked any authorization NSO might claim. WhatsApp first disabled NSO-related accounts, including those used to

37

conduct the intrusions. SER-52-59.[5] WhatsApp then filed this action expressly alleging that NSO's access was unauthorized and seeking a permanent injunction barring any further access to its systems. 3-ER-486. NSO admits that it nonetheless developed, tested, and deployed a new WhatsApp installation vector while this litigation was pending. 2-ER-125-126. NSO's continued access—following explicit account terminations and the filing of a federal lawsuit—cannot be squared with any claim of authorization. *See Nosal*, 844 F.3d at 1035-37; *Power Ventures*, 844 F.3d at 1067.

### 3. *NSO Obtained Valuable Information from a Protected Computer*

The CFAA's "obtaining information" element was satisfied. Under Section 1030(a)(2)(C), NSO's unauthorized access must have enabled it to "thereby obtain[] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). Under Section 1030(a)(4), NSO must have accessed a protected computer and, "by means of such conduct," furthered an intended fraud and "obtain[ed] anything of value." *Id.* § 1030(a)(4). NSO's conduct satisfies both provisions on two

---

[5]   NSO observed the blocking in real time and acknowledged it in internal communications. SER-52–53.

independent grounds: NSO obtained information directly from WhatsApp's servers during the Pegasus installation process, and it used that access to extract information from target devices communicating through WhatsApp's infrastructure. Either ground independently supports affirmance under both provisions. NSO's arguments to the contrary rest on a misreading of the statute and, in any event, are foreclosed by NSO's own admissions.

First, NSO obtained information from WhatsApp's servers, and the statute requires nothing more. Section 1030(a)(2)(C) imposes no requirement that the information be confidential, proprietary, or otherwise unavailable to others. The wrong the statute punishes flows from the unauthorized access, not from the character of the information obtained. NSO's own brief concedes that during the research and development phase, NSO obtained information from WhatsApp's servers that NSO itself characterizes as "unprotected" and "publicly available." Br. at 43. That is the same phase in which NSO was reverse-engineering the WhatsApp client and operating the WIS—conduct that, as explained above, exceeded NSO's authorized access.

39

The concession therefore satisfies the element on its own terms, regardless of whether the information was confidential.

The record goes further. NSO's head of R&D testified that Pegasus retrieved information through WhatsApp's infrastructure that "a regular WhatsApp user using the WhatsApp client app cannot obtain," SER-36, and confirmed that Pegasus retrieved information about whether a phone number had an active WhatsApp account, obtained directly from WhatsApp servers during the installation process. SER-33-34. Together, NSO's concession and its own deposition testimony establish that NSO accessed WhatsApp servers and obtained information from them (both publicly available and not).

Second, NSO used its unauthorized access to WhatsApp's infrastructure to extract information from target devices. Pegasus retrieved information about the structure of a target device's operating system and the location of memory files, SER-34-36, and ultimately "deliver[ed] the data" extracted directly from the compromised devices "to the customers," SER-9.

NSO argues that the CFAA requires WhatsApp to show the information was obtained specifically from WhatsApp servers rather

than from target devices. Br. at 32. That argument misreads the statute on two independent grounds. First, Section 1030(a)(2)(C) requires only that a defendant access a protected computer and "thereby obtain[] . . . information from *any* protected computer," not that the information come from the specific machine initially accessed. 18 U.S.C. § 1030(a)(2)(C) (emphasis added); *see Theofel*, 359 F.3d at 1078 ("'any' has an expansive meaning"). Under the proper reading of Section 1030(a)(2)(C), NSO's unauthorized access to WhatsApp's servers, which it used as the mechanism to reach and extract information from target devices, satisfies the statute regardless of where the information ultimately resided. Second, and independently, the target devices are part of the same "protected computer" in any event: the CFAA's definition of "computer" expressly includes "any data storage facility or communications facility directly related to or operating in conjunction with such device," 18 U.S.C. § 1030(e)(1), and this Court has recognized that definition encompasses computer networks, *Nosal*, 844 F.3d at 1032 n.2. Target devices communicating through WhatsApp's infrastructure, including the proprietary

41

WhatsApp application that resides on them, fall within that definition. Either ground independently defeats NSO's argument.[6]

Finally, NSO's discovery failures infected each element of WhatsApp's CFAA claims. The district court found that NSO "repeatedly failed to produce relevant discovery" in violation of the court's orders—most significantly, by refusing to produce Pegasus source code that would have confirmed precisely how the installation vectors operated, what access they obtained, and what information they retrieved. 1-ER-61. On ***access***, that code would have resolved how NSO's infrastructure interacted with WhatsApp's servers and target devices. On ***exceeding authorized access***, it would have shown precisely how the WIS bypassed WhatsApp's client-authentication system. On ***obtaining information***, it would have established exactly what Pegasus retrieved and from where. NSO's head of R&D compounded NSO's obstruction by refusing to answer whether NSO was

---

[6] NSO's reading would produce an absurd result: a hacker who gains unauthorized access to a server to extract data from every device on the network would escape CFAA liability because the data came from the devices rather than the server. Congress used deliberately broad language—"any protected computer"—precisely to foreclose that interpretation. *See Theofel*, 359 F.3d at 1078.

actively developing WhatsApp-based installation vectors. 1-ER-60. The district court imposed evidentiary sanctions as a result. 1-ER-61. NSO cannot withhold the evidence that would answer these questions and then fault the record for lacking detail. NSO's violations of the district court's discovery orders, not any gap in WhatsApp's proof, are responsible for whatever evidentiary uncertainty NSO now seeks to exploit. It is entitled to no favorable inference from the consequences of its own discovery violations.

