No. 25-7380

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WhatsApp LLC; Meta Platforms, Inc.,

*Plaintiffs–Appellees,*

v.

NSO Group Technologies Limited; Q Cyber Technologies Limited,

*Defendants–Appellants.*

On appeal from the United States District Court for the
Northern District of California — No. 4:19-cv-7123-PJH (Hamilton, J.)

## BRIEF OF *AMICUS CURIAE* THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY IN SUPPORT OF PLAINTIFFS–APPELLEES AND AFFIRMANCE

Stephanie Krent
Nicola Morrow
Carrie DeCell
Knight First Amendment Institute at
 Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

*Counsel for Amicus Curiae*

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel certifies that *amicus curiae* the Knight First Amendment Institute has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

/s/ *Stephanie Krent*
Stephanie Krent

i

## Table of Contents

Corporate Disclosure Statement ................................................................ i

Table of Contents................................................................................... ii

Table of Authorities.............................................................................. iii

Interest of Amicus Curiae ...................................................................... 1

Introduction........................................................................................... 1

I. The development and deployment of commercial spyware
threatens freedom of expression and freedom of the press
worldwide and within the United States. ................................... 3

II. The Computer Fraud and Abuse Act is a crucial tool to protect
against the harms of spyware. ................................................. 12

Conclusion ........................................................................................ 17

## Table of Authorities

**Cases**

*Alhathloul v. DarkMatter Grp.*, 795 F. Supp. 3d 1253 (D. Or. 2025).............. 14, 15

*Apple, Inc. v. NSO Grp. Techs.*, No. 3:21-cv-09078-JD, 2024 WL 251448 (N.D. Cal. Jan. 23, 2024) .............................................. 14, 16

*Carpenter v. United States*, 585 U.S. 296 (2018)..................................... 6

*Dada v. NSO Grp. Techs. Ltd.*, No. 3:22-cv-07513 (N.D. Cal. 2022)............ 1, 7, 11

*Dada v. NSO Grp. Techs. Ltd.*, Nos. 24-2179, 24-3463 (9th Cir. 2024) ................ 17

*Dada v. NSO Grp. Techs. Ltd.*, Nos. 24-2179, 24-3463, 2025 WL 1879527 (9th Cir. July 8, 2025)............................................. 10

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016)................ 15

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) .......................... 13

*hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019) ........................... 12

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) ...................................... 11

*Microsoft Corp. v. Does 1–2*, No. 20-CV-1217 (LDH) (RER), 2021 WL 4755518 (E.D.N.Y. May 28, 2021)........................................... 14

*Riley v. California*, 573 U.S. 373 (2014)............................................... 5

*Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004) ....................................... 16

*United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013)...................................... 6

*United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012)............................................. 14

*United States v. Yücel*, 97 F. Supp. 3d 413 (S.D.N.Y. 2015) .................................. 14

*Van Buren v. United States*, 593 U.S. 374 (2021) ............................................. 13

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, No. 4:19-cv-07123-PJH (N.D. Cal. 2019) ...................................................................... 16

**Statutes**

Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 .......................................................................... 3

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 .............................. 3, 12, 14, 16

**Other Authorities**

*Apple iPhone 17 Pro*, https://perma.cc/47US-QU4K ................................................. 5

Bill Marczak & John Scott-Railton, *Graphite Caught: First Forensic Confirmation of Paragon's iOS Mercenary Spyware Finds Journalists Targeted*, The Citizen Lab (June 12, 2025), https://perma.cc/37DN-TP4Q ................................................................ 8

Bill Marczak et al., *Stopping the Press: New York Times Journalist Targeted by Saudi-Linked Pegasus Spyware Operator*, The Citizen Lab (Jan. 28, 2020), https://perma.cc/WV9N-KSCE ................................... 7, 10

Craig Timberg et al., *Pegasus spyware used to hack U.S. diplomats working abroad*, Wash. Post. (Dec. 3, 2021), https://perma.cc/6WCW-HHYM .................................................... 10

Darya Antoniuk, *Over 500 people targeted by Pegasus spyware in Poland, officials say*, The Record (Apr. 16, 2024), https://perma.cc/NE47-JCYJ ...................................................... 10

David Pegg & Sam Cutler, *What is Pegasus spyware and how does it hack phones?*, The Guardian (July 18, 2021), https://perma.cc/UP94-45NT ..................................................... 3, 4