### B. Summary Judgment Was Proper on WhatsApp's Contract Claim

NSO does not dispute that its conduct violated WhatsApp's Terms of Service. Its sole argument on appeal is that no contract was formed because, according to NSO, WhatsApp failed to prove the presentation of its signup interface. That argument fails. California law requires actual or constructive notice of the agreement and an affirmative act of acceptance. *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024). The summary-judgment record establishes through screenshots and testimony that WhatsApp's registration screen presented the Terms prominently and required NSO to click "Agree and Continue" to proceed. Further, NSO's own internal documents show

43

that it had actual knowledge of the Terms and their specific prohibitions. NSO has no answer to this evidence.

### 1. The Undisputed Record Establishes that NSO Had Notice and Assented to the Terms

The summary-judgment record establishes that WhatsApp's registration flow provided conspicuous notice of the Terms and required affirmative assent. WhatsApp's expert identified the exact versions of WhatsApp that NSO's accounts were running when the attacks occurred, using version data recorded in WhatsApp's server logs during the period NSO was actively exploiting the platform. SER-3-4. Working from those version numbers, the expert located archived copies of the precise WhatsApp builds that NSO would have encountered when creating its accounts. *Id.* After installing those builds on a test device, the expert confirmed that both versions presented the same opening screen. *Id.*[7] Before a user could create an account or send any message, the application displayed the text "Read our Privacy Policy. Tap 'Agree and Continue' to accept the Terms of Service"—with "Terms of Service" hyperlinked to WhatsApp's published Terms—directly above a large

---

[7] NSO's assertion that "there was no admissible record evidence whatsoever on the subject," Br. at 37, ignores this expert declaration.

44

green "Agree and Continue" button that the user had to click to proceed. *Id.* There was no way to proceed without agreeing to the WhatsApp Terms. *Id.*

WhatsApp's registration interface satisfies both requirements for contract formation. Courts consistently find assent where "the website provides reasonably conspicuous notice of the terms to which the consumer will be bound" and "the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Here, WhatsApp presented the Terms as a blue hyperlink immediately above the action button, and NSO clicked on "Agree and Continue"—a button whose label makes the act of assent explicit. SER-3-5. Courts have consistently found assent on comparable or less prominent interfaces. *See, e.g.*, *Laatz v. Zazzle, Inc.*, 2024 WL 377970, at *7 (N.D. Cal. Jan. 9, 2024) (enforcing terms hyperlinked above "Create Account" button); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011) (enforcing terms hyperlinked below "Accept" button).

The record further establishes that NSO repeatedly created WhatsApp accounts through that registration flow as part of NSO's day-to-day business operations. NSO created at least fifty WhatsApp accounts and used them to track WhatsApp's security updates in real time. 3-ER-385. NSO used these accounts as, among other things, working communication channels—including to track and respond to WhatsApp's security updates in real time. When WhatsApp disabled the "Heaven" installation vector in December 2018, an NSO support team member reported to colleagues via WhatsApp that "WhatsApp had made changes in their servers that currently fail all installations." SER-28, 51. When WhatsApp disabled the "Eden" installation vector in May 2019, NSO's pre-sales manager reported via WhatsApp that "Eden has finished its duty with us," but that NSO had "the resources to find some thing [*sic*] new in a relatively short time." SER-113.

NSO faults the district court for not conducting a detailed visual analysis of the registration interface. *See* Br. at 37-38. But detailed conspicuousness analyses typically arise when evidence puts conspicuousness in doubt—e.g., upon declarations from consumers claiming they did not see the terms, did not understand what they were

46

agreeing to, or were misled by the interface design.  *See, e.g.*, *Laatz*, 2024 WL 377970, at *7; *Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 939-42 (N.D. Cal. 2023); *Adibzadeh v. Best Buy, Co. Inc.*, 2021 WL 4440313, at *5-6 (N.D. Cal. Mar. 2, 2021).  NSO submitted no declaration claiming confusion about the registration flow, no evidence that it encountered a different interface, no evidence of any kind suggesting the Terms were not conspicuously presented as WhatsApp's expert showed, and "refused to produce information about the phones that were used to create Whats[A]pp accounts on defendants' behalf." 1-ER-66.  NSO cannot demand a visual analysis when it has identified no confusion.