Ellen Nakashima & Tim Starks, *At least 50 U.S. government employees targeted with phone spyware overseas*, Wash. Post (Mar. 27, 2023), https://perma.cc/YGV8-JBE7 ............................... 10

Gabriel Labrador, *El Salvador Misses Deadline from Inter-American Commission to Find Man Deported to CECOT*, El Faro English (Oct. 21, 2025); https://perma.cc/94FT-8KFD ................................................... 11

Gabriel Labrador, *Frozen US Aid Puts Salvadoran Civil Society in a Bind*, El Faro English (Mar. 11, 2025), https://perma.cc/99NG-ULAW ........................................................................................................ 12

*Global: "Intellexa Leaks" investigation provides further evidence of spyware threats to human rights*, Amnesty Int'l (Dec. 4, 2025), https://perma.cc/ZGP9-WZEF ..................................................................... 8

H.R. Rep. No. 98-894 (1984) ............................................................. 13

H.R. Rep. No. 99-612 (1986) ............................................................. 13

Jen Roberts et al., *Mythical Beasts and Where to Find Them: Mapping the global spyware market and its threats to national security and human rights*, Atlantic Council (2024), https://perma.cc/FG6Z-3P65 ................................................................................................. 4

Jessica Lyons, *NSO claims 'no more than 5' EU states use Pegasus spyware*, The Register (June 24, 2022), https://perma.cc/S2H9-PFAC ...................................................................................................... 4

John Scott-Railton et al., *GeckoSpy: Pegasus Software Used Against Thailand's Pro-Democracy Movement*, The Citizen Lab (July 17, 2022), https://perma.cc/VG2F-ZRWV ................................................. 9

*Journalism under attack: Predator spyware in Angola*, Amnesty Int'l (Feb. 18, 2026), https://perma.cc/CLU3-XSC3 .................................................. 8

Katie Benner et al., *Israeli Company's Spyware Is Used to Target U.S. Embassy Employees in Africa*, New York Times (Dec. 3, 2021), https://perma.cc/A2RK-368J ..................................................... 8

*Kazakhstan: Four activists' mobile devices infected with Pegasus Spyware*, Amnesty Int'l (Dec. 9, 2021), https://perma.cc/V5FE-97AX ...................................................................................................... 9

Mehul Srivastava & Tim Bradshaw, *Israeli group's spyware 'offers keys to Big Tech's cloud'*, Financial Times (July 19, 2019), https://perma.cc/J2T6-DL5E ................................................................. 4

Nelson Rauda, *US Wife of CECOT Deportee: 'He was seeking asylum . . . Sometimes I think he's dead'*, El Faro English (Apr. 6, 2025), https://perma.cc/4FEE-7L66 .............................................................. 12

Phineas Rueckert, *Pegasus: The new global weapon for silencing journalists*, Forbidden Stories (July 18, 2021), https://perma.cc/MF9P-Z3V7 .............................................................. 7

*Poland charges ex-intel chiefs for using Israel's Pegasus spyware*, Al Jazeera (Feb. 25, 2026), https://perma.cc/4XL6-BMJX .................................... 10

Sarah Anne Aarup, *Pegasus spyware targets top Catalan politicians and activists*, Politico (Apr. 18, 2022), https://perma.cc/523N-JETT ................................................................................................... 9

*Serbia: Technical Briefing: Journalists targeted with Pegasus spyware*, Amnesty Int'l (Mar. 27, 2025), https://perma.cc/H6DL-8LNQ ................................................................................................ 8

Stephanie Kirchgaessner & Andrew Roth, *Exiled Russian journalist hacked using NSO Group spyware*, The Guardian (Sep. 13, 2023), https://perma.cc/8KBF-P3AK ............................................... 12

Stephanie Kirchgaessner & Angela Giuffrida, *Italian activists and journalist targeted by spyware in 2024, prosecutors confirm*, The Guardian (Mar. 6, 2026), https://perma.cc/MHZ5-ZH4N .................................. 8

Stephanie Kirchgaessner, *Dozens of Thai democracy activists targeted with Pegasus phone spyware*, The Guardian (July 17, 2022), https://perma.cc/N5K9-JUH4 ............................................................. 9