NSO's specific reliance on *Godun v. JustAnswer LLC*, 135 F.4th 699 (9th Cir. 2025) and *Chabolla v. ClassPass, Inc.*, 129 F.4th 1147 (9th Cir. 2025), Br. at 36-37, is misplaced in two respects.  First, those cases involved interfaces with specific deficiencies absent here—notices that were "deemphasized by the overall design of the page," "timid in both size and color," "distan[t] from relevant action items," and "place[d] outside of the user's natural flow," *Chabolla*, 129 F.4th at 1157, or with a "gray-on-gray presentation" that "did not contrast with the

47

background" and was "not located directly above or below the action button," *Godun*, 135 F.4th at 711-12. NSO does not contend that WhatsApp's interface suffered from any comparable deficiency, and the screenshots in the record show the opposite. *See* SER-5. Second, and more fundamentally, the conspicuousness requirement exists "[t]o avoid the unfairness of enforcing contractual terms that consumers never intended to accept." *Berman*, 30 F.4th at 856. NSO fits neither description. It is a sophisticated commercial actor whose internal documents show it studied the Terms, identified their restrictions, and proceeded to violate them deliberately. NSO's conspicuousness argument cannot survive contact with its own internal documents.

### 2. NSO Had Actual Knowledge of the Terms It Claims Never Bound It

NSO's contract challenge fails on a wholly independent ground, which provides an alternative basis for affirmance: NSO had actual knowledge of the very Terms it now claims were not conspicuously presented. NSO's internal documents reflect that the company analyzed WhatsApp's Terms of Service, identified the restrictions they imposed, and specifically noted the prohibition on reverse-engineering. SER-23-24; 3-ER-386. NSO's head of R&D admitted that he made no

48

effort to comply with those Terms when developing the installation vectors. SER-23-24. A party with actual knowledge of the Terms is bound regardless of how prominently they were displayed. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014).

## II. The District Court Ordered a Carefully Tailored Permanent Injunction

The CFAA and CDAFA expressly authorize injunctive relief. 18 U.S.C. § 1030(g); Cal. Penal Code § 502(e)(1). This Court reviews the district court's decision to grant a permanent injunction for abuse of discretion, reversing only if the court's decision "resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013). The court's factual findings are reviewed for clear error. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018).

NSO does not dispute that affirmance of liability satisfies the first *eBay* factor. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[8] NSO's remaining *eBay* arguments—irreparable harm,

---

[8] The district court relied solely on the statutory claims in entering the injunction. 1-ER-24. NSO's passing suggestion that California law

adequacy of damages, balance of hardships, and the public interest—are addressed in turn below. None has merit.

## A. The District Court's Finding of Irreparable Harm Was Not Clearly Erroneous

NSO cannot show that the district court clearly erred in finding a likelihood of ongoing harm. "[T]here is little precedent for" vacating an injunction "due to insufficient findings alone." *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 955 (9th Cir. 2025). Here, the district court's finding rested on extensive record evidence showing that NSO repeatedly engineered new installation vectors each time WhatsApp closed a vulnerability and continued developing installation vectors even after this litigation began. That factual assessment was not clearly erroneous.

### 1. The Record Establishes a Likelihood of Ongoing Harm

The district court's finding of ongoing threat rests on a documented—indeed, admitted—pattern, not speculation. The record

categorically bars injunctive relief for contract breaches, Br. at 39 n.1, is therefore beside the point—and in any event overstates the rule. *See Deerpoint Grp., Inc. v. Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1225–26 (E.D. Cal. 2018); Cal. Civ. Code § 3422(3).

shows a consistent cycle: WhatsApp closed a vulnerability, and NSO quickly developed a new exploit to replace it. Even the filing of this lawsuit did not break that pattern. As NSO testified, "[T]his is our business." 2-ER-266.

As the district court found, there is no "dispute that any such harm is ongoing." 1-ER-15. Citing *Herb Reed*, the district court "place[d] emphasis on the covert, undetectable nature of defendants' technology, as well as the repeated efforts to circumvent plaintiffs' security measures." 1-ER-17.

NSO has admitted that it "constantly work[s]" on "possible ways" and "rapid solutions" to circumvent any technical restriction it encounters—including WhatsApp's own security updates. 2-ER-125. That admission was not hypothetical. As detailed above, each time WhatsApp disabled an installation vector, NSO had a replacement operational within weeks—"Heaven" replaced by "Eden," "Eden" replaced by "Erised." *Supra* pp. 11-13. That cycle continued even after WhatsApp filed this lawsuit. As the manager of NSO's pre-sales team stated, the company's greatest strength has always been its ability to "survive" the "cat and mouse game." 2-ER-124.

51

The district court found, based on this record, that the prospect of future harm was established—largely based on NSO's own sworn testimony. 1-ER-14-15. In August 2024, NSO's CEO testified that NSO has "installation vectors for Pegasus today." 2-ER-134. The next month, NSO's head of R&D confirmed that Pegasus remained capable of obtaining "unlimited access to targets' mobile devices," covertly activating microphones and cameras, and tracking a target's relationships, locations, calls, and activities. 2-ER-120. When asked whether NSO continued to invest in circumventing WhatsApp's security measures, he answered without qualification: "this is our business." 2-ER-125. The district court correctly recognized that statement as the functional equivalent of what doomed the defendants in the injunction this Court upheld in *Power Ventures*—a declared business decision to continue the very conduct at issue. *See Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017). That finding is not clearly erroneous.