Stephanie Kirchgaessner, *Hotel Rwanda activist's daughter placed under Pegasus surveillance*, The Guardian (July 19, 2021), https://perma.cc/FF86-WE7S ............................................................. 9, 10

vi

Stephanie Kirchgaessner, *Saudis behind NSO spyware attack on Jamal Khashoggi's family, leak suggests*, The Guardian (July 18, 2021), https://perma.cc/3QES-SSMJ ........................................................ 11

Stephanie Kirchgaessner, *Top Human Rights Watch investigator allegedly hacked with Pegasus spyware*, The Guardian (Jan. 26, 2022), https://perma.cc/Q2AX-9UUT ............................................... 9

Steve Feldstein & Brian Kot, *Why Does the Global Spyware Industry Continue to Thrive? Trends, Explanations, and Responses*, Carnegie Endowment for Int'l Peace (Mar. 14, 2023), https://perma.cc/VMH3-U6W4 .............................................................. 4

Thomas Brewster, *Exclusive: Saudi Dissidents Hit With Stealth iPhone Spyware Before Khashoggi's Murder*, Forbes (Nov. 21, 2018), https://perma.cc/QLV9-SDL2 ........................................... 7

**Interest of Amicus Curiae**

The Knight First Amendment Institute at Columbia University ("Knight Institute") is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and of the press in the digital age. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. The Institute is particularly committed to protecting individuals' rights to privacy, self-expression, and expressive association in the face of emerging surveillance technologies, and it currently represents eighteen plaintiffs who were the victims of spyware attacks in a suit against the Defendants in this case. *See Dada v. NSO Grp. Techs. Ltd.*, No. 3:22-cv-07513 (N.D. Cal. 2022).[1]

**Introduction**

The proliferation of commercial spyware is a profound threat to privacy, free speech, and press freedom around the globe, and it has serious implications for people living in the United States. The use of spyware like NSO Group's Pegasus is devastating for victims, revealing intimate details about their personal relationships,

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. The parties have consented to the filing of this amicus brief.

1

political and religious affiliations, and their day-to-day activities. Many victims of spyware are independent journalists, human rights advocates, and political dissidents; for them, spyware not only attacks their personal expression and privacy, but also threatens the crucial work they undertake, often under dangerous and repressive conditions. That spyware is frequently deployed against victims abroad does not make it any less threatening for Americans or for U.S. interests more broadly. Many Americans, including U.S. officials, have been attacked with spyware while they were out of the country, and more still have had their communications surveilled through attacks on foreign friends, colleagues, or associates. All of us suffer when the use of spyware undermines global press freedom, limiting the supply of independent journalism that Americans rely on to understand the world and the United States' role within it.

While alarming, the global proliferation of spyware is not inevitable; nor are U.S. courts powerless to protect Americans and others from its harms. U.S. laws already prohibit the conduct that makes spyware tools so dangerous, and this case shows that U.S. courts can hold those who develop and deploy spyware accountable for their unlawful conduct. The Knight Institute writes to emphasize that spyware manufacturers who are involved in the development and deployment of commercial spyware—as the facts show NSO Group was here—violate the Computer Fraud and

2

Abuse Act, 18 U.S.C. § 1030, as well as California's state-law analogue, the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502.

## I. The development and deployment of commercial spyware threatens freedom of expression and freedom of the press worldwide and within the United States.

The proliferation of commercial spyware across the globe is a profound threat to free expression and freedom of the press, with serious implications for the United States.

The technology at issue in this case, NSO Group's Pegasus, allows for near-perfect surveillance of the victims targeted by NSO Group's customers. Pegasus enables operators to take full control of a target's smartphone, providing access to GPS locations, contact details, text messages, phone calls, notes, web-browsing history, messaging-application activity, files, and passwords—even if the target used security measures like encryption to protect their data.[2] Pegasus allows operators to activate the microphone and camera on a target's smartphone, turning the phone into a real-time recording device.[3] It also gives operators access to a target's cloud-based data, by allowing operators to copy the authentication keys that smartphones use to

---

[2] *See* David Pegg & Sam Cutler, *What is Pegasus spyware and how does it hack phones?*, The Guardian (July 18, 2021), https://perma.cc/UP94-45NT.