In arguing that there is no evidence of irreparable harm, NSO relies on a statement in a post-trial declaration from its CEO that NSO "no longer has any installation vectors for Pegasus that use WhatsApp,

WhatsApp's servers, or WhatsApp's client" and "currently has no products, either in use or development, that use WhatsApp as an installation vector." 2-ER-209. That assurance cannot carry the weight NSO places on it. NSO has made verification impossible—by design and by obstruction. At trial, the CEO himself testified that NSO consistently found "an alternative way to get—to allow the technology to get to the target device," SER-95, and NSO's head of R&D acknowledged that NSO's spyware was "undetectable by design," SER-102. At the time of the jury trial, NSO employed over 140 people in research and development and spent $52 million in 2023 and $59 million in 2024 to, among other things, "find vectors, or ways to access the phone." SER-92-94, 96, 100.

A company whose entire operational model is built around undetectable access cannot be taken at its word that it has stopped. The Ninth Circuit confronted the same problem in *AK Futures LLC v. Boyd Street Distro, LLC*: a CEO's declaration of intent to cease unlawful conduct could not overcome a finding of irreparable harm where the company's own business structure made that assurance inherently unverifiable. 35 F.4th 682, 694 (9th Cir. 2022). NSO built its

53

operations around evasion and concealment—undetectable installations, anonymized servers, and a dedicated operational security team whose explicit mandate was to keep NSO's activities hidden from platforms like WhatsApp. That structure makes NSO's compliance assurances even less credible than the CEO declaration this Court rejected in *AK Futures*, especially because NSO also obstructed discovery into its ongoing activities.

NSO's argument that its witnesses stopped short of admitting every element of a CFAA or CDAFA violation, *see* Br. at 41, rests on the wrong premise. Those seeking injunctive relief must present evidence sufficient to establish a likelihood of irreparable harm, not the existence of an ongoing statutory violation. *See Herb Reed*, 736 F.3d at 1251. The inquiry requires a likelihood of future injury to the interests the statute protects. *See Garcia v. Google*, 786 F.3d 733, 744-45 (9th Cir. 2015) (en banc). Courts therefore assess irreparable harm "by reference to the purposes of the statute being enforced," not by asking whether the plaintiff has proven the most extreme form of future violation. *National Wildlife Federation*, 886 F.3d at 818.

The same principle applies here. The CFAA and CDAFA protect against unauthorized access to computer systems and the resulting harm to those systems and their operators. The relevant question, therefore, is whether there is a meaningful risk that NSO's ongoing spyware operations will again target or exploit WhatsApp's infrastructure—not whether WhatsApp can identify the precise mechanism of a future statutory violation.

### 2. Unauthorized Access to Protected Systems Constitutes Irreparable Harm

Unauthorized intrusion into protected computer systems is a paradigmatic form of irreparable harm. *Power Ventures*, 252 F. Supp. 3d at 782. The district court concluded that the specific conduct proven here inflicts a type of injury that courts routinely recognize as irreparable. 1-ER-12. That conclusion is well-grounded: as the district court observed, "[n]umerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm." *Power Ventures*, 252 F. Supp. 3d at 782. The reason is straightforward. Computer intrusion is not a purely retrospective injury, as it compromises a system owner's ability to control access to its own infrastructure and exposes sensitive systems

55

and data to misuse in ways that are difficult, often impossible, to fully remediate after the fact.  Once a defendant has demonstrated the ability to penetrate a protected system, the resulting compromise of security and control is precisely the kind of harm equity treats as irreparable.  *Id.* (irreparable harm where defendants "interfered with Facebook's right to control access to its own computers").[9]

NSO's contrary argument, Br. at 40, distorts the district court's reasoning.  The court did not hold that the mere fact of a statutory violation alone establishes irreparable harm.  Instead, it relied on the well-established principle that computer hacking—like other forms of unlawful interference with property rights—inflicts a type of injury that is inherently difficult to remedy through damages and therefore supports injunctive relief.  *See, e.g.*, *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1044 (9th Cir. 2012) (finding irreparable injury

---

[9]  NSO's citation to *Fiber Systems International, Inc. v. Roehrs*, 470 F.3d 1150 (5th Cir. 2006), is not to the contrary.  The Fifth Circuit declined to find irreparable harm there because the jury found that the defendants had not actually taken anything from the plaintiff's systems.  *Id.* at 1159.  Here, NSO used its access to extract information from thousands of target devices and install surveillance software on them—precisely the kind of concrete taking the Fifth Circuit found missing in *Fiber Systems*.

56

from violation of right to privacy); *Morning Star, LLC v. Canter*, 2023 WL 5092764, at \*2 (9th Cir. Aug. 9, 2023) ("California law recognizes that violation of a property right itself constitutes irreparable harm.").

NSO's effort to recharacterize this harm as goodwill or reputational injury, Br. at 44-46, fails on its own terms. WhatsApp disclaimed below—and disclaims here—any theory that it suffered harm because users would migrate away from the platform. The injury is not that WhatsApp's reputation has suffered, but that NSO compromised the integrity of the platform itself: WhatsApp's proprietary client code, its authentication architecture, and its exclusive control over access to its own servers. *See Power Ventures*, 252 F. Supp. 3d at 782. The district court's factual reference to encryption as part of WhatsApp's "pitch to users," 1-ER-16, does not mean that NSO's impact on WhatsApp's client-authentication security architecture and delivery of end-to-end encrypted communications affects *only* reputation or goodwill, let alone that the district court relied on harms of those kinds.