[3] *Id.*

3

access cloud services like iCloud, Google Drive, and Facebook Messenger.[4] NSO Group designed Pegasus to do all of this remotely and surreptitiously, making it all but impossible for even sophisticated smartphone users to prevent or detect attacks.[5]

NSO Group is not alone. In 2024, the Atlantic Council identified 25 distinct spyware vendors, including Candiru, Intellexa, FinFisher, Hacking Team, Paragon Solutions, and others.[6] And the Carnegie Endowment for International Peace has reported that over the last fifteen years, 74 governments have procured commercial spyware or digital forensics technology from various spyware manufacturers.[7] Global sales of commercial spyware reportedly reach $12 billion annually,[8] and the software is used to target tens of thousands of individuals each year.[9]

It would be impossible to overstate the scale and sensitivity of information swept up in these kinds of spyware attacks. Over ten years ago in *Riley v. California*,

---

[4] *See* Mehul Srivastava & Tim Bradshaw, *Israeli group's spyware 'offers keys to Big Tech's cloud'*, Financial Times (July 19, 2019), https://perma.cc/J2T6-DL5E.

[5] *See* Pegg & Cutler, *supra* n.2.

[6] Jen Roberts et al., *Mythical Beasts and Where to Find Them: Mapping the global spyware market and its threats to national security and human rights*, Atlantic Council (2024), https://perma.cc/FG6Z-3P65.

[7] Steve Feldstein & Brian Kot, *Why Does the Global Spyware Industry Continue to Thrive? Trends, Explanations, and Responses*, Carnegie Endowment for Int'l Peace (Mar. 14, 2023), https://perma.cc/VMH3-U6W4.

[8] *Id.*

[9] Jessica Lyons, *NSO claims 'no more than 5' EU states use Pegasus spyware*, The Register (June 24, 2022), https://perma.cc/S2H9-PFAC.

the Supreme Court explained succinctly why cell phone searches constitute such a profound invasion of privacy rights: they offer up "the sum of an individual's private life." 573 U.S. 373, 394 (2014). First, cell phones "collect[] in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record." *Id*. Modern cell phones include "cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, [and] newspapers," and user-installed applications that may reveal the user's political or religious affiliations, financial health, romantic interests, fertility or pregnancy status, or shopping history. *Id*. at 393, 396. Second, the capacity of cell phones means that "even just one type of information" can "convey far more than previously possible," including "every piece of mail" the owner has received, "every picture they have taken, or every book or article they have read." *Id*. at 393–94.[10] Third, because of this immense storage capacity, "the data on a phone can date back to the purchase of the phone, or even earlier." *Id*. at 394. Fourth, cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude that they were an important feature of human anatomy." *Id*. at 385, 395.

---

[10] When *Riley* was decided, standard smart phone capacity was "16 gigabytes," with up to "64 gigabytes" offered. 573 U.S. at 394. Today, Apple sells iPhones with a standard 256 gigabytes of storage, offering up to 2 terabytes for iPhone 17 Pro users. *See Apple iPhone 17 Pro*, https://perma.cc/47US-QU4K.

The brief search in *Riley* was one in which an officer manually scrolled through parts of the defendant's phone; spyware attacks expose much more. Through these attacks, spyware manufacturers and their clients can extract information from a device for unlimited subsequent searching and analysis, something more akin to a "computer strip search." *See United States v. Cotterman*, 709 F.3d 952, 966 (9th Cir. 2013). And because spyware attacks can persist over time, manufacturers and their clients can transform a cell phone into a real-time private surveillance weapon, recording the victim as they go about their life. Location tracking alone provides "an intimate window into a person's life," "secretly monitor[ing] and catalogu[ing] every single movement . . . for a very long period." *Carpenter v. United States*, 585 U.S. 296, 310–11 (2018). Spyware allows manufacturers and their clients to pair "every single movement" with audio and video by enabling the camera or microphone on a victim's smartphone. Spyware manufacturers and their clients can ascertain not only the location of a meeting but also the calendar invitations, text messages, emails, or notes associated with the meeting. In *Dada v. NSO Group*, a spyware case the Knight Institute is currently litigating, plaintiff Carlos Martínez recalled that one of his news organization's sources played his colleague an audio recording of his private conversation with his brother Óscar Martínez, also a journalist; the recording was apparently made through the installation of NSO

6

Group's spyware on his phone. *See* Am. Compl. ¶¶ 105, 109, *Dada v. NSO Grp. Techs. Ltd.*, No. 3:22-cv-07513-JD (N.D. Cal. 2022), ECF No. 31.