### 3. Monetary Damages Cannot Adequately Remedy the Harm

Monetary damages cannot adequately remedy the ongoing harm caused by unauthorized intrusion into WhatsApp's systems. As the

district court explained, NSO's conduct compromises WhatsApp's proprietary code, exposes users' communications, and undermines the end-to-end encryption that is central to the service WhatsApp provides. 1-ER-18-19. Injuries of that kind are inherently difficult to quantify, particularly where the intrusion is deliberately concealed. *See Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023). Damages are also inadequate because, as the district court explained, when the injunction issued there was "no dispute that defendants still possess[ed] the software at issue in this litigation"—the WIS—making the case for injunctive relief even stronger than in *Power Ventures*. 1-ER-19.[10] Courts routinely grant injunctions in these circumstances, because monetary relief for past violations does nothing to prevent future ones. *See Power Ventures*, 252 F. Supp. 3d at 781. Finally, the district court correctly recognized that forcing WhatsApp to bring repeated lawsuits each time NSO exploits its systems would itself demonstrate the inadequacy of legal remedies. 1-ER-19; *see Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1220 (C.D. Cal.

---

[10] The injunction required NSO to destroy the WIS. 1-ER-6. The record does not yet reflect whether NSO has complied.

2007) ("A legal remedy is inadequate if it would require a multiplicity of suits.").

> ## B. The District Court Did Not Abuse Its Discretion in Balancing the Hardships

The balance of hardships likewise supports the injunction. In weighing the equities, the court considered both sides of the ledger and found that WhatsApp faces substantial harm if NSO is permitted to continue accessing WhatsApp's systems and users' data, including the risk that WhatsApp's end-to-end encryption—one of the core features of the service—would be rendered ineffective. 1-ER-19-20. That weighing was not an abuse of discretion. *Epic Games*, 67 F.4th at 1003. Protecting the integrity of WhatsApp's infrastructure and the privacy of its users outweighs any hardship NSO claims from being barred from further unauthorized access to those systems.

NSO argues that the injunction threatens its entire business. Br. at 47. But "harm caused by illegal conduct does not merit significant equitable protection." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017). As the district court observed, defendants "will suffer no harm from being unable to develop software to engage in illegal conduct." 1-ER-19 (quoting *Power Ventures*, 252 F. Supp. 3d at

785). The injunction here is carefully tailored to the mechanisms NSO used to access WhatsApp unlawfully and the facilitating conduct that enabled those intrusions. NSO's contention that it cannot operate without such conduct only underscores the grave risk of future injury that necessitates injunctive relief.

NSO's reliance on *hiQ* is misplaced. That case involved access to publicly available data—information "available to anyone with a web browser." 31 F.4th at 1199. Here, by contrast, NSO seeks access to data protected by authentication controls and end-to-end encryption. 1-ER-20. The district court therefore did not abuse its discretion in concluding that the balance of hardships favors an injunction.

## C. The District Court Did Not Abuse Its Discretion in Concluding that the Public Interest Favors Injunctive Relief

The public interest also favors injunctive relief, and the district court did not abuse its discretion in so concluding. *Epic Games*, 67 F.4th at 1003. The public has a strong interest in preventing unauthorized access to protected computer systems and ensuring compliance with computer-hacking laws. Congress enacted the CFAA in response to the growing problem of "hackers hatch[ing] ways to coopt

60

computers for illegal ends." *Van Buren*, 593 U.S. at 378. And the Ninth Circuit has recognized that "Internet companies and the public do have a substantial interest in thwarting denial-of-service attacks and blocking abusive users, identity thieves, and other ill-intentioned actors." *hiQ*, 31 F.4th at 1202. The injunction here advances precisely those interests by preventing further unauthorized intrusion into WhatsApp's systems and protecting the privacy and security of its users—a conclusion well within the district court's discretion to reach.

NSO argues that the injunction disserves the public interest because Pegasus may assist law enforcement investigations. Br. at 48-49. That argument founders at the threshold. Congress already considered whether law enforcement use should exempt a defendant from CFAA liability—and enacted an express exception for conduct that is part of a "lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States." 18 U.S.C. § 1030(f). The district court found that NSO failed to satisfy that exception: despite repeatedly invoking the FBI's alleged use of Pegasus, NSO never produced evidence that the conduct

61

challenged in this case fell within Section 1030(f)'s requirements. 2-ER-74. Having failed to satisfy the exception Congress provided, NSO cannot ask this Court to create a broader judicial version of the same exemption through the back door of the public interest analysis.

The district court also reasonably declined to credit NSO's generalized policy arguments. As the court explained, NSO's expert relied largely on publicly available sources and had no firsthand knowledge of Pegasus's clients or how the technology was actually used. 1-ER-20. The court correctly noted that NSO provided no evidence of legitimate domestic law enforcement use. 1-ER-21. In contrast, the undisputed evidence showed that NSO has been placed on the U.S. Department of Commerce's Entity List after the government determined that its activities were "contrary to the national security or foreign policy interests of the United States." 86 Fed. Reg. 60,759 (Nov. 4, 2021).

Finally, NSO's argument misreads the impact of the injunction. The order does not regulate encryption policy or prohibit the development of surveillance technology generally. It simply bars NSO from accessing WhatsApp's protected systems, intercepting users'

communications, and collecting users' data without authorization. The public interest is not served by permitting a party already found liable for computer intrusion to continue accessing private systems without authorization.