Given these capabilities, it is perhaps unsurprising that commercial spyware has become a preferred tool of repressive governments seeking to stifle press independence and political dissent. According to the Pegasus Project—a 2021 collaboration of more than eighty journalists from seventeen media organizations in ten countries—at least 180 journalists from twenty countries had been selected as targets of Pegasus attacks by authoritarian or rights-abusing governments.[11] The group included family members and close associates of Washington Post journalist Jamal Khashoggi, whom Saudi agents brutally murdered in 2018. Citizen Lab also identified Pegasus attacks on an Amnesty International staff member based in Saudi Arabia and an American New York Times journalist who had reported extensively on the country.[12] More recently, in 2024, the Angolan government likely deployed Intellexa's Predator spyware against Teixeira Cândido, a journalist and press

---

[11] *See* Phineas Rueckert, *Pegasus: The new global weapon for silencing journalists*, Forbidden Stories (July 18, 2021), https://perma.cc/MF9P-Z3V7.

[12] *See* Bill Marczak et al., *Stopping the Press: New York Times Journalist Targeted by Saudi-Linked Pegasus Spyware Operator*, The Citizen Lab (Jan. 28, 2020), https://perma.cc/WV9N-KSCE; Thomas Brewster, *Exclusive: Saudi Dissidents Hit With Stealth iPhone Spyware Before Khashoggi's Murder*, Forbes (Nov. 21, 2018), https://perma.cc/QLV9-SDL2.

freedom advocate.[13] Last year, the Italian government targeted three prominent European journalists with Paragon's Graphite spyware, while Serbia used Pegasus to surveil two investigative journalists associated with the Balkan Investigative Reporting Network.[14]

Prominent human rights activists, diplomats, and political opposition figures, too, have been frequent victims of spyware attacks. In 2025, Amnesty International's Security Lab discovered that a Pakistani human rights lawyer had been targeted using Intellexa's Predator spyware.[15] Italian prosecutors confirmed that two immigration activists were hacked in 2024 using Paragon's Graphite spyware.[16] In 2021 alone, Pegasus was used to surveil U.S. diplomats working in Uganda;[17] Carine

---

[13] *See Journalism under attack: Predator spyware in Angola*, Amnesty Int'l (Feb. 18, 2026), https://perma.cc/CLU3-XSC3.

[14] *See* Bill Marczak & John Scott-Railton, *Graphite Caught: First Forensic Confirmation of Paragon's iOS Mercenary Spyware Finds Journalists Targeted*, The Citizen Lab (June 12, 2025), https://perma.cc/37DN-TP4Q; *Serbia: Technical Briefing: Journalists targeted with Pegasus spyware*, Amnesty Int'l (Mar. 27, 2025), https://perma.cc/H6DL-8LNQ.

[15] *See Global: "Intellexa Leaks" investigation provides further evidence of spyware threats to human rights*, Amnesty Int'l (Dec. 4, 2025), https://perma.cc/ZGP9-WZEF.

[16] *See* Stephanie Kirchgaessner & Angela Giuffrida, *Italian activists and journalist targeted by spyware in 2024, prosecutors confirm*, The Guardian (Mar. 6, 2026), https://perma.cc/MHZ5-ZH4N.

[17] *See* Katie Benner et al., *Israeli Company's Spyware Is Used to Target U.S. Embassy Employees in Africa*, New York Times (Dec. 3, 2021), https://perma.cc/A2RK-368J.

Kanimba, a dual U.S.–Belgian citizen who was targeted while she was campaigning for the release of her father, Hotel Rwanda hero Paul Rusesabagina, from detention;[18] Lama Fakih, a prominent Lebanese activist and Human Rights Watch director;[19] at least four members of the civic youth movement "Oyan, Qazaqstan" ("Wake Up, Khazakhstan");[20] and at least thirty pro-democracy protesters and activists in Thailand.[21] In 2020, more than sixty pro-Catalonian independence activists were the victims of Pegasus attacks.[22] And between 2017 and 2022, spyware was used to surveil almost 600 Polish citizens, including opposition

---

[18] *See* Stephanie Kirchgaessner, *Hotel Rwanda activist's daughter placed under Pegasus surveillance*, The Guardian (July 19, 2021), https://perma.cc/FF86-WE7S.