### D. The Scope of the Permanent Injunction Is Well Within the District Court's Discretion

A district court has "considerable discretion in fashioning suitable relief and defining the terms of an injunction." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024). Because the scope of equitable relief is reviewed for abuse of discretion, reversal is warranted only where the district court applied an incorrect legal rule or relied on clearly erroneous factual findings. *Id.* In exercising that discretion, courts may restrain not only the precise unlawful conduct already adjudicated but also related acts that would enable the defendant to continue or easily resume the same violations. *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88-89 (1950). The injunction here fits comfortably within those principles: it targets the mechanisms and facilitating conduct NSO used to access WhatsApp servers unlawfully and collect user data, and it does so against the

63

backdrop of NSO's refusal to explain how it continues to collect WhatsApp messages today.  1-ER-15.

NSO argues that the injunction improperly reaches "lawful activity," pointing to provisions restricting the use of technology interacting with the WhatsApp platform, collecting data from the platform, and creating accounts.  Br. at 51.  The district court rejected that argument based on the record in this case, explaining that although it "may remain legal to create new Whatsapp accounts and to use Whatsapp," here "such activities have been used as a precursor to illegal activities."  1-ER-25; *see U.S. Gypsum*, 340 U.S. at 88-89 (injunctions may cover acts "entirely proper when viewed alone" if doing so will prevent future violations).  The evidence showed that NSO created WhatsApp accounts to extract authorization keys and facilitate its exploit, reverse-engineered WhatsApp code to develop vectors capable of attacking WhatsApp servers, and repeatedly redesigned those vectors when WhatsApp closed earlier installation vectors. 1-ER-24-25.  The injunction therefore restrains conduct of the same "type or class" as the unlawful acts the court found.  *Oracle USA, Inc. v. Rimini St., Inc.,* 81 F.4th 843, 857 (9th Cir. 2023).  And although

64

reverse-engineering also breached the WhatsApp Terms of Service, the district court found it to be the mechanism through which NSO developed the exploit that enabled its unlawful access. 1-ER-25. Courts routinely prohibit such facilitating conduct even where it could be characterized as lawful in isolation. *U.S. Gypsum*, 340 U.S. at 88-89.

NSO next argues that Section 3(b) is overbroad because it reaches the collection of data from the WhatsApp platform—including the application on users' devices—rather than only collection "via the WhatsApp servers." Br. at 51. NSO's argument depends on a distinction NSO has invoked but never substantiated. Throughout this litigation, NSO has drawn a line between vectors that use WhatsApp servers and vectors that do not—and now asks this Court to redraw the injunction along that same line. But NSO refused to produce discovery into its non-WhatsApp-server vectors, leaving the record without any basis to determine how those vectors operate or whether they extract WhatsApp users' data through other means. The district court found that NSO's "ultimate purpose" in deploying all of its vectors was to obtain WhatsApp users' data. 1-ER-15-16. NSO declined to explain how its ongoing vectors differ technically from the enjoined conduct,

65

even when pressed. 1-ER-15. An injunction need not be drawn around technical lines that the defendant has placed beyond the court's view. *See AK Futures*, 35 F.4th at 695. The provisions NSO challenges are tailored to the conduct the court found: NSO actively deploying technology to extract WhatsApp data, by whatever vector.

NSO's argument that the injunction improperly regulates foreign sovereigns, Br. at 52-53, is likewise unfounded. The injunction imposes obligations only on NSO and other covered non-sovereign actors, and the district court expressly excluded foreign sovereign customers from its scope. 1-ER-21-23. NSO's objection is simply that compliance may limit the tools or services *NSO* can provide to its customers. That is the ordinary consequence of regulating a defendant's own unlawful conduct. Section 4, for example, requires NSO to disable customer access only to code or technologies maintained by NSO or related prohibited parties; it imposes no obligation on sovereign customers themselves. 1-ER-6.

The scope of the injunction was also justified by NSO's demonstrated pattern of misconduct, including its repeated redesigning of its installation vectors when earlier vulnerabilities were closed. 1-ER-9-10, 17, 61. Where a defendant has shown a "record of continuing

66

and persistent violations," courts may craft broader injunctions to prevent the defendant from working around the injunction. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949). The district court reasonably concluded that an injunction keyed only to the precise method previously identified would invite exactly that result.

## III. The Remitted Punitive Damages Award Properly Punished NSO for Its Conduct and Was Not Excessive

The district court reduced the jury's $167 million punitive damages award by more than 97 percent—to $4,002,471, a 9:1 ratio— after evaluating the award in light of *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003). NSO asks this Court to reduce the award still further to a 4:1 ratio. That request finds no support in the record or this Court's precedent.

### A. The District Court Did Not Abuse Its Discretion in Excluding NSO's Client-Screening Evidence

NSO contends that the district court should have admitted two categories of evidence to mitigate punitive damages: (1) evidence that Pegasus was designed for law enforcement purposes, and (2) evidence of NSO's internal screening and oversight procedures. Br. at 54. The district court excluded both categories, 1-ER-39-40, because NSO failed

67

to produce—and actively resisted producing—evidence connecting either category to specific attacks at issue. 1-ER-34-39. The ruling was a straightforward application of Federal Rules of Evidence 401 and 403, and NSO comes nowhere near showing manifest error.