[19] *See* Stephanie Kirchgaessner, *Top Human Rights Watch investigator allegedly hacked with Pegasus spyware*, The Guardian (Jan. 26, 2022), https://perma.cc/Q2AX-9UUT.

[20] *See Kazakhstan: Four activists' mobile devices infected with Pegasus Spyware*, Amnesty Int'l (Dec. 9, 2021), https://perma.cc/V5FE-97AX.

[21] *See* Stephanie Kirchgaessner, *Dozens of Thai democracy activists targeted with Pegasus phone spyware*, The Guardian (July 17, 2022), https://perma.cc/N5K9-JUH4; John Scott-Railton et al., *GeckoSpy: Pegasus Software Used Against Thailand's Pro-Democracy Movement*, The Citizen Lab (July 17, 2022), https://perma.cc/VG2F-ZRWV.

[22] *See* Sarah Anne Aarup, *Pegasus spyware targets top Catalan politicians and activists*, Politico (Apr. 18, 2022), https://perma.cc/523N-JETT.

leaders,[23] eventually leading to criminal charges against Polish intelligence officials and Poland's former justice minister.[24]

Even when spyware is deployed against people abroad, there are profound effects felt within the United States. Most notably, Americans' communications have been swept up in spyware attacks. Many Americans are victims of attacks themselves, including government officials as well as journalists and human rights activists.[25] In *Dada v. NSO Group*, for example, three of eighteen plaintiffs who were subjected to spyware attacks were American citizens or residents. *See Dada v. NSO Grp. Techs. Ltd.*, Nos. 24-2179, 24-3463, 2025 WL 1879527, at *1 (9th Cir. July 8, 2025). And even when they are not subject to direct attacks, Americans are still at risk of being surveilled through their communications with foreigners that are spyware targets. Before his murder, Washington Post correspondent and Virginia resident Jamal Khashoggi was likely monitored through spyware attacks on his close

---

[23] *See* Darya Antoniuk, *Over 500 people targeted by Pegasus spyware in Poland, officials say*, The Record (Apr. 16, 2024), https://perma.cc/NE47-JCYJ.

[24] *Poland charges ex-intel chiefs for using Israel's Pegasus spyware*, Al Jazeera (Feb. 25, 2026), https://perma.cc/4XL6-BMJX.

[25] *See* Ellen Nakashima & Tim Starks, *At least 50 U.S. government employees targeted with phone spyware overseas*, Wash. Post (Mar. 27, 2023), https://perma.cc/YGV8-JBE7; Craig Timberg et al., *Pegasus spyware used to hack U.S. diplomats working abroad*, Wash. Post. (Dec. 3, 2021), https://perma.cc/6WCW-HHYM; Marczak, *supra* n.12; Kirchgaessner, *supra* n.18.

10

associates and family members.[26] And several of the Salvadoran *Dada* plaintiffs were in close contact with U.S. Embassy officials during the periods of time in which their devices were hacked. *See* Am. Compl. ¶¶ 105, 121, 133, *Dada v. NSO Grp. Techs. Ltd.*, No. 3:22-cv-07513-JD (N.D. Cal. 2022), ECF No. 31.

Americans are also injured when spyware attacks undermine press freedom worldwide. For over fifty years, the Court has recognized that the protections of the First Amendment must include the right to receive information from abroad. *See Lamont v. Postmaster General*, 381 U.S. 301, 307 (1965). But that fundamental right is threatened when journalists are attacked with spyware and they—or their sources—are chilled from communicating openly. Americans rely on independent reporting from local sources to provide us with different perspectives on, for example, conditions in Salvadoran prisons, wars in Iran and Ukraine, elections occurring in key allied nations, and the effects of U.S. policies worldwide. When spyware attacks threaten the reporting of international journalists, American audiences suffer as well.[27]

---

[26] *See* Stephanie Kirchgaessner, *Saudis behind NSO spyware attack on Jamal Khashoggi's family, leak suggests*, The Guardian (July 18, 2021), https://perma.cc/3QES-SSMJ.