This Court reviews evidentiary rulings for abuse of discretion and only reverses if the ruling is "manifestly erroneous." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997). Determinations under Rule 403 receive "great deference" because they require case-specific "examination of the surrounding facts, circumstances, and issues." *United States v. Cabrera*, 83 F.4th 729, 736 (9th Cir. 2023). That deference is dispositive here.

The court's reasoning across these rulings rested on a single principle: "the punitive damages analysis looks to defendants' intent with respect to the conduct alleged in this case," not to NSO's generalized business practices. 1-ER-35-36; *see State Farm*, 538 U.S. at 423 (punitive damages evidence must relate to "the conduct that harmed the plaintiff"). NSO admitted it "d[id] not have discovery about who [its] clients target, what their criminal investigations are," and disclaimed any knowledge of the specific investigations its attacks

68

purportedly served. 1-ER-35. The district court accordingly found the evidentiary record "opaque as to which of [NSO's] clients were responsible for the attacks at issue," leaving WhatsApp unable to test whether NSO's screening procedures were followed with respect to those clients. 1-ER-40. Generalized evidence of a law-enforcement mission and vetting practices, untethered from the 1,400 intrusions before the jury, had no tendency to negate malice in connection with the conduct that generated liability.

NSO reframes the ruling as a "de facto discovery sanction" because the court had previously deemed specific, non-anonymized client identities outside the scope of discovery. Br. at 55. The district court expressly rejected that characterization, and made clear that its decision was "based purely on the absence of evidence, not on alleged discovery misconduct." 1-ER-37. In a prior discovery ruling, the district court permitted NSO to shield from disclosure the specific identities of its clients. 3-ER-414. That ruling did not relieve NSO of its obligation to produce evidence about the conduct of those clients in connection with the attacks at issue in the litigation. To the contrary, the court explained that "plaintiffs are permitted to discover

69

information about what actions were taken by those third parties." *Id.* WhatsApp sought that information, but NSO failed to produce it. *See* 1-ER-35-36.

In any event, NSO suffered no prejudice. NSO told the jury that Pegasus is licensed exclusively to governments. SER-97. The jury heard the law-enforcement theme and awarded substantial punitive damages anyway. And the exclusion cut both ways: the district court also excluded WhatsApp's evidence that the specific attacks targeted journalists, human-rights activists, and other members of civil society. 1-ER-38-39. Had the full record come in, NSO would have faced both its inability to "provide a coherent explanation for how [it is] able to detect misuses if [it] do[es]n't monitor the use of Pegasus or know when it is being used," 1-ER-38, and a lack of concrete proof of who the attacks actually targeted. NSO cannot show prejudice from a ruling that spared it the worse half of the trade.

### B. The Remitted Award Satisfies Constitutional Requirements

This Court reviews the constitutionality of a punitive damages award de novo but "defer[s] to the district court's findings of fact unless they are clearly erroneous." *Hardeman v. Monsanto Co.*, 997 F.3d 941,

970 (9th Cir. 2021). Courts assess three factors: the reprehensibility of the defendant's misconduct; the ratio between compensatory and punitive damages; and the difference between the punitive award and civil penalties in comparable cases. *Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 900 (9th Cir. 2022).

### 1. The District Court Properly Found NSO's Conduct Reprehensible

Reprehensibility is the "most important indicium of the reasonableness of a punitive damages award." *State Farm*, 538 U.S. at 419. In this regard, the district court made explicit findings: "the repeated, deliberate, and covert nature of defendants' intrusions, and the fact that defendants specifically designed around plaintiffs' attempted fixes," justified the high-end award. 1-ER-31. NSO does not argue that those findings are clearly erroneous—it ignores them and asks this Court to reweigh the evidence.

Substantial trial evidence supports the district court's findings on the two disputed reprehensibility factors—repeated conduct and intentional malice. On repetition, WhatsApp's engineers documented 1,568 instances of NSO's malicious code traversing WhatsApp servers in just four days in May 2019—nearly 400 attempted installations per

71

day. SER-107. And NSO's head of R&D testified that Pegasus was deployed through WhatsApp servers "between hundreds and tens of thousands" of times from April 2018 through May 2020. 1-ER-118-19. This is not a case of repeated conduct in the abstract; it is a case in which NSO responded to each of WhatsApp's security measures by engineering a new exploit to replace the one that had been blocked—a cycle it repeated three times, including after learning it was being sued.

On malice and deceit, NSO designed Pegasus to be "undetectable by design," SER-76, and organized its operations to stay hidden from WhatsApp specifically. It maintained an "OpSec" team to "minimize the risk of detection" by WhatsApp and a "White Services" team to acquire anonymized infrastructure for its customers. SER-77-82. The district court instructed the jury that it could award punitive damages only upon finding clear and convincing evidence of malice, oppression, or fraud—instructions NSO does not challenge on appeal. The jury made that finding. A jury is "presumed to follow the instructions given to it," *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1247 (9th Cir. 2014), and NSO's complaint that the jury "answered no special interrogatories," Br. at 57, does not rebut that presumption. The

72

district court has discretion to submit or withhold special interrogatories, *Lam v. City of San Jose*, 869 F.3d 1077, 1086 (9th Cir. 2017), and no authority holds that their absence undermines a facially supported verdict.