[27] *See* Am. Compl. ¶¶ 4, 133, *Dada v. NSO Grp. Techs. Ltd.*, No. 3:22-cv-07513-JD (N.D. Cal. 2022), ECF No. 31; *see also* Gabriel Labrador, *El Salvador Misses Deadline from Inter-American Commission to Find Man Deported to CECOT*, El Faro English (Oct. 21, 2025); https://perma.cc/94FT-8KFD; Nelson Rauda, *US Wife of CECOT Deportee: 'He was seeking asylum . . . Sometimes I think he's dead'*, El

## II. The Computer Fraud and Abuse Act is a crucial tool to protect against the harms of spyware.

The continued global proliferation of spyware is not inevitable; nor are U.S. courts powerless to protect Americans and others from spyware's harms. Federal courts have an important role to play because U.S. laws explicitly prohibit the conduct that makes spyware tools like NSO Group's Pegasus so dangerous. Chief among these laws is the Computer Fraud and Abuse Act ("CFAA"), whose prohibition on unauthorized access to protected computers squarely encompasses those who develop and deploy spyware against unsuspecting victims. *See* 18 U.S.C. § 1030(a)(2) (making it illegal to "intentionally access[] a computer without authorization or exceed[] authorized access").[28]

The CFAA differentiates unlawful hacking from ordinary computer use, criminalizing only those violations that can be analogized to "breaking and entering." *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1000–01 (9th Cir. 2019);

---

Faro English (Apr. 6, 2025), https://perma.cc/4FEE-7L66; Gabriel Labrador, *Frozen US Aid Puts Salvadoran Civil Society in a Bind*, El Faro English (Mar. 11, 2025), https://perma.cc/99NG-ULAW; Stephanie Kirchgaessner & Andrew Roth, *Exiled Russian journalist hacked using NSO Group spyware*, The Guardian (Sep. 13, 2023), https://perma.cc/8KBF-P3AK.

[28] The Knight Institute does not separately address the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), because courts in this Circuit consistently interpret the relevant provisions of CDAFA in the same way as the CFAA. *See Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895–96 (N.D. Cal. 2010).

H.R. Rep. No. 98-894, at 20 (1984) (explaining that "section 1030 deals with an 'unauthorized access' concept of computer fraud rather than the mere use of a computer" and concluding that "the conduct prohibited is analogous to that of 'breaking and entering'""); *Van Buren v. United States*, 593 U.S. 374, 390 (2021) (describing § 1030(a)(2) as requiring "a gates-up-or-down inquiry"); *see also* H.R. Rep. No. 99-612, at 5–6 (1986) (explaining that "electronic trespassers" are guilty of trespass "just as much as if they broke a window and crawled into a home while the occupants were away").

In this case, Defendants have argued that their abuses of Plaintiffs' servers do not amount to electronic trespass because they did not "access[] or obtain[] information from any off-limits parts of the WhatsApp servers." Defs.' Br. at 28, ECF No. 28.1. Whatever the Court makes of that argument, Plaintiffs have also asserted that Defendants violated the CFAA through their involvement in attacks on target devices, Pls.' Br. at 26–28, ECF No. 35.1, and the CFAA squarely prohibits this type of conduct.

Courts agree that the CFAA's prohibition on unauthorized access means, if nothing else, that those who develop and deploy spyware to hack into target devices may be liable. Indeed, "[t]he CFAA was enacted to prevent intentional intrusion onto someone else's computer—*specifically, computer hacking*." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022) (emphasis added); *see also*

13

*United States v. Nosal*, 676 F.3d 854, 858, 863 (9th Cir. 2012) (observing that the "general purpose" of the CFAA "is to punish hacking—the circumvention of technological access barriers"). Thus, in Apple's lawsuit against NSO Group, which involved allegations similar to the ones made in this case, the district court concluded that "[t]he anti-hacking purpose of the CFAA fits Apple's allegations to a T." *See Apple, Inc. v. NSO Grp. Techs.*, No. 3:21-cv-09078-JD, 2024 WL 251448, at *4 (N.D. Cal. Jan. 23, 2024). Similarly, in *Alhathloul v. DarkMatter Group*, the district court found that that the plaintiff's description of the development and deployment of spyware used to surveil her was "sufficient to connect DarkMatter to [] CFAA . . . claims." 795 F. Supp. 3d 1253, 1286–87 (D. Or. 2025); *see also Microsoft Corp. v. Does 1–2*, No. 20-CV-1217 (LDH) (RER), 2021 WL 4755518, at *7–8 (E.D.N.Y. May 28, 2021) (finding CFAA violation where Defendants used a global botnet to "control infected computers without the users' knowledge"); *United States v. Yücel*, 97 F. Supp. 3d 413, 419–21 (S.D.N.Y. 2015).