### 2. The 9:1 Ratio Is Squarely Within Constitutional Limits

*Riley* established three categories of proportionality review: punitive damages are limited to 4:1 where economic damages are significant and behavior is not particularly egregious; the ratio may extend to 9:1 where behavior is "more egregious"; and awards may exceed 9:1 only where economic damages are insignificant and conduct is "particularly egregious." 51 F.4th at 902 & n.5. The district court placed this case squarely in the second category and capped the award at 9:1. That is *Riley*'s framework, faithfully applied.[11]

---

[11] Neither *Hardeman* nor *Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 2020) establishes a categorical 4:1 ceiling. *See* Br. at 58. Both turned on case-specific facts with no parallel here: *Hardeman* reduced the award in part because "credible evidence on both sides of the scientific debate" diminished the defendant's culpability, 997 F.3d at 973, and *Ramirez* found the defendant's conduct "probably was not the result of intentional malice, trickery, or deceit," 951 F.3d at 1036—the opposite of the finding that both the jury and the district court made against NSO.

73

NSO argues that $444,719 is "substantial" under Ninth Circuit precedent, capping the permissible ratio at 4:1. Br. at 59. That argument depends on a premise the district court rejected. The court expressly held that its analysis "would be the same regardless of whether the compensatory damage award is considered 'significant' or 'insignificant.'" 1-ER-29-30. The 9:1 ratio rested on the court's reprehensibility analysis—NSO's "repeated, deliberate, and covert" conduct, 1-ER-31—not on any adjustment tied to the size of the compensatory award or WhatsApp's wealth. NSO's substantial-damages argument therefore challenges a step the district court did not take.

NSO argues that the district court failed to make specific findings supporting the "more egregious" classification. Br. at 61. The court made exactly those findings. It found that NSO's intrusions were "repeated, deliberate, and covert," that NSO "specifically designed around plaintiffs' attempted fixes," and that those facts "persuade[d] the court that the punitive damages award should not be further reduced." 1-ER-31. Those findings are specific, and they support the court's conclusion.

74

NSO's contrary reading rests on the court's acknowledgment that certain *State Farm* subfactors cut both ways.  Br. at 61; *see* 1-ER-28-30.  But the court worked through each subfactor in turn and then drew its bottom-line conclusion from the conduct findings referenced above—not from a tally of subfactors.  1-ER-30.  NSO points to no authority holding that a finding of "more egregious" conduct requires every reprehensibility subfactor to favor the plaintiff.  *Riley* contains no such rule, and the Supreme Court has rejected any such categorical approach.  *State Farm*, 538 U.S. at 425.

### 3. The Remitted Award Is Consistent With Applicable Civil Penalties

The district court correctly treated the civil-penalties guidepost as having "limited . . . usefulness" given "the lack of any similar cases."  1-ER-31.  That approach is consistent with how courts often apply this factor.  The Supreme Court in *State Farm* did "not dwell long on this guidepost."  538 U.S. at 428.  This Court in *Ramirez* found "consideration of civil penalties is not useful in the FCRA context."  951 F.3d at 1037.  And in *Hardeman*, the Ninth Circuit declined to find the civil penalties factor helpful at all.  997 F.3d at 974.  The district court was well within its discretion to follow the same path.

NSO's argument that the CDAFA's $10,000 maximum fine automatically caps any permissible punitive damages award in this case misreads how courts apply this factor. Courts look to civil penalties in "comparable cases"—cases involving similar *conduct*, not merely the same *statute*. *State Farm*, 538 U.S. at 428. As this Court held in *Riley*, civil penalty comparisons are unreliable where the relevant statute "may also be invoked to punish much less reprehensible behavior." 51 F.4th at 904. CDAFA covers the full spectrum from trivial unauthorized access to systematic exploitation of critical communications infrastructure. A $10,000 fine calibrated to that entire range says little about the appropriate punitive damages for the specific conduct at issue here. In any event, applied at $10,000 per violation, even the minimum documented 1,568 intrusions in four days would yield exposure exceeding $15 million—nearly four times the remitted award. SER-107. And that figure reflects only four days of logged intrusions—NSO itself admits that its spyware was active for at least two years and that it successfully installed Pegasus on "between hundreds and tens of thousands" of devices in total, 1-ER-118-19,

76

meaning the full exposure under the civil penalty alone would dwarf the remitted award.

The remitted award of $4,002,471 is constitutionally sound and should be affirmed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated:  May 13, 2026     Respectfully Submitted,

DAVIS POLK & WARDWELL LLP

By:  */s/ Greg D. Andres*
Greg D. Andres
Antonio J. Perez-Marques
Luca Marzorati
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: greg.andres@davispolk.com
antonio.perez@davispolk.com
luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email: micah.block@davispolk.com

*Attorneys for Plaintiffs-Appellees
WhatsApp LLC and Meta Platforms,
Inc.*

78

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7380

I am the attorney or self-represented party.

**This brief contains** 13,896 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Greg D. Andres **Date** 5/13/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*