It is not true, as Defendants have argued, that third-party involvement in the deployment of spyware automatically erases liability for spyware manufacturers. *See* Defs.' Br. at 33–35, ECF No. 28.1. This theory fails to account for the fact that the CFAA embraces conspiracy liability, 18 U.S.C. § 1030(b), and it also ignores the well-settled principle that "technological gamesmanship or the enlisting of a third party . . . will not excuse liability." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d

1058, 1067 (9th Cir. 2016) (citing *United States v. Nosal*, 828 F.3d 865 (9th Cir. 2016)). The central inquiry in establishing CFAA liability is not who selected the specific target in a spyware attack, but whether the defendant played a meaningful role in enabling or carrying out the attack. *See Alhathloul*, 795 F. Supp. 3d at 1286–87; *see also id.* at 1287 n.4 (explaining a victim's harms "flowed directly" from a spyware manufacturer's conduct where the manufacturer "facilitated" the harms (cleaned up)). Spyware manufacturers are generally not mere tool makers who release their products into the stream of commerce without any connection to their subsequent use. Instead, they are typically intimately involved in the actual use of their products. The fact that their customers select the targets does not automatically absolve spyware manufacturers of responsibility for *their role* in the ensuing attacks.

Here, for example, the facts demonstrated that Defendants were involved in both the development and deployment of the spyware in question, including by providing ongoing customer support and retaining the ability to suspend or terminate service to customers who they believe misuse the technology. *See* ER-208; ER-309; ER-369; ER-441. Defendants also acknowledged that the process for installing Pegasus through WhatsApp was "a matter for NSO and the system to take care of, not a matter for customers to operate." ER-391; *see also* ER-102. While not every spyware manufacturer may have continuing involvement in the deployment of that spyware, Defendants and other similarly situated spyware companies should not be

15

able to evade liability under the CFAA for their hacking activities simply by pointing to the involvement of third-party customers.

Defendants have also previously suggested that technology companies cannot sue on the basis of attacks on their customers. *See* Mot. to Dismiss at 22–23, *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, No. 4:19-cv-07123-PJH (N.D. Cal. 2019), ECF No. 45. Because this argument may arise any time a technology company attempts to recover losses it incurred mitigating the effects of spyware attacks, it is worth emphasizing that it is flat wrong. The plain text of the CFAA makes clear that liability does not hinge on the plaintiff's identity so long as the plaintiff was harmed; in other words, the CFAA allows for suits to be brought not only by end-user victims of spyware attacks, but also by others who experienced losses, including technology companies like WhatsApp. *See* 18 U.S.C. § 1030(g) (extending the civil remedy to "[a]ny person who suffers damage or loss by reason of a violation of this section"); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004) ("Individuals other than the computer's owner may be proximately harmed by unauthorized access"); *Apple*, 2024 WL 251448, at *4 (dismissing the argument that Apple could not sue over hacks against "Apple's user's devices").

This is correct not only as a matter of law, but also as a matter of policy. Many companies invest heavily in cybersecurity to "secure their technology from . . . malicious actors" that may try to attack both "governmental and private software

16

and services." *See* Br. for Microsoft et al. at 2–3, *Dada v. NSO Grp. Techs. Ltd.*, Nos. 24-2179, 24-3463 (9th Cir. 2024), ECF No. 29.1. These technology companies suffer their own losses when they attempt to investigate and remediate the effects of cyberhacking for their users. They, too "have a strong interest in ensuring that entities who facilitate covert access to their products and services . . . are held accountable," *id.* at 3, and have an important role to play in mitigating the harms of commercial spyware.

### Conclusion

For these reasons, the Court should affirm the district court's entry of judgment on Plaintiffs' CFAA and CDAFA claims.

May 20, 2026

Respectfully submitted,

/s/ *Stephanie Krent*

Stephanie Krent
Nicola Morrow
Carrie DeCell
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

*Counsel for Amicus Curiae*

17

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7380

I am the attorney or self-represented party.

**This brief contains** 3,913 **words,** including ___ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated ___.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Stephanie Krent     **Date** 05/20/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